**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

|  |  |  |
|---|---|---|
| The Center for Investigative Reporting, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 4:25-cv-07309-AMO |
| United States Department of Justice, | ) ) | |
| Defendant. | ) ) ) | |

**<u>DECLARATION OF JOHN BUCHKO</u>**

# EXHIBIT 13



Melanie Ann Pustay, Director
Office of Information Policy
U.S. Department of Justice
1425 New York Avenue, NW
Suite 11050
Washington, D.C. 20530-0001
DOJ.OIP.FOIA@usdoj.gov

FOIA/PA Mail Referral Unit
Department of Justice
Room 115
LOC Building
Washington, DC 20530-0001
MRUFOIA.Requests@usdoj.gov

May 22, 2024

Via US Mail and email

**Re: Freedom of Information Act Appeal Letter No. 19-00078-F**

To Whom It May Concern:

The Center for Investigative Reporting (CIR) hereby writes to appeal on behalf of the requester, Mr. Jonathan Jones, pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), given the denial issued by the United States Department of Justice in response to Mr. Jones' request was incorrectly determined, for the second time.

## I.    Procedural History

On December 13, 2019, a reporter at CIR, submitted a FOIA request (hereinafter "the Request") to the DOJ seeking records pertaining to "matters investigated or reviewed by the Civil Rights Division under 18 U.S.C. §§ 241-242, Deprivation or Rights Under the Color of Law, between 1998 and 2018" and "*any long-form closing memoranda* reflecting the Division's decision not to prosecute a 242 matter that resulted in death." A true and correct copy of initial request is attached as Exhibit A. In a letter dated September 19, 2022, the DOJ sent a letter to with a responsive document attached but withheld the request for "any long-form closing memoranda" pursuant to 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). *See*

First Denial, Exhibit B. As to the disclosed document, the agency chose to redact "subject names, victim names, and lead attorney/investigators" pursuant to 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C), stating that this public information constituted an invasion of personal privacy. *Id.*

On October 17, 2022, CIR appealed the DOJ's decision to the Office of Information Policy (OIP) withhold records pursuant to 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). A true and correct copy of initial request is attached as Exhibit C. On June 9, 2023, OIP remanded the Request to the Civil Rights Division ("Division" or "CRD") for further processing based on CIR's arguments to determine what records are "releasable." A true and correct copy of initial request is attached as Exhibit D. On September 20, 2023, the Division issued a final response to the Request, again declining to disclose the records claiming that the production was too burdensome because there was no date range. A true and correct copy of initial request is attached as Exhibit E. On March 4, 2024, Mr. Jonathan Jones resubmitted the Request with a date range of 2018-2024. The Division then closed the resubmitted request by email, considering it duplicative and stated that the Division was still processing the original Request. A true and correct copy of initial request is attached as Exhibit F.

On April 23, 2024, the Division sent a final letter "in further response to [the] December 13, 2018 [request]." A true and correct copy of initial request is attached as Exhibit G. The Division again *withheld in their entirety the long-form closing memoranda* without any justification and instead produced a spreadsheet with victim names redacted pursuant to Exemption 7(C). *See id*. The spreadsheet did not even contain most of the information included in closing memoranda, as seen in other memoranda that have been disclosed, repeatedly by the agency.

## II.    Argument

### A.  The Division unjustifiably withheld the closing memoranda in full without justification under FOIA and instead produced a redacted spreadsheet that was not responsive to the request.

The FOIA embodies a strong policy in favor of disclosing public records. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) ("Official information that sheds light on an agency's performance of its statutory duties falls squarely within [the FOIA's] statutory purpose."). Such records must be disclosed unless they come within one of the nine narrowly construed exemptions. *Id*. Even then, the exemptions usually only justify redacting documents rather than withholding in full, unless the agency can provide a justifiable reason. Moreover, historical records are often disclosed subsequently. *Elec. Frontier Found. v. Dep't of Justice*, No. 3:2016-cv-02041, 2016 U.S. Dist. LEXIS 177630 (N.D. Cal. 2016); *Florez v. CIA*, 829 F.3d 178  (2d Cir. 2016).

Under FOIA, the Division is required to produce the requested records and may then choose to redact any exempt material. Here, Mr. Jones requested that the Division

release *in full* "any long-form closing memoranda reflecting the Division's decision not to prosecute a (18 U.S.C.) 242 matter that resulted in death between 2018 and 2024." In response the Division failed to meet its burden because it did not provide *any* of memoranda, let alone in redacted format, and did not provide *any explanation* as to why these records continue to be withheld in full. Moreover, any explanation for withholding the records in full, would likely not be justifiable given that these memos are regularly and consistently disclosed by the agency on its website. *See* Dep't of Justice, Civil Rights Division Emmett Till Act (Cold Case Closing Memoranda), https://www.justice.gov/crt/civil-rights-division-emmett-till-act-cold-case-closing-memoranda. Indeed, attached are two notice to close memoranda files from similar cases. *See* Exhibit H & I.

As to the produced spreadsheet, it is not sufficiently responsive to Mr. Jones request that the Division released *in full* "any long-form closing memoranda reflecting the Division's decision not to prosecute a (18 U.S.C.) 242 matter that resulted in death between 2018 and 2024." Indeed, the agency's first denial of the memoranda show that they exist – and the agency's reluctance to produce them is insufficient under FOIAs requirement to search, produce, and redact those records. Indeed, the produced spreadsheet does not even contain nearly any substantive information from the requested memoranda (as can be seen from other memoranda that have been released over the years. Therefore, the agency has failed to fulfill its burden.

### B. The Division has not met the independent foreseeable harm standard and shown that disclosure would result in any harm.

Even if an Exemption were to apply to the withheld memoranda, the Division was required to show that disclosure would result in "foreseeable harm." 5 U.S.C. § 552(a)(8)(A)(i)(I). "[T]he foreseeable harm requirement 'impose[s] an independent and meaningful burden on agencies.'" *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting *Center for Investigative Reporting v. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019)). This analysis and burden are separate from that of proving the Exemption's applicability.

To prove foreseeable harm, an agency must "concretely explain how disclosure 'would'—not 'could'—adversely impair" the interest protected by the relevant exemption. *RCFP*, 3 F.4th at 369-70 (citations omitted). Agencies must "identify *specific harms* to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect [] the harms in [a] meaningful way to the information withheld." *Judicial Watch, Inc. v. DOJ*, No. CV-17-0832, 2019 U.S. Dist. LEXIS 163473, at *14 (D.D.C. Sep. 24, 2019) (citing H.R. Rep. No. 114-391, at 9 ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm that would be caused by a disclosure would require the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld.")).

The Division has not attempted to make any showing of reasonably foreseeable harm that would result from disclosing the requested records, much less to "concretely explain" what "specific, identifiable harm" would occur. The Division merely states "we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions." This paltry statement is insufficient to meet the burden here particularly where nearly identical records have previously been disclosed. As such, even if Exemption 6 and Exemption 7(C) or any other Exemptions apply, The Division has not and likely could not meet its burden in showing a foreseeable harm where many of the facts about the alleged events in the memoranda are already largely in the public and the general accusations are again, well-documented in the press, including any possible of civil rights violations. Indeed, other such memoranda have been disclosed with no noticeable foreseeable harm.

   **C.  Exemption 7(C) is inapplicable here, as there are no putative privacy interests and, even so, any privacy concerns are outweighed by the public interest.**

While CIR asserts that the spreadsheet is nonresponsive, nevertheless the agency improperly withheld information from the spreadsheet pursuant to Exemption 7(C). Exemption 7(C) permits withholding of records that, if released, would be an unwarranted invasion of personal privacy. Here, no privacy concerns exist for multiple reasons.

First, the historical nature of these files eliminate the Exemption 7(C) concerns. Indeed, the requested records detail the agency's decision *to close a case*. In these memoranda – the investigations at issue are, admittedly, no longer ongoing. Further, they relate to investigations that resulted in death, and as such, all responsive records will involve only victims who are deceased, and *do not have any privacy claims*. Additionally, many personnel involved in the investigations no longer at work at the agency. The putative privacy concerns of victims—as well as subjects, attorneys, investigators, and other involved parties—are therefore all unlikely.

Moreover, many of these cases, including the names of these individuals and the facts have already been published, exposed and closely scrutinized by the local and national governments, as well as the press. Indeed, "privacy interests of individuals," specifically victims and subject names, are "plainly substantially weaker.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Just.*, 854 F.3d 675, 682 (2017). This reasoning has been upheld in the Division's own practice of releasing a very readable document of all the cases they looked into under the cold case initiative, including the name of the victim, in paper format and on their website. *See* Exhibit J. It is unclear why the agency could disclose in that instance, and not in this one. Given the law and the agency's own practice, the agency's wholesale withholdings of victim names and other information in this case are improper and should be released.

Last, the public interest in this case is immense and outweighs any possible privacy concerns. The Civil Rights Division is charged with upholding the civil and

constitutional rights of all Americans, particularly the most vulnerable members of society. Disclosure would help the public understand how division enforces its obligations and how these momentous events in history relate to current events involving the African American community. Thus, as was the case in *Florez v. CIA*, 829 F.3d 178 (2d Cir. 2016), where records are of a historical nature – the agency should disclose records because law enforcement and privacy concerns are diminished.

> **D. To the extent that some of the information in the memoranda is properly exempt, the Division has produced no segregable portions, as required.**

Even if some of the memoranda material would be properly withheld, courts consistently hold that the segregable portions such as factual information must be disclosed. Under FOIA, agencies cannot withhold disclosable information merely because the record also contains exempt information. *Hamdan*, 797 F.3d at 779 (discussing FOIA's requirement of segregability); *see also Willamette Industries, Inc. v. United States*, 689 F.2d 865, 867 (1982) ("The focus of the FOIA is information, not documents, and the agency cannot justify withholding an entire document simply by showing that it contains some exempt material."). FOIA states that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Thus, agencies have a "duty to segregate" and provide releasable information through redaction. *Id.* "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008). It is reversible error for the district court "to simply approve the withholding of an entire document without entering a finding on segregability." *Hamdan*, 797 F.3d at 779 (internal quotation and citation omitted).

Here, the agency failed on its duty to segregate and should be required to do the same exact thing it does in countless other FOIA cases: review and redact. Even if there are exempt portions, the Division should redact non-releasable sections and reveal portions that can be disclosed rather than withhold the pages in full. Indeed, this type of review and redaction is conducted all the time by various branches of government. For instance, federal agencies engage in this type of review and redaction in countless FOIA cases, involving requests of much greater sensitivity. *See* Charlie Savage, *U.S. Releases Rules for Airstrike Killings of Terror Suspects*, N.Y. TIMES, Aug. 6, 2016, http://nyti.ms/2aJTOX8 (declassifying portions of documents about military drone policies).

## III. Conclusion

In conclusion, the Division should release all relevant information immediately. Should the Division need clarification as to any aspect of the Request, it may reach me at <u>vbaranetsky@revealnews.org</u> or (201) 306-4831. **Additionally,**

**please copy Jonathan Jones, [jjones@revealnews.org](mailto:jjones@revealnews.org) on any final agency determination.**

Sincerely,

Victoria D. Baranetsky
General Counsel
The Center for Investigative Reporting

cc: Jonathan Jones, jjones@revealnews.org

# Exhibit A



from The Center for Investigative Reporting
2376A SE 43rd Ave. Portland, OR 97215
510-929-1099/mlewis@revealnews.org

Friday, December 13, 2019

Federal Bureau of Investigation
Civil Rights Unit
Attn: FOI/PA Request
Record/Information Dissemination Section
170 Marcel Drive
Winchester, VA 22602-4843

Re: Freedom of Information Act Request [Date Range of Request: 1998-2018]

Dear FOIA officer:

This is a request under the federal Freedom of Information Act. I hereby request copies of the following information:

- *The number of matters opened for investigation or review by the FBI Civil Rights Unit under federal statutes 18 USC 241-242, Deprivation of Rights Under the Color of Law, **between 1998 and 2018** including:*

    - *File Number or Case Number*
    - *Date Opened*
    - *Type of Case*
    - *Synopsis of Case*
    - *Cause & Manner of Death When Applicable*
    - *Date of Disposition*
    - *Recommendation/Disposition of case*
    - *Name of Victim(s)/Subject(s)/Each Party*
    - *Race of Victim(s)/Subject(s)/Each Party*
    - *Age of Victim(s)/Subject(s)/Each Party*
    - *Gender of Victim(s)/Subject(s)/Each Party*
    - *Date(s) of Incident*
    - *Location of Incident - Municipality, County, State*
    - *Name of Lead Investigator/Trial Attorney*
    - *Other local and federal agencies involved in reviewing, assisting or investigating*
    - *Any other significant actions, recommendations or findings*

Please search the FBI's indices in both the Central Records System and local field offices for information responsive to this request. We also request the release of this information in a machine-readable format if possible, whether as PDFs or as tabular data. If it is easier, we are also willing to request access to and copies of the database that includes all relevant cases.

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, I request that you nonetheless exercise your discretion to disclose them. As the FOIA requires, please release all reasonably segregable non-exempt portions of documents. To permit me to reach an intelligent and informed decision whether or not to file an administrative appeal of any denied material, please describe any withheld records (or portions thereof) and explain the basis for your exemption claims.

I am making this request on behalf of the Center for Investigative Reporting as a representative of the news media for non-commercial use and qualifies for a waiver of search and review fees. Release of materials is in the public interest and sheds light on the workings of the government.

To expedite the release of documents, please disclose them on an interim basis as they become available to you, without waiting until all the documents have been processed.

If you have other questions, please contact me at 510-929-1099 or mlewis@revealnews.org.

I look forward to receiving your response within the twenty day statutory time period.

Respectfully submitted,

Melissa Lewis
mlewis@revealnews.org
(510) 929-1099
2376A SE 43rd Ave. Portland, OR 97215

FOIA REQUEST    2

# Exhibit B



U.S. Department of Justice
Civil Rights Division

KK:ANF:RG3
20-00072-F

*Freedom of Information/PA Unit – 4CON*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

9/19/2022

*Via Electronic Mail Only*
Ms. Melissa Lewis
Reveal News
2376A SE 43rd Ave.
Portland, OR 97215
mlewis@revealnews.org

Dear Ms. Lewis:

This is in further response to your December 13, 2019 Freedom of Information Act request, received by the Civil Rights Division January 2, 2020, seeking access to documents pertaining to "matters investigated or reviewed by the Civil Rights Division under 18 USC 241-242, Deprivation of Rights Under the Color of Law, between 1998 and 2018" and "any long-form closing memoranda reflecting the Division's decision not to prosecute a 242 matter that resulted in death."

After review of the responsive Civil Rights Division documents, I have determined that the enclosed records may be released to you in their entirety. Please be advised, the Civil Rights Division does not track race, age, and gender of subjects and victims in our database. Further, we do not maintain synopses in the database.

Regarding your request for any long-form closing memoranda, after consideration of the responsive records, I have determined that access to the documents should be denied pursuant to 5 U.S.C. §552(b)(5), since the records consist of attorney work product and include intra-agency memoranda containing pre-decisional, deliberative material. I have further determined that certain information within these records that is exempt from disclosure pursuant to 5 U.S.C. §552(b)(5) should also be denied pursuant to 5 U.S.C. §552(b)(7)(C), since disclosure of information contained in these records could reasonably be expected to constitute an unwarranted invasion of personal privacy; 5 U.S.C. §552(b)(7)(E) since disclosure of guidelines for law enforcement investigations and prosecutions could reasonably be expected to risk circumvention of the law.

Regarding subject names, victim names, and lead attorney/investigators, I have determined that the requested information should be denied pursuant to 5 U.S.C. § 552 (b)(6) and 5 U.S.C. §552(b)(7)(C) since disclosure thereof would constitute an unwarranted invasion of personal privacy. Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions.

If you are not satisfied with the Civil Rights Division's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account on the following website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.  Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

I hope the Civil Rights Division has been of some assistance to you in this matter.

Sincerely,

*Kilian Kagle*

Kilian Kagle, Chief
Freedom of Information/Privacy Acts Unit
Civil Rights Division

# Exhibit C



Melanie Ann Pustay, Director
Office of Information Policy
U.S. Department of Justice
441 G Street, NW, 6th Floor
Washington, D.C. 20530-0001
DOJ.OIP.FOIA@usdoj.gov

October 17, 2022

Via U.S. mail and email

**Re: Freedom of Information Act Appeal Letter No. 20-00072-F**

To Whom It May Concern:

The Center for Investigative Reporting (CIR) hereby writes on behalf of the requesters, Ms. Melissa Lewis and Mr. Jonathan Jones pursuant to the Freedom of Information Act, 5 U.S.C. § 552, given the denial issued by the United States Department of Justice in response to Ms. Lewis's request.

**I.      Procedural History**

On December 13, 2019, Ms. Lewis, a reporter at CIR submitted a FOIA request to the DOJ (hereinafter "the Request"). A true and correct copy of the Request is attached as Exhibit A. The Request sought records pertaining to "matters investigated or reviewed by the Civil Rights Division under 18 USC 241-242, Deprivation or Rights Under the Color of Law, between 1998 and 2018" and "any long-form closing memoranda reflecting the Division's decision not to prosecute a 242 matter that resulted in death." *See* Request, Exhibit A. In a letter dated September 19, 2022, the DOJ sent a letter to Ms. Lewis with a responsive document attached and withholding the request for "any long-form" closing memorandum pursuant to 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). *See* Denial, Exhibit B. As to the disclosed document, the agency chose to redact the "subject names, victim names, and lead attorney/investigators" pursuant to 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C), stating that this public information constituted an invasion of personal privacy. *Id.*

1400 65th, Suite 200  Emeryville, CA 94608
PHONE  510 809 3160                              TWITTER  @reveal
                    WEB  revealnews.org

The FOIA embodies a strong policy in favor of disclosing public records and must be disclosed unless they come under one of the narrow exemptions. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) ("Official information that sheds light on an agency's performance of its statutory duties falls squarely within [the FOIA's] statutory purpose."). Here, none of the exemptions are properly invoked and so Plaintiffs request the agency remand with instruction for the agency to review and disclose the records.

## II.     Argument

### A. The DOJ's wholesale withholding of the long-form closing memoranda pursuant to 5 U.S.C. §§ 552 (b)(5) is unjustifiable where the facts must be disclosed and closing memoranda are typically disclosed by the agency.

The agency claims that the long-form closing memoranda are properly withheld under FOIA Exemption 5, 5 U.S.C. § 552 (b)(5). Exemption 5 allows withholding of "inter-agency or intra-agency" records only if they "would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To qualify for Exemption 5's protection, a document "must fall within the ambit of a privilege against discovery," such as the attorney-client privilege, the work product privilege, or the deliberative process privilege. *Dep't of Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 8 (2001). For the deliberative process privilege to apply, the document must be "both 'predecisional' *and* part of the agency's 'deliberative process,'" *Kowack v. USFS*, 766 F.3d 1130, 1135 (9th Cir. 2014)," and the privilege must apply only to information that would "expose an agency's decision-making process," *Sierra Club Inc. v. USFWS.*, 925 F.3d 1000, 1011 (9th Cir. 2019). In other words, "factual material" is not protected. *Kowack*, 766 F.3d at 1135. Historical or previously published material have often been disclosed under Exemption 5. *Elec. Frontier Found. v. Dep't of Justice*, No. 3:2016-cv-02041, 2016 U.S. Dist. LEXIS 177630 (N.D. Cal. 2016); *Florez v. CIA*, 829 F.3d 178  (2d Cir. 2016).

Here, the agency provides no logic as to why the materials are properly withheld *in full* pursuant to Exemption 5. The agency does not explain whether the identified materials "would not be available by law to a party other than an agency in litigation with the agency," as attorney-client privilege or work product privilege. 5 U.S.C. § 552(b)(5). Nonetheless, that explanation would likely not be justifiably provided for the withholding of these materials which are regularly and consistently disclosed by the agency on its website. *See* Dep't of Justice, Civil Rights Division Emmett Till Act (Cold Case Closing Memoranda), https://www.justice.gov/crt/civil-rights-division-emmett-till-act-cold-case-closing-memoranda. Indeed, attached are two notice to close memoranda files from similar cases. *See* Exhibit D & C. And even if some of the memoranda material is properly withheld under Exemption 5, courts consistently hold that the segregable portions, such as factual information must be disclosed. While CIR allows that *some* material within the full withheld pages *may possibly* be protected by Exemption 5, the

agency must at the very least, release factual information, as well as other segregable material.

**B.  The DOJ's withholdings under 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C), are unjustifiable where there is no privacy concern and this information is consistently disclosed by the agency**

Exemption 6 and 7(C) protect an unwarranted invasion of privacy and requires carefully balancing "the privacy interest protected by the exemption [] against the public interest in government openness that would be served by disclosure." *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009) (citing *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 158 (2004)).  Under Exemption 7(C), public officials enjoy far less privacy protection.  *Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1223 (9th Cir. 2001); *see also Kimberlin v. Dep't of Just.*, 139 F.3d 944, 949 (D.C. Cir. 1998).  Additionally, the "privacy interests of individuals who have been convicted or pled guilty…plainly substantially weaker than the privacy interests of individuals who have been investigated but never publicly charged at all.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Just.*, 854 F.3d 675, 682 (2017) (citation omitted).  Where "the public interest substantially outweighs any residual privacy interest," the documents must be disclosed. *Bartko*, 898 F.3d at 70.  *See also Rosenfeld v. United States Dep't of Justice*, 57 F.3d 803, 812 (9th Cir. 1995) (ordering disclosure "[i]n light of this strong public interest" which outweighed asserted privacy interests).

**1.  The agency did not justifiably withhold the long-form closing memoranda where there are no putative privacy interests and, even so, they are outweighed by the public interest.**

Here, the agency should disclose the long-form closing memoranda records, because the privacy and law enforcement concerns are likely no longer extant, and especially because it is agency practice to disclose closing memoranda. As previously mentioned, the agency has previously published dozens of closing memoranda, same as the kind requested here. *See supra* Dep't of Justice, Civil Rights Division Emmett Till Act. Indeed, the two attached exhibits, *see* Ex. C & D, are notice to close memoranda from an officer-involved case and a suspicious death case, not unsimilar from the cases at issue here.  As was the circumstance with those cases, no privacy or law enforcement concerns exist given the historical nature of these files – that pertain to the closed cases from 1998-2018, and the records should be disclosed. Indeed, some of these cases date back to nearly twenty-five years ago.  Furthermore, the central subjects of many of these files are dead. Many personnel involved in the investigations are also no longer alive or work at the agency. Even more importantly, the Department of Justice has announced that they have **closed** all of these investigations into the cases. Thus, as was the case in *Florez v. CIA* – the agency should disclose records because law enforcement and privacy concerns are nonextant. 829 F.3d 178  (2d Cir. 2016).

Additionally, the public interest in these memorandums is immense and outweigh any possible privacy concerns.  Many of these cases were closely scrutinized by the local and

1400 65th, Suite 200 Emeryville, CA 94608
PHONE 510 809 3160                    TWITTER @CIRonline
WEB cironline.org

national media.  And since their closing, the public's immense interest in these cases has only grown since that time following the recent Black Lives Matter movement.  In addition, the Civil Rights Division is charged with upholding the civil and constitutional rights of all Americans, particularly the most vulnerable members of society. Disclosure would help the public understand how division enforces its obligations and how these momentous events in history relate to current events involving our national community.

    **2. The agency did not justifiably withhold the subject names, victim names, and lead attorney/investigators in the spreadsheet, pursuant to 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C), given disclosure would not constitute an unwarranted invasion of personal privacy.**

The agency improperly withheld the subject names, victim names, and lead attorneys/investigators from the spreadsheet pursuant to Exemptions 6 and 7(C). The putative privacy concerns of subject names and victims are unlikely in these cases where many of these names have already been published, exposed and closely scrutinized by the local and national governments, as well as the press. Indeed, "privacy interests of individuals," specifically victims and subject names, are "plainly substantially weaker than the privacy interests of individuals who have been investigated but never publicly charged at all.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Just.*, 854 F.3d 675, 682 (2017). Additionally, names of lead attorneys and investigators are even less likely to pose a privacy concern. *Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1223 (9th Cir. 2001). This reasoning has been upheld in the DOJ CRD's own practice of releasing a very readable document of all the cases they looked into under the cold case initiative, including the name of the victim. *See* Exhibit E. It is unclear why the agency could disclose in that instance, and not in this one. Given the law and the agency's own practice, the agency's wholesale withholdings of subject, victim, and lead attorney/investigator names in this case are improper and should be released.

### C.  The FBI's Assertion of Exemption 7(E) Should Be Reviewed *In Camera.*

Exemption 7(E) allows withholding of investigative techniques where disclosure would "risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  To justify non-disclosure, the agency "must provide non-conclusory reasons why disclosure of each category of withheld documents would risk circumvention of the law." *Feshbach v. SEC*, 5 F. Supp. 2d 774, 787 (N.D. Cal. 1997) (granting summary judgment for plaintiffs on (b)(7)(E)). "Exemption 7(E) only exempts investigative techniques ***not generally known to the public***," not "routine" techniques that "would leap to the mind of the most simpleminded investigator." *Rosenfeld v. U.S. DOJ*, 57 F.3d 803, 815 (9th Cir. 1995).

Here, the agency seeks to withhold records related to unnamed techniques and procedures, which is impermissible under the FOIA statute. CIR concedes that it is *possible* that some of the information within the memoranda might contain *some* exempted techniques or procedures.  However, it cannot be gleaned from agency's insufficiently vague explanation whether these are indeed sensitive and secret or merely public or

routine. Given the age of these documents and the celerity with technology, it is unlikely any of the techniques are still unknown and properly withheld. Regardless, this information should likely be released, and if not, simply redacted from the records.

### D. The agency failed to release all segregable portions in the disclosed spreadsheet and long-form memoranda, as required by FOIA

Under FOIA, agencies cannot withhold disclosable information merely because the record also contains exempt information. *Hamdan*, 797 F.3d at 779 (discussing FOIA's requirement of segregability); *see also Willamette Industries, Inc. v. United States*, 689 F.2d 865, 867 (1982) ("The focus of the FOIA is information, not documents, and the agency cannot justify withholding an entire document simply by showing that it contains some exempt material."). FOIA states that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Thus, agencies have a "duty to segregate" and provide releasable information through redaction. *Id.* "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008). It is reversible error for the district court "to simply approve the withholding of an entire document without entering a finding on segregability." *Hamdan*, 797 F.3d at 779 (internal quotation and citation omitted).

Here, the federal government should do the same exact thing it does in countless other FOIA cases: review and redact. Even if there are exempt portions, DOJ should redact non-releasable sections and reveal portions that can be disclosed rather than withhold the pages in full. Indeed, this type of review and redaction is conducted all the time by various branches of government. For instance, federal agencies engage in this type of review and redaction in countless FOIA cases, involving requests of much greater sensitivity. *See* Charlie Savage, *U.S. Releases Rules for Airstrike Killings of Terror Suspects*, N.Y. TIMES, Aug. 6, 2016, http://nyti.ms/2aJTOX8 (declassifying portions of documents about military drone policies).

### E. The government has not demonstrated any foreseeable harm that would result from disclosure of the communications.

As the D.C. Circuit recently explained, an agency's determination that a particular exemption applies "does not end the matter." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) ("*RCFP*"). The agency must also demonstrate "foreseeable harm" would result from disclosure. 5 U.S.C. § 552(a)(8)(A)(i)(I). "[T]he foreseeable harm requirement 'impose[s] an independent and meaningful burden on agencies.'" *RCFP*, 3 F.4th at 369 (quoting *Center for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019)). "[A]gencies must concretely explain how disclosure 'would'—not 'could'—adversely impair" the interest protected by the relevant exemption. *Id.* at 369-70 (citations omitted). *See also Reporters Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, No. 1:18-cv-

00155 (TNM), 2021 U.S. Dist. LEXIS 200240, at *53 (D.D.C. Oct. 18, 2021) ("agency must establish a foreseeable harm" to invoke Exemption 7(C)).

DOJ-CRM has not attempted to make any showing of reasonably foreseeable harm that would result from disclosing the requested records, much less to "concretely explain" what harms might occur – the agency merely states "we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions." This paltry statement is insufficient to meet the burden here particularly where nearly identical records have previously been disclosed. As such, even if Exemptions apply, DOJ-CRM has not and likely could not meet its burden in showing a foreseeable harm where many of the facts about the investigation are already public due to the fact that these were highly publicized cases.

## III.    Conclusion

In conclusion, DOJ should release all relevant information immediately.  Should DOJ need clarification as to any aspect of the Request, it may reach me at vbaranetsky@revealnews.org or (510) 982-2890.

Sincerely,

Victoria D. Baranetsky
General Counsel
The Center for Investigative Reporting

cc: Melissa Lewis, Jonathan Jones

# Exhibit D



**U.S. Department of Justice**

Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

June 9, 2023

Victoria Baranetsky, Esq.
1400 65th Street
Suite 200
Emeryville, CA  94608
vbaranetsky@revealnews.org

Re:    Appeal No. A-2023-00087

Request No. 20-00072-F
DRC: EH

**VIA: Online Portal**

Dear Victoria Baranetsky, Esq.:

You appealed from the action of the Civil Rights Division (CRT) on your Freedom of Information Act request for access to records concerning investigations under 18 U.S.C. 241-242 as well as any long form closng memos where the matter resulted in death and CRT did not prosecute.  I note that your appeal concerns the exemptions asserted by CRT.

After carefully considering your appeal, and as a result of discussions between CRT personnel and this Office, I am remanding your request to CRT for further processing as it relates to the second portion of your request.  If CRT determines that records are releasable, it will send them to you directly, subject to any applicable fees.  You may appeal any future adverse determination made by CRT.  If you would like to inquire about the status of this remanded request or to receive an estimated date of completion, please contact CRT directly at (202) 514-4210.  I am otherwise affirming CRTs action on your request.

The FOIA provides for disclosure of many agency records.  At the same time, Congress included in the FOIA nine exemptions from disclosure that provide protection for important interests such as personal privacy, privileged communications, and certain law enforcement activities.  CRT properly withheld certain information because it is protected from disclosure under the FOIA pursuant to:

5 U.S.C. § 552(b)(6), which concerns material the release of which would constitute a clearly unwarranted invasion of the personal privacy of third parties; and

5 U.S.C. § 552(b)(7)(C), which concerns records or information compiled for law enforcement purposes the release of which could reasonably be expected to constitute an unwarranted

invasion of the personal privacy of third parties.

Please be advised that for each of these exemptions, it is reasonably foreseeable that disclosure of the information withheld would harm the interests protected by these exemptions.

Please be advised that this Office's decision was made only after a full review of this matter. Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeal, your underlying request, and the action of Civil Rights in response to your request.

If you are dissatisfied with my action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; email at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769. If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office and speak with the undersigned agency official by calling (202) 514-3642.

Sincerely,

X   *Daniel Castellano*
_____

Daniel Castellano,
Associate Chief, for
Matthew W. Hurd,
Chief, Administrative Appeals Staff

# Exhibit E



U.S. Department of Justice
Civil Rights Division

KK:TC
20-00072-F
23-00001-APP

*Freedom of Information/PA Unit –4CON*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*

Victoria Baranetsky, Esq.                        September 20, 2023
1400 65th Street, Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org

Dear Ms. Baranetsky:

The Office of Information Policy (OIP) remanded your administrative appeal to the Civil Rights Division (CRT) for further review regarding the <u>second</u> portion of your request for documents pertaining to "any long-form closing memoranda reflecting the Division's decision not to prosecute a (18 U.S.C.) 242 matter that resulted in death."

OIP affirmed the Division's decision for the <u>first</u> portion of your request for documents pertaining to "matters investigated or reviewed by the Civil Rights Division under 18 USC 241-242, Deprivation of Rights Under the Color of Law, between 1998 and 2018."  In its response, CRT provided a 217-page listing of the Criminal Section's color of law investigations from 1998 – 2018.  This list reflects almost 16,000 separate investigations.  Each investigation would have a closing memoranda which can range from 10 to 25 pages or more.   A number of these investigations include grand jury proceedings which is reflected by the "G" in the listing. With an estimated page count of 20 pages per memoranda, the potentially responsive records would consist of approximately 320,000 pages.

The remanded second portion of your request is for documents pertaining to any longform closing memoranda reflecting the Division's decision not to prosecute under 18 U.S.C. 242 for a matter that resulted in death. This request does not include a date range and would presumably require a search going back indefinitely. The blanket nature of your request, untied to any discrete time frame, is far removed from the accepted functions and purposes of FOIA. A request under the FOIA must be one that reasonably describes [the requested] records." 5 U.S.C. 552(a)(3). Courts have explained that the rationale for this rule was not intended to reduce government agencies to full-time investigators on behalf of requesters, or to allow requesters to conduct "fishing expeditions" through agency files. *Immanuel v. Sec'y of the Treasury,* No. 94- 884, 1995 WL 464141, at 1 (D. Md. Apr. 4, 1995),  *aff''d* 81 F. 3d 150 (4th Cir. 1996).  In addition to the "reasonably described" inquiry, courts have held that agencies are not required to conduct wide-ranging "unreasonably burdensome" searches for records.  *AFGE v. US. Dep't of Commerce,* 907 F.2d 203, 209 (D.C. Circ. 1990) (holding that while plaintiffs requests might identify the documents requested with sufficient precision to enable the agency to identify them...it is clear that these requests are so broad as to impose an unreasonable burden upon the agency, because the agency would have to *locate, review and redact a vast*

*quantity of material*)(emphasis added).  Your request did not include a date range and would presumably require a search going back indefinitely. For instance, for only two decades of records, CRT would have to review almost 16,000 separate investigative files for the closing memoranda which consists of an estimated 320,000 pages.  Each page would have to be reviewed line-by-line for FOIA exemptions including privacy and multiple privileges.  The number of hours necessary to fulfill the breath and broad nature of your request to review thousands of files covering decades will require a substantial expenditure of the Division's resources and would be unreasonably burdensome.  In addition, each of the approximately 16,000 distinct files would have to be requested from the Federal Records Center which is a time-consuming process by itself.  Thus, your request constitutes a "fishing expedition" through the agency files; in essence, requesting the agency to be a full-time investigator on your behalf. Therefore, this request falls within the parameters of the court case noted above as this request is "so broad as to impose an unreasonable burden upon the agency, because the agency would have to locate, review and redact a vast quantity of material."

On administrative appeal, the requester claims the longform closings have no privacy interests and it is the "agency practice to disclose closing memoranda."  The list of Till Act cases and exhibits provided by the requester clearly show the privacy interests were protected under Exemption 7 (c) as names, identifying information and personal information were redacted.  The requester states that CRT should release records for its request similar to the criminal memoranda which CRT released pursuant to the "Emmett Till Unsolved Civil Rights Crime Act" signed into law on October 8, 2008, and its Reauthorization (Till Act).  The Till Act required the FBI and DOJ to investigate cold cases from the 1930s -1960's pertaining to civil rights cases resulting in deaths (the time frame was extended in the Emmett Till Reauthorization Act). Also, under the Till Act, DOJ is required to provide periodic reports to Congress on the status of these Emmett Till cold case investigations and to post the memoranda.  The Till cases are between 60 - 90 years old; thus, in nearly all of these cases, the subjects, victims, and witnesses are deceased and no further law enforcement action may be taken.  The statute of limitations has also run in these types of cases.  In contrast, the requested longform closing memoranda related to 18 U.S.C. Sections 241 and 242, are either current or recent investigations where additional law enforcement investigations or prosecutions are reasonably anticipated.  Many of these investigations are closed and frequently reopened upon further information or evidence.  Additional subjects may also be identified so the investigation is reopened. Again, these color of law criminal statutes do not fall under the Till Act and are treated differently.

Finally, please note the Division's closed investigative and case files are archived at the Federal Records Center (FRC).  As part of the National Archives and Records Administration, FRC stores records and files for federal agencies. FRC was closed as a result of the pandemic and satisfied only exigent record requests and retrievals pending conclusion of the pandemic restrictions. Emergency requests took priority such as court orders or information relating to the health and safety of individuals. Thus, even though the pandemic is over, there is still a considerable backlog in requests for files and it will take a substantial amount of time for files to be retrieved.  FRC is continuing to work through its significant backlog.

Please note that if you are seeking records pertaining to a specific investigation, you can submit a new request to this office.

If you are not satisfied with the Civil Rights Division's determination in response to this remand, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account on the following website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.  Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

I hope the Civil Rights Division has been of some assistance to you in this matter.

Sincerely,

*Tink Cooper*

Tink Cooper, Deputy Chief
Freedom of Information/Privacy Acts Unit
Civil Rights Division

# Exhibit F

**Wednesday, May 1, 2024 at 16:29:42 Central Daylight Time**

**Subject:** RE: 24-00143-F (24-00004-APP) RE: [EXTERNAL] FOIA REQUEST
**Date:** Thursday, March 7, 2024 at 10:13:25 AM Central Standard Time
**From:** FOIArequests, CRT (CRT)
**To:** Victoria Baranetsky, Madisen Hursey
**CC:** FOIArequests, CRT (CRT), Jonathan Jones

Good morning,

Once we respond to a request, that request is closed, unless it's noted it was an interim response. After we issued a response for the original request, 20-00072-F, we closed it in our system. You all filed an appealed to our response. That appeal was opened in this office as 23-00001-APP. For that appeal, OIP affirmed part and remanded in part. CRT issued a final response to that appeal (23-00001-APP) stating the request was overly broad. An appeal was filed again. The new appeal is 24-00004-F, which remains open and being processed. Although request, 20-00072-F is closed, the appeals are connected and pertain to that initial request.

Hopefully, I provided clarification.

April

**From:** Victoria Baranetsky <vbaranetsky@revealnews.org>
**Sent:** Wednesday, March 6, 2024 7:55 PM
**To:** Madisen Hursey <madisen.hursey@law.northwestern.edu>
**Cc:** FOIArequests, CRT (CRT) <CRT.FOIArequests@usdoj.gov>; Jonathan Jones <jjones@revealnews.org>
**Subject:** Re: 24-00143-F (24-00004-APP) RE: [EXTERNAL] FOIA REQUEST

April,

The part we are confused about is what the content of the second appeal is? We were told the request was closed?

Can you clarify and or shed some light on this?

Vickie

On Wed, Mar 6, 2024 at 1:43 PM Madisen Hursey <madisen.hursey@law.northwestern.edu> wrote:

April,

Thanks for memorializing our phone conversation so promptly and for your patience with all our questions. Looking forward to hearing from you early next month.

Best,
Madisen

Madisen Hursey, MAT
JD Candidate, Class of 2024
Northwestern Pritzker School of Law

**From:** FOIArequests, CRT (CRT) <CRT.FOIArequests@usdoj.gov>
**Date:** Wednesday, March 6, 2024 at 8:00 AM
**To:** Jonathan Jones <jjones@revealnews.org>, FOIArequests, CRT (CRT) <CRT.FOIArequests@usdoj.gov>
**Cc:** Victoria Baranetsky <vbaranetsky@revealnews.org>, Madisen Hursey <madisen.hursey@law.northwestern.edu>
**Subject:** 24-00143-F (24-00004-APP) RE: [EXTERNAL] FOIA REQUEST

Dear Mr. Jones:

This request was opened in the Civil Rights Division and assigned FOIA number 24-00143-F, however, it will be closed as a duplicate request.  This is a duplicate of request, 20-00072-F, which is now appeal, 24-00004-APP.  Your new request will be combined with that appeal.  I spoke to Ms. Hursey twice about the appeal and informed her that it's currently with OIP and will take approximately 4 weeks to complete the appeal.  Tink Cooper, the FOIA attorney processing the appeal also conveyed that information to Ms. Hursey.  As soon as information is available pertaining to this request, we will forward a response to you.

Best,
April N. Freeman
FOI/PA Unit
Civil Rights Division
CRT.FOIArequests@usdoj.gov

**From:** Jonathan Jones <jjones@revealnews.org>
**Sent:** Monday, March 4, 2024 2:11 PM

**To:** FOIArequests, CRT (CRT) <CRT.FOIArequests@usdoj.gov>
**Cc:** Victoria Baranetsky <vbaranetsky@revealnews.org>; Madisen Hursey <madisen.hursey@law.northwestern.edu>
**Subject:** [EXTERNAL] FOIA REQUEST

Dear FOIA officer:

Please see the attached FOIA request (also copied and pasted below). Please send a receipt and acknowledgement of this request within the statutory time period.

Thank you for your assistance.

Sincerely,

Jonathan Jones

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Freedom of Information Act Request Letter**

**March 4, 2024**

U.S. Department of Justice
Kilian B. Kagle, Chief, April Freeman, FOIA Public Liaison
Civil Rights Division, 4CON, Room 6.153, 950 Pennsylvania Ave., N.W. Washington, DC 20530
CRT.FOIArequests@usdoj.gov

Re: Freedom of Information Act Request

Dear Ms. Freeman and Ms. Kagle :

This is a request under the Freedom of Information Act.

I request a copy of the following documents: any long-form closing memoranda reflecting the Division's decision not to prosecute a (18 U.S.C.) 242 matter that resulted in death between 2018 and 2024. Please release the closing memos in full with redacted names, social media accounts, and identifying contact information under (b)(7)(c).

For clarification, I previously requested this exact material and the OIP remanded the request on September 20, 2023 to your office, stating that the records should be disclosed, but your office still has not processed the request. (See FOIA Request # A-2023-00087). To help determine my status to assess fees, you should know that I am a news media member. This information is for news gathering purposes for dissemination to the public and not for commercial use.

I am willing to pay fees for this request up to a maximum of $100. If you estimate the fees will exceed this limit, please inform me first. I request a waiver of all fees for this request. Disclosure of the requested information to me is in the public interest because it will likely contribute significantly to public understanding of the Civil Rights Division and its investigations.

Thank you for considering this request.

Sincerely,

Jonathan Jones (Tel: 510-501-5957)
Reveal, Center for Investigative Reporting,
Mother Jones
PO Box 584
San Francisco, CA 94104

**Jonathan Jones, Investigative Reporter & Producer**
Reveal from The Center for Investigative Reporting
**Mobile**: 510-501-5957
**Check** out our podcast and follow us on Twitter
Sunblocked: Resistance to Solar in Farm Country
The Battle for Clean Energy in Coal Country
Mississippi Goddam
No Retreat: The Dangers of Stand Your Ground

# Exhibit G



U.S. Department of Justice
Civil Rights Division

KK:ANF:AKL
19-00078-F

*Freedom of Information/PA Unit – 4CON*

*950 Pennsylvania Ave., NW*
*Washington, DC 20530*

*Via Electronic Mail*
Mr. Jonathan Jones
Reveal News
1400 65th, Suite 200
Emeryville, CA 94608
jjones@revealnews.org

April 23, 2024

Dear Mr. Jones:

This is in further response to your December 14, 2018, Freedom of Information Act request, received by the Civil Rights Division, seeking access to all death investigations reviewed by the Department of Justice's Civil Rights Division including fatal shootings, suicides, and homicides in an effort to determine whether to pursue criminal civil rights charges from 2008 to 2018.

After review of the responsive Civil Rights Division records, I have determined that the enclosed document may be disclosed to you subject to the deletion of personal information pursuant to 5 U.S.C. § 552 (b)(7)(C) since disclosure thereof would constitute an unwarranted invasion of personal privacy. Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions.

If you are not satisfied with the Civil Rights Division's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account on the following website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

I hope the Civil Rights Division has been of some assistance to you in this matter.

Sincerely,

*Kilian Kagle*

Kilian Kagle, Chief
Freedom of Information/Privacy Acts Unit
Civil Rights Division

| DJ_NUMBER | INITIAL_DATE | CLOSED_DT | CASE_MATTER | OCCUR_DATE | VICTIM | VICTIM | VICTIM | VICTIM | VICTIM |
|---|---|---|---|---|---|---|---|---|---|
| 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 | 1/7/2008 | 7/26/2012 | M | 1/25/2007 | (b)(7)(C) | | | | |
| 144-84-839 | 1/7/2008 | 10/1/2015 | M | 9/1/2007 | | | | | |
| 144-90-220 | 1/10/2008 | 7/9/2009 | M | | | | | | |
| 144-24-779 | 1/11/2008 | 4/4/2013 | M | 11/16/2007 | | | | | |
| 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 | 1/15/2008 | 10/7/2014 | M | 10/21/2007 | | | | | |
| 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 | 1/16/2008 | 7/26/2018 | M | | | | | | |
| 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 | 1/17/2008 | 5/15/2018 | M | 11/3/2004 | | | | | |
| 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 | 1/28/2008 | 1/2/2014 | G | 12/10/1964 | | | | | |
| 144-12C-4007 | 1/30/2008 | 5/8/2019 | M | 12/31/2007 | | | | | |
| 208-13-18 | 1/30/2008 | 2/29/2008 | M | 12/9/2007 | | | | | |
| 144-45-424 | 2/4/2008 | 7/22/2011 | M | 1/20/2008 | | | | | |
| 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 | 2/7/2008 | 7/26/2013 | M | 6/3/2007 | | | | | |
| 144-12C-4008 | 2/8/2008 | 5/20/2009 | M | 10/29/2006 | | | | | |
| 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 | 2/21/2008 | 11/13/2008 | M | 10/28/2007 | | | | | |
| 144-22-426 | 2/21/2008 | 3/20/2009 | M | | | | | | |
| 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 | 2/21/2008 | 2/24/2010 | M | 1/23/2008 | | | | | |
| 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 | 2/26/2008 | 10/18/2019 | M | 8/6/2006 | | | | | |
| 50-85-12 | 2/26/2008 | 5/27/2009 | M | | | | | | |
| 144-10-595 | 2/28/2008 | 11/7/2011 | M | 11/15/2006 | | | | | |
| 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 | 2/29/2008 | 1/28/2010 | M | 2/16/2008 | | | | | |
| 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 | 3/3/2008 | 5/19/2014 | M | 1/30/2008 | | | | | |
| 144-12C-4016 | 3/5/2008 | 1/26/2010 | M | 12/4/2007 | | | | | |
| 144-14-963 | 3/14/2008 | 5/8/2013 | M | 1/31/2008 | | | | | |
| 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 | 3/17/2008 | 2/24/2014 | M | 1/17/2008 | | | | | |
| 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 | 3/17/2008 | 10/15/2015 | M | 10/3/2007 | | | | | |
| 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 | 3/24/2008 | 8/20/2008 | M | 11/2/2007 | | | | | |
| 144-11E-1520 | 4/1/2008 | 8/10/2011 | M | 9/28/2007 | | | | | |
| 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 | 4/9/2008 | 6/18/2014 | M | 9/11/2003 | | | | | |
| 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 | 4/14/2008 | 7/17/2008 | M | 10/31/2006 | | | | | |
| 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 | 4/15/2008 | 2/9/2012 | M | 2/14/2008 | | | | | |
| 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 | 4/15/2008 | 6/16/2017 | M | 3/29/2008 | | | | | |
| 50-29-12 | 5/5/2008 | 6/29/2011 | C | | | | | | |
| 144-77-532 | 5/6/2008 | 1/5/2016 | M | 3/20/2008 | | | | | |
| 144-12C-4023 | 5/16/2008 | 10/22/2010 | M | 3/25/2008 | | | | | |
| 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 | 5/21/2008 | 4/5/2013 | M | 8/14/2007 | | | | | |
| 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 | 5/29/2008 | 7/26/2017 | M | 6/3/2007 | | | | | |
| 144-8-1762 | 6/3/2008 | 3/23/2010 | M | 4/24/2008 | | | | | |
| 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 | 6/4/2008 | 5/11/2011 | M | 3/19/2008 | | | | | |
| 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 | 6/4/2008 | 1/12/2009 | M | 5/6/2008 | | | | | |
| 144-15-217 | 6/12/2008 | 5/11/2010 | M | | | | | | |
| 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 | 6/19/2008 | 7/12/2011 | C | 5/30/2004 | | | | | |
| 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 | 6/23/2008 | 9/17/2015 | M | 3/14/2008 | | | | | |
| 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 | 6/27/2008 | 11/2/2015 | M | 6/12/2008 | | | | | |
| 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 | 7/3/2008 | 9/9/2014 | M | 1/9/2008 | | | | | |
| 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 | 7/10/2008 | 10/16/2013 | C | 6/29/2008 | | | | | |
| 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 | 7/21/2008 | 9/21/2009 | M | 7/15/2006 | | | | | |
| 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 | 7/23/2008 | 3/19/2009 | M | 7/19/2008 | | | | | |
| 144-2-1425 | 7/24/2008 | 2/10/2016 | M | 10/22/1957 | | | | | |
| 144-2-1426 | 7/24/2008 | 4/28/2010 | M | 8/12/1950 | | | | | |
| 144-2-1428 | 7/24/2008 | 4/28/2010 | M | 11/20/1966 | | | | | |

| | | | | |
|---|---|---|---|---|
| 144-3-1429 | 7/24/2008 | 5/20/2011 M | 3/9/1965 | (b)(7)(C) |
| 144-3-1430 | 7/24/2008 | 11/13/2013 M | 11/28/1964 | |
| 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 | 7/24/2008 | 1/26/2011 M | 6/18/2008 | |
| 144-2-1429 | 7/25/2008 | 4/26/2011 M | 8/20/1965 | |
| 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 | 7/28/2008 | 4/27/2009 M | 7/27/2008 | |
| 144-2-1430 | 8/8/2008 | 4/9/2010 M | 6/14/1956 | |
| 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 | 8/12/2008 | 1/17/2020 M | 4/13/2008 | |
| 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 | 8/18/2008 | 11/1/2019 M | 7/25/2008 | |
| 144-17M-3156 | 8/18/2008 | 6/14/2017 M | 6/7/2008 | |
| 144-9-1904 | 8/19/2008 | 5/10/2019 M | 6/29/2008 | |
| 144-80-645 | 8/21/2008 | 3/9/2015 M | 7/2/2008 | |
| 144-11E-1525 | 9/12/2008 | 4/24/2019 M | 5/28/2008 | |
| 144-17M-3158 | 9/16/2008 | 6/4/2011 M | 1/1/1965 | |
| 144-12C-4030 | 10/2/2008 | 11/24/2009 M | 8/5/2008 | |
| 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 | 10/2/2008 | 6/18/2010 M | 8/27/2008 | |
| 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 | 10/3/2008 | 10/10/2008 M | 1/1/2006 | |
| 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 | 10/15/2008 | 10/12/2016 M | 7/7/2008 | |
| 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 | 10/16/2008 | 2/10/2016 M | 8/16/2008 | |
| 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 | 10/28/2008 | 1/28/2020 M | 7/5/2008 | |
| 144-12C-4033 | 10/30/2008 | 5/8/2019 M | 10/28/2008 | |
| 144-25-912 | 11/6/2008 | 5/28/2014 M | 10/26/2008 | |
| 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 | 11/7/2008 | 11/27/2012 M | 9/16/2005 | |
| 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 | 11/7/2008 | 4/18/2014 M | 6/24/2008 | |
| 144-39-961 | 11/17/2008 | 9/27/2013 M | 10/1/2008 | |
| 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 | 11/20/2008 | 10/25/2019 M | 12/15/2007 | |
| 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 | 11/26/2008 | 10/24/2017 M | 3/18/2008 | |
| 144-17-782 | 12/2/2008 | 4/9/2010 M | 5/5/1962 | |
| 144-12C-4035 | 12/5/2008 | 10/12/2010 M | 9/3/2008 | |
| 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 | 12/10/2008 | 8/29/2011 M | 12/7/2008 | |
| 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 | 12/22/2008 | 4/22/2010 M | 6/9/2008 | |
| 144-2-1431 | 12/22/2008 | 3/28/2011 M | 1/3/1966 | |
| 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 | 12/22/2008 | 4/15/2010 M | | |
| 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 | 1/8/2009 | 7/22/2015 M | 1/1/2009 | |
| 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 | 1/8/2009 | 4/3/2012 M | 3/12/2007 | |
| 144-1-3408 | 1/8/2009 | 3/18/2010 M | 9/18/2008 | |
| 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 | 1/8/2009 | 7/7/2015 M | 7/16/2008 | |
| 144-84-849 | 1/8/2009 | 10/25/2010 M | 7/11/2008 | |
| 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 | 1/15/2009 | 10/20/2009 G | 12/19/2008 | |
| 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 | 1/15/2009 | 7/21/2017 M | 12/11/2008 | |
| 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 | 1/15/2009 | 7/5/2011 M | 12/8/2008 | |
| 144-12C-4037 | 1/23/2009 | 6/14/2011 M | 12/22/2008 | |
| 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 | 1/23/2009 | 2/15/2012 M | 12/24/2008 | |
| 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 | 1/23/2009 | 2/5/2014 M | 12/31/2008 | |
| 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 | 1/27/2009 | 11/6/2013 M | 3/23/2000 | |
| 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 | 1/28/2009 | 7/6/2011 M | 12/20/2008 | |
| 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 | 1/29/2009 | 11/6/2014 C | 9/2/2005 | |
| 144-19M-1751 | 2/5/2009 | 4/6/2010 M | 5/25/1958 | |
| 144-19M-1752 | 2/5/2009 | 4/6/2009 M | | |
| 144-19M-1753 | 2/5/2009 | 4/6/2010 M | 4/20/1958 | |
| 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 | 2/5/2009 | 4/15/2010 M | | |
| 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 | 2/5/2009 | 4/22/2010 M | 7/20/1958 | |

| | | | | (b)(7)(C) |
|---|---|---|---|---|
| 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 | 2/5/2009 | 7/5/2011 M | | |
| 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 | 2/17/2009 | 4/6/2010 M | | |
| 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 | 2/17/2009 | 5/20/2011 M | 8/20/1965 | |
| 175-19-376 | 2/17/2009 | 7/6/2012 M | 5/19/1960 | |
| 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 | 2/18/2009 | 4/16/2010 M | 4/30/1957 | |
| 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 | 2/19/2009 | 4/12/2010 M | | |
| 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 | 2/19/2009 | 7/7/2010 M | 2/27/1965 | |
| 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 | 2/19/2009 | 2/18/2016 M | 11/1/1959 | |
| 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 | 2/19/2009 | 4/12/2010 M | 8/10/1964 | |
| 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 | 2/19/2009 | 8/13/2012 M | 10/12/1959 | |
| 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 | 2/19/2009 | 4/12/2010 M | 12/3/1955 | |
| 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 | 2/19/2009 | 6/7/2011 M | 1/7/1958 | |
| 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 | 2/19/2009 | 4/16/2010 M | 10/20/1963 | |
| 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 | 2/19/2009 | 5/27/2011 M | 1/11/1966 | |
| 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 | 2/19/2009 | 11/30/2012 M | 9/24/1965 | |
| 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 | 2/19/2009 | 4/12/2010 M | 6/21/1958 | |
| 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 | 2/19/2009 | 4/28/2010 M | 1/23/1965 | |
| 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 | 2/19/2009 | 7/20/2012 M | 9/30/1962 | |
| 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 | 2/19/2009 | 7/12/2011 M | 5/7/1955 | |
| 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 | 2/19/2009 | 4/16/2010 M | | |
| 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 | 2/19/2009 | 5/2/2010 M | | |
| 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 | 2/19/2009 | 5/27/2011 M | | |
| 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 | 2/19/2009 | 4/16/2010 M | 1/22/1965 | |
| 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 | 2/19/2009 | 5/24/2010 M | 1/20/1956 | |
| 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 | 2/19/2009 | 7/26/2013 M | 8/8/1965 | |
| 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 | 2/19/2009 | 3/7/2013 M | 5/12/1967 | |
| 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 | 2/19/2009 | 4/16/2010 M | 10/13/1961 | |
| 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 | 2/19/2009 | 4/12/2010 M | 9/7/1964 | |
| 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 | 2/19/2009 | 5/27/2011 M | 11/6/1964 | |
| 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 | 2/19/2009 | 5/2/2010 M | 1/17/1963 | |
| 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 | 2/19/2009 | 5/9/2011 M | 2/25/1965 | |
| 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 | 2/19/2009 | 6/17/2010 M | 6/30/1964 | |
| 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 | 2/19/2009 | 4/28/2010 M | | |
| 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 | 2/19/2009 | 4/12/2010 M | | |
| 175-41-211 | 2/19/2009 | 10/1/2013 M | 2/28/1964 | |
| 175-41-212 | 2/19/2009 | 11/5/2009 M | 4/27/1958 | |
| 175-41-213 | 2/19/2009 | 7/6/2012 M | 8/14/1959 | |
| 144-1-3411 | 2/20/2009 | 3/28/2011 M | 9/15/1963 | |
| 144-1-3412 | 2/20/2009 | 4/6/2011 M | 8/28/1965 | |
| 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 | 2/20/2009 | 5/2/2010 M | | |
| 144-19M-1755 | 2/20/2009 | 4/12/2010 M | 7/18/1946 | |
| 144-19M-1756 | 2/20/2009 | 7/27/2011 M | 10/11/1962 | |
| 144-19M-1757 | 2/20/2009 | 4/12/2010 M | 12/1/1966 | |
| 144-19M-1758 | 2/20/2009 | 4/28/2010 M | 8/30/1964 | |
| 144-30-989 | 2/20/2009 | 5/27/2011 M | 8/14/1966 | |
| 144-3-1434 | 2/20/2009 | 5/2/2010 M | | |
| 144-3-1435 | 2/20/2009 | 4/28/2010 M | 12/25/1967 | |
| 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 | 2/20/2009 | 9/24/2013 M | | |
| 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 | 2/20/2009 | 5/21/2012 M | | |
| 144-32M-797 | 2/20/2009 | 5/21/2012 M | | |
| 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 | 2/20/2009 | 4/22/2010 M | 7/13/1960 | |

| | | | | |
|---|---|---|---|---|
| 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 | 2/20/2009 | 6/1/2011 M | 7/17/1965 | (b)(7)(C) |
| 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 | 2/20/2009 | 4/12/2010 M | 12/24/1955 | |
| 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 | 2/20/2009 | 5/2/2010 M | 3/1/1964 | |
| 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 | 2/20/2009 | 4/12/2010 M | 4/9/1962 | |
| 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 | 2/20/2009 | 4/12/2010 M | 8/13/1955 | |
| 175-41-214 | 2/20/2009 | 4/16/2010 M | 6/20/1957 | |
| 144-1-3413 | 2/23/2009 | 3/8/2013 M | 4/23/1963 | |
| 144-17M-3165 | 2/23/2009 | 6/10/2015 M | 3/23/1964 | |
| 144-19M-1759 | 2/23/2009 | 4/2/2013 M | 3/1/1957 | |
| 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 | 3/9/2009 | 4/6/2009 M | 12/5/1956 | |
| 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 | 3/11/2009 | 5/29/2013 M | 1/1/2009 | |
| 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 | 3/11/2009 | 2/16/2011 M | 2/20/2009 | |
| 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 | 3/11/2009 | 2/5/2014 M | 2/22/2009 | |
| 144-1-3416 | 3/19/2009 | 3/25/2019 M | 9/28/2008 | |
| 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 | 3/19/2009 | 8/27/2012 M | 9/16/2008 | |
| 144-26-813 | 3/20/2009 | 1/27/2010 M | 12/23/2007 | |
| 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 | 4/2/2009 | 10/30/2013 M | 1/21/2009 | |
| 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 | 4/2/2009 | 1/6/2016 M | 3/18/2009 | |
| 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 | 4/9/2009 | 2/19/2020 M | 3/6/2009 | |
| 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 | 4/9/2009 | 11/7/2019 M | | |
| 144-39-964 | 4/16/2009 | 6/10/2009 M | 8/22/2006 | |
| 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 | 4/17/2009 | 7/25/2014 M | 10/18/2008 | |
| 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 | 4/24/2009 | 4/16/2010 M | 9/25/1961 | |
| 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 | 4/30/2009 | 11/15/2019 M | 6/3/2008 | |
| 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 | 5/7/2009 | 7/20/2011 M | 7/5/2008 | |
| 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 | 5/7/2009 | 10/25/2019 M | 11/14/2007 | |
| 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 | 5/21/2009 | 1/30/2015 M | 5/23/2007 | |
| 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 | 5/27/2009 | 1/5/2016 M | 4/30/2009 | |
| 144-29-954 | 6/8/2009 | 9/26/2017 G | 5/31/2009 | |
| 144-14-968 | 6/10/2009 | 7/10/2012 M | 5/6/2009 | |
| 144-12C-4045 | 6/11/2009 | 10/30/2019 M | 5/17/2009 | |
| 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 | 6/11/2009 | 5/10/2010 C | 6/10/2009 | |
| 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 | 6/11/2009 | 1/10/2020 M | 5/19/2009 | |
| 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 | 6/11/2009 | 11/2/2015 M | 4/27/2009 | |
| 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 | 6/11/2009 | 11/10/2015 M | 5/11/2009 | |
| 144-84-854 | 6/17/2009 | 8/12/2009 M | | |
| 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 | 6/22/2009 | 2/23/2011 M | 6/8/2009 | |
| 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 | 6/22/2009 | 8/15/2017 M | 6/14/2009 | |
| 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 | 7/6/2009 | 7/8/2011 M | 5/9/2009 | |
| 144-22-430 | 7/7/2009 | 1/28/2010 M | 5/18/2009 | |
| 175-12C-625 | 7/13/2009 | 10/14/2011 M | 6/27/2009 | |
| 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 | 7/14/2009 | 5/4/2015 M | 2/27/1967 | |
| 144-3-1437 | 7/21/2009 | 7/21/2009 M | 12/25/1967 | |
| 144-12C-4051 | 8/6/2009 | 10/25/2017 M | 7/10/2009 | |
| 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 | 8/7/2009 | 6/27/2017 M | 8/1/2009 | |
| 144-83-389 | 8/11/2009 | 2/12/2013 M | | |
| 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 | 8/17/2009 | 7/22/2010 M | 7/28/2009 | |
| 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 | 8/26/2009 | 9/17/2015 M | 8/15/2009 | |
| 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 | 8/26/2009 | 11/27/2017 M | 7/4/2009 | |
| 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 | 8/31/2009 | 11/2/2015 M | 4/27/2007 | |
| 144-11E-1534 | 9/9/2009 | 2/4/2011 M | 4/30/2009 | |

| | | | | |
|---|---|---|---|---|
| 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 | 10/1/2009 | 7/2/2013 M | 8/24/2009 | (b)(7)(C) |
| 144-12C-4056 | 10/7/2009 | 10/12/2010 M | 5/17/2008 | |
| 144-81-281 | 10/7/2009 | 4/28/2016 M | 9/14/2009 | |
| 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 | 10/8/2009 | 10/30/2019 M | 6/25/2009 | |
| 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 | 10/21/2009 | 11/2/2015 M | 9/6/2009 | |
| 144-2-1437 | 11/16/2009 | 7/9/2013 M | 1/11/1957 | |
| 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 | 11/20/2009 | 5/23/2017 M | 4/18/2009 | |
| 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 | 12/2/2009 | 2/13/2018 M | 2/13/2009 | |
| 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 | 12/2/2009 | 10/17/2012 M | 8/25/2009 | |
| 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 | 12/2/2009 | 8/15/2012 M | 11/13/2009 | |
| 144-24-788 | 12/9/2009 | 2/14/2011 M | 10/9/2009 | |
| 144-85-631 | 12/15/2009 | 9/25/2015 M | 1/18/2009 | |
| 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 | 12/23/2009 | 3/24/2015 M | 12/15/2009 | |
| 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 | 12/28/2009 | 12/21/2018 M | 10/2/2009 | |
| 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 | 1/6/2010 | 9/4/2018 M | 2/21/2008 | |
| 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 | 1/6/2010 | 12/19/2014 M | 12/25/2009 | |
| 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 | 1/15/2010 | 5/19/2014 M | 8/20/2009 | |
| 144-38-402 | 1/25/2010 | 5/30/2014 M | 9/23/2009 | |
| 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 | 3/1/2010 | 4/16/2012 M | 11/27/2009 | |
| 144-12C-4063 | 3/4/2010 | 6/13/2019 M | 12/11/2009 | |
| 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 | 3/4/2010 | 8/24/2012 M | 11/5/2009 | |
| 144-24-789 | 3/4/2010 | 5/23/2017 M | 11/13/2009 | |
| 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 | 3/10/2010 | 11/22/2010 M | 12/22/2009 | |
| 144-22-438 | 3/16/2010 | 9/26/2012 M | 2/27/2008 | |
| 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 | 3/23/2010 | 10/25/2017 M | 1/27/2010 | |
| 144-3-1440 | 3/26/2010 | 5/10/2019 M | 3/3/2010 | |
| 144-17M-3178 | 4/20/2010 | 3/2/2020 M | 3/25/2010 | |
| 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 | 4/28/2010 | 12/19/2014 M | 3/11/2010 | |
| 144-12C-4070 | 4/29/2010 | 11/7/2014 M | 10/29/2006 | |
| 144-17-786 | 5/3/2010 | 7/17/2019 M | | |
| 144-17M-3179 | 5/6/2010 | 8/31/2011 M | 3/23/2006 | |
| 144-12C-4072 | 5/13/2010 | 5/7/2019 M | 12/19/2009 | |
| 144-19M-1764 | 5/14/2010 | 5/19/2014 M | 11/11/2008 | |
| 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 | 5/24/2010 | 12/19/2014 M | 3/7/2010 | |
| 144-85-632 | 5/24/2010 | 7/21/2011 M | 5/7/2010 | |
| 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 | 5/27/2010 | 4/10/2013 M | 10/6/2008 | |
| 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 | 6/2/2010 | 9/14/2015 M | 5/16/2010 | |
| 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 | 6/2/2010 | 5/15/2012 M | 5/28/2010 | |
| 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 | 6/10/2010 | 5/3/2012 G | 6/7/2010 | |
| 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 | 6/14/2010 | 11/6/2015 G | 5/28/2010 | |
| 144-11E-1538 | 6/17/2010 | 6/1/2012 M | 11/3/2009 | |
| 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 | 6/21/2010 | 1/14/2014 M | 2/8/2009 | |
| 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 | 7/2/2010 | 2/20/2013 M | 7/12/1964 | |
| 144-12C-4074 | 7/8/2010 | 7/31/2014 M | 9/14/2009 | |
| 144-11E-1539 | 7/13/2010 | 4/14/2016 M | 7/9/2010 | |
| 144-14-974 | 7/15/2010 | 4/21/2014 M | 7/13/2010 | |
| 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 | 7/23/2010 | 9/27/2013 M | 7/9/2010 | |
| 144-19M-1765 | 7/26/2010 | 9/19/2013 M | 5/7/2010 | |
| 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 | 7/28/2010 | 5/13/2019 M | 7/5/2010 | |
| 144-46-952 | 7/29/2010 | 4/26/2011 M | 7/10/2010 | |
| 144-11E-1541 | 8/5/2010 | 4/16/2014 M | 3/28/2010 | |

| | | | | (b)(7)(C) |
|---|---|---|---|---|
| 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 | 8/6/2010 | 1/16/2014 M | 7/23/2010 | |
| 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 | 8/10/2010 | 4/2/2014 M | 8/9/2007 | |
| 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 | 8/11/2010 | 5/28/2014 M | 7/2/2008 | |
| 144-12C-4077 | 8/16/2010 | 6/16/2011 M | 11/23/2008 | |
| 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 | 8/19/2010 | 9/12/2012 M | 8/7/2010 | |
| 144-11E-1544 | 8/20/2010 | 5/10/2019 M | 7/1/2010 | |
| 144-12C-4078 | 8/23/2010 | 3/16/2016 M | 6/30/2010 | |
| 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 | 8/24/2010 | 6/23/2017 M | 2/15/2008 | |
| 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 | 8/26/2010 | 10/23/2019 M | 6/26/2010 | |
| 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 | 8/27/2010 | 9/26/2012 M | 8/22/2010 | |
| 144-2-1441 | 8/31/2010 | 5/8/2019 M | 7/22/2010 | |
| 144-26S-1482 | 9/10/2010 | 3/1/2011 M | 8/6/2010 | |
| 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 | 9/13/2010 | 3/1/2011 M | 7/30/2010 | |
| 144-2-1442 | 9/13/2010 | 8/18/2016 C | 8/4/2010 | |
| 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 | 9/13/2010 | 5/26/2016 M | 8/14/2010 | |
| 144-12C-4082 | 9/27/2010 | 2/26/2014 M | 4/17/2009 | |
| 144-38-405 | 10/5/2010 | 2/25/2011 M | 9/8/2005 | |
| 144-8-1789 | 10/7/2010 | 2/28/2014 M | 10/5/2010 | |
| 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 | 10/12/2010 | 3/22/2011 M | 3/29/2010 | |
| 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 | 10/12/2010 | 1/24/2012 M | 10/4/2010 | |
| 144-63-855 | 10/15/2010 | 2/17/2016 M | 6/11/2010 | |
| 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 | 10/15/2010 | 6/27/2017 M | 7/14/2010 | |
| 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 | 10/20/2010 | 8/14/2018 M | 8/20/2010 | |
| 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 | 10/20/2010 | 1/20/2011 M | | |
| 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 | 10/20/2010 | 10/23/2019 M | | |
| 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 | 10/29/2010 | 8/26/2014 M | 8/22/2010 | |
| 144-8-1790 | 11/5/2010 | 1/30/2020 M | 12/2/2007 | |
| 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 | 12/1/2010 | 10/1/2015 M | 7/26/2010 | |
| 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 | 12/2/2010 | 1/14/2014 M | 10/6/2010 | |
| 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 | 12/2/2010 | 7/20/2012 M | 6/19/2010 | |
| 144-82-876 | 12/6/2010 | 6/30/2014 M | 12/19/2009 | |
| 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 | 12/17/2010 | 5/21/2014 M | 11/18/2010 | |
| 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 | 1/6/2011 | 4/24/2019 M | 12/15/2007 | |
| 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 | 1/10/2011 | 8/21/2017 M | 12/6/2010 | |
| 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 | 1/11/2011 | 3/27/2013 M | 10/7/2010 | |
| 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 | 1/19/2011 | 8/5/2011 M | 12/27/2009 | |
| 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 | 1/20/2011 | 1/10/2020 M | 7/29/2010 | |
| 144-28-278 | 1/21/2011 | 6/8/2016 M | 5/30/2010 | |
| 144-8-1796 | 1/31/2011 | 10/14/2011 M | 5/30/2009 | |
| 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 | 2/22/2011 | 8/3/2011 M | 3/28/2010 | |
| 144-12C-4101 | 2/24/2011 | 3/15/2017 M | 6/4/2006 | |
| 144-11E-1554 | 3/9/2011 | 10/21/2019 M | 3/4/2011 | |
| 144-12C-4103 | 3/10/2011 | 6/13/2019 M | 7/22/2010 | |
| 144-9-1922 | 3/10/2011 | 8/24/2012 M | 3/9/2011 | |
| 144-3-1444 | 3/14/2011 | 9/7/2018 M | 1/21/2010 | |
| 144-9-1923 | 3/24/2011 | 8/8/2014 M | 12/9/2010 | |
| 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 | 4/5/2011 | 12/17/2014 M | 12/24/2010 | |
| 144-11E-1555 | 4/6/2011 | 10/5/2016 M | 9/24/2010 | |
| 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 | 4/6/2011 | 5/13/2019 M | 2/10/2011 | |
| 144-1-3444 | 4/15/2011 | 9/26/2017 M | 3/21/2011 | |
| 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 | 4/19/2011 | 7/11/2014 M | 9/17/2008 | |

| | | | | | (b)(7)(C) |
|---|---|---|---|---|---|
| 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 | 5/6/2011 | 10/8/2013 | M | 2/28/2007 | |
| 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 | 5/6/2011 | 10/12/2011 | M | 8/16/2010 | |
| 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 | 5/12/2011 | 4/8/2016 | M | 9/6/2010 | |
| 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 | 5/13/2011 | 2/9/2016 | M | 8/1/2009 | |
| 144-12C-4111 | 6/16/2011 | 6/21/2019 | M | 5/9/2007 | |
| 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 | 7/15/2011 | 2/10/2017 | M | 6/21/2011 | |
| 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 | 7/26/2011 | 4/12/2017 | M | 6/30/2011 | |
| 144-12C-4113 | 7/28/2011 | 1/16/2017 | M | 7/5/2011 | |
| 144-59-757 | 7/29/2011 | 7/13/2017 | M | 7/11/2011 | |
| 144-12C-4114 | 8/1/2011 | 4/4/2018 | M | 5/10/2011 | |
| 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 | 8/1/2011 | 2/23/2015 | M | 6/7/2011 | |
| 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 | 8/18/2011 | 10/25/2019 | M | 11/25/2010 | |
| 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 | 9/8/2011 | 3/21/2014 | M | 7/16/2011 | |
| 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 | 9/30/2011 | 6/6/2017 | M | 9/28/2010 | |
| 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 | 10/5/2011 | 11/5/2014 | M | | |
| 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 | 10/24/2011 | 6/19/2015 | M | 5/30/2011 | |
| 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 | 11/15/2011 | 10/17/2014 | M | 10/4/2011 | |
| 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 | 12/6/2011 | 10/23/2019 | M | 11/13/2007 | |
| 144-12C-4127 | 1/5/2012 | 7/15/2014 | M | 10/16/2011 | |
| 144-1-3452 | 2/7/2012 | 5/8/2019 | M | 9/30/2009 | |
| 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 | 3/6/2012 | 12/23/2016 | M | 4/30/2011 | |
| 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 | 3/23/2012 | 6/27/2017 | M | 2/20/2011 | |
| 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 | 3/29/2012 | 9/4/2014 | M | 3/21/2012 | |
| 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 | 3/29/2012 | 3/27/2013 | M | 3/1/2012 | |
| 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 | 4/24/2012 | 9/11/2015 | M | 2/6/2012 | |
| 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 | 4/26/2012 | 9/16/2013 | M | 7/24/1965 | |
| 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 | 5/11/2012 | 10/10/2019 | M | 12/15/2010 | |
| 144-12C-4132 | 5/15/2012 | 6/25/2014 | M | 2/7/2012 | |
| 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 | 5/16/2012 | 4/16/2014 | M | 4/22/2008 | |
| 144-77-549 | 5/16/2012 | 10/30/2019 | M | 10/31/2010 | |
| 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 | 6/1/2012 | 4/30/2014 | M | 3/1/2012 | |
| 144-32M-805 | 6/1/2012 | 2/3/2016 | M | 4/11/2011 | |
| 144-12C-4133 | 6/19/2012 | 10/5/2016 | M | 6/15/2012 | |
| 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 | 6/20/2012 | 10/14/2014 | M | 3/6/2011 | |
| 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 | 6/28/2012 | 10/16/2014 | M | 1/7/2012 | |
| 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 | 6/28/2012 | 12/15/2015 | M | 4/6/2012 | |
| 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 | 7/6/2012 | 3/16/2017 | M | 12/14/2011 | |
| 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 | 7/6/2012 | 5/19/2014 | G | 8/5/2007 | |
| 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 | 7/17/2012 | 6/15/2015 | M | 7/9/2012 | |
| 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 | 8/1/2012 | 6/20/2014 | M | 7/14/2010 | |
| 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 | 8/1/2012 | 6/20/2014 | M | 7/1/2008 | |
| 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 | 8/24/2012 | 2/9/2015 | M | 7/1/2012 | |
| 144-63-863 | 9/11/2012 | 8/18/2016 | M | 3/6/2012 | |
| 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 | 9/13/2012 | 10/24/2018 | M | 8/8/2012 | |
| 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 | 10/2/2012 | 10/11/2019 | M | | |
| 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 | 10/2/2012 | 4/18/2016 | M | 9/22/2012 | |
| 144-85-648 | 10/2/2012 | 9/9/2013 | M | | |
| 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 | 10/4/2012 | 6/21/2016 | M | 6/9/2012 | |
| 144-8-1808 | 10/16/2012 | 11/6/2019 | C | 10/12/2012 | |
| 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 | 10/25/2012 | 6/8/2016 | M | 9/21/2012 | |
| 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 | 10/25/2012 | 9/11/2014 | M | 10/9/2009 | |

| | | | | |
|---|---|---|---|---|
| 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 | 11/8/2012 | 12/21/2018 | M | 6/26/2012 |
| 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 | 11/8/2012 | 7/17/2014 | M | 3/7/2012 |
| 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 | 11/28/2012 | 10/2/2013 | M | 7/22/2012 |
| 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 | 12/3/2012 | 10/22/2019 | M | |
| 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 | 12/18/2012 | 9/10/2018 | M | |
| 144-86-248 | 1/15/2013 | 2/7/2018 | M | 11/9/2012 |
| 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 | 2/20/2013 | 6/27/2017 | M | 8/16/2011 |
| 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 | 2/22/2013 | 10/30/2019 | M | 2/18/2013 |
| 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 | 2/28/2013 | 10/30/2019 | M | 1/4/2012 |
| 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 | 5/15/2013 | 2/11/2016 | M | 8/11/2012 |
| 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 | 6/6/2013 | 7/26/2013 | M | 11/7/2011 |
| 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 | 7/1/2013 | 7/22/2015 | M | 8/19/2012 |
| 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 | 7/1/2013 | 11/6/2019 | M | |
| 144-21-617 | 7/10/2013 | 5/27/2015 | M | 6/3/2013 |
| 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 | 8/29/2013 | 3/26/2019 | C | 7/9/2013 |
| 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 | 9/4/2013 | 1/16/2014 | M | 3/31/2013 |
| 144-19M-1777 | 9/9/2013 | 9/8/2017 | M | |
| 144-82-899 | 9/24/2013 | 10/5/2016 | M | |
| 144-25-936 | 10/24/2013 | 9/21/2018 | M | 7/7/2013 |
| 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 | 10/30/2013 | 12/19/2014 | M | 4/10/2013 |
| 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 | 11/8/2013 | 2/14/2017 | M | 3/16/2013 |
| 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 | 12/12/2013 | 10/23/2019 | M | 6/26/2013 |
| 144-11E-1576 | 12/16/2013 | 1/7/2014 | M | 9/2/2012 |
| 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 | 2/7/2014 | 7/11/2018 | M | 8/29/2013 |
| 144-83-402 | 3/11/2014 | 6/2/2016 | M | 3/13/2013 |
| 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 | 3/25/2014 | 11/7/2019 | M | |
| 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 | 4/1/2014 | 2/10/2016 | M | 1/12/2013 |
| 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 | 4/15/2014 | 4/14/2015 | M | 3/12/2014 |
| 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 | 5/14/2014 | 11/20/2019 | M | |
| 144-3-1452 | 5/14/2014 | 5/18/2015 | M | 5/10/2012 |
| 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 | 5/15/2014 | 11/7/2019 | M | |
| 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 | 5/19/2014 | 3/15/2019 | M | 2/5/2002 |
| 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 | 6/3/2014 | 7/1/2015 | M | 10/22/2013 |
| 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 | 6/18/2014 | 3/23/2018 | M | 12/18/2011 |
| 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 | 6/26/2014 | 2/5/2019 | M | 12/7/2013 |
| 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 | 6/27/2014 | 1/23/2015 | M | 4/21/2013 |
| 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 | 7/9/2014 | 9/25/2014 | M | 11/4/2013 |
| 144-82-905 | 7/11/2014 | 10/30/2019 | M | 6/1/2014 |
| 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 | 7/14/2014 | 12/19/2014 | M | |
| 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 | 7/23/2014 | 10/10/2019 | M | 7/31/2013 |
| 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 | 8/12/2014 | 12/3/2019 | M | 11/7/2013 |
| 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 | 8/19/2014 | 4/30/2018 | M | 2/9/2014 |
| 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 | 9/3/2014 | 2/2/2016 | M | 3/3/2014 |
| 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 | 9/5/2014 | 4/25/2016 | M | 7/14/2014 |
| 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 | 9/22/2014 | 11/8/2019 | M | |
| 144-77-558 | 9/22/2014 | 1/16/2019 | M | 9/10/2014 |
| 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 | 10/21/2014 | 11/7/2019 | M | 12/28/2013 |
| 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 | 12/9/2014 | 3/16/2018 | M | |
| 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 | 12/18/2014 | 11/7/2019 | M | 10/12/2013 |
| 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 | 1/7/2015 | 11/7/2019 | M | 9/25/2013 |
| 144-84-893 | 1/7/2015 | 11/7/2019 | M | 6/13/2014 |

(b)(7)(C)

| | | | | |
|---|---|---|---|---|
| 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 | 2/9/2015 | 2/7/2019 M | 2/11/2011 | (b)(7)(C) |
| 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 | 2/10/2015 | 4/14/2016 M | 9/26/2014 | |
| 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 | 2/26/2015 | 2/23/2016 M | 11/18/2013 | |
| 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 | 3/10/2015 | 10/2/2018 M | 1/9/2015 | |
| 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 | 5/12/2015 | 9/13/2017 M | 4/12/2015 | |
| 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 | 5/20/2015 | 10/17/2019 M | 6/14/2014 | |
| 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 | 5/27/2015 | 6/10/2016 M | 9/23/2014 | |
| 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 | 5/28/2015 | 6/30/2016 M | 5/4/2015 | |
| 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 | 6/2/2015 | 12/14/2015 M | 11/13/2014 | |
| 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 | 6/18/2015 | 6/16/2017 M | 7/14/2012 | |
| 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 | 6/18/2015 | 11/7/2019 M | 6/18/2014 | |
| 144-39-996 | 6/19/2015 | 8/15/2017 M | 2/7/2014 | |
| 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 | 6/26/2015 | 6/23/2016 M | 4/30/2015 | |
| 144-83-405 | 7/29/2015 | 1/7/2016 M | 7/1/2015 | |
| 144-1-3486 | 8/10/2015 | 7/12/2018 M | 8/11/2013 | |
| 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 | 8/12/2015 | 11/6/2019 M | 8/7/2015 | |
| 144-87-232 | 8/14/2015 | 7/21/2017 M | 7/18/2015 | |
| 144-11E-1584 | 8/18/2015 | 7/16/2019 M | 7/23/2015 | |
| 144-29-972 | 8/25/2015 | 2/1/2017 M | | |
| 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 | 9/8/2015 | 12/13/2019 M | 8/28/2015 | |
| 144-82-916 | 9/17/2015 | 3/25/2019 M | 4/7/2015 | |
| 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 | 10/6/2015 | 9/15/2016 M | 6/27/2014 | |
| 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 | 11/2/2015 | 7/20/2017 C | 5/30/2015 | |
| 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 | 11/3/2015 | 8/1/2017 M | | |
| 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 | 11/5/2015 | 12/4/2019 M | 10/18/2015 | |
| 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 | 11/9/2015 | 10/5/2017 M | 11/3/2015 | |
| 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 | 11/19/2015 | 6/1/2016 G | 11/15/2015 | |
| 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 | 11/20/2015 | 1/13/2017 M | | |
| 144-80-666 | 11/20/2015 | 9/30/2019 M | 5/4/2013 | |
| 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 | 11/25/2015 | 12/11/2015 M | 12/6/2013 | |
| 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 | 12/18/2015 | 3/17/2016 G | 3/4/2014 | |
| 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 | 1/5/2016 | 8/19/2019 C | 8/30/2015 | |
| 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 | 1/5/2016 | 11/2/2016 M | 10/4/2010 | |
| 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 | 1/11/2016 | 5/23/2019 C | 3/13/2013 | |
| 144-8-1824 | 1/29/2016 | 5/9/2016 M | 9/19/2015 | |
| 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 | 2/18/2016 | 3/16/2017 M | 2/8/2016 | |
| 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 | 3/29/2016 | 11/6/2019 M | 2/8/2016 | |
| 144-17M-3226 | 6/14/2016 | 12/13/2018 M | 5/22/2016 | |
| 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 | 6/17/2016 | 5/26/2017 M | 3/4/2016 | |
| 144-32M-815 | 7/8/2016 | 5/2/2017 G | 7/6/2016 | |
| 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 | 7/8/2016 | 10/4/2016 M | 7/7/2016 | |
| 144-3-1455 | 7/26/2016 | 9/7/2017 M | 6/13/2016 | |
| 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 | 8/2/2016 | 5/31/2019 M | 7/9/2015 | |
| 144-8-1829 | 8/2/2016 | 10/12/2017 M | 3/27/2006 | |
| 144-84-904 | 8/4/2016 | 9/17/2019 M | | |
| 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 | 10/4/2016 | 6/1/2017 M | 8/5/2016 | |
| 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 | 11/1/2016 | 7/10/2019 C | 11/16/2012 | |
| 144-11E-1597 | 12/19/2016 | 11/6/2019 M | 12/13/2016 | |
| 144-29-981 | 2/23/2017 | 9/13/2018 C | 2/22/2017 | |
| 144-59N-719 | 3/29/2017 | 3/1/2019 M | 9/16/2016 | |
| 144-28-284 | 6/29/2017 | 12/18/2018 C | 3/2/2016 | |

| | | | | |
|---|---|---|---|---|
| 144-26S-1515 | 7/11/2017 | 4/12/2019 M | 6/29/2017 | (b)(7)(C) |
| 144-29-988 | 11/14/2017 | 11/9/2018 M | 9/28/2017 | |
| 144-29-989 | 2/13/2018 | 4/26/2018 M | 10/6/2017 | |
| 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 | 5/23/2018 | 2/13/2020 M | | |
| 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 | 6/21/2018 | 6/12/2019 M | 5/10/2018 | |
| 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 | 8/1/2018 | 10/30/2019 M | 7/6/2018 | |
| 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 | 8/21/2018 | 11/19/2018 M | 1/23/2018 | |
| 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 | 9/12/2018 | 4/17/2019 M | 10/20/2017 | |

# Exhibit H

CIVIL RIGHTS DIVISION

Notice to Close File

File No. 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                                     Date:

MAY 2 3 2016

To:    Chief, Criminal Section

Re:    Investigation into the death of Lennon Lacy
       Bladenboro, NC
       CIVIL RIGHTS

**NOTE:  THIS MEMORANDUM CONTAINS POSSIBLE GARRITY MATERIAL**

It is recommended that the above captioned case be closed for the following reasons:

I.    Summary

On August 29, 2014, 17-year old Lennon Lacy, a Black male, was found hanging from a swing set in a mobile home park near his home in Bladenboro, North Carolina.  He was hanging from two belts that had been looped together and one was looped over the top bar of the swing set.

Kristy Parker
Deputy Chief

---

To:  Records Section
     Office of Legal Administration

The above numbered file has been closed as of this date.

5-23-16
Date

Paige M. Fitzgerald
Principal Deputy Chief

(b)(7)(C)

(b)(7)(C) found him and immediately called 911. While on the phone with the dispatcher, the (b)(7)(C) was able to lower Lennon to the ground. Paramedics responded and Lennon was declared dead. The Chief Medical Examiner performed an autopsy and concluded that the cause of death was asphyxia due to hanging and the manner of death was suicide.

The Bladenboro Police Department responded to the scene and requested assistance from the North Carolina State Bureau of Investigation (SBI). The SBI conducted an investigation, but before it was completed, Lacy's family expressed concerns that the investigation was not being done thoroughly. They opined that Lacy was the victim of a racially-motivated murder and asked the Department of Justice to investigate.

The United States Attorney's Office for the Eastern District of North Carolina, the Criminal Section, and the FBI reviewed the SBI's 990-page report and conducted independent interviews of 14 people. The evidence supports the conclusion that Lacy's death was a suicide. For this reason, the matter should be closed.

## II.    Overview of the Investigation

(b)(7)(C)
(b)(7)(C)

(b)(7)(C)

(b)(7)(C)

(b)(7)(C)

(b)(7)(C)

(b)(7)(C)

At about 7:15 a.m. on the morning of August 28, 2014, (b)(7)(C) arrived at the Bladenboro Mobile Home Park to (b)(7)(C) glanced toward the playground and saw what thought was a man standing by a swing set. When got to the office, a resident reported to that a man had been loitering by the swing set. (b)(7)(C) went toward the swing set, which was in a grassy area between two rows of mobile homes. As got closer, realized that the man was hanging by two "straps" from the top beam of the swing set with his feet about five inches from the ground. immediately called 911. The operator asked if could get him down, so (b)(7)(C) climbed up a ladder attached to the swing set and was able to untie the straps. Once the man was on the ground, checked for a pulse but found none.

(b)(7)(C)

At this time, (b)(7)(C) arrived. had heard a report on vehicle radio that there was an unresponsive person at the trailer park. (b)(7)(C) said that (b)(7)(C) was very upset. The man lay on the ground with a blue belt around his neck. He was wearing one shoe and the other shoe was on the ground next to him. EMS arrived at the same time as (b)(7)(C) When the paramedics rolled the man over, he had no pulse and rigor had set in. They backed away and called law enforcement and the Medical Examiner.

Officers from the Bladenboro Police Department arrived and requested assistance from the North Carolina State Bureau of Investigation (SBI). The SBI arrived and immediately began an investigation, canvassing neighboring homes and collecting evidence. A young man who lived in the neighborhood recognized Lacy, identifying him for police. The young man then went to Lacy's home, less than a five minute walk away, and told his (b)(7)(C) to come to the scene.

(b)(7)(C)

(b)(7)(C)

Lacy's (b)(7)(C) told investigators that had last seen (b)(7)(C) when went to bed at approximately 10:30 p.m. the night before. Earlier that day, they had attended the funeral of Lacy's great uncle, with whom Lacy was close. Lacy had been depressed and angry over the death, prompting (b)(7)(C) to call (b)(7)(C) at Lacy's school a few days

earlier. (b)(7)( asked the (b)(7)(C) to let the (b)(7)(C) know about the (b)(7)(C death since Lacy was close to (b)(7)(C)

(b)(7)(C said that when — got up on August 29, she saw Lacy's football equipment. knew he had a game that night so — called the school and was told that Lacy was not there. (b)(7)(C) had told — that a body was found in a park but (b)(7)( did not know which park. — did not make a connection between Lacy and the body until someone who knew Lacy came and got — to identify the body.

The SBI conducted a three-month investigation. Two weeks into it, Lacy's family met with the SBI and gave them a three-page document in which they asserted that on August 29 the police had ruled the death a suicide. The document listed "leads" which the family felt supported a conclusion that the death was a homicide. The SBI conducted approximately 65 interviews, including multiple interviews aimed at following up on the information provided by the family and by other interviewees. They also gathered evidence from Lacy's home and school locker, surveillance camera footage from the area around Lacy's home and the mobile home park where he died, and Facebook postings. The final 990-page SBI report was completed on November 30, 2014.

On November 18, 2014, members of the Lacy family, their attorney, and the President of the North Carolina NAACP met with United States Attorney Thomas Walker. They requested that the U.S. Attorney and the Department of Justice "exercise their authority under the Hate Crimes Prevention Act, Conspiracy Against Rights, and Violent Crime Control and Law Enforcement Act of 1994" to conduct a thorough investigation into Lacy's death. They asserted that there were suspicious circumstances surrounding Lacy's death, such as the fact that the shoes found with the body were too small; the shoes did not have laces and Lacy always had laces in his shoes; they thought that one of the belts used to hang him belonged to a neighbor; and they did not believe that he could have physically positioned himself on the swing set. They opined that there were several potential suspects in the murder: (b)(7)(C) Lacy's (b)(7)( (b)(7)(C) of Lacy's (b)(7)(C) in the trailer park where Lacy died; (b)(7)(C) (b)(7)( Lacy and two of his friends the year before.

In mid- December 2014, the U.S. Attorney's Office received a copy of the FBI's report. AUSAs Jane Jackson and Seth Wood, the Criminal Section attorney, and the FBI agent all reviewed the entire report, interviewed the Chief Medical Examiner in Raleigh, and made several trips to Bladenboro to visit the scene of Lacy's death and to interview witnesses, as well as to Illinois to interview Lacy' (b)(7)(C)

III.    Investigative Findings

a.    Autopsy

Chief Medical Examiner Deborah Radisch conducted the autopsy on Lennon Lacy. She documented her findings in an autopsy report and was also interviewed by both state and federal investigators. She described that there were "numerous" red ants on Lacy's body and clothing when she received it, and the body, including the face, had multiple abrasions consistent with ant bites. There was also a patterned abrasion around his neck. No other external injuries or defensive wounds were noted. Signs of injury to the eyes, tongue, and neck were all

- 4 -

consistent with hanging, and there was no evidence to suggest that Lacy was strangled by someone else. Toxicology tests showed no signs of drugs or alcohol in Lacy's system. Radisch thus concluded that the cause of death was asphyxia due to hanging and the manner of death was suicide.

Dr. Radisch was aware of the scrutiny being given this case and had heard claims that it would be difficult for Lacy to hang himself from the swing set. She visited the site in December and concluded that it would be "easy" for someone to climb up and hang himself. She found no evidence during her autopsy examination or the site visit that would support a manner of death other than suicide.

b. Interviews

According to family and friends, Lennon Lacy was well-liked by his peers, was in Junior ROTC and a member of the football team, and stayed out of trouble. His closest friend was (b)(7)(C). But Lacy also reportedly suffered from low self-esteem, calling himself "ugly" and "fat" and saying that people did not like him and he would never find a girl to like him.

(b)(7)(C) and Lacy's (b)(7)( friend. The night before Lacy's death, and the same day as his uncle's funeral, Lacy went to (b)(7)(C). Lacy told (b)(7)( that Lacy's (b)(7)(C) Lacy lamented that no one else would date him. He also told (b)(7)(C that he had tried to kill himself earlier that week by hanging himself, but the rope broke. He asked (b)(7)(C for a gun or a rope, "anything to get me out of this mess." (b)(7)(C encouraged Lacy to "get his mind right," and when Lacy left, (b)(7)(C asked him to promise he would not hurt himself. (b)(7)(C)

(b)(7)(C) also reported that two years earlier, Lacy told ⸺ about another occasion when he had contemplated suicide. A girl had broken up with him because he was ugly and he had put a gun to his head. At that time, Lacy told (b)(7)(C that his (b)(7)( knew he had done that. (b)(7)(C) (b)(7)(C) (b)(7)(C)

(b)(7)(C) Lacy's (b)(7)(C and ⸺ was staying at Lacy's home. (b)(7)(C) said that (b)(7)(C) with Lacy earlier in the week. (b)(7)(C) told ⸺ that ⸺ caught Lacy going through (b)(7)(C) home. Lacy later confirmed to (b)(7)(C) that (b)(7)(C) with him. (b)(7)(C)

The night before his death, after Lacy came home from the (b)(7)(C) house he spoke with (b)(7)(C a couple of times. They first talked at about 10:00 p.m. Lacy said that (b)(7)(C) (b)(7)( had told him that (b)(7)(C) on him. Lacy was hurt and upset by the conversation and (b)(7)(C tried to cheer him up. ⸺ eventually went to ⸺ bedroom but Lacy knocked on ⸺ door around 11:00 p.m. to ask who was at (b)(7)(C) house across the street. There was a vehicle he did not recognize. (b)(7)(C and Lacy watched out the window as (b)(7)(C) and a male walked into (b)(7)(C) home. (b)(7)(C talked to Lacy until around midnight, when (b)(7)(C went back to ⸺ bedroom while Lacy got his football gear ready for the next day. At approximately 1:00 a.m., (b)(7)(C heard Lacy's (b)(7)(C) tell him that he should go to bed.

- 5 -

Lacy's (b)(7)(C) was interviewed three times by the SBI and once by the FBI and AUSAs. (b)(7)(C) (b)(7)(C) (b)(7)(C) that and Lacy (b)(7)(C) with Lacy, but explained that they had a "secret pact" to tell everyone (b)(7)(C) in part because Lacy's (b)(7)(C) disapproved (b)(7)(C) also acknowledged that had asked him to leave home several nights before his death, after found out he had gone through cell phone. They had not talked since then. did not attend his funeral because did not feel welcome. also said did not talk to Lacy's family after his death because felt they blamed for the inappropriate relationship with Lacy.

(b)(7)(C) that Lacy was very down on himself as a person, calling himself ugly and saying he was not worth anything. But does not believe he committed suicide because he "would not do something so cruel to his mother." told the SBI and FBI that did not know of anyone who would want to hurt Lacy. But also told the SBI that (b)(7)(C) (b)(7)(C) was violent and might do something to Lacy, and told the FBI that maybe someone killed Lacy to "get back" at (b)(7)(C) did not have any evidence to support either of these possibilities.

In the approximately 80 interviews done by the SBI and FBI, there was no evidence to support that Lacy's death was anything other than a suicide. Furthermore, information provided by Lacy's family about supposed "suspects" could not be substantiated. For example, they suggested that (b)(7)(C) might have killed Lacy but there is no evidence that traveled from (b)(7)( to North Carolina during the week of Lacy's death. They also suggested that (b)(7)(C) killed Lacy but, again, the investigation revealed no evidence to tie to Lacy's death. During an interview of the (b)(7)(C) the FBI agent all the text messages in phone, including those from the morning Lacy's body was discovered and heard about it. Many of the texts dealt with but there was nothing to suggest was involved with Lacy's death. The family also said that a witness overheard (b)(7)( (b)(7)(C) of Lacy's (b)(7)(C) , say, "We didn't mean to kill him." That witness was located and denied ever having said, or heard, such a thing. No other witnesses were aware of that statement.

c. Facebook postings
Lacy had a Facebook account and posted pictures of himself. There are two pictures that show him wearing belts that are very similar to the belts used in the hanging. There was nothing in his Facebook postings to suggest that he had any ongoing disputes or that anyone was threatening him.

d. Surveillance camera footage
Surveillance camera footage from the area where Lacy lives showed a lone individual walking away from the area of his home toward the mobile home park where Lacy died. The footage is too grainy to definitively determine whether the individual is Lacy but the time stamp is 1:02 a.m., just after the last time (b)(7)(C) heard Lacy at home.

IV.    Issues without Investigative Resolution

a. Shoes

Lennon Lacy was found wearing a pair of white Nike sneakers, size 10 ½, without laces. His family said that those shoes are too small and that he has never worn shoes without laces. Investigators looked at eight pairs of Lacy's shoes to compare the sizes. His football cleats were sizes 12 and 13. His black dress ROTC shoes were size 10 ½. His ROTC instructor said that he measured Lacy's feet himself before ordering the shoes. Finally, four pairs of Nike shoes from Lacy's home ranged in size from 11 to 12 ½. One of these pairs of sneakers were white and looked very much like the shoes found on Lacy's body.

There is no explanation for why the laces were not in Lacy's sneakers when he died and any hypothesis would be mere speculation. However, the lack of laces is not evidence of foul play and does not change our conclusion as to the cause and manner of death.

b. Belts

(b)(7)(C)

The family has asserted that the belts used to hang Lacy did not belong to him. As noted above, Facebook pictures show Lacy wearing belts that appear to be the same as those found with his body. When the SBI agent showed those pictures to Lacy's (b)(7)(C) said that had not seen those belts and did not have them.

V.    Conclusion

The death of 17-year old Lennon Lacy is tragic, but it does not constitute a prosecutable violation of federal criminal civil rights statutes. Federal and State investigators collected and reviewed physical evidence, conducted witness interviews, performed an autopsy, and followed up on leads relevant to their investigation. Federal prosecutors with the Criminal Section of the Civil Rights Division and the United States Attorney's Office for the Eastern District of North Carolina concluded that there is no credible evidence to support any allegation that Lacy's death was a homicide. The results of the investigation are consistent with the findings of the forensic pathologist that the manner of death was suicide.

For the reasons set forth above, this matter should be closed. The United States Attorney's Office for Eastern District of North Carolina concurs in this recommendation.

**U.S. Department of Justice**

Civil Rights Division

PMF:KP:KS:tc
DJ 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

*Criminal Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

**JUN 1 5 2016**

(b)(7)(C)

Durham, NC  27709

Dear (b)(7)(C)

The Civil Rights Division of the Department of Justice, the United States Attorney's Office for the Eastern District of North Carolina, and the Federal Bureau of Investigation (FBI) have been investigating the circumstances related to the death of (b)(7)(C Lennon Lacy on August 29, 2014.   Please accept our condolences on your loss.

In conducting our investigation, we were tasked with determining whether the events that led to the death of (b)(7)(C) gave rise to a prosecutable federal criminal civil rights case under the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249. After a thorough and independent investigation into the facts surrounding (b)(7)(C) death, we have determined that there is insufficient evidence to prove, beyond a reasonable doubt, a willful violation of Section 249.

To establish a violation of 18 U.S.C. § 249, the government must prove, beyond a reasonable doubt, that an individual willfully caused bodily injury (or attempted to do so using fire, a firearm, or another dangerous weapon) when (1) the crime was committed because of the actual or perceived race, color, religion, national origin of any person, or (2) the crime was committed because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person and the crime affected interstate or foreign commerce or occurred within federal special maritime and territorial jurisdiction.

During our investigation, a team of experienced civil rights prosecutors and agents reviewed all of the materials and evidence generated and provided by the North Carolina State Bureau of Investigation, including law enforcement reports, statements made by family members and friends, witness statements, social media postings, surveillance camera footage, and forensic evidence reports.  Federal officials also took additional investigative steps, including interviewing numerous individuals such as Lennon's (b)(7)(C) and the Chief Medical Examiner.

-2-

The evidence obtained and reviewed by the Department of Justice is insufficient to meet the high burden of proof required for a federal criminal civil rights prosecution. Local and federal investigators found no evidence to suggest that your son died as the result of foul play or was the victim of a hate crime.

We understand that you may be greatly disappointed by the news that we cannot prosecute any individual in connection with (b)(7)(C) death, but please be assured that the United States Attorney's Office, the Civil Rights Division of the Department of Justice, and the Federal Bureau of Investigation conducted a complete and thorough review and investigation of the events surrounding his death. Our decision not to pursue federal charges is based on the facts developed by that extensive investigation.

Again, please accept our most sincere condolences on your tragic loss. We regret that we cannot be of further assistance to you.

Sincerely,

Paige Fitzgerald
Acting Principal Deputy Chief
Criminal Section

John Stuart Bruce
Acting United States Attorney
Eastern District of North Carolina

# Exhibit I

CIVIL RIGHTS DIVISION

Notice to Close File

File No.  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                    Date: _____

To:    Chief, Criminal Section

Re:    | (b)(7)(C) |  Subject
       Billey Joe Johnson, Jr., (Deceased) - Victim
       CIVIL RIGHTS_____

It is recommended that the above-captioned case be closed for the following reasons:

1.    Date of the Incident:  December 8, 2008.

2.    Synopsis of the Facts and Reasons for Closing:

       On Monday, December 8, 2008, around 5:50 a.m., George County Sheriff's Office
("GCSO") (b)(7)(C) pulled over 17-year-old football star Billey Joe Johnson, Jr.,
for a traffic violation in Lucedale, Mississippi.  Less than two minutes after the subject radioed in

                                             _____
                                             AeJean Cha, Trial Attorney
_____

To:  Records Section
     Office of Legal Administration

       The above numbered file has been closed as of this date.


_____                    _____
    Date                                 Chief, Criminal Section

                                         FORMERLY CVR-3    FORM CL-3

cc:  USAO, Jackson, MS
     FBI - Jackson Field Office
     Unit Chief (FBI)
     Chrono
     Cha
     Fitzgerald
     T. 06/28/11
     (b)(7)(C)

-2-

Johnson's tags, (b)(7)(C) called dispatch to report that the victim had shot himself. Johnson was found lying on his back, perpendicular to his pick-up truck's cab with his feet closest to the truck. He had a gunshot wound on the left side of his head and a rifle lying across his body, butt-end by his feet. The driver's side door was open, with the glass window shattered.

The Mississippi Bureau of Investigation (MBI) investigated the shooting. The case was presented to a local grand jury in February 2009, and the grand jury issued a report concluding that Johnson accidentally shot himself. Johnson's parents, as well as Congressman Bennie G. Thompson, asked that the Department investigate his death further. The Federal Bureau of Investigation (FBI) opened the matter at the Department's request.

This matter should be closed because there is insufficient evidence to establish, beyond a reasonable doubt, that (b)(7)(C) shot Johnson or otherwise willfully violated his civil rights. Four eyewitnesses corroborate the subject's account that [ ] was in [ ] patrol car when the gun was (b)(7)(C) fired. Furthermore, all of the medical experts agree that the wound was self-inflicted. The Mississippi State Medical Examiner's Office determined that the victim had shot himself, either accidentally or intentionally, and that, because it was unclear whether the shooting was intentional, the manner of death was "unknown." However, the Armed Forces Institute of Pathology ("AFIP") reviewed the forensic evidence and concluded that Johnson's death was a suicide.

3.    Investigative History and Predication:

On Monday, December 8, 2008, at approximately 5:53 a.m., (b)(7)(C) called the GCSO dispatch to report that Johnson shot himself. Local law enforcement and other emergency personnel arrived shortly thereafter. The GCSO contacted the MBI requesting assistance with the death investigation. MBI investigators arrived at the scene approximately two hours after the shooting and took over the investigation.

According to press clippings, at least two other organizations — the Cochran Firm and the George County National Association for the Advancement of Colored People ("NAACP") — investigated Johnson's death at the behest of his family.[1] Both organizations began their investigations before the case was presented to the grand jury. One newspaper article reported that the Cochran Firm obtained an independent autopsy.[2] According to the article, that autopsy reportedly determined that Johnson was outside his truck with his door open when the fatal shot was fired; no further conclusions, including the manner of death, were possible because "specific portions of the wound were not present during the examination." Another newspaper article

---

[1]  We do not have any reports regarding their investigations. All information regarding their investigations was gleaned from press clippings. Both organizations presented witnesses to the local grand jury where they presumably summarized their investigative findings to the grand jury.

[2]  *Investigation Continues in Death of Mississippi Athlete Billey Joe Johnson, Jr.*, PR NEWSWIRE, Dec. 23, 2008.

reported that the George County NAACP interviewed 15 witnesses and concluded that Johnson could not have committed suicide because he was not depressed.[3] Both articles were published before the grand jury issued its findings.

This matter was presented to a state grand jury on February 6, 2009, which reached the following relevant conclusions: (1) (b)(7)(C) did not shoot Johnson; (2) Johnson did not commit suicide; and (3) Johnson accidentally shot himself when trying to move his shotgun.[4] The grand jury's findings are further discussed below.

Johnson (b)(7)(C) asked the Department of Justice to investigate the shooting, as they did not believe that (b)(7)(C) whom several colleges were heavily recruiting, could have shot himself. They believe that the subject, the only other individual present at the time of the shooting, must therefore have killed (b)(7)(C) In addition, they raise the following as reasons why they do not trust the local investigation: (1) they did not see (b)(7)(C) body for two to three days following the incident; (2) they were not permitted to identify his body (b)(7)(C) were called to identify him); (3) his truck was not impounded; and (4) the 911 tape is "missing."[5]

Congressman Thompson also requested a federal investigation because he too questioned why a "life loving college bound star athlete" would shoot himself.

4.    Investigative Findings:

    A.    Events Leading up to the Traffic Stop

The victim was driving from the home of (b)(7)(C) when the subject pulled him over. MBI investigators interviewed (b)(7)(C), together with (b)(7)(C) (b)(7)(C) on December 8, 2008, and January 9, 2009. (b)(7)(C) also provided a written statement on December 8 regarding that morning's events. All three of (b)(7)(C) statements are consistent and summarized as follows. At approximately 5:26 a.m., heard (b) (b)(7)(C) screen door open and heard someone punch the door twice.[6] was home alone as (b)(7)(C)

---

[3] (b)(7)(C) *Meeting Soothes: Johnson family 'well satisfied' with investigation,* SUN HERALD, Dec. 16, 2008.

[4] After the grand jury's finding were announced, the press reported that Willie Gaines, the George County NAACP president, said they had "enough evidence to contradict" the grand jury report. Sheila Byrd, *NAACP mulls claim in athlete's death,* HATTIESBURG AMERICAN, Feb. 15, 2009. Another article reported that the George County NAACP intended to submit that evidence to the Department of Justice. (b)(7)(C) *doesn't buy ruling on Miss. athlete shooting,* ASSOCIATED PRESS, Feb. 13, 2009. To date, we have not received any such evidence.

[5] It is unclear why they believe that the 911 tape is missing. The grand jury report, which the family enclosed with their request that the Department investigate their son's death, listed the 911 tape as evidence presented.

[6] The times offered by witnesses and time cards do not always correspond with the times reflected by the 911 calls. It is, however, not critical because 911/dispatch recordings provide a

-4-

(b)(7)(C) had already left for work. Frightened, [ ] called (b)(7)(C) at approximately 5:30 a.m. to tell
(b)(7)(C) [ ] that someone was trying to break into home. (b)(7)( told MBI investigators that [ ] then (b)(7)(C)
called 911 and drove to (b)(7)(C) home. (b)(7)(C) continued to lie in (b) bed when (b)(7)
heard someone "kind of tap[]" (b) bedroom window. Shortly thereafter, (b)(7)(C) heard
sirens and then "someone move[d] across the rocks in the trailer park" as if to run away. [ ] (b)(7)(C)
(b)(7)(C) went to [ ] window to catch a glimpse of the suspect, and recognized Johnson as he ran to his
truck.

Lucedale Police Department (b)(7)(C) responded
to (b)(7)( 911 call. MBI investigators interviewed (b)(7)(C) on December 8, 2008,
and (b)(7)( also wrote an incident report, dated December 8. Both of [ ] oral statements and (b)(7)(C)
the incident report are consistent and summarized as follows. When [ ] arrived at (b)(7)(C)
(b)(7)(C) home, the suspect had already left. (b)(7)( spoke with the complainant,
(b)(7)(C) the intruder as Johnson, (b)(7)(C) (b)(7)(C) that he
left in a maroon Chevy truck Z-71. When asked, (b)(7)(C) wanted to press charges
against Johnson. (b)(7)( told MBI investigators that [ ] did not broadcast Johnson's identity or (b)(7)(C)
(b)(7)(C) vehicle description over the radio because in [ ] experience with domestic situations, victims
sometimes change their mind about pressing charges. The (b)(7)(C) unit and
(b)(7)(C) 911/dispatch recordings confirm that [ ] did not broadcast Johnson's identity or a description of
his vehicle.

B.    Subject's Statement

(b)(7)(C)

metric of how much time elapsed between significant events, which is more important than
determining what precise time they occurred. The timeline established by the 911/dispatch
recordings is discussed in Section 4.D.

-5-

[(b)(7)(C)]

## C. Witness Statements Concerning the Incident

### 1) Civilian Statements

Four eyewitnesses, in three cars, drove by the shooting scene either as it occurred or immediately afterwards. None of these witnesses saw the actual shooting. Their statements are generally consistent with each other and the subject's statement.

On December 27, 2008, MBI investigators interviewed [(b)(7)(C)] who witnessed the incident as [ ] was driving home from taking [(b)(7)(C)] to the emergency room. [ ] left the hospital sometime between 5:20 a.m. and 5:25 a.m. As [ ] drove home, [ ] noticed two patrol cars with flashing lights headed toward Main Street. At around 5:37 a.m., a truck passed him going "pretty rapidly." [ ] estimated it was travelling at least 50 to 60 mph, passing [ ] as he drove 35 mph. A flashing patrol car occupied by one officer followed the truck. Roughly a mile later, [(b)(7)(C)] saw the traffic stop. [ ] observed the victim exit his vehicle with what appeared to be a wallet in his hand. As [ ] passed the scene, [ ] watched the subject exit [(b)(7)] [(b)(7)(C)] patrol car. In [(b)] rear-view mirror, [ ] saw them speaking face-to-face. [ ] did not observe any sign of altercation or discord between the two individuals.

When [(b)(7)(] arrived home —approximately 90 seconds later — [(b)(7)(] told [(b)(7)(] was hungry. Without stopping [ ] car, [ ] drove [ ] car through [ ] circular driveway and headed to McDonald's, which took him past the traffic stop again. [ ] estimated that approximately 2 minutes and 45 seconds had elapsed from the last time [ ] saw it. From a distance, [ ] observed the victim standing in the door of the truck, looking inside the truck's cab; [(b)(7)(] told MBI investigators that [ ] thought Johnson was searching his truck. As [(b)(7)(] got closer to the traffic stop, however, [ ] saw that the victim was no longer standing by the truck and there was a body on the ground parallel to the truck. The officer was in [ ] car and [(b)(7)(C] did not see any other person on the scene.

On December 11, 2008, MBI investigators interviewed [(b)(7)(C)] who saw the victim at the traffic stop just prior to the shooting. [(b)(7)(C)] was on [ ] way to work when [ ] saw the flashing blue lights and slowed down. [ ] saw a man (whom [ ] did not recognize, even though he knew Johnson) dressed in a camouflage jacket facing his truck. [(b)(7)(C)] thought that the victim was reaching into his truck for something when he changed his mind and stood up. Johnson then walked over to the end of his open truck door and [(b)(7)(C)] Johnson was looking at [ ] [(b)(7)(C)] said that there was no police officer in the vicinity of the truck although he assumed the officer was in his patrol car.



(b)(7)(C) drove past the scene shortly after the shooting occurred. They told MBI investigators that they were at Hardy's drive-through when, at approximately 5:30 a.m., they saw two police cars going "this way." Approximately 20 seconds later, they observed a "colored truck" followed by a sheriff's car going "that way." (b)(7)(C) estimated that they left Hardy's about a minute — but no more than two — after the sheriff's car had passed. He drove past the traffic stop and saw the patrol car with its lights still flashing. saw a man, lying on his back, with his feet under an open door that was still swinging. No one else was near the truck. At that point, the officer was in (b)(7)(C) closed-door patrol car parked roughly four feet behind the truck.

2)    Law Enforcement Statements

A number of law enforcement officers arrived almost immediately after the subject radioed that there had been a shooting. MBI investigators interviewed the first two law enforcement officers to respond. Both of those officers confirmed that the subject told them what had happened and that consistently reported that Johnson shot himself.

(b)(7)(C) , Mississippi Department of Wildlife and Fishery, was the first law enforcement officer to respond to the scene. MBI investigators interviewed (b)(7)(C) on December 8, 2008. (b)(7)(C) was on Highway 26 when heard (b)(7)(C) radio that was (b)(7)(C) stopping a car that ran a stop sign within city limits. then heard the subject call out that (b)(7)(C) needed assistance because the victim had shot himself (b)(7)(C) arrived at the scene approximately fifteen seconds later.

Upon arriving on the scene (b)(7)(C) saw (b)(7)(C) standing by patrol car. The truck's (b)(7)(C) driver's side door was open, the glass was shattered, and the victim was lying on the ground by the truck. (b)(7)(C) that Johnson shot himself, and that had not seen the gun (b)(7)(C) when initially stopped the victim. (b)(7)(C) walked to Johnson, saw a shotgun by him, and noted that the victim appeared to be dead. returned to stand by (b)(7)(C) until city officers arrived on the scene, approximately two to three minutes later. (b)(7)(C) did not do anything "out of the way" while was present.

(b)(7)(C) , the subject's partner and the second officer to arrive on the scene, wrote an incident report dated December 8, 2008. MBI investigators also interviewed (b)(7)(C) on December 27, 2008, at which point repeated the substance of his written report. (b)(7)( stated that on December 8, (b)(7)( called at home to meet for coffee as routinely did. (b)(7)(C) About three or four minutes later, as (b)(7) was starting up (b)(7)( car, heard (b)(7)( announce (b)(7)(C) that was stopping a car for a traffic violation and recite the license plate. then heard (b)(7)(C) dispatch advise the tags belonged to Johnson. "[I]n what seemed like less than a minute" later, partner radioed that the victim had shot himself. (b)(7)( driving as quickly as could, (b)(7)(C) arrived about three or four minutes later. (b)(7)( asked (b)(7)( what happened and the (b)(7)(C (b)(7)(C) Johnson over for running a red light and a stop sign. returned to (b)(7)(C) patrol car to run the license when heard a gunshot, looked up, and saw that the victim had shot himself.

-7-

### D.    Dispatch/911 Recordings

Dispatch/911 recordings indicate that [(b)(7)(C)] called the George County 911 operator at 5:44:47 a.m. to report an attempted break-in of [(b)(7)(C)] home. The subject informed dispatch at 5:47:09 a.m. that he was on duty. Approximately two minutes later, [(b)(7)(C)] radioed their arrival at [(b)(7)(C)] residence. Two minutes after that, [(b)(7)(C)] reported from [(b)(7)(C)] residence that the complainant knew the suspect; however, [(b)(7)(C)] did not provide Johnson's identity or a description of his [(b)(7)(C)] vehicle. At 5:51.51 a.m., [(b)(7)(C)] radioed that [ ] was pulling over a vehicle on Highway 26, and he identified the license plate. Less than a minute later, dispatch advised that Billey Joe Johnson was the registered owner of the vehicle. Seven seconds after dispatch told [(b)(7)(C)] this, [(b)(7)(C)] said something unintelligible, the dispatcher said "go ahead [(b)(7)(C)]," [(b)(7)(C)] and [ ] responded "[unintelligible] self." About 30 seconds after dispatch told [(b)(7)(C)] that Johnson owned the car, [(b)(7)(C)] needed an investigator because "subject shot himself." Thirty seconds later, at 5:53:46 a.m., [(b)(7)(C)] further informed dispatch: "gonna need some paramedics on route there."

### E.    Physical Evidence

The driver's side window of Johnson's truck was shattered. The interior surface of the driver's door was spattered with blood and possibly tissue. An earring post, without the jewel, was embedded in the panel of the driver's side door to the base of the jewel mount. The jewel was found lying on the access drive behind the truck.[7]

Tissue, possibly brain matter, and bone fragments were found on the ground adjacent to the victim and further away in the driveway. Two spatters of blood were found on a sign several feet away.

Johnson's car was shifted in park, with the engine running, and with the driver's side door open.

The toxicology analyses indicated that Johnson had not ingested alcohol, drugs, or steroids.

Particles consistent with gunshot residue were found on both sides of Johnson's left hand but they "d[id] not possess the combination of morphological characteristics and elemental composition necessary to identify them as gunshot residue to the exclusion of all other environmental sources." No gunshot residue was found on the victim's right hand.

---

[7] The significance of this entry and the following is explained in the autopsy section and grand jury report, Sections 4.F. and 4.H., respectively. Briefly, they support the proposition that the gunshot's trajectory was away from the truck, rather than toward it.

Gunshot residue was found on both sides of (b)(7)(C) [8] One particle of gunshot residue, and one particle indicative of (though not conclusively determined to be) gunshot residue, were found on the right sleeve of (b)(7)(C) jacket. No gunshot residue was found on (b)(7)(C) left sleeve. The subject's uniform     jacket, shirt and pants     tested negative for the presence of blood.

A Sears and Roebuck Model 200 12-gauge shotgun, which was found on top of the victim, tested positive for the possible presence of blood, but no further testing was completed because the test reportedly would have consumed the sample. ATF agents traced the shotgun — through two sales at two different pawnshops — to (b)(7)(C) Johnson (b)(7)(C) No latent prints of value were found on the firearm. One fired 12-gauge hull was removed from the chamber. The Mississippi Crime Laboratory (MCL) attempted to perform a firearm functionality examination on the rifle, but was unable to complete testing because the slide lock release became non-functional during the test.

A Glock, Model 22, which was taken from Sullivan at the scene, tested negative for the presence of blood. No fingerprints of value were found on the firearm.

A Mossberg Model 590 12-gauge shotgun, which was removed from the ceiling of Sullivan's patrol car, tested negative for the presence of blood. No fingerprints of value were found on it.

F.    Autopsy Reports

1)    Mississippi State Medical Examiner's Office

The state coroner, Dr. Adele Lewis, determined that the cause of the victim's death was a close-range shotgun wound to the left side of the head. She noted that the "left ear is absent" and there was "no soot deposition or stippling visible in the wound or wound edges." She reported that Johnson's tongue "ha[d] a large ragged ballistic defect" and there was "heavy soot deposition on the surface of the tongue." She concluded that the wound on the left side of Johnson's head was the entrance wound: "[a]fter perforating the scalp of the left side of the head and amputating the left ear, the projectile(s) entered the cranial cavity." She hypothesized that the "overall path of the projectile [was] upward, from front to back, and from left to right."

Dr. Lewis ruled that the manner of death was "unknown." As mentioned above, the shotgun used in the shooting could not be fully evaluated in terms of functionality, and "[a]s such, it [was] not possible to determine whether the decedent discharged the weapon accidentally or intentionally."

_____

[8] There was no further analysis of this in the Mississippi Crime Laboratory's (MCL) report nor did the AFIP report mention it. The grand jury report is the only document in which it was further discussed. The findings of the grand jury are discussed in a later section of this memo.

-11-

2)    Armed Forces Institute of Pathology (AFIP) Report

At the Department's request, the AFIP reviewed the forensic evidence.[9]  The AFIP agreed with the state coroner that the victim's cause of death was a shotgun wound to the head, but disagreed "significant[ly]" regarding the shotgun entrance site, exit site, and path of travel. The AFIP determined that the cause of death was an "intra-oral shotgun wound to head" and manner of death should have been ruled as "suicide."

From the autopsy report's description of the wound characteristics and photographs, the AFIP determined that the gun was inside the victim's mouth when the shotgun was fired: "Heavy soot deposition and injuries to the tongue indicate that the muzzle of weapon was located in the mouth when the shotgun was actually fired."  The AFIP concluded that bone, soft tissue and buck-shot traveled from right to left and exited on the left side of his head; some of that material passed through the left side of the shattered truck window.  Contrary to the state coroner's findings, the AFIP concluded that the left side of his head was the exit — not entry — site, and "the course of the wound track was right to left, slightly upward and slightly front to back."  The AFIP stated that because the shotgun was in his mouth when it was discharged, there "should be no issues of a possible accident or a possible homicide in this case."

G.    Evidence Regarding Johnson's State of Mind

1)    The Week Prior to the Incident:

(b)(7)(C) the victim for (b)(7)(C) described Johnson as having "good days" and "bad days."  (b) characterized the week before his death as "bad days." (b)(7)(C) charges against Johnson for

_____

[9]  Specifically, AFIP reviewed the following materials:  MBI's investigation report; authorization for autopsy by the Corner, George County, MS; autopsy report by the Mississippi State Medical Examiner's office; toxicology report; MCL reports; Xerox copies of photograph images of the scene and postmortem examination; a compact disc with photographs of the scene and postmortem examination; and audio interviews of witnesses by the MBI.

-12-

threatening (b)(7)(C) [10] said that (b)(7)(C) had altercations the week before the incident.[11] On Friday, December 5, they fought when he informed ___ he was (b)(7)(C) (b)(7)(C) ___ (b)(7)(C) [12] During that fight, ___ told him that ___ hoped he "wrecked and died." (b)(7)(C) did not have any contact with Johnson over the weekend despite his attempts to contact ___ multiple times. ___ told MBI investigators that he texted ___ several times over the weekend, asking ___ to text him back or it "was going to be bad." ___ said that he also texted three of (b)(7)(C) to ask them to persuade ___ to speak with him.[13] On Saturday, December 6, he called ___ three times but ___ did not answer his calls. That evening ___ saw him driving back and forth past ___ house. He held a phone by his ear indicating that ___ should call him or pick up his phone calls, but ___ ignored him. He did not call ___ on Sunday, the day before the incident, but sent ___ a few texts asking ___ to call him. According to (b)(7)(C) he also texted one of (b)(7)(C) Sunday evening that things were going to be different on Monday and that everyone in the county would know who they [i.e. (b)(7)(C) and Johnson] were. Johnson's subpoenaed phone records confirm that he sent (b)(7)(C) three text messages on Sunday evening between 8:50 p.m. and 8:55 p.m.[14]

On Sunday, December 7, 2008, (b)(7)( logged onto ___ MySpace account. ___ received a new message the victim had sent two days prior that asked to be ___ MySpace friend and warned that Monday was not going to be "good."[15] ___ interpreted that to mean that he was

---

[10] Johnson allegedly pulled (b)(7)(C) by ___ hair in the school's parking lot. On September 17, 2008, (b)(7) submitted an affidavit, notarized by the George County Justice Court Clerk, in which ___ swore that the victim "did put (b)(7)(C) in fear of serious bodily by making threats to ___ harassing ___ and causing ___ undue stress and alarm." ___ explained that ___ later dropped the charges because a school security officer informed ___ that ___ would not prevail.

[11] Specifically, (b)(7)(C) alleged that on Wednesday, December 3, and the following day, Johnson hit ___ and threatened to "get" (i.e., physically abuse) ___.

[12] MBI investigators interviewed (b)(7)( Despite receiving about 60 texts from Johnson the day before the incident, ___ revealed no knowledge relevant to the shooting.

[13] (b)(7)(C) described those text messages as follows: "tell (b)(7)( that I know ___ has ___ phone and ___ needs to stop ignoring me;" "tell (b)(7)(C) has one more time to ignore me but when ___ comes home it's going to be bad and everyone is going to know ___ and everyone is going to know me;" and "please tell (b)(7)( I'm sorry and please just talk to me."

[14] ___ provided three of (b)(7)(C) phone numbers but the subpoenaed phone records only cover Sunday, December 7 through Tuesday, December 9. The victim did not text any of those friends on December 7.

[15] The entire message read: "so (b)(7)( y th hell aint you added me yet huh I kno I sent you a friend request….im tryint to be nice an I wonder what guy you so wit today but I do kno one thing Monday isn't going to be so good an I better not get on tomorrow an you been on an I aint one of your friends."

-13-

going to "get" (i.e. hit [(b)(7)(C)] in the parking lot or somehow publicly embarrass [(b)(7)(C)] While on MySpace, [(b)(7)(C)] checked the MySpace pages of Johnson and his new [(b)(7)(C)] Johnson had a new headline since the last time she visited his page on December 5. The new headline said "seein my people put to rest got a nigga mine stress wit that iron an a vest knowin my time could be next." Neither [(b)(7)(C)] nor [(b)(7)(C)] knew what this headline meant.

### 2) Prior Suicidal Threats

[(b)(7)(C)] told MBI investigators that [  ] did not believe that Johnson killed himself, [(b)(7)(C)] but [  ] also admitted that Johnson had alluded to suicide during their relationship. He had [(b)(7)(C)] repeatedly warned [  ] that if the relationship was going to end, he was going to "go" and [  ] [(b)(7)(C)] was going to "go" with him. He also threatened suicide at least once during their relationship. [(b)(7)(C)] In January 2008, he called [  ] to tell [  ] he was going hunting. During that call, he said he was [(b)(7)(C)] "fed up with it," and [  ] heard the sound of a trigger being pulled.

### 3) AFIP Psychological Analysis

Rosemary Malone, Chief Deputy Medical Examiner, Psychological Investigations Division of the Office of the Armed Forces Medical Examiner, reviewed the investigative file.[16] She concurred with the AFIP autopsy's finding that "to a reasonable degree of medical certainty … Mr. Billey Joe Johnson's manner of death was the result of suicide." Dr. Malone noted that gender, age and race were risk factors since suicide rates among male African-Americans rise during adolescence. She further remarked that he had significant relationship problems with [(b)(7)(C)] and that he expressed thoughts of suicide to [  ] when he was angry. Moreover, [(b)(7)(C)] Dr. Malone opined that on the day of the incident, he "experienced significant stressful events" as he was alleged to be breaking into [(b)(7)(C)] residence. [  ] hypothesized that Johnson [(b)(7)(C)] likely believed that he was being pulled over for the alleged break-in and traffic violation [(b)(7)(C)] resulting in "significant acute stress." [  ] opined that possible motives for suicide included: "desire to escape from mental pain due to significant relationship issues; anger and rage toward [(b)(7)(C)]; guilt and shame following the morning's incidents in the setting of being a local football star; and/or a wish to make an important statement to [(b)(7)(C)]"

### H.    Local Grand Jury Findings

---

[16]  She reviewed the following materials: MBI's investigation report; authorization for autopsy by the Corner, George County, MS; autopsy report by the Mississippi State Medical Examiner's office; toxicology report; reports by Mississippi Crime Laboratory; Xerox copies of photograph images of the scene and postmortem examination; a compact disc with photographs of the scene and postmortem examination; audio interviews of witnesses by the MBI; incident report; [(b)(7)(C)] written statement; general affidavit dated 9/15/08 by [(b)(7)(C)]; MySpace excerpts; the subject's professional records; and media reports.

-14-

(b)(3):FED. R. CRIM. P. 6e

(b)(3):FED. R. CRIM. P. 6e

-15-

(b)(3):FED. R. CRIM. P. 6e

5.      Analysis of Prosecutive Merit:

(b)(5),(b)(7)(C)

-16-

(b)(5),(b)(7)(C)

# Exhibit J

**Cases opened under the Till Act and its Reauthorization**

| | NAME OF VICTIM | INCIDENT LOCATION | INCIDENT DATE | CLOSING DATE |
|---|---|---|---|---|
| 1. | Anthony Adams | Salt Lake City, Utah | November 3, 1978 | May 26, 2020 |
| 2. | Louis Allen | Amite County, Mississippi | January 31, 1964 | May 18, 2015 |
| 3. | Andrew Lee Anderson | Crittenden County, Arkansas | July 17, 1963 | April 9, 2010 |
| 4. | Frank Andrews | Lisman, Alabama | November 28, 1964 | November 13, 2013 |
| 5. | Jerry Lee Armstrong | De Soto County, Mississippi | December 23, 1977 | |
| 6. | Isadore Banks | Marion, Arkansas | June 8, 1954 | August 2, 2012 |
| 7. | John Bennett* | Augusta, Georgia | May 9-11, 1970 | |
| 8. | John Larry Bolden | Chattanooga, Tennessee | May 3, 1958 | April 15, 2010 |
| 9. | Preston Bouldin | San Antonio, Texas | May 8, 1953 | May 26, 2011 |
| 10. | Michael Bowman* | Barton, Arkansas | May 23, 1974 | |
| 11. | James Brazier | Dawson, Georgia | April 20, 1958 | April 6, 2009 |
| 12. | Thomas Brewer | Columbus, Georgia | February 18, 1956 | April 6, 2009 |
| 13. | Clyde Briggs* | Franklin County, Mississippi | January 18, 1965 | April 21, 2021 |
| 14. | Hilliard Brooks | Montgomery, Alabama | August 12, 1950 | April 9, 2010 |
| 15. | Benjamin Brown | Jackson, Mississippi | May 11, 1967 | March 19, 2013 |
| 16. | Leonard Brown* | Baton Rouge, Louisiana | November 16, 1972 | |
| 17. | Charles Brown | Benton, Mississippi | June 18, 1957 | April 16, 2010 |
| 18. | Gene Brown/a.k.a. Pheld Evans | Canton, Mississippi | 1964 | April 21, 2010 |
| 19. | Jessie Brown | Winona, Mississippi | On or about January 13, 1965 | April 19, 2010 |
| 20. | Carie Brumfield | Franklinton, Louisiana | September 12, 1967 | September 24, 2013 |
| 21. | Eli Brumfield | McComb, Mississippi | October 13, 1962 | April 16, 2010 |
| 22. | Johnnie Mae Chappell | Jacksonville, Florida | March 23, 1964 | March 20, 2015 |
| 23. | Jesse Cano | Brookville, Florida | January 1, 1965 | June 3, 2011 |
| 24. | Silas Caston | Hinds County, Mississippi | March 1, 1964 | May 2, 2010 |
| 25. | James Cates | Chapel Hill, North Carolina | November 21, 1970 | |
| 26. | James Chaney | Philadelphia, Mississippi | June 21, 1964 | June 20, 2016 |
| 27. | Thad Christian | Anniston, Alabama | August 28, 1965 | April 6, 2011 |
| 28. | Clarence Cloninger | Gaston, North Carolina | October 10, 1960 | April 3, 2009 |
| 29. | Jo Etha Collier* | Drew, Mississippi | May 25, 1971 | January 13, 2020 |
| 30. | Eddie Cook* | Detroit, Michigan | November 7, 1965 | May 15, 2020 |
| 31. | Willie Countryman | Dawson, Georgia | May 25, 1958 | April 6, 2009 |
| 32. | Jean Cowsert* | Mobile, Alabama | January 1967 | |
| 33. | Lee Culbreath* | Portland, Arkansas | December 5, 1965 | May 7, 2019 |
| 34. | Vincent Dahmon | N/A | N/A | April 12, 2010 |
| 35. | Jonathan Daniels | Lowndes County, Alabama | August 20, 1965 | April 26, 2011 |
| 36. | Woodrow Wilson Daniels | Yalobusha County, Mississippi | June 21, 1958 | April 12, 2010 |

| 37. | **Rayfield Davis*** | Mobile, Alabama | March 7, 1948 | |
| 38. | **Henry Hezekiah Dee** | Parker's Landing, Mississippi | May 2, 1964 | March 15, 2010 |
| 39. | **George Dorsey** | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| 40. | **Mae Dorsey** | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| 41. | **Roman Ducksworth** | Taylorsville, Mississippi | April 9, 1962 | April 12, 2010 |
| 42. | **Joseph Dumas** | Perry, Florida | May 5, 1962 | April 9, 2010 |
| 43. | **Joseph Edwards** | Vidalia, Louisiana | July 12, 1964 | February 20, 2013 |
| 44. | **Willie Edwards** | Montgomery, Alabama | January 22, 1957 | July 2, 2013 |
| 45. | **James Evansingston** | Tallahatchie County, Mississippi | December 24, 1955 | April 12, 2010 |
| 46. | **Peter Francis*** | Perry, Maine | November 15, 1965 | October 5, 2018 |
| 47. | **Phillip Gibbs*** | Jackson, Mississippi | May 15, 1970 | |
| 48. | **Andrew Goodman** | Philadelphia, Mississippi | June 21, 1964 | June 20, 2016 |
| 49. | **James Earl Green*** | Jackson, Mississippi | May 15, 1970 | |
| 50. | **Mattie Green** | Ringgold, Georgia | May 19, 1960 | May 4, 2012 |
| 51. | **Jasper Greenwood** | Vicksburg, Mississippi | June 29, 1964 | June 17, 2010 |
| 52. | **Jimmie Lee Griffith** | Sturgis, Mississippi | September 24, 1965 | August 14, 2012 |
| 53. | **Paul Guihard** | Oxford, Mississippi | September 30, 1962 | July 19, 2011 |
| 54. | **A.C. Hall** | Macon, Georgia | October 13, 1962 | July 27, 2011 |
| 55. | **Rogers Hamilton** | Lowndes County, Alabama | October 22, 1957 | February 10, 2016 |
| 56. | **Adlena Hamlett** | Sidon, Mississippi | January 11, 1966 | May 26, 2011 |
| 57. | **Samuel Hammond** | Orangeburg, South Carolina | February 8, 1968 | |
| 58. | **Collie Hampton** | Winchester, Kentucky | August 14, 1966 | June 1, 2011 |
| 59. | **Alphonso Harris** | Albany, Georgia | December 1, 1966 | April 12, 2010 |
| 60. | **Robert Lee Harris*** | Barton, Arkansas | May 23, 1974 | |
| 61. | **Isaiah Henry** | Greensburg, Louisiana | July 28, 1954 | May 21, 2012 |
| 62. | **Arthur James Hill** | Villa Rica, Georgia | August 20, 1965 | May 18, 2011 |
| 63. | **Ernest Hunter** | St. Marys, Georgia | September 13, 1958 | April 6, 2009 |
| 64. | **Eddie Jackson*** | Barton, Arkansas | May 23, 1974 | |
| 65. | **Jimmie Lee Jackson** | Marion, Alabama | February 18, 1965 | May 3, 2011 |
| 66. | **Luther Jackson** | Philadelphia, Mississippi | October 25, 1959 | April 16, 2010 |
| 67. | **Wharlest Jackson** | Natchez, Mississippi | February 27, 1967 | May 4, 2015 |
| 68. | **Carol Jenkins*** | Martinsville, Indiana | September 16, 1968 | |
| 69. | **Alberta O. Jones*** | Louisville, Kentucky | August 5, 1965 | |
| 70. | **Ernest Jells** | Clarksdale, Mississippi | September 20, 1963 | April 16, 2010 |
| 71. | **Joseph Jeter** | Atlanta, Georgia | September 13, 1958 | May 2, 2010 |
| 72. | **Nathan Johnson** | Alabaster, Alabama | May 8, 1966 | April 21, 2011 |
| 73. | **Marshall Johns** | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| 74. | **Birdia Keglar** | Sidon, Mississippi | January 11, 1966 | May 18, 2011 |
| 75. | **Bruce Klunder** | Cleveland, Ohio | April 7, 1964 | April 16, 2010 |
| 76. | **Margaret Knott*** | Butler, Alabama | September 11, 1971 | |
| 77. | **William Henry "John" Lee** | Rankin County, Mississippi | February 25, 1965 | May 5, 2011 |
| 78. | **George Lee** | Belzoni, Mississippi | May 7, 1955 | June 6, 2011 |
| 79. | **Herbert Lee** | Amite County, Mississippi | September 25, 1961 | April 16, 2010 |

| 80. | Richard Lillard | Nashville, Tennessee | July 20, 1958 | April 15, 2010 |
|---|---|---|---|---|
| 81. | George Love | Ruleville, Mississippi | January 8, 1958 | June 10, 2011 |
| 82. | Maybelle Mahone | Zebulon, Georgia | December 5, 1956 | April 6, 2009 |
| 83. | Dorothy Malcolm | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| 84. | Roger Malcolm | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| 85. | Henry Marrow* | Granville County, North Carolina | May 11, 1970 | |
| 86. | Sylvester Maxwell | Canton, Mississippi | January 17, 1963 | May 2, 2010 |
| 87. | Sammie L. McCullough* | Augusta, Georgia | May 9-11, 1970 | |
| 88. | Bessie McDowell | Andalusia, Alabama | June 14, 1956 | April 9, 2010 |
| 89. | Ernest McFarland | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| 90. | Robert McNair | Pelahatchie, Mississippi | November 6, 1965 | May 26, 2011 |
| 91. | Clinton Melton | Glendora, Mississippi | December 3, 1955 | April 12, 2010 |
| 92. | Delano Middleton | Orangeburg, South Carolina | February 8, 1968 | |
| 93. | James Andrew Miller | Jackson, Georgia | August 30, 1964 | April 12, 2010 |
| 94. | Hosie Miller | Newton, Georgia | March 15, 1965 | June 21, 2011 |
| 95. | Booker T. Mixon | Clarksdale, Mississippi | October 12, 1959 | August 13, 2012 |
| 96. | Neimiah Montgomery | Merigold, Mississippi | August 10, 1964 | April 12, 2010 |
| 97. | Charles Edward Moore | Parker's Landing, Mississippi | May 2, 1964 | March 15, 2010 |
| 98. | Harriette Moore | Mims, Florida | December 25, 1951 | July 15, 2011 |
| 99. | Harry Moore | Mims, Florida | December 25, 1951 | July 15, 2011 |
| 100. | Oneal Moore | Varnado, Louisiana | June 2, 1965 | March 31, 2016 |
| 101. | William Moore | Attalla, Alabama | April 23, 1963 | August 2, 2012 |
| 102. | Frank Morris | Ferriday, Louisiana | December 10, 1964 | December 30, 2013 |
| 103. | James Motley | Elmore County, Alabama | November 20, 1966 | April 12, 2010 |
| 104. | Charlie Mack Murphy* | Augusta, Georgia | May 9-11, 1970 | |
| 105. | Claude Neal | Greenwood, Florida | October 26, 1934 | October 1, 2013 |
| 106. | Charles Oatman* | Augusta, Georgia | May 9-11, 1970 | |
| 107. | Samuel O'Quinn | Centreville, Mississippi | August 14, 1959 | May 4, 2012 |
| 108. | Herbert Orsby | Canton, Mississippi | September 7, 1964 | April 12, 2010 |
| 109. | Will Owens | New Bern, North Carolina | March 5, 1956 | April 3, 2009 |
| 110. | Mack Charles Parker | Pearl River County, Mississippi | May 4, 1959 | |
| 111. | Larry Payne | Memphis, Tennessee | March 28, 1968 | July 5, 2011 |
| 112. | Clarence Horatious Pickett | Columbus, Georgia | December 21, 1957 | April 12, 2010 |
| 113. | William Piercefield | Concordia Parish, Louisiana | July 24, 1965 | September 16, 2013 |
| 114. | Albert Pitts | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| 115. | David Pitts | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| 116. | Jimmy Powell | New York City, New York | July 16, 1964 | February 9, 2012 |
| 117. | William Roy Prather | Corinth, Mississippi | October 31, 1959 | February 16, 2016 |
| 118. | Edwin Pratt* | Shoreline, Washington | January 26, 1969 | June 15, 2022 |
| 119. | Johnny Queen | Fayette, Mississippi | August 8, 1965 | July 26, 2013 |
| 120. | Donald Raspberry | Okolona, Mississippi | February 27, 1965 | May 17, 2010 |

| 121. | Donna Reason* | Chester, Pennsylvania | May 18, 1970 | |
|---|---|---|---|---|
| 122. | James Reeb | Selma, Alabama | March 9, 1965 | May 18, 2011 |
| 123. | John Earl Reese | Gregg County, Texas | October 22, 1955 | April 15, 2010 |
| 124. | Fred Robinson | Edisto Island, South Carolina | August 3, 1960 | February 2, 2012 |
| 125. | Johnnie Robinson | Birmingham, Alabama | September 15, 1963 | April 9, 2010 |
| 126. | Dan Carter Sanders | Johnston Co., North Carolina | November 18, 1946 | March 5, 2019 |
| 127. | Willie Joe Sanford | Hawkinsville, Georgia | March 1, 1957 | July 5, 2012 |
| 128. | Michael Schwerner | Philadelphia, Mississippi | June 21, 1964 | June 20, 2016 |
| 129. | Marshall Scott | Orleans Parish, Louisiana | January 23, 1965 | May 25, 2012 |
| 130. | Milton Scott | Baton Rouge, Louisiana | July 18, 1973 | May 8, 2019; reopened, then closed September 29, 2021 |
| 131. | Jessie James Shelby | Yazoo City, Mississippi | January 21, 1956 | May 24, 2010 |
| 132. | Ollie Shelby | Hinds County, Mississippi | January 22, 1965 | April 16, 2010 |
| 133. | George Singleton | Shelby, North Carolina | April 30, 1957 | April 16, 2010 |
| 134. | Denver Smith* | Baton Rouge, Louisiana | November 16, 1972 | |
| 135. | Ed Smith | State Line, Mississippi | April 27, 1958 | November 5, 2009 |
| 136. | Henry Smith | Orangeburg, South Carolina | February 8, 1968 | |
| 137. | Lamar Smith | Brookhaven, Mississippi | August 13, 1955 | April 12, 2010 |
| 138. | Maceo Snipes | Butler, Georgia | July 18, 1946 | April 12, 2010 |
| 139. | Eddie Stewart | Jackson, Mississippi | July 9, 1966 | May 26, 2011 |
| 140. | John Stokes* | Augusta, Georgia | May 9-11, 1970 | |
| 141. | Isaiah Taylor | Ruleville, Mississippi | June 26, 1964 | April 12, 2010 |
| 142. | Emmett Till | Money, Mississippi | August 28, 1955 | December 28, 2007; reopened, then closed December 6, 2021 |
| 143. | Ann Thomas | San Antonio, Texas | April 8, 1969 | April 15, 2010 |
| 144. | Freddie Lee Thomas | Sidon, Mississippi | August 20, 1965 | June 9, 2011 |
| 145. | John Thomas* | West Point, Mississippi | August 15, 1970 | April 17, 2019 |
| 146. | Selma Trigg | Hattiesburg, Mississippi | January 23, 1965 | May 2, 2010 |
| 147. | Ladislado Uresti | San Antonio, Texas | April 22, 1953 | April 20, 2010 |
| 148. | Hulet Varner | Atlanta, Georgia | September 10, 1966 | April 6, 2009 |
| 149. | Clifton Walker | Woodville, Mississippi | February 29, 1964 | October 1, 2013 |
| 150. | Virgil Ware | Birmingham, Alabama | September 15, 1963 | March 29, 2011 |
| 151. | James Waymers | Allendale, South Carolina | July 10, 1965 | April 15, 2010 |
| 152. | Ben Chester White | Natchez, Mississippi | June 10, 1966 | October 16, 2003 |
| 153. | John Wesley Wilder | Ruston, Louisiana | July 17, 1965 | May 25, 2011 |
| 154. | Elbert Williams | Brownsville, Tennessee | June 20, 1940 | November 4, 2018 |
| 155. | Johnny Lee Williams* | Barton, Arkansas | May 23, 1974 | |
| 156. | Rodell Williamson | Camden, Alabama | On or about May 20-22, 1967 | May 2, 2010 |

| 157. | Mack Wilson* | Augusta, Georgia | May 9-11, 1970 | |
| 158. | Archie Wooden | Snow Hill, Alabama | December 25, 1967 | April 20, 2010 |
| 159. | William Wright, Jr.* | Augusta, Georgia | May 9-11, 1970 | |
| 160. | Samuel Younge | Tuskegee, Alabama | January 3, 1966 | March 28, 2011 |
| 161. | Unknown* | West Point, Mississippi | 1960s/1970s | May 6, 2019 |

**\*Denotes matter referred to the Department by an eligible entity or a State or local law enforcement agency or prosecutor.  *See* Section 2(2)(B)(i)(IV) of the Reauthorization Act.**