# CIR Exhibit 1

CIVIL RIGHTS DIVISION

Notice to Close File

File No.  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                          Date: _____

To:    Chief, Criminal Section

Re:    [(b)(7)(C)] Subject
       Billey Joe Johnson, Jr., (Deceased) - Victim
       CIVIL RIGHTS_____

It is recommended that the above-captioned case be closed for the following reasons:

1.     Date of the Incident:  December 8, 2008.

2.     Synopsis of the Facts and Reasons for Closing:

       On Monday, December 8, 2008, around 5:50 a.m., George County Sheriff's Office ("GCSO") [(b)(7)(C)] pulled over 17-year-old football star Billey Joe Johnson, Jr., for a traffic violation in Lucedale, Mississippi.  Less than two minutes after the subject radioed in

                                            _____
                                            AeJean Cha, Trial Attorney

_____

To:  Records Section
     Office of Legal Administration

       The above numbered file has been closed as of this date.


_____                _____
    Date                                      Chief, Criminal Section

                                             FORMERLY CVR-3   FORM CL-3

cc:  USAO, Jackson, MS
     FBI - Jackson Field Office
     Unit Chief (FBI)
     Chrono
     Cha
     Fitzgerald
     T. 06/28/11
     [(b)(7)(C)]

-2-

Johnson's tags, (b)(7)(C) called dispatch to report that the victim had shot himself. Johnson was found lying on his back, perpendicular to his pick-up truck's cab with his feet closest to the truck. He had a gunshot wound on the left side of his head and a rifle lying across his body, butt-end by his feet. The driver's side door was open, with the glass window shattered.

The Mississippi Bureau of Investigation (MBI) investigated the shooting. The case was presented to a local grand jury in February 2009, and the grand jury issued a report concluding that Johnson accidentally shot himself. Johnson's parents, as well as Congressman Bennie G. Thompson, asked that the Department investigate his death further. The Federal Bureau of Investigation (FBI) opened the matter at the Department's request.

This matter should be closed because there is insufficient evidence to establish, beyond a reasonable doubt, that (b)(7)(C) shot Johnson or otherwise willfully violated his civil rights. Four eyewitnesses corroborate the subject's account that ☐ was in ☐ patrol car when the gun was      (b)(7)(C) fired. Furthermore, all of the medical experts agree that the wound was self-inflicted. The Mississippi State Medical Examiner's Office determined that the victim had shot himself, either accidentally or intentionally, and that, because it was unclear whether the shooting was intentional, the manner of death was "unknown." However, the Armed Forces Institute of Pathology ("AFIP") reviewed the forensic evidence and concluded that Johnson's death was a suicide.

3.    <u>Investigative History and Predication</u>:

On Monday, December 8, 2008, at approximately 5:53 a.m., (b)(7)(C) called the GCSO dispatch to report that Johnson shot himself. Local law enforcement and other emergency personnel arrived shortly thereafter. The GCSO contacted the MBI requesting assistance with the death investigation. MBI investigators arrived at the scene approximately two hours after the shooting and took over the investigation.

According to press clippings, at least two other organizations — the Cochran Firm and the George County National Association for the Advancement of Colored People ("NAACP") — investigated Johnson's death at the behest of his family.[1] Both organizations began their investigations before the case was presented to the grand jury. One newspaper article reported that the Cochran Firm obtained an independent autopsy.[2] According to the article, that autopsy reportedly determined that Johnson was outside his truck with his door open when the fatal shot was fired; no further conclusions, including the manner of death, were possible because "specific portions of the wound were not present during the examination." Another newspaper article

---

[1]  We do not have any reports regarding their investigations. All information regarding their investigations was gleaned from press clippings. Both organizations presented witnesses to the local grand jury where they presumably summarized their investigative findings to the grand jury.

[2]  *Investigation Continues in Death of Mississippi Athlete Billey Joe Johnson, Jr.*, PR NEWSWIRE, Dec. 23, 2008.

reported that the George County NAACP interviewed 15 witnesses and concluded that Johnson could not have committed suicide because he was not depressed.[3]  Both articles were published before the grand jury issued its findings.

This matter was presented to a state grand jury on February 6, 2009, which reached the following relevant conclusions:  (1) (b)(7)(C) did not shoot Johnson; (2) Johnson did not commit suicide; and (3) Johnson accidentally shot himself when trying to move his shotgun.[4]  The grand jury's findings are further discussed below.

Johnson (b)(7)(C) asked the Department of Justice to investigate the shooting, as they did not believe that (b)(7)(C) whom several colleges were heavily recruiting, could have shot himself.  They believe that the subject, the only other individual present at the time of the shooting, must therefore have killed (b)(7)(C)  In addition, they raise the following as reasons why they do not trust the local investigation:  (1) they did not see (b)(7)(C) body for two to three days following the incident; (2) they were not permitted to identify his body (b)(7)(C) were called to identify him); (3) his truck was not impounded; and (4) the 911 tape is "missing."[5]

Congressman Thompson also requested a federal investigation because he too questioned why a "life loving college bound star athlete" would shoot himself.

4.    Investigative Findings:

A.    Events Leading up to the Traffic Stop

The victim was driving from the home of (b)(7)(C) when the subject pulled him over.  MBI investigators interviewed (b)(7)(C) together with (b)(7)(C) (b)(7)(C) on December 8, 2008, and January 9, 2009. (b)(7)(C) also provided a written statement on December 8 regarding that morning's events.  All three of (b)(7)(C) statements are consistent and summarized as follows.  At approximately 5:26 a.m., heard (b) (b)(7)(C) screen door open and heard someone punch the door twice.[6] was home alone as (b)(7)(C)

---

[3] (b)(7)(C) *Meeting Soothes: Johnson family 'well satisfied' with investigation,* SUN HERALD, Dec. 16, 2008.

[4]  After the grand jury's finding were announced, the press reported that Willie Gaines, the George County NAACP president, said they had "enough evidence to contradict" the grand jury report.  Sheila Byrd, *NAACP mulls claim in athlete's death,* HATTIESBURG AMERICAN, Feb. 15, 2009.  Another article reported that the George County NAACP intended to submit that evidence to the Department of Justice. (b)(7)(C) *doesn't buy ruling on Miss. athlete shooting,* ASSOCIATED PRESS, Feb. 13, 2009.  To date, we have not received any such evidence.

[5]  It is unclear why they believe that the 911 tape is missing.  The grand jury report, which the family enclosed with their request that the Department investigate their son's death, listed the 911 tape as evidence presented.

[6]  The times offered by witnesses and time cards do not always correspond with the times reflected by the 911 calls.  It is, however, not critical because 911/dispatch recordings provide a

(b)(7)(C) had already left for work. Frightened, [ ] called (b)(7)(C) at approximately 5:30 a.m. to tell (b)(7)(C) [ ] that someone was trying to break into home. (b)(7)( told MBI investigators that [ ] then (b)(7)(C) called 911 and drove to (b)(7)(C) home. (b)(7)(C) continued to lie in (b)(7) bed when (b)(7) heard someone "kind of tap[]" (b) bedroom window. Shortly thereafter, (b)(7)(C) heard sirens and then "someone move[d] across the rocks in the trailer park" as if to run away. [ ] (b)(7)(C) (b)(7)(C) went to [ ] window to catch a glimpse of the suspect, and recognized Johnson as he ran to his truck.

Lucedale Police Department (b)(7)(C) responded to (b)(7)( 911 call. MBI investigators interviewed (b)(7)(C) on December 8, 2008, and (b)(7)( also wrote an incident report, dated December 8. Both of [ ] oral statements and (b)(7)(C) the incident report are consistent and summarized as follows. When [ ] arrived at (b)(7)(C) (b)(7)(C) home, the suspect had already left. (b)(7)( spoke with the complainant, (b)(7)(C) the intruder as Johnson, (b)(7)(C) (b)(7)(C) that he left in a maroon Chevy truck Z-71. When asked, (b)(7)(C) wanted to press charges against Johnson. (b)(7)( told MBI investigators that [ ] did not broadcast Johnson's identity or (b)(7)(C) (b)(7)(C) vehicle description over the radio because in [ ] experience with domestic situations, victims sometimes change their mind about pressing charges. The (b)(7)(C) unit and (b)(7)(C) 911/dispatch recordings confirm that [ ] did not broadcast Johnson's identity or a description of his vehicle.

B.    Subject's Statement

(b)(7)(C)

metric of how much time elapsed between significant events, which is more important than determining what precise time they occurred. The timeline established by the 911/dispatch recordings is discussed in Section 4.D.

(b)(7)(C)

### C.    Witness Statements Concerning the Incident

#### 1)    Civilian Statements

Four eyewitnesses, in three cars, drove by the shooting scene either as it occurred or immediately afterwards.  None of these witnesses saw the actual shooting.  Their statements are generally consistent with each other and the subject's statement.

On December 27, 2008, MBI investigators interviewed (b)(7)(C) who witnessed the incident as ☐ was driving home from taking (b)(7)(C) to the emergency room. ☐ left the hospital sometime between 5:20 a.m. and 5:25 a.m.  As ☐ drove home, ☐ noticed two patrol cars with flashing lights headed toward Main Street.  At around 5:37 a.m., a truck passed him going "pretty rapidly." ☐ estimated it was travelling at least 50 to 60 mph, passing ☐ as he drove 35 mph.  A flashing patrol car occupied by one officer followed the truck.  Roughly a mile later, (b)(7)( saw the traffic stop. ☐ observed the victim exit his vehicle with what appeared to be a wallet in his hand.  As ☐ passed the scene, ☐ watched the subject exit (b)(7) patrol car.  In (b) rear-view mirror, ☐ saw them speaking face-to-face. ☐ did not observe any sign of altercation or discord between the two individuals.

When (b)(7)( arrived home —approximately 90 seconds later — (b)(7)( told (b)(7)( was hungry.  Without stopping ☐ car, ☐ drove ☐ car through ☐ circular driveway and headed to McDonald's, which took him past the traffic stop again. ☐ estimated that approximately 2 minutes and 45 seconds had elapsed from the last time ☐ saw it.  From a distance, ☐ observed the victim standing in the door of the truck, looking inside the truck's cab; (b)(7)( told MBI investigators that ☐ thought Johnson was searching his truck.  As (b)(7)( got closer to the traffic stop, however, ☐ saw that the victim was no longer standing by the truck and there was a body on the ground parallel to the truck.  The officer was in ☐ car and (b)(7)(C did not see any other person on the scene.

On December 11, 2008, MBI investigators interviewed (b)(7)(C) who saw the victim at the traffic stop just prior to the shooting.  (b)(7)(C) was on ☐ way to work when ☐ saw the flashing blue lights and slowed down. ☐ saw a man (whom ☐ did not recognize, even though he knew Johnson) dressed in a camouflage jacket facing his truck.  (b)(7)(C) thought that the victim was reaching into his truck for something when he changed his mind and stood up.  Johnson then walked over to the end of his open truck door and (b)(7)(C) Johnson was looking at ☐  (b)(7)(C) said that there was no police officer in the vicinity of the truck although he assumed the officer was in his patrol car.

-6-

[(b)(7)(C)] drove past the scene shortly after the shooting occurred. They told MBI investigators that they were at Hardy's drive-through when, at approximately 5:30 a.m., they saw two police cars going "this way." Approximately 20 seconds later, they observed a "colored truck" followed by a sheriff's car going "that way." [(b)(7)(C)] estimated that they left Hardy's about a minute — but no more than two — after the sheriff's car had passed. He drove past the traffic stop and saw the patrol car with its lights still flashing. [ ] saw a man, lying on his back, with his feet under an open door that was still swinging. No one else was near the truck. At that point, the officer was in [(b)(7)] closed-door patrol car parked roughly four feet behind the truck.

### 2)    Law Enforcement Statements

A number of law enforcement officers arrived almost immediately after the subject radioed that there had been a shooting. MBI investigators interviewed the first two law enforcement officers to respond. Both of those officers confirmed that the subject told them what had happened and that [ ] consistently reported that Johnson shot himself.

[(b)(7)(C)], Mississippi Department of Wildlife and Fishery, was the first law enforcement officer to respond to the scene. MBI investigators interviewed [ ] (b)(7)(C) on December 8, 2008. [(b)(7)(C)] was on Highway 26 when [ ] heard [(b)(7)( ] radio that [ ] was [(b)(7)(C)] stopping a car that ran a stop sign within city limits. [ ] then heard the subject call out that [ ] [(b)(7)(C)] needed assistance because the victim had shot himself. [(b)(7)(C)] arrived at the scene approximately fifteen seconds later.

Upon arriving on the scene [(b)(7)( ] saw [(b)(7)(C ] standing by [ ] patrol car. The truck's [(b)(7)(C)] driver's side door was open, the glass was shattered, and the victim was lying on the ground by the truck. [(b)(7)(C)] that Johnson shot himself, and that [ ] had not seen the gun [(b)(7)(C)] when [ ] initially stopped the victim. [(b)(7)(C)] walked to Johnson, saw a shotgun by him, and noted that the victim appeared to be dead. [ ] returned to stand by [(b)(7)( ] until city officers arrived on the scene, approximately two to three minutes later. [(b)(7)(C)] did not do anything "out of the way" while [ ] was present.

[(b)(7)(C)], the subject's partner and the second officer to arrive on the scene, wrote an incident report dated December 8, 2008. MBI investigators also interviewed [ ] (b)(7)(C) on December 27, 2008, at which point [ ] repeated the substance of his written report. [(b)(7)( ] stated that on December 8, [(b)(7)( ] called [ ] at [ ] home to meet for coffee as [ ] routinely did. (b)(7)(C) About three or four minutes later, as [(b)(7) ] was starting up [(b)(7)( ] car, [ ] heard [(b)(7)( ] announce that [ ] was stopping a car for a traffic violation and recite the license plate. [ ] then heard dispatch advise the tags belonged to Johnson. "[I]n what seemed like less than a minute" later, [ ] partner radioed that the victim had shot himself. [(b)(7)( ] driving as quickly as [ ] could, arrived about three or four minutes later. [(b)(7)( ] asked [(b)(7)( ] what happened and the [(b)(7)(C ] [(b)(7)(C)] Johnson over for running a red light and a stop sign. [ ] returned to [ ] [(b)(7)(C)] patrol car to run the license when [ ] heard a gunshot, looked up, and saw that the victim had shot himself.

### D.    Dispatch/911 Recordings

Dispatch/911 recordings indicate that (b)(7)(C) called the George County 911 operator at 5:44:47 a.m. to report an attempted break-in of (b)(7)(C) home. The subject informed dispatch at 5:47:09 a.m. that he was on duty. Approximately two minutes later, (b)(7)(C) radioed their arrival at (b)(7)(C) residence. Two minutes after that, (b)(7)( reported from (b)(7)(C) residence that the complainant knew the suspect; however, (b)(7)( did not provide Johnson's identity or a description of his vehicle. At 5:51:51 a.m., (b)(7)( radioed that was pulling over a vehicle on Highway 26, and he identified the license plate. Less than a minute later, dispatch advised that Billey Joe Johnson was the registered owner of the vehicle. Seven seconds after dispatch told (b)(7)(C) this, (b)(7)( said something unintelligible, the dispatcher said "go ahead (b)(7)(C )," and responded "[unintelligible] self." About 30 seconds after dispatch told (b)(7)( that Johnson owned the car, (b)(7)(C) needed an investigator because "subject shot himself." Thirty seconds later, at 5:53:46 a.m., (b)(7)(C further informed dispatch: "gonna need some paramedics on route there."

### E.    Physical Evidence

The driver's side window of Johnson's truck was shattered. The interior surface of the driver's door was spattered with blood and possibly tissue. An earring post, without the jewel, was embedded in the panel of the driver's side door to the base of the jewel mount. The jewel was found lying on the access drive behind the truck.[7]

Tissue, possibly brain matter, and bone fragments were found on the ground adjacent to the victim and further away in the driveway. Two spatters of blood were found on a sign several feet away.

Johnson's car was shifted in park, with the engine running, and with the driver's side door open.

The toxicology analyses indicated that Johnson had not ingested alcohol, drugs, or steroids.

Particles consistent with gunshot residue were found on both sides of Johnson's left hand but they "d[id] not possess the combination of morphological characteristics and elemental composition necessary to identify them as gunshot residue to the exclusion of all other environmental sources." No gunshot residue was found on the victim's right hand.

---

[7] The significance of this entry and the following is explained in the autopsy section and grand jury report, Sections 4.F. and 4.H., respectively. Briefly, they support the proposition that the gunshot's trajectory was away from the truck, rather than toward it.

Gunshot residue was found on both sides of (b)(7)(C) [8] One particle of gunshot residue, and one particle indicative of (though not conclusively determined to be) gunshot residue, were found on the right sleeve of (b)(7)(C) jacket. No gunshot residue was found on (b)(7)(C) left sleeve. The subject's uniform    jacket, shirt and pants    tested negative for the presence of blood.

A Sears and Roebuck Model 200 12-gauge shotgun, which was found on top of the victim, tested positive for the possible presence of blood, but no further testing was completed because the test reportedly would have consumed the sample. ATF agents traced the shotgun — through two sales at two different pawnshops — to (b)(7)(C) Johnson (b)(7)(C) No latent prints of value were found on the firearm. One fired 12-gauge hull was removed from the chamber. The Mississippi Crime Laboratory (MCL) attempted to perform a firearm functionality examination on the rifle, but was unable to complete testing because the slide lock release became non-functional during the test.

A Glock, Model 22, which was taken from Sullivan at the scene, tested negative for the presence of blood. No fingerprints of value were found on the firearm.

A Mossberg Model 590 12-gauge shotgun, which was removed from the ceiling of Sullivan's patrol car, tested negative for the presence of blood. No fingerprints of value were found on it.

F.      Autopsy Reports

1)      Mississippi State Medical Examiner's Office

The state coroner, Dr. Adele Lewis, determined that the cause of the victim's death was a close-range shotgun wound to the left side of the head. She noted that the "left ear is absent" and there was "no soot deposition or stippling visible in the wound or wound edges." She reported that Johnson's tongue "ha[d] a large ragged ballistic defect" and there was "heavy soot deposition on the surface of the tongue." She concluded that the wound on the left side of Johnson's head was the entrance wound: "[a]fter perforating the scalp of the left side of the head and amputating the left ear, the projectile(s) entered the cranial cavity." She hypothesized that the "overall path of the projectile [was] upward, from front to back, and from left to right."

Dr. Lewis ruled that the manner of death was "unknown." As mentioned above, the shotgun used in the shooting could not be fully evaluated in terms of functionality, and "[a]s such, it [was] not possible to determine whether the decedent discharged the weapon accidentally or intentionally."

---

[8] There was no further analysis of this in the Mississippi Crime Laboratory's (MCL) report nor did the AFIP report mention it. The grand jury report is the only document in which it was further discussed. The findings of the grand jury are discussed in a later section of this memo.

-11-

2)    Armed Forces Institute of Pathology (AFIP) Report

At the Department's request, the AFIP reviewed the forensic evidence.[9]  The AFIP agreed with the state coroner that the victim's cause of death was a shotgun wound to the head, but disagreed "significant[ly]" regarding the shotgun entrance site, exit site, and path of travel. The AFIP determined that the cause of death was an "intra-oral shotgun wound to head" and manner of death should have been ruled as "suicide."

From the autopsy report's description of the wound characteristics and photographs, the AFIP determined that the gun was inside the victim's mouth when the shotgun was fired: "Heavy soot deposition and injuries to the tongue indicate that the muzzle of weapon was located in the mouth when the shotgun was actually fired."  The AFIP concluded that bone, soft tissue and buck-shot traveled from right to left and exited on the left side of his head; some of that material passed through the left side of the shattered truck window.  Contrary to the state coroner's findings, the AFIP concluded that the left side of his head was the exit — not entry — site, and "the course of the wound track was right to left, slightly upward and slightly front to back."  The AFIP stated that because the shotgun was in his mouth when it was discharged, there "should be no issues of a possible accident or a possible homicide in this case."

G.    Evidence Regarding Johnson's State of Mind

1)    The Week Prior to the Incident:

(b)(7)(C)              the victim for (b)(7)(C) described Johnson as having "good days" and "bad days." (b) characterized the week before his death as "bad days." (b)(7)(C)                    charges against Johnson for

---

[9]  Specifically, AFIP reviewed the following materials:  MBI's investigation report; authorization for autopsy by the Corner, George County, MS; autopsy report by the Mississippi State Medical Examiner's office; toxicology report; MCL reports; Xerox copies of photograph images of the scene and postmortem examination; a compact disc with photographs of the scene and postmortem examination; and audio interviews of witnesses by the MBI.

threatening (b)(7)(C) [10] said that (b)(7)(C) had altercations the week before the incident.[11] On Friday, December 5, they fought when he informed ☐ he was (b)(7)(C) (b)(7)(C) (b)(7)(C) (b)(7)(C) [12] During that fight, ☐ told him that ☐ hoped he "wrecked and died." (b)(7)(C) (b)(7)(C) did not have any contact with Johnson over the weekend despite his (b)(7)(C) attempts to contact ☐ multiple times. ☐ told MBI investigators that he texted ☐ several (b)(7)(C) (b)(7)(C) times over the weekend, asking ☐ to text him back or it "was going to be bad." ☐ said that he (b)(7)(C) also texted three of (b)(7)(C) to ask them to persuade ☐ to speak with him.[13] On Saturday, (b)(7)(C) (b)(7)(C) December 6, he called ☐ three times but ☐ did not answer his calls. That evening ☐ saw (b)(7)(C) (b)(7)(C) him driving back and forth past ☐ house. He held a phone by his ear indicating that ☐ should (b)(7)(C) (b)(7)(C) call him or pick up his phone calls, but ☐ ignored him. He did not call ☐ on Sunday, the day (b)(7)(C) (b)(7)(C) before the incident, but sent ☐ a few texts asking ☐ to call him. According to (b)(7)(C) (b)(7)(C) he also texted one of (b)(7)(C) Sunday evening that things were going to be different on Monday and that everyone in the county would know who they [i.e. (b)(7)(C) and Johnson] were. Johnson's subpoenaed phone records confirm that he sent (b)(7)(C) three text messages on Sunday evening between 8:50 p.m. and 8:55 p.m.[14]

On Sunday, December 7, 2008, (b)(7)( logged onto ☐ MySpace account. ☐ received (b)(7)(C) a new message the victim had sent two days prior that asked to be ☐ MySpace friend and (b)(7)(C) warned that Monday was not going to be "good."[15] ☐ interpreted that to mean that he was (b)(7)(C)

---

[10] Johnson allegedly pulled (b)(7)(C) by ☐ hair in the school's parking lot. On (b)(7)(C) September 17, 2008, (b)(7) submitted an affidavit, notarized by the George County Justice Court (b)(7)(C) Clerk, in which ☐ swore that the victim "did put (b)(7)(C) in fear of (b)(7)(C) serious bodily by making threats to ☐ harassing ☐ and causing ☐ undue stress and alarm." (b)(7)(C) (b)(7)(C) ☐ explained that ☐ later dropped the charges because a school security officer informed (b)(7)(C) ☐ that ☐ would not prevail.

[11] Specifically, (b)(7)(C) alleged that on Wednesday, December 3, and the following (b)(7)(C) day, Johnson hit ☐ and threatened to "get" (i.e., physically abuse) ☐ (b)(7)(C)

[12] MBI investigators interviewed (b)(7)( Despite receiving about 60 texts from Johnson (b)(7)(C) the day before the incident, ☐ revealed no knowledge relevant to the shooting.

[13] (b)(7)(C) described those text messages as follows: "tell (b)(7)( that I know ☐ (b)(7)(C) (b)(7)(C) has ☐ phone and ☐ needs to stop ignoring me;" "tell (b)(7)(C) has one more time to ignore (b)(7)(C) me but when ☐ comes home it's going to be bad and everyone is going to know ☐ and (b)(7)(C) everyone is going to know me;" and "please tell (b)(7)( I'm sorry and please just talk to me."

[14] ☐ provided three of (b)(7)(C) phone numbers but the subpoenaed phone records (b)(7)(C) only cover Sunday, December 7 through Tuesday, December 9. The victim did not text any of those friends on December 7.

[15] The entire message read: "so (b)(7)( y th hell aint you added me yet huh I kno I sent you a friend request….im tryint to be nice an I wonder what guy you so wit today but I do kno one thing Monday isn't going to be so good an I better not get on tomorrow an you been on an I aint one of your friends."

going to "get" (i.e. hit (b)(7)(C) in the parking lot or somehow publicly embarrass (b)(7) While on MySpace, (b)(7)(C) checked the MySpace pages of Johnson and his new (b)(7)(C). Johnson had a new headline since the last time she visited his page on December 5. The new headline said "seein my people put to rest got a nigga mine stress wit that iron an a vest knowin my time could be next." Neither (b)(7)(C) nor (b)(7)(C) knew what this headline meant.

### 2)    Prior Suicidal Threats

(b)(7)(C) told MBI investigators that (b)(7)(C) did not believe that Johnson killed himself, (b)(7)(C) but (b)(7)(C) also admitted that Johnson had alluded to suicide during their relationship. He had repeatedly warned (b)(7)(C) that if the relationship was going to end, he was going to "go" and (b)(7)(C) was going to "go" with him. He also threatened suicide at least once during their relationship. In January 2008, he called (b)(7)(C) to tell (b)(7)(C) he was going hunting. During that call, he said he was "fed up with it," and (b)(7)(C) heard the sound of a trigger being pulled.

### 3)    AFIP Psychological Analysis

Rosemary Malone, Chief Deputy Medical Examiner, Psychological Investigations Division of the Office of the Armed Forces Medical Examiner, reviewed the investigative file.[16] She concurred with the AFIP autopsy's finding that "to a reasonable degree of medical certainty … Mr. Billey Joe Johnson's manner of death was the result of suicide." Dr. Malone noted that gender, age and race were risk factors since suicide rates among male African-Americans rise during adolescence. She further remarked that he had significant relationship problems with (b)(7)(C) and that he expressed thoughts of suicide to (b)(7)(C) when he was angry. Moreover, (b)(7)(C) Dr. Malone opined that on the day of the incident, he "experienced significant stressful events" as he was alleged to be breaking into (b)(7)(C) residence. (b)(7)(C) hypothesized that Johnson (b)(7)(C) likely believed that he was being pulled over for the alleged break-in and traffic violation resulting in "significant acute stress." (b)(7)(C) opined that possible motives for suicide included: "desire to escape from mental pain due to significant relationship issues; anger and rage toward (b)(7)(C); guilt and shame following the morning's incidents in the setting of being a local football star; and/or a wish to make an important statement to (b)(7)(C)."

### H.    Local Grand Jury Findings

---

[16] She reviewed the following materials: MBI's investigation report; authorization for autopsy by the Corner, George County, MS; autopsy report by the Mississippi State Medical Examiner's office; toxicology report; reports by Mississippi Crime Laboratory; Xerox copies of photograph images of the scene and postmortem examination; a compact disc with photographs of the scene and postmortem examination; audio interviews of witnesses by the MBI; incident report; (b)(7)(C) written statement; general affidavit dated 9/15/08 by (b)(7)(C); MySpace excerpts; the subject's professional records; and media reports.

-14-

(b)(3):FED. R. CRIM. P. 6e

**CIR Ex. 1 p. 12**

-15-

(b)(3):FED. R. CRIM. P. 6e

5.    Analysis of Prosecutive Merit:

(b)(5),(b)(7)(C)

-16-

(b)(5),(b)(7)(C)