# CIR Exhibit 3

CIVIL RIGHTS DIVISION

Notice to Close File

File No. 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                             Date  8/11/2023

To:     Chief, Criminal Section

Re:     Unknown individuals,
        Louisville, Kentucky - Subjects;
        Alberta Jones (deceased) – Victim
        CIVIL RIGHTS

        It is recommended that the above case be closed for the following reasons:

1.      Synopsis of the Facts and Investigative Findings:

        On August 5, 1965, at about 10:30 a.m., the body of 34-year-old Alberta Jones was found floating in the Ohio River near Fontaine Ferry Park, in Louisville, Kentucky.  Jones, a prominent Black attorney, whose private clients included Muhammad Ali, was the first female prosecutor in Louisville.  Jones was also the Executive Director of the Independent Voters Association, Inc. (I.V.A.), a nonpartisan organization dedicated to enfranchising Black voters and providing them information on political candidates.  Given Jones's high profile as a Black woman prosecutor and her involvement in civil rights activities, there was, at the time of her death, speculation that she was killed because of her race, because of those activities, or both, and that speculation remains today.  For this reason, her death was referred to the Cold Case Unit in the Criminal Section of the Civil Rights Division, pursuant to the Emmett Till Unsolved Civil Rights Crimes


                                          _____
                                          Cristina Gamondi
                                          Attorney

_____
_____

To:  Records Section
     Office of Legal Administration

The above numbered file has been closed as of this date.


_____                    _____
  Date                                Barbara K. Bosserman
                                   Deputy Chief, Cold Case Unit, Criminal Section

                                   FORMERLY CVR -3          FORM CL-3

−2−

Reauthorization Act of 2016 (the Till Act).

As explained more fully below, our review of both the extensive state investigative file and the FBI file provides no clear evidence that Jones was murdered because of her race or civil rights activism. Indeed, the only direct evidence points away from those motives. However, because we cannot determine who murdered Jones, we cannot altogether discount that possibility. There are no obvious leads that we could pursue that would lead to the prosecution of a living subject for a crime covered by the Till Act. All but one or two of the individuals identified as potential suspects, either during the initial investigation, or during subsequent investigations, are dead. Moreover, it does not appear that any of those suspects were motivated by either Jones's race or by her voting rights work with the I.V.A. Additionally, we considered allegations made by Jones's family members (and the eligible entity that referred the case to us), that police or other city officials might have been involved in Jones's murder or in covering it up, but there ultimately is a lack of evidence to substantiate the allegations or to tie any specific, living, police official to Jones's murder. Finally, even if the government could develop evidence of a federal civil rights crime, the applicable statute of limitations has long run on any possible federal prosecution. Accordingly, this matter does not disclose a prosecutable violation of any federal criminal civil rights statute and is being closed without further investigation.

Jones was last seen alive about nine hours before her body was found floating in the Ohio River. She had left the home of her friend and occasional client, Gladys Wyckoff, at about 1:30 a.m., driving a rented white 1965 Ford Fairlane. Sometime between 1:30 and 2:00 a.m., Jessie and Raymond Morgan, who lived a mile away from Wyckoff's home, were awakened by a woman screaming. Raymond Morgan had then seen a woman being dragged into a white car, which sped off heading west toward the river. On the evening of August 6, at about 7:30 p.m., Louisville Metropolitan Police Department (LMPD) investigators acting on a report of an abandoned car, found the Fairlane in the 3100 block of Del Park Terrace, a little over two miles from where Jones's body had been found floating, and two blocks from the Morgans' home.[1]

An autopsy determined that Jones's cause of death was drowning. The post-mortem revealed the presence of two cuts on her head, a large hematoma on the right temporal area, and hemorrhage in her right eye, but she suffered no skull fractures or brain damage severe enough to have been fatal. In Jones's abandoned car, investigators found her blood and other evidence of a struggle. Investigators also found multiple fingerprints on the inside and outside of the Fairlane.

Jones's murder was investigated four times – in the 1960s, late 1980s, between 2008 and 2010, and between 2016 and 2018. Much work was done in each investigation to determine whether any possible suspect's fingerprints matched those found on the Fairlane. The third and fourth investigations focused on the same suspect. In the 1960s, LMPD investigators interviewed more than 400 witnesses and suspects.[2] Investigators considered various theories

---

[1] At the time, the LMPD was simply the Louisville Police Department (LPD) but the current name will be used throughout this memorandum.

[2] The LMPD file indicates that 394 witnesses and suspects had been interviewed by late September 1965. Given that the 1960s investigation continued until at least the end of July 1968, ultimately more than 400 witnesses and suspects were interviewed.

–3–

and motives, including any related to Jones's work as a prosecutor, her representation of private clients, other aspects of Jones's private life, as well as robbery. They also considered other theories and allegations, including whether Jones's murder could be tied to any of the suspects in other murders of Black women that occurred in the West End neighborhood, around the same time. They identified and investigated numerous potential suspects, obtaining the fingerprints and palmprints of those individuals and many more, and conducting polygraph examinations of at least eight of the suspects. Prosecutors reportedly at one time sought indictments of two men, but the grand jury declined to indict them.[3] Ultimately, the original investigators could not match the prints of any suspect to those found on Jones's rental car.

The 1980s investigation was focused initially primarily on the possible connection between Jones's murder and the drowning death of another Black woman, DeCora White, whom Jones knew. White died in October 1964. Again, investigators could not connect the two deaths or any potential suspect to the physical evidence.

In 2008, an automated search conducted by the FBI at the request of LMPD cold case investigators, matched a latent fingerprint found on the Fairlane to XXX, a Black XXX, with no known ties to any groups opposed to Jones's voting-rights advocacy work. XXX was XX years old at the time of the murder. During the prior investigations, no one had identified XXX as a possible suspect or even mentioned XXX as someone who might have had knowledge of the crime. XXX's only apparent connections to the case were that XXXXXXX; that XXX and XXX closest friends spent time in Elliott Park, which was located next to the Morgans' home; and that XXXXX. Investigators interviewed XXX in XXX, California, where XXX was living in 2008. XXX denied any involvement in the crime. XXX also submitted to a polygraph examination which XXX reportedly failed. In 2010, the Kentucky Commonwealth Attorney's Office declined to investigate the case further, citing the death of the most important witnesses and the inability to locate significant physical evidence. Nonetheless, the LMPD Cold Case Homicide took additional investigative steps between 2016 and 2018. Among other things, they obtained a full set of XXX's fingerprints and palmprints and compared them to a print found on a torn newspaper in Jones's car: the prints did not match.

2.      Predication, Initial Review, and Meetings

The Criminal Section initiated a review of this matter in 2017, after receiving a request from XXX, pursuant to the Till Act. XXXXX had been working XXXX to bring awareness to the case, to help solve it. XXX provided electronic copies of the LMPD's investigative reports as well as information XXX had obtained XXX. Shortly thereafter, the Criminal Section obtained the relatively short FBI file associated with the case.[4]

An experienced cold case attorney in the Criminal Section thoroughly organized and reviewed both the materials provided by XXX and the FBI file. The attorney also conducted

---

[3] The attempt to obtain an indictment against two men was reported in a June 8, 1966, article of the Louisville *Courier-Journal*.

[4] The bulk of the FBI file involved responses to requests made by the LMPD.

–4–

numerous database and internet searches for information related to the crime and to potential suspects and witnesses.  In 2021, the attorney obtained and reviewed the full LMPD investigative file.[5]

In March 2021, cold case attorneys met with XXX and XXX, and received additional information.[6]  In March 2022 and August 2023, cold case attorneys met again with XXX.

3.      Timeline of Events:

A.      **Significant Events in Jones's Life**

i.      **Early Life and Education**

Alberta Odell Jones was born on November 12, 1930.  She attended Central High School from which she was an honor graduate at the mid-year commencement in January 1949.  Jones attended Louisville Municipal College and, in 1951, became one of the first Black students to attend the University of Louisville, after it integrated that year.[7]  She graduated with a Bachelor of Science degree in accounting in 1953.  She worked as an accountant in an insurance firm in Louisville to earn money for living expenses before entering law school in 1957 at the University of Louisville.  After one year, Jones transferred to Howard University Law School on a scholarship.

At Howard, Jones was on the staff of the Law Journal and a student counselor.  She was also one of the students who volunteered to help draft legislation.  In June 1959, Jones graduated fourth in her class from Howard.  A month later, she sat for the Kentucky bar exam and was one of 64 men and women to pass it, reportedly making her the first Black woman attorney in Kentucky.

ii.      **Representation of Muhammad Ali**

In October 1960, 18-year-old Ali, then still named Cassius Clay, turned pro after winning a gold medal at the Olympics in Rome.  An October 9 article reported that Ali and his father were mulling over offers from individuals seeking to manage the boxer.  According to the article, Jones was helping them "with this knotty problem."  According to another article, two weeks later, on October 26, 1960, Jones was representing Ali when he signed a contract with the "Louisville Sponsoring Group."  The contract term was for two years with an option for the Louisville Group to renew for another year.  The terms of the contract guaranteed Ali a

---

[5] Except for the investigative steps undertaken in 2016 through 2018, the LMPD file was almost identical to the file provided by XXX.

[6] XXX provided additional information both at and following the 2021 meeting. XXX also forwarded information on multiple occasions since then, including in 2022 and 2023.

[7] According to its website: "Louisville Municipal College (LMC), 1931-1951, opened as a separate and segregated municipal college under the administration of the Board of Trustees of the University of Louisville; established for the purpose of meeting the higher education needs of African Americans."

–5–

minimum of $18,000 over the next two years and a portion of Ali's earnings would also be placed in a trust until he turned 35.[8]

### iii.    Civil Rights Activities

In early 1960, Black leaders, including members of the N.A.A.C.P. and the Nonpartisan Registration Committee, were involved in advocacy efforts to desegregate businesses in downtown Louisville, including stores, hotels, restaurants, and theatres.  On January 20 of that year, Jones wrote an op-ed in the Louisville *Courier-Journal* charging the newspaper with hypocrisy for "crying shame" when discrimination was practiced elsewhere but remaining silent in the face of such practices in Louisville.

Jones helped organize the I.V.A. in late 1961 or early 1962 and became its Executive Director.[9]  According to articles in the *Courier-Journal*, the I.V.A. had registered 995 new voters in the fall of 1963 and 6000 voters by early 1965.

On August 21, 1963, the I.V.A. sponsored a voter-registration rally at the Memorial Auditorium where James H. Meredith spoke to a crowd of about 1200 people.  Two days earlier, at a meeting at Lampton Baptist Church, Jones urged Black Louisvillians to join the March on Washington (as she would do), stating: "We cannot overcome by singing and moaning."

On August 17, 1964, Jones spoke at a non-partisan voter registration rally held at Shawnee Park.  She called on youths who had recently turned 18 to join the voter registration drive: "You young people who greet each other with 'Hiya baby,' … start changing it to 'Hiya, baby, are you registered.'"

In August 1964, Jones and others created the James "Bucky" Welch Rehabilitation Trust Fund, Inc. to raise money to pay the medical bills of James "Bucky" Welch, a seven-year-old Black boy whose arms had been severed at the elbow, while trying to rescue a dog from under a freight train that started moving.  Jones became the Fund's chairman and by March 1965, the Fund totaled more than $10,000.

### iv.    Appointment as Prosecutor

In late February 1965, six months prior to her death, Jones was appointed to serve as prosecutor in Louisville's Domestic Relations Court, becoming the first female prosecutor in Louisville.  She started work on Monday, March 1, 1965.

### v.    Alberta O. Jones Park

In March 2023, the Parks Alliance of Louisville, a nonprofit organization "with a mission to drive equitable investment in our public parks to elevate the well-being of the ENTIRE

---

[8] As will be discussed later in this memorandum an LMPD investigator alleged that Jones and Ali had an argument concerning portions of his money going to the Nation of Islam.

[9] Edward Faye, a long-time friend of Jones, told investigators that he and Jones founded the I.V.A. together.

community," launched the first phase of the Alberta O. Jones Park project. According to the Park Alliance website, the project will transform the roughly 20 acres of vacant land along Maple Street between Dr. W.J. Hodge and 25th Streets in the California neighborhood, into "a vibrant public park." On July 8, 2023, the first annual Alberta O. Jones Park Day was celebrated, which included the unveiling of an original portrait of Jones. The event also marked the launch of the #BecauseofAlbertaJones campaign, which invited residents to submit photos to be incorporated into Jones's portrait which will serve as the base image of a large photomosaic mural. According to news media, the mural and Jones's portrait will be permanently displayed in the park's Performance Pavilion.

## B.      Timeline of Events Surrounding Murder

The following is a timeline of the events that preceded and followed the discovery of Jones's body in the Ohio River on August 5, 1965.

### i.      Timeline summary

August 4, 1965, around 6:00 p.m. – Jones picked up her rental car, a 1965 white Ford Fairlane, two-door, from Hermann & Moore Leasing.

August 4, about 11:30 p.m. to August 5, about 1:30 a.m. – Jones was at the home that she shared with her mother, Sadie Jones (Mrs. Jones) XXXXX.[10] Her friend Gladys Wyckoff called and begged Jones to come over. Jones acquiesced and drove to Wyckoff's home and beauty salon, ostensibly to pick up a wig Wyckoff had obtained for her. According to Wyckoff, shortly after Jones arrived, she and Wyckoff drove to the King Fish Drive-In restaurant, where Jones ate shrimp and Wyckoff had a lemonade, while sitting in Jones's car. Wyckoff said that two white men in a nearby car made suggestive remarks to the two women, but Wyckoff never saw the men again after leaving the restaurant. On the way back to Wyckoff's home, Jones made two stops in search of a copy of the August 5, 1965, edition of the *Louisville Defender* newspaper– first at Union Station, where she found none, and then at Catherine's Eat Shop, where she bought two copies (one for herself and one for Wyckoff). The women arrived at Wyckoff's home sometime around 1:00 a.m. At about 1:30 a.m., Wyckoff watched Jones drive away in her rental car.

August 5, between 1:00 and 2:00 a.m. – Raymond and Jessie Morgan, who lived in the 2900 block of W. Magazine Street, were awakened by a woman's screams. They looked out their front door and saw a light-colored Ford parked across the street. Raymond Morgan then saw a man dragging a woman from the center of the street into the car. There was a least one other person in the car. The car drove away, heading west.

August 5, about 6:00 a.m. – XXX, resident of XXX Del Park Terrace, saw what was later confirmed to be Jones's rental car parked outside his home.

August 5, about 9:30 a.m. – A worker for Louisville's Recreation Department found Jones's shoes in the grass of the Shawnee Golf Course, just west of the Sherman Minton Bridge, which spans the Ohio River between Louisville and New Albany, Indiana.

---

[10] XXXXXXXXXXXXX.

–7–

August 5, about 10:30 a.m. – Jones's body was found floating in shallow water of the Ohio River near Fontaine Ferry Park, immediately adjacent to the Shawnee Golf Course, and about two miles away from the Morgans' home.[11]  Jones's shoes and purse were missing. Deputy Coroner Charles Proctor later opined that Jones likely died sometime between 2:30 and 4:30 a.m. - no more than two hours after the Morgans had seen the light-colored Ford drive away.  Based on information obtained from Army Corps of Engineers consultants, combined with other physical and medical evidence, investigators eventually concluded that Jones had been placed semi-conscious (or her head had been held underwater), no more than 100 feet from where her body was eventually found – probably at, or near, the Shawnee Park boat ramp.

August 6, about 7:30 p.m. – Investigators responding to a report of an abandoned car found the Fairlane parked between 3121 and 3125 Del Park Terrace.[12]  The upper half of Jones's dentures was in the car, along with dried blood later matched to Jones's blood-type. Investigators found several fingerprints and palmprints, including one in blood on a piece of paper torn from a copy of the August 5, 1965, edition of the *Louisville Defender*.

November 17, 1965 – A Coroner's Inquest was held, and the jury concluded that Jones's cause of death was drowning and that she had been killed by unknown individuals.

July 18, 1968 – Investigators learned that Jones's purse had been found by a group of white teenagers in a hole of the brace of a lower deck girder of the Sherman Minton Bridge.[13] Among other items, the purse contained the lower half of Jones's dentures, a billfold with no money in it, credit cards, identification cards, a payroll check with Jones's name on it, a 5-year diary, and two rolls of film.[14]  Investigators reportedly concluded that the purse's relatively good condition indicated that it had not been there since the night of the murder.[15]

### ii.    Detailed timeline of the events of August 2 through August 5, 1965

---

[11] Fontaine Ferry Park was a popular amusement park by the Ohio River, located at the west end of Market Street.  It opened to the public in 1905 but was not integrated until 1964.  It closed in 1969.

[12] It appears that 3123 Del Park Terrace did not exist.

[13] Specifically, the purse was found under the horizontal girder inside the lower deck of the bridge (between girders 34 and 35 on the west side).  The lower deck carried traffic into Kentucky, and the girder is closer to the Indiana side of the bridge, but well over the water of the Ohio River.

[14] There is no indication in the file as to the contents of the diary.  Similarly, there is no indication that the rolls of film were ever developed.  However, there was also no camera found in the Fairlane or in the purse, and no reason to believe that the crime had been captured on film.

[15] Officer John Elliot who processed physical evidence during the original investigation, told investigators in 1989 that it was his and other detectives' belief that the purse had been planted on the Sherman Minton Bridge, not thrown there during the crime.  A description and photographs of the purse's location suggest that it would have been protected from the elements, but they also suggest that it was probably placed there intentionally, rather than thrown from a moving car.

–8–

### Monday, August 2, night into Tuesday, August 3, morning

James McGill, who worked at G.E. during the day, and cleaned Jones's office at 2108 W. Broadway Street at night, said that he arrived at her office at about 10:30 p.m. Jones was busy, so he waited to start cleaning. At 11:00 p.m., Jones asked him to accompany her to the King Fish Drive-In restaurant, at Fourth Street and River Road. Jones drove her 1964 pink Ford Thunderbird, and they arrived at the restaurant at about 11:00 p.m. Jones bought shrimp for herself and a bottle of beer for McGill. McGill said that Jones paid for their order from her purse. McGill did not see a large amount of cash in the purse. According to McGill, a man named Tracey Levison walked up and he, McGill, and Jones stood by Jones's car, talking. Levison, who had recognized Jones because she had represented both him and his brother in certain legal matters, also recalled the incident. Unlike McGill, however, Levison claimed that when Jones paid for the food and beer, he saw her pull out a large roll of bills from her purse (more than $300). Levison also saw that she had a second roll of bills and looked through "quite a few" $20s before finding a small enough bill to pay for the food.

Both McGill and Levison said that Jones had trouble with her car, and that McGill pointed out that Jones never got it serviced. Levison suggested that Jones take the car to one of the downtown service stations.

According to McGill, he and Jones left the restaurant around 11:45 p.m. They went to a gas station at Third and Broadway Streets, but the attendant said he could not help Jones with her car trouble. Ronnie Smallwood, the attendant at the station, gave an account consistent with McGill's recollection. McGill said that he and Jones then drove back to Jones's office, where he got in his 1960 blue Ford and drove home; she drove her car toward 21st Street.

### Tuesday, August 3, between 6:00 p.m. and midnight

According to Lyman Hill, who was working at the C & D Texaco Station (operated by a client of Jones's, Roderick Dooley), Jones brought her Thunderbird in sometime between 6:30 and 8:00 p.m., saying that it was running hot. Jones said that she had a meeting and was in a hurry and left her car at the station. Dooley's wife was at the station in her car and gave Jones a ride home (Jones lived about four blocks from the station). Sometime later, Jones called the station and Hill told her the water pump was not working properly. She asked if someone could drive the car back to her house. Hill said that Roderick Dooley had gone to a meeting and Hill could not leave the station. After they closed the station that night, however, Dooley drove the Thunderbird to Jones's home, and Hill followed behind in another car so he could then drive Dooley home.

XXX corroborated Hill's account in relevant detail. XXX added that Jones drove XXX's car to a Bucky Welch Rehabilitation Trust Fund meeting that evening. Jones arrived home at about 10:30 p.m. and asked whether her car had been returned; XXX told her that it had not. According to XXX, Dooley returned the Thunderbird at about 11:00 p.m., told Jones that she needed a new water pump, and suggested she take her car to Summers-Hermann Ford for repair.

According to Gladys Wyckoff, sometime that evening, she called Jones's home to tell her that the wig Jones had ordered was ready. Jones was not home so Wyckoff spoke with Jones's

–9–

mother, Sadie Jones, for about 20 minutes.  Wyckoff asked Mrs. Jones to let her daughter know that the wig would be ready the next day and to have her pick it up.

Sadie Jones confirmed that Wyckoff called and they spoke about the wig.  Mrs. Jones added that she told her daughter about the call when the latter returned home.  Jones told her mother that she would call Wyckoff the next day.  Jones then called her close friend, Ella Weathers, and was on the phone with her until midnight, when she went to bed.[16]

### Wednesday, August 4, morning and afternoon

Sometime between 9:30 and 10:00 a.m., Jones brought her Thunderbird into the Summers-Hermann Ford dealer and was told that they would try to get it back to her that afternoon.  They later informed her that they could not do so.

After dropping off her car, Jones crossed the street to Hermann & Moore Leasing, where manager C.L. Hannah, had an unidentified employee drive Jones to an unknown location.  Hannah did not know Jones's destination.[17]

Shortly before 10:00 a.m., Jones called Judge Lucien Wilcox and said that she would be a little late for court that day.

Shortly before 12:00 p.m., Jones arrived in Judge Wilcox's courtroom.  According to the Judge Wilcox, Jones appeared to be upset and in a hurry.  She asked about Roderick Dooley's case, which involved a dispute between Dooley and a man for whom Dooley had installed a transmission.  When Judge Wilcox told her that the case had not been scheduled for that day, she briefly spoke to Dooley (who had been in the courtroom all morning).  She then went to the clerk's office and confirmed that the case was not docketed for that day.  Jones left without talking to Dooley again.  Judge Wilcox then told Dooley to leave.[18]

Sometime around 2:00 or 3:00 p.m., Jones called Hermann & Moore Leasing and manager C.L. Hannah told her that he had a number of cars that she could rent.

At about 6:00 p.m., Jones picked up her rental car from Hermann & Moore Leasing.  According to manager C.L. Hannah, Jones arrived there in a 1957 or 1958 dark blue Mercury driven by a Black man.  Jones came into the office, confirmed that a car was available, and ran

---

[16] Ella Weathers was named by a number of people as one of Jones's closest friends, but it does not appear that investigators ever spoke to Weathers.

[17] It does not appear that investigators ever identified the employee who drove Jones that morning.  Since Lyman Hill, who worked at night at Roderick Dooley's Texaco Station, worked at Summers-Hermann during the day, it is possible that he was the employee who drove Jones.  However, he was not asked about it and did not mention doing so during his interview.

[18] Investigators considered Dooley as a possible suspect after learning that he might have been a disgruntled client of Jones – specifically over the case for which Dooley appeared in court on the morning of August 4, 1965.  Investigators eventually eliminated Dooley as a suspect.

−10−

back out to let the man know he could leave, which he did.[19]

As already mentioned, the rental car was a 1965 white Ford Fairlane, two-door, bearing license plate #L23-270.  Because Jones had done business with the leasing company several times before, Hannah had the rental form already filled out.  The form did not indicate the exact time of the rental, but it did state that the Ford's odometer read 10846 miles.

At 8:15 p.m., Barbara Cox, a close friend of Jones, called Jones's office, as she often did. Cox said that she and Jones spoke for about 30 minutes about "generalities."  Cox recalled Jones telling her about the broken water pump on the Thunderbird and that she had taken the car to Dooley's gas station.  Cox added that Jones sounded happy - in fact, happier than she had sounded in some time.

Sometime later that evening, Jones returned home.[20]

<u>Wednesday, August 4, late night to Thursday, August 5, early morning</u>

Gladys Wyckoff told investigators that she called Jones at about 11:00 p.m. and suggested that Jones come by to pick up the wig Wyckoff had obtained for her.  Jones initially balked, saying that it was too late and that she was in for the night, but eventually acquiesced. When investigators told Wyckoff that they had information indicating that Wyckoff had called about some "trouble" she was having, Wyckoff explained that the issue involved discussions with members of the of the Kentucky State Barbers and Cosmetologists Examining Board (the Board of Beauticians) about one of Wyckoff's employees, Frances Beatty.  When Beatty had tried to take the beauticians' test, she had not been permitted to do so because she had not brought hot irons and other tools most often used for Black women's hair, and she had complained about the double standard.  Wyckoff had promised the Board of Beauticians members that she would cooperate, but Beatty had taken her allegations to the *Louisville Defender*, and the story became the headline of the August 5, 1965, edition of the paper. Wyckoff stated that it was Jones who first told her that she had made the headlines.[21]  Finally, Wyckoff said that they also spoke about Wyckoff's husband, Green Lee, and about Wyckoff buying the building in which she lived and had her salon.

Sadie Jones testified at the Coroner's Inquest that her daughter was sitting on the couch reading the *Saturday Evening Post* magazine, when Wyckoff called.[22]  Mrs. Jones overheard

---

[19] The man who drove Jones to Hermann & Moore Leasing to pick up her rental was never identified.  James McGill, who cleaned Jones's office, drove a 1960 blue Ford but he stated that the last time he saw Jones was in the early morning hours of August 3.

[20] An August 23, 1965, LMPD report indicates that Jones returned home at 9:15 p.m. but it does not cite the source for that information – it would have to have been either Mrs. Jones, XXX, or both.

[21] In Wyckoff's second interview, she said that Jones had learned about the story from Barbara Cox.

[22] A folded copy of the August 14, 1965, edition of the *Saturday Evening Post* was found in the Ford Fairlane; it had bloody smears on it.

−11−

part of the telephone conversation between her daughter and Wyckoff, and confirmed that Jones said that she did not want to go out so late. Mrs. Jones also reported hearing her daughter tell Wyckoff that Wyckoff would not be in all the "trouble" she was, if only she had done what Jones had told her to do. She also heard Jones say that that there was no point in her going to Wyckoff's place because there was nothing she could do about the unknown issue. Mrs. Jones heard Wyckoff and Jones further debate whether and when Jones should pick up the wig. Mrs. Jones reported that her daughter finally agreed to pick up the wig after Wyckoff told her that she would not have to pay cash for it.[23] Jones eventually remarked to her mother that she would go check on what the "old fool" wanted. Jones put on one of her mother's dresses and left.

According to both Gladys Wyckoff and her 13-year-old son, Charles Wyckoff, Jones arrived at their home at about 11:30 p.m. Gladys Wyckoff said that almost immediately after she arrived, Jones called the King Fish Drive-In restaurant. Although Wyckoff was working on Jones's wig, Jones said that she wanted to eat some shrimp and persuaded Wyckoff to accompany her to the restaurant. At the Coroner's Inquest, Gladys Wyckoff added that just before they left, Jones, who was sitting near a heater in the salon, said that she hoped that she would not be assassinated like President Kennedy had been.[24] According to Charles Wyckoff, his mother and Jones left around midnight.[25] Gladys Wyckoff told investigators that a couple she knew, Arthur Evans and his wife Theo (who worked for Wyckoff in the salon), drove by around the time Jones and Wyckoff were leaving for the restaurant, and Evans later told Wyckoff that it was about 12:15 a.m.[26]

Wyckoff said that when they arrived at the restaurant, Jones ordered shrimp and a lemonade for Wyckoff.[27] As the two women then sat in Jones's car, another car with two white men slowly drove by them.[28] Wyckoff told Jones that she suspected the men were "meddling," but Jones disagreed. As Jones was finishing her meal, the white men parked some spaces away, and Wyckoff heard them say "you girls…"[29] Jones said that Wyckoff "sure knew men." As Jones backed the car out of the parking space, one of the men yelled, "don't leave girls, we want

---

[23] On August 7, 1965, XXX called the LMPD and told investigators that Jones's purse would likely contain an American Express money order in the amount of $50, three or four checks, and $40 in cash.

[24] XXX also reported that Jones had expressed concern about being assassinated like Kennedy.

[25] Charles Wyckoff said that he assumed his mother and Jones would go to Probus Restaurant on Cane Run Road to get fish as they were wont to do.

[26] In a later interview, Wyckoff stated that the Evanses passed her home as Jones was leaving by herself at 1:15 a.m. It does not appear that investigators interviewed either Arthur or Theo Evans.

[27] In a later interview, Wyckoff also said that Jones ordered a beer.

[28] Wyckoff did not provide a description of the men. She also did not specify their age but did refer to them as "boys."

[29] In Wyckoff's second interview, she said that the men parked immediately next to Wyckoff's side of the car, and she heard the man say "baby, you're all right eating lunch."

−12−

to f**k you all for a while."  Wyckoff said that she did not see the white men again that night.[30]

Jones drove to 9th and Broadway Streets where she stopped at the red light and said to Wyckoff that she felt dizzy.  Wyckoff commented that it was probably because Jones worked too hard.  Both women agreed that the other worked long hours.

Gladys Wyckoff said that they stopped at Union Station (at 10th and Broadway Streets) to try to get a copy of the *Louisville Defender* but did not find the paper there.[31]  They then went to Catherine's Eat Shop, at 15th and Broadway Streets, where Jones got out, got a copy of the *Defender*  (which contained the Board of Beauticians story) and stood and read it briefly, then got a second copy and came back to the car.  As soon as the women pulled into the restaurant's parking lot, a man in a car pulled in behind them, got out, and went into the restaurant.  Wyckoff could not tell whether the man was white or Black, and she did not see the man leave the restaurant.[32]

Jones then drove to Marvin's Texaco station next door to Wyckoff's house and parked in the lot.[33]  Jones locked both doors, and they returned to Wyckoff's beauty salon, where, at Jones's request, Wyckoff trimmed the bangs of the wig.  Wyckoff estimated that Jones stayed at the salon 15 to 25 minutes.[34]

 Upon prompting by investigators in a July1966 interview, Wyckoff said, for the first time, that Jones received two calls while at her house, but Wyckoff could not remember from whom.  According to Wyckoff, Jones left between 1:30 and 2:00 a.m.  In Wyckoff's second interview, she said that, as she and Jones stood on the porch, Jones told her to call the Board of Beauticians and assure them that she had nothing to do with the *Defender* story.  Jones also suggested that Wyckoff fire Beatty for going to the *Defender*.[35]  In her early interviews, Wyckoff said that she watched until Jones got into her car, and then went back inside, but she claimed that

---

[30] Investigators spoke to two King Fish waitresses, but neither woman recalled seeing Jones or her car that night.  However, it does not appear that either woman worked the specific section of the lot where Jones and Wyckoff were parked that night.  Investigators attempted to interview another waitress, but she was not home.

[31] In Wyckoff's first interview, she showed investigators a copy of the August 5 edition of the *Louisville Defender* and told them that she had gotten it while out with Jones.  In a later interview, Wyckoff provided more details about where she had gotten the paper.

[32] At the Inquest, Wyckoff said that the driver of the car stayed in it the entire time the women were parked in the restaurant's lot.

[33] Wyckoff told officers that Jones always parked behind Wyckoff's own car on Broadway and this was the first time that she parked in the station lot.

[34] In 1989, Wyckoff told investigators that, after returning from the restaurant, Jones did not come back into Wyckoff's house.

[35] When Beatty was interviewed on September 1, 1965, she had already stopped working for Wyckoff.  She said that she had left over money and, coincidentally, she went to clear out her things on the day of Jones's funeral (Monday, August 9, 1965).

−13−

she did not watch Jones drive away.  However, in September 1965 and again at the Coroner's Inquest in November of that year, Wyckoff said that she had seen Jones drive north out of the station onto 21st Street.

Charles Wyckoff estimated that his mother and Jones returned between 12:30 and 1:00 a.m.  At that point, he, XXXXX, and his mother were the only XXX who were awake.  He watched from the top of the stairs as his mother said goodbye to Jones.  He heard his mother say that she would wait until Jones got into her car and warn Jones to be sure she locked the doors of her car.  After a moment, his mother came back inside and joined him XXXXX to watch the ending of the late-night movie (*Body Snatchers*).  After that, all three went to bed.  In a later interview, he said that the television program ended a few minutes after his mother and Jones returned from the restaurant.  XXX confirmed XXX's and XXX's accounts, although XXX could not remember specific arrival and departure times.[36]  Green Lee Wyckoff, Gladys Wyckoff's husband, who had gone to sleep at around 11:00 p.m., said that he thought his wife came into their bedroom around 2:00 a.m.  At the time, she told him that she had gone out to eat with someone but did not specify that it had been Jones.

John DeToma, who operated the Broadway Fruit Market on 27th and Broadway Streets until 2:00 a.m. on August 4, stated that Jones was a regular customer, often buying food and soda.[37]  DeToma was interviewed twice and, in both interviews, he stated that he was not sure whether Jones came into the store on the night of August 4, recalling only that he had seen her in the store either that night or one of the two prior nights.[38]

### Thursday, August 5, after 1:00 a.m.

Jessie Morgan (who lived at 2916 W. Magazine Street) said that she was awakened by a woman's screams at about 2:00 a.m.  She and her husband Raymond slept in the front room of their house, with the door open and the screen-door latched.  She woke up her husband, and they looked out through the front screen-door.  Both Morgans stated that they saw a car parked across Magazine Street and to the east, almost in front of the Fisher-Klosterman Company (2907 W. Magazine); the car was parked facing west, toward the Morgan residence.[39]  Jessie Morgan could not identify the make, model, or color of the car.  Raymond Morgan said the car was a light-colored (possibly white) Ford two-door.[40]

---

[36] Gladys Wyckoff's sister, Patricia Stowes, also lived in the building.  Charles Wyckoff never mentioned Stowes.  XXX, on the other hand, said that Patricia Stowes was in the room with XXX as they watched television.  Patricia Stowes was not interviewed by LMPD investigators, and she died in 2022.

[37] John DeToma's brother, James DeToma, who also worked at the Fruit Market, concurred that Jones was a regular customer and that she usually came in late at night.  James DeToma was not in the store late at night on August 4, so he could not say whether she came in that night.

[38] Later investigative reports and Detective Roy Myers's testimony at the Coroner's Inquest state as a fact that Jones stopped at the Fruit Market that night, despite the lack of certainty on DeToma's part.

[39] Investigators determined that the Fisher-Klosterman Company completely shut down at 1:00 a.m.

[40] In Raymond's Morgan's first interview, he described the car as a white Ford, possibly 1959 model.  In a later

–14–

Both Morgans were interviewed several times and gave somewhat varying accounts of what they saw, although Raymond Morgan was more consistent.  He stated that he saw a man dragging a woman towards the car from the center of the street.  In one of his interviews, he said that he could not be sure but would have guessed that the man was Black.  As the man reached the car, a second person reached out of the car and pulled the screaming woman into the back seat; at that point, she stopped screaming.  Once the woman was in the back seat, the driver got in and closed the door.  Immediately afterwards, the driver got out of the car again, picked up something from the street, and threw the object into the back seat.  The car started heading west on Magazine.  Morgan heard the driver of the car say something to the effect of "somebody's looking out that door over there."  Morgan said that from the man's voice, he thought the man was Black.  When the car slowed as it passed the Morgan home, he and his wife jumped back so as not to be seen by its occupants.  The car then picked up speed and Morgan went back to the door.  He watched until he saw the car's brake lights brighten as the car went through the underpass/viaduct to the west.  He stated that he assumed that the car simply slowed down for the viaduct dip, but he conceded that the car could have stopped and parked, instead.  He then walked outside and checked the street where the car had been, but he found nothing.

Jessie Morgan gave a number of statements to the LMPD, in which she gave slightly inconsistent accounts of what she saw that night.  In her earliest statement on August 6, 1965, she said that she saw a man get out of the driver's side of the car, pick up something out of the middle of the street, and then get back into the car.[41]  The car then drove slowly past the Morgan home heading west.  She added that her husband watched the car and that there were three men inside.  In her second interview, she provided additional information, stating that there were three or four cars parked across the street and it was her husband who pointed out the white car.  She could see what she thought were three people in the back seat and the driver in the front, but she could not tell the race or gender of any of the car's occupants.  When someone opened the driver's side door and started to get out, she stepped back away from the door and only heard from her husband what was happening outside, including that "he" (the driver) had picked up something (either a pair of shoes or a purse) and gotten back in the car.  She estimated that the car was outside for 15 minutes before starting to pull away.  In her third account, in November 1965, she said that she moved away from the front door as soon as her husband pointed out the car.  Shortly thereafter, she moved back to the front door at her husband's suggestion and got there in time to see the driver's-side door being slammed shut.  The car did not move for a few moments.  She moved away from the door again.  She estimated that the car drove away around 2:15 a.m.[42]

Margaret Hager, who lived at 2918 W. Magazine, next door to the Morgans, said that she was awakened at around 1:15 a.m., by what she first thought was the howl of a dog.  She then

---

interview, he described it as light-colored.

[41] Jessie Morgan spoke twice with investigators on August 6, and it was the second time that she talked about hearing the woman screaming and the events that followed.

[42] Jessie Morgan's third interview on November 16, 1965, and her testimony at the Coroner's Inquest the next day were consistent.

–15–

heard the sound of a woman trying to scream with a hand over her mouth. Finally, she clearly heard a woman scream. Hager got out of bed and went to the open front door. She saw two men of unknown race walk from her side of Magazine Street (near the United Furniture Company Warehouse) to a car (of unknown color) parked in front of the Fisher-Klosterman Company. The two men got into the car and the car left at high speed. Hager said that at about 2:20 a.m., she saw Raymond Morgan come from the rear of his car (parked in front of his home) and walk into his house.[43]

### Thursday, August 5, between 5 and 10 a.m.

As has been noted, investigators found Jones's rental Ford Fairlane on the evening of August 6, parked between 3121 and of 3125 Del Park Terrace. Magazine Street turns into Del Park Terrace after the viaduct and immediately prior to 31st Street, just two blocks west of the Morgans' home. Investigators interviewed numerous neighborhood witnesses, and it appears that the earliest definitive sighting of the car was by XXX, resident of XXX Del Park Terrace, when he left for work between 6:00 and 6:15 a.m. on August 5. Mary T. Clarke (XXX's landlady), Anna Horton (3127 Del Park Terrace) and Lorean Mayfield (3121 Del Park Terrace) all similarly stated that they first saw the car on the morning of August 5.[44] J.P. Fitzgerald (3129 Del Park Terrace), whose call to the LMPD on August 6 alerted investigators to the location of the Fairlane, initially said that he had seen the car there for at least three days (which was not possible). In a later interview, he said that he had seen the car on August 5 (at an unspecified time) and again on August 6.[45]

Lorean Mayfield and Sanford Combs, who lived at 3121 Del Park Terrace, both said that sometime on the morning of August 5, Raymond Morgan told them that he had found his car (which he said had been stolen the night before) parked in front of their home, and he asked them whether they had seen anyone around the car.[46] Raymond Morgan confirmed that his car had been stolen, that he eventually had found it in the 3100 block of Del Park, and that he had spoken

---

[43] Hager did not specify what she was doing for the hour that elapsed between her sightings of the car and of Raymond Morgan.

[44] In Lorean Mayfield's first interview, she stated that she first saw the car on the morning of August 4. Bernetta Rothfuss (3115 Del Park Terrace) initially said that she had seen the car for about the last two days (which could have included the evening of August 4). She later said that she was not sure whether she'd seen the car on the night of August 4 but definitively saw it on the morning of August 5.

[45] Fitzgerald stated that he had grown suspicious when he noticed that the Fairlane's front passenger window was rolled down. Both Fitzgerald and Mary Clarke said they noticed the car in part because of the rolled-down right window, but by the time investigators were looking at the car, both front windows were down. Fitzgerald wrote down the car's license plate and called the LMPD to ask whether the car had been stolen. He was told that the Fairlane had not been stolen, but that investigators would respond immediately to check it out. Fitzgerald estimated that two detectives arrived 5 minutes later.

[46] Investigators considered Mayfield and Combs as suspects in large part due to witness accounts of an argument between Mayfield and another Black woman on August 4. Investigators later determined that the other woman could not have been Jones, and the witnesses could not identify her from photos. Both Mayfield and Combs submitted to polygraphs, which they passed.

−16−

to Sanford Combs about it.  However, Morgan consistently claimed that the theft had occurred on the night of Tuesday, August 3, and that he found the car the next morning on August 4.[47]

At around 7:00 a.m., XXX called the Wyckoffs, looking for Jones, and was told by XXX that Mrs. Wyckoff was downtown doing business.  At about 8:30 a.m., Gladys Wyckoff called XXX back and said that she and Jones had parted at around 1:00 a.m.

Gladys Wyckoff said that she went to the bank sometime in the morning and when she got back she found a note to call Mrs. Jones.

XXX said that sometime that morning, she got a phone call from an unidentified Black woman who asked if Jones was home.  When XXX replied in the negative, the woman said to the effect, "I know she's not because she's dead."[48]

### Thursday, August 5, 9:30 a.m. to 2:00 p.m.

Bradley Hardin, a worker for Louisville's Recreation Department,[49] was mowing the grass at the Shawnee Golf Course, at about 9:30 a.m. on August 5, and found a pair of women's shoes in the grass a few feet west of the exit ramp from Indiana of the Sherman Minton Bridge.[50] Sadie Jones later confirmed that the shoes belonged to her daughter.

At about 10:35 a.m., a group of young white boys were walking along the Ohio River, behind the Fontaine Ferry Park, and saw Jones's body floating face-down, in the river, about 15 feet from the shore.  They asked a man riding by on a horse to call the police.  LMPD officers responded and called the Coroner and the Coast Guard.  The Coast Guard arrived at around 11:30 a.m. and pulled Jones's body from the river.

---

[47] Jessie Morgan initially told investigators on August 6, that the car had been stolen on Tuesday night, August 3, consistent with her husband's account.  However, the second time she spoke to them on August 6, she said that the car had been stolen the night of Wednesday, August 4, which was consistent with the statements of Lorean Mayfield and Sanford Combs.

[48] XXX first mentioned the call in 1989.  In 2021, XXX told Criminal Section attorneys that XXX had since spoken with Patricia Stowes (Gladys Wyckoff's sister) and opined that Stowes had been the caller.  As indicated previously, LMPD investigators did not interview Stowes.  Stowes died on May 17, 2022.

[49] Investigators briefly considered as a suspect one of Hardin's co-workers at the Golf Course, Robert Lester Dallas, when a witness claimed that Dallas had been in possession of Jones's missing wig and initially missing lower dental plate (which was recovered inside her purse in 1968).  Dallas had coincidentally been among the 200 people interviewed on the Sherman Minton Bridge on August 12, 1965.  At that time, he said that he had not driven on the bridge on either August 4 or August 5.  He stated that he had not known Jones but had seen her when he sought employment in the city.  Dallas's fingerprints and palmprints were checked and did not match those found on the Fairlane.

[50] At the Inquest in November 1965, Detective Roy Myers testified that the location of the shoes suggested the possibility that they had been thrown by someone in a car or on foot inbound from Indiana on the Sherman Minton Bridge.

LMPD detectives and Deputy Coroner Charles Proctor immediately began examining the body.  Jones was wearing a green and white vertical-striped dress, but no shoes, stockings, or jewelry.  She also did not have on a wig.[51]  Deputy Coroner Proctor reported later that he examined Jones's body at about 12:30 p.m., and estimated the time of death to have occurred 8 to 10 hours before – anytime between 2:30 and 4:30 a.m.  As will be discussed later in this memorandum, there was a small, shallow cut on Jones's forehead, and another shallow cut twice as long and deep as the first, near her right eyebrow.  She had scrapes on her right leg, below the knee, and on her right arm.

At 1:30 p.m., Sadie Jones called in a missing person report, unaware that her daughter's dead body had been found in the river that morning.  The report stated that Jones had left a friend's house (at 21st and Broadway) at midnight headed home but had never arrived.  The report included the information that Jones was driving the Ford Fairlane and its license plate and listed "unknown" as a probable destination.

4.    Relevant Physical and Medical Evidence

A.    The 1965 Ford Fairlane

i.    External and internal observations

Jones's rental car, which had been found on the evening of August 6, parked between 3121 and 3125 Del Park Terrace, and facing west toward the river, was towed to an LMPD station, and parked in the basement.  Investigators began a detailed examination of the exterior and interior of the car at about 9:00 p.m. and finished about 5 hours later, at 2:00 a.m. on August 7.  Following is a summary of the most relevant observations.

Both car-doors were unlocked, and both front windows were rolled down.  The left vent window was open at an angle; the right vent window and the two rear windows were closed. Fingerprint smears and spots of what appeared to be blood were found on the chrome strip around the right front window and at the base of the passenger's side door. There were also what appeared to be smears on the chrome strips around the drivers-side windows but no blood.  There were wine-colored bird droppings on the right front fender, on the hood, and on the top of the car.[52]

The odometer read 10895.7—51 miles more than when Jones rented the car on the afternoon of August 4, about two days earlier.[53]  The majority of the remaining relevant evidence

---

[51] Despite numerous efforts, investigators were never able to locate the wig that, according to Gladys Wyckoff, Jones was wearing when she left Wyckoff's salon in the early morning hours of August 5.

[52] Investigators found a brown-paper bag with red spots in a gutter near the Cabot Pipe-Fitting Company's plant at 2929 W. Magazine (between the Morgans' home and the 3100 block of Del Park Terrace).  The investigative report states that the red spots were not blood, rather, the droppings of birds that were "devouring" red berries and other fruit during that time period.

[53] Although the odometer was checked by investigators more than 48 hours after Jones rented the Fairlane, the car had been first sighted by the neighbors considerably earlier, on the morning of August 5.  This fact, combined with

−18−

was found in the back seat, particularly on the right side, and on the right side of the front seat.

Blood was found on more than half of the back seat, and on the rear "hump" of the floorboard. Blood smears were found on the backs of both front seats, and on two books of matches found on the right side of the front seat; spots of blood were also on the seat itself. No blood was found on the driver's side of the front seat.

On the right side of the front floorboard, there was a torn piece of green paper from the August 5, 1965, edition of the *Louisville Defender* with prints in blood.

On the right side of the rear floorboard, investigators found Jones's upper dental plate and a folded copy of the August 14, 1965, edition of the *Saturday Evening Post* with several blood smears.[54]

Also, on the right side of the rear floorboard, investigators found a small piece of red brick with blood smears and spots, and a number of smaller pieces of the same red brick.

A 4-inch knife-blade was wedged between the seat and the backrest of the rear seat; the blade was stamped "Sabre, Stainless, Japan." It did not appear to have any blood on it.

On the left side of the rear floorboard, investigators found a piece of metal that appeared to be the handle of a knife, a small piece of pink-colored sponge or foam-type rubber, and pieces of black hair (some long and some short). On the left side of the front floorboard (where the driver's feet would have been), investigators found a few long hairs, small pieces of gravel, and an empty cellophane wrapper for a pack of cigarettes.

The front ashtray contained six Marlboro cigarette-butts, including one with lipstick on it, a chewed wad of gum, and two spent paper matches. The right rear ashtray contained a Viceroy cigarette-butt. Additional pieces of evidence included an unlit Winston cigarette, a book of matches, and a spent paper match found under the front passenger seat.

### ii.    Fingerprinting (and issues with discarded, damaged, or missing prints)

Immediately after the examination of the interior and exterior of the car described above, Officer John Elliott of the LMPD lab started taking prints off the car. That effort took about 5 hours, ending sometime around 7:00 a.m. on the morning of August 7. Although unclear, it appears that Elliott developed at least 25 prints. As will be discussed later, the FBI lab

---

other evidence indicating that it had not been moved since that sighting, indicates that the car was driven 51 miles between the late afternoon of August 4 and the morning of August 5.

[54] As previously mentioned, Sadie Jones said that her daughter had been reading the *Saturday Evening Post* when Gladys Wyckoff called and asked her to come try her wig. The reviewing attorney obtained a copy of the August 14, 1965, edition and confirmed from the pictures in the file that it was indeed that edition that investigators found in the car. Since the magazine was likely placed in the car on August 4 or 5, it must be presumed that home subscribers must have received their copies at least 10 days in advance.

–19–

confirmed that it ultimately received three latent fingerprints, three palmprints, and one impression.

At one point on the morning of August 7, Elliott left the lab and, when he returned, he found Technician John Patterson looking through the envelope of prints. Sgt. Sharon Miller told Patterson to leave the prints alone and that he wanted to review them when he came back from getting coffee. Elliott went home and Miller went outside.[55] When Elliott returned to the lab at about 10:00 p.m. that evening, he looked into the envelope and found that all the print-cards were missing. When Elliott asked Patterson about the missing print-cards, Patterson said that he had not touched them and did not know where they had gone. Patterson added that Sgt. Miller was the only other person who had gone through the print-cards.

Elliott began to search for the print-cards and found the following items in a trash basket:

- 4 partial prints on rubber lifters taken from each of the right door trim, left window inside, right door post, and left rear window;
- 3 plastic lifters with prints taken from the left door trim; and
- a cellophane lifter (transparency) that had been pulled from its backing, thereby destroying a print taken from the right door trim.

Elliott also discovered that three "good" first-joint prints on rubber lifts taken from the left front window were missing entirely, and that there were no photographs or negatives of those prints in the envelope. Thus, the only print from the left front window was a slightly smeared one (presumably the partial print found in the trash).[56]

All of the prints that had been thrown away or otherwise damaged were placed in a separate envelope initialed by Detective William Z. Lancaster (W. Z. L.) and taken to the homicide office for safekeeping, along with all of the remaining prints, negatives, and photographs. Although Lancaster referred to the incident as "very disturbing and serious," there is no indication in the file that anyone followed up with Sgt. Miller about the discarded, damaged, or missing prints.[57] However, on the morning of August 9, after Lancaster learned about the issue, Miller supervised the removal by a glass expert of the left front window from the door of the Fairlane so that prints on it could be photographed.

In 2009, Elliott told investigators that it was his belief that Sgt. Miller had thrown away

---

[55] The investigative report makes a cryptic reference to "some other events on this date reference restocking the lab, etc." The report states that other detectives were aware of these other "events," so the report would not elaborate further.

[56] At the time of the writing of the report in the early morning of August 9, the photo lab had not yet been contacted to determine whether they were still in the process of photographing the three missing prints.

[57] Detective Lancaster ended his report with the following in all-caps: IT IS THE OPINION OF THE UNDERSIGNED THAT IN THE INVESTIGATION OF HOMICIDE NO PIECES OF EVIDENCE SHOULD BE DISPOSED OF OR MATERIALLY CHANGED EVER. AND THAT NO MATTER HOW SMALL IT MAY SEEEM IT MAY BE BIG ENOUGH TO SOLVE THE CASE."

−20−

the prints "for no apparent reason."[58]  Elliott added that the prints had been "recovered and processed with negative results."  However, as will be discussed with respect to the print matched to suspect XXX in 2008, it is possible that the matching print had been among those that Elliott recovered from the trash basket.

Elliott continued to expend efforts to obtain good prints.  Elliott was reportedly able to bring out a clear print from the blood on the torn piece of the *Louisville Defender* (the *Defender* print), and several prints from the blood smears on the *Saturday Evening Post*, by using iodine fumes and Ninhydrin Spray.[59]

### iii.      Sweepings and tests by the Kentucky State Police (KSP)

On the afternoon of August 7, at about 2:00 p.m., Lt. Fred Watson, head of the KSP's Laboratory, used an electric sweeper to obtain sweepings from both sides of the front and rear floorboard mats, and from under the back seat of the Ford Fairlane.[60]  In addition, tests determined that there were traces of blood on the knob of the gear-shift lever, the part of the steering wheel where the driver's right hand would normally rest, the knob of the headlight switch, and on the lever to open the left door.  No evidence of blood was found on the side of the steering-wheel where the driver's left hand would have rested.  Investigators concluded that the driver had blood on both hands, but much more on their right hand.[61]

### iv.      Findings by the FBI Lab

Between August 10, and August 25, 1965, the LMPD submitted numerous pieces of evidence to the FBI.  The submission included the evidence found in the Fairlane; Jones's shoes; the torn piece of the *Louisville Defender*; a photograph and negative of the *Defender* print; a blood sample and hair samples taken from Jones; 19 white rubber lifts, 14 transparent lifts; 2 black rubber lifts; and nine photographs.

In reports, dated August 19, 20, and 25, the FBI lab provided the following findings:

Jones's blood was type "B."  The same type blood was found on the rear floor mat, on the cover from the back of the right front seat, and on the covers of the back seat and the backrest of the back seat of the Fairlane.[62]  Additionally, human blood in insufficient quantity to type, was

---

[58] Sgt. Sharon Miller died in 1995.

[59] All those prints were photographed by the LMPD photographer, XXX.  Officer Elliott and XXX continued to work on the *Defender* print, and Elliott concluded on August 12, that they had a very good photograph of the print - one which would allow for 12-16 points of comparison.

[60] Vacuum sweeping is an evidence collection technique used to recover trace evidence such as hair or fibers from an item or area.

[61] Lt. Watson tested various other spots and found blood, but the report does not indicate where those spots were.

[62] DNA profiling was not developed until the mid-80's and, therefore, not available at the time of Jones's death in 1965.

–21–

found on the piece of brick, on the seat cover from the driver's seat, on matchbooks on the right front seat and on the back of the front seat, and on the upper dental plate.

No blood was found on the piece of metal that appeared to be the handle of a knife, on the knife blade, on the unlit Winston cigarette, on the cigarette-pack cellophane wrapper, on a matchbook from under the right front seat, on the contents of the front and right rear ashtrays, on the pink sponge, or on the victim's shoes.

Light brown to dark brown head and limb hair, and numerous fragments of head and limb hair (from both white and Black individuals), were found in the sweepings from both sides of the front and rear floormats, from under the left side of the back seat, and from miscellaneous items found under the back seat. Additionally, head-hair fragments, dyed grayish-green, were found in the sweepings from both sides of the front and rear floormats, and from under the left side of the back seat. Some of these hairs were microscopically similar to Jones's hair samples.

Two long hairs found on the left rear floor had been dyed dark brown and were most likely from white individuals. A yellowish hair found alongside the right front seat appeared to have been treated with alkaline solution. These three hairs were microscopically dissimilar to Jones's hair samples.

The FBI report confirmed that the piece of metal found on the left side of the rear floorboard was from the hinge of a clasp knife. Based on the size, the handle and knife blade, that were found separately in the Fairlane, could have been part of the same knife, but there were insufficient marks to make the comparison.

According to an August 20, 1965, report, no latent impressions of value "appeared on or were developed on" the torn piece of paper from the *Louisville Defender*; and none appeared on the photograph or negative of the *Defender* print.[63]

The FBI was unable to develop any latent fingerprint impressions on Jones's shoes, the unlit Winston cigarette, the cellophane, the matchbooks found on the right front seat, the back of the front seat, or under the right seat, the knife blade, the contents of either the front ashtray or rear right ashtray, or from any of the miscellaneous items found under the back seat. However, on September 1, 1965, the FBI lab reported that three latent fingerprints, three latent palmprints, and a latent impression (which could be either a fingerprint or a palmprint) appeared on seven of the lifts and nine of the photographs submitted by the LMPD. Two of the palmprints and one impression also appeared on four other lifts. The remaining were not of value. The report states that the FBI retained the prints for future comparison.

---

[63] The *Defender* print was still in the case file in 1989, but Officer Elliott told the investigator that it had been treated with Ninhydrin and was no longer good. However, Elliott was able to use a photograph of the print for comparison purposes. In March 2008, the piece of newspaper was again processed for latent prints and re-photographed. The digital photograph was burned to a CD and forwarded to the forensic lab.

–22–

### v.      Return of the car

On the morning of August 9, 1965, investigators removed the left front window, the seat covers, and the rear floormat of the car, and then had it towed back to Summers-Hermann.[64]

### B.      Autopsy

According to the autopsy report, dated August 9, 1965, Jones died by drowning.  The report noted two small lacerations on her forehead: one just above the bridge of her nose, that was 1.9 cm long and a ½ centimeter deep (0.7 x 0.19 inch); the second above her right eyebrow, that was 3.5 cm long and 0.7 cm deep (1.3 x 0.27 inch).  Additional findings included a hematoma on the right temporoparietal area; hemorrhage in Jones's right eye; contusions and abrasions between her eyebrows, over the right arm and elbow, and above the right knee; and a scrape on the side of her right leg.

Significantly, she suffered no skull fractures or "severe brain damage which could be considered fatal."

Deputy Coroner Charles Proctor opined that Jones likely died 8 to 10 hours before he conducted the initial body investigation at 12:30 p.m. on August 5.

Proctor concluded that the cuts (or the blows that caused them) could not have caused Jones's death.[65]

The autopsy also determined that Jones's blood alcohol level was zero.

### C.      Other relevant physical evidence findings

Representatives of the U.S. Army Corps of Engineers opined to investigators that Jones's body had not been thrown from the Sherman Minton Bridge because the current would have carried it to the Indiana shore.  They opined further that Jones's body would not have traveled more than 100 feet from where it was found.

The approximate distance from the location of the body to the Shawnee Park boat ramp was 440 feet.  Although the body was found in very shallow water, the area immediately around the boat ramp had been dredged out to make it deeper for the boats.

---

[64] Investigators initially did not check inside the trunk of the Fairlane because the key was missing.  They reported that they could possibly obtain a key from Summers-Hermann (as they had done for Jones's Thunderbird). However, strangely, there is no evidence in the police file indicating that they ever did obtain the key or check the trunk. On the other hand, they did have the seats removed so it's likely that would have given them access to the trunk.  Nonetheless there is no report indicating what if anything was in the trunk.

[65] Some news accounts, and an August 10, 1965, letter from the LMPD to the FBI, said that Jones had been struck on the head, producing the cuts and rendering her unconscious.  However, Deputy Coroner Proctor specifically stated that he could not determine whether the blows that caused the two cuts could have had sufficient force to render her unconscious, and that it could only be theorized that they did.

−23−

According to an August 16, 1965, LMPD report, officers searching the area around the Shawnee Park boat ramp, took samples of the limestone around the boat ramp to compare to the limestone found in the Fairlane (the gravel found on the driver's side front floorboard).  There is no indication whether the comparisons were made.  However, based on the opinion of the Corps of Engineers and the finding of limestone both at the ramp, and in the car, it is likely that Jones's body was placed in the water near the Shawnee Park boat ramp.

### D.      Current location of the physical evidence

In 1989, the LMPD homicide file still contained negatives and/or photographs of some of the prints.[66]  In 2008, the FBI released to Detective Terry Jones 24 photographs of latent prints.  At that point, the FBI no longer had any blood, fibers, or hairs from the case.  Detective Jones was informed that the LMPD Property Room also no longer had physical evidence related to the case.

As indicated later, in 2016, LMPD investigators conducted a search of the digital record logs for any available physical or other evidence.  They located only the torn piece of paper from the *Louisville Defender*.  An inspection of the area of the property room dedicated to homicides failed to locate any evidence associated with the case.

### 5.      Summary of Suspects and Motive Theories

Numerous possible suspects were investigated in the four successive investigations into this matter.  Review of the file does not suggest that any suspects were overlooked or ignored by authorities or that any obvious leads were not pursued.  In the 1960s, investigators considered many suspects, based on opportunity and various different motive theories and leads.  Some of the initial suspects had opportunity but no obvious or strong motive.  The remainder of the suspects could be classified under one or more of the motive theories that were investigated.  None of the identified suspects at the time were thought to have been motivated either by Jones's race or by her voting-rights work for the I.V.A.  Instead, the possible motives included ones focused on personal connections, on her work as a prosecutor in Domestic Relations Court, or on her representation of certain clients, including Muhammad Ali.  Some theories involved robbery or other financial motivations.[67]  Ultimately, and most significantly, investigators were not able to find definitive evidence (including matching fingerprints) against any of the numerous suspects they considered.

When the murder investigation was re-opened in 1988, the LMPD focused initially on

---

[66] On March 8 and 9, 1989, Detective XXX reported that investigators succeeded in locating the negatives for both the Jones and DeCora White investigations from a box in the archives. He also reported finding some of the photographs.  Both the negatives and photos were placed in the casefile.  XXX also contacted the FBI.

[67] Jones's estate was not insignificant.  According to a newspaper article, the estate included seven parcels of land worth $54,089 and personal property worth $12,627 for a total of $66,716.  Indexed for inflation, $67,000 in 1965 would be about $540,000 today.  Moreover, it seems likely that the seven parcels of land might be worth a good deal more today.  Investigators did not consider the estate a motive for Jones's surviving heirs, nor was there any evidence to support the theory.

–24–

whether Jones's murder had any connection to the drowning death less than a year earlier of another Black woman, DeCora White.

In 2008, investigators discovered that one of the fingerprints developed from the Fairlane belonged to XXX, and they conducted further investigation to determine whether XXX could be tied to the crime. The 2016-2018 investigation was also focused on XXX.

The suspects developed in each investigation are discussed sequentially.

### A.      1960s Suspects and Theories

The following discussion will focus on the suspects identified as such by the 1960s investigators, broken into broad motive theories: 1) personal; 2) robbery; 3) Nation of Islam; and 4) other/unknown. Additionally, as discussed at the end of this section, investigators looked into whether Jones's murder could have been tied to the murders of five other Black women that occurred in the West End of Louisville in 1965.

As explained more fully with respect to each suspect, none of the suspects identified in the 1960s had fingerprints that matched those found on the Fairlane. To the extent incriminating information exists with respect to any of them, it is unlikely that such information would be sufficient to prove guilt beyond a reasonable doubt. More importantly, there is no evidence that any of these suspects may have been motivated by Jones's race or her civil rights activities or for any other reason prohibited by federal civil rights laws; thus, none could be prosecuted under the federal statutes covered by the Till Act. Even if such evidence could be developed, the statute of limitations has expired for the federal civil rights statutes that might be applicable to the murder. Finally, as discussed more fully below with respect to each suspect, all of the major suspects identified in the 1960s investigations are now deceased and thus cannot be prosecuted under any statute.

#### i.      Personal

<u>Gladys Wyckoff and Green Lee Wyckoff, Sr.</u>

**Gladys Wyckoff** was considered a potential suspect because she had spent time with Jones immediately before her death. Jones's family suspected Wyckoff of some involvement in Jones's death because Wyckoff made the call that resulted in Jones going out on the night of her murder. According to Mrs. Jones, her daughter did not want to leave home on the night of August 4, and Wyckoff convinced her to do so. But Wyckoff was candid from the start in admitting that Jones had not wanted to leave her own home to visit Wyckoff. Moreover, Wyckoff's children and Jones's close friend, Barbara Cox, stated that the two women regularly were out late together.

Wyckoff had no obvious motive for the murder. Wyckoff had known Jones for several years, both as a friend and as a client. In fact, Wyckoff was reportedly one of Jones's three closest friends, the other two being Ella Weathers and Barbara Cox. Moreover, there is insufficient evidence to prove that Wyckoff harmed Jones. Three members of Wyckoff's family

–25–

corroborate relevant aspects of her account, including that Jones, still alive, left the house at around 1:00 or 1:30 a.m. Additionally, Wyckoff's polygraph examination did not show deception. Even if evidence could be developed inculpating Wyckoff in Jones's murder, she could not be prosecuted as she died in 2017.

**Green Lee Wyckoff, Sr. (Green Lee)**, Gladys Wyckoff's husband, lived at the same address as his wife and theoretically also had opportunity to harm Jones. He stated that he was in bed and asleep by 11:00 p.m. It is possible that he was not asleep and that, instead, he got into the Fairlane while Jones was having the wig trimmed, after she and Gladys returned from the restaurant. However, this scenario seems at best theoretical. No witnesses reported seeing anyone matching Green Lee's description in the vicinity, and neither Gladys nor anyone else in the house reported seeing Green Lee leave that night.

At the time, investigators considered whether Green Lee may have been motivated to harm Jones because Jones was helping Gladys obtain a divorce from him.[68] However, none of the witnesses interviewed, including Marvin McCoomer, operator of Marvin's Texaco and a confidante of Green Lee, reported hearing him blame any third party for his marital problems, nor did any witness indicate that Green Lee ever threatened to harm anyone, including Jones. Green Lee also passed a polygraph in which he denied knowledge of Jones's death.

Ultimately, the evidence against Green Lee, with respect to both opportunity and motive, is lacking. Moreover, Green Lee could not be prosecuted for Jones's murder because he died on March 18, 1993.

### Randolph "Randy" O. Reid

Investigators considered whether **Randy Reid, Jones's boyfriend,** might have been jealous of Jones, personally or professionally.

Reid said that he and Jones had known each other since high school and that they had started dating in "about 1960." Reid stated that he and Jones would go to movies or plays, but never bars. If they wanted to have a party they would do so at "Celebrity House," a private event venue which he owned.[69] Reid said that Jones was the only woman he had ever loved or dated and that he had it in his mind to marry her once they had both "reached the peak that they were striving for."

---

[68] Gladys Wyckoff said that about seven to ten days prior to Jones's death, she had visited Jones's office to institute divorce proceedings against Green Lee. And Green Lee had been one of the topics Gladys discussed with Jones discussed during their phone call on August 4.

[69] Reid taught at a junior high school during the day and worked at Celebrity House at night, and all summer. Reid had also owned the building that housed Celebrity House – 2431 W. Broadway Street – for five years; he had rented out both floors until 1963 when he opened Celebrity House on the first floor. Notably, the Wyckoffs and Gladys Wyckoff's beauty salon had moved to the same address by the time she was interviewed in July 1966, and Gladys Wyckoff was living at the same address when she was interviewed in 1989. Thus, it appears likely that Reid closed Celebrity House sometime in the year following Jones's death and sold the building to Gladys Wyckoff.

–26–

Reid said that he had last seen Jones on Sunday, July 25, 1965, when they had gone together to see *What's New Pussycat?* at a movie theater in town.  On the night of August 4, Reid had gone by himself to see *The Sound of Music*, again in downtown Louisville.  He had stopped at Celebrity House to lock the back gate on his way home.  He arrived home at 12:30 a.m. on August 5.  Reid's mother, who lived with him, was awake when Reid arrived home.  Reid's prints were checked against latent prints recovered on the Fairlane and did not match.

The evidence in the file is thus insufficient to suggest that Randy Reid was responsible for Jones's death.  Even if evidence could be developed inculpating Randy Reid, he could not be prosecuted because he died on July 5, 1982.

### Barbara Cox and Ethel DeLois Davis

Several witnesses reported rumors or beliefs that Jones was a lesbian.  While none of the witnesses provided any direct evidence to support those opinions, investigators, nonetheless, considered whether Jones might have been murdered by a former lover or the jealous partner of that lover.  Among those rumored to have been tied romantically to Jones was Barbara Cox, as discussed below.  Ethel Delois Davis had no known ties to Jones but is discussed here because an informant claimed that she had been Jones's lover.

**Barbara Cox** described herself as one of Jones's closest friends, having known Jones all her life.  Cox said that she and Jones became particularly close in 1962 when they were both working for the I.V.A.  Cox lived in a building owned by Jones, which also housed the I.V.A., from March 1963 through August 1964.  She said that she spoke to Jones on the phone most days.

Investigators developed no evidence that Cox would have wanted to harm Jones.  Jones's mother told investigators that Jones had, at one point, stated that she did not want to associate with Cox.[70]  Investigators, however, found no other indication of a rift between Cox and Jones.

Moreover, Cox provided an alibi for the murder.  Cox told investigators that the last time she had seen Jones was at an I.V.A. meeting on July 30, 1965.  As already discussed in the timeline section of this memo, Cox said that she spoke to Jones on the phone from about 8:15 to 8:45 p.m. on the night of the murder.  Following that phone call, Cox immediately left Louisville with (Jerry) A. Cantrell, headed to Frankfort, where they arrived around 10:00 p.m., and spent the night there.  At about noon the following day, Cox and Cantrell drove to Lexington, and it was there that, around 5:00 or 6:00 p.m. on August 5, Cox learned of Jones's death from a radio broadcast.  Cox became hysterical.  Cantrell and Cox immediately drove home, and then Cox drove herself to Jones's house where she and Gladys Wyckoff spent the night.

During the interview, Cox suggested she call Cantrell to verify her alibi, but investigators

---

[70] According to Mrs. Jones, her daughter had made the comment after returning from a trip with Cox to New York City for the World's Fair.  Mrs. Jones did not give an exact date or range of dates for the trip.  However, the World's Fair ran for 2 six-month periods – between April 22 and October 18, 1964, and April 21 to October 17, 1965.

told her it would not be necessary at that time.[71]  It does not appear that investigators ever followed up with Cantrell.  Although investigators at one point suggested that Cox submit to a polygraph, it appears that Cox ultimately was not given a polygraph.[72]

Barbara Cox died on May 29, 1999.[73]

**Dr. Rev. Ethel Delois Davis** was identified as a potential suspect by Willie Lee Richardson.  In July 1966, after pleading guilty to an unrelated murder, Richardson asked to speak to investigators, saying that he had information on Jones's murder.

Richardson said that Delois Davis (a teacher at the Phyllis Wheatley School) had been in a relationship with Jones.  According to Richardson, at some point, Davis tried to break off her relationship with Jones and, when Jones refused, Davis asked a friend, David Guy, to kill Jones.  Richardson claimed that Guy and four or five other men killed Jones.

According to Richardson, Davis called Jones at the Wyckoff residence on the night of August 4 and asked her to come over.[74]  Jones had stopped her car almost in front of Davis's house when Guy and the other men jumped into the car. Richardson said that on the morning of August 5, at 9:00 or 9:30 a.m., he saw Guy at Turner's Grill.  There, Guy told Richardson that he had killed Jones.  Guy also told Richardson that Guy had taken Jones's purse, which had more than $100 in it, which Guy split with the other men.  In later interviews, Richardson specified that "Chick" or "Chico" (Henry Lee Mills) was among the other men involved in the murder.

Richardson claimed that he had been to Davis's house on numerous occasions and had seen Jones there a number of times.  He said that Davis told him that she needed to get rid of Jones and hinted at offering the job to Richardson; Richardson demurred.  Richardson claimed further that Davis and another of her partners, Gertrude Williams, talked about the "case" in his presence.

Although Richardson passed a polygraph examination as to his basic account, there are glaring problems with his story, the most important of which is his significant animus towards Davis and Gertrude Williams.  According to Davis, in 1961, Richardson was convicted and

---

[71] Mrs. Jones told investigators in 1967 that they should look into Cantrell, whom she described as "high tempered." Mrs. Jones alleged further that her daughter had had "words" with Cantrell over money he and Cox wanted from her.

[72] It is not clear from the file whether Cox's prints were compared to the latents recovered from the Fairlane.  A September 24, 1965, report lists Cox among the suspects interviewed by that date.  The same report states that the prints of 132 people had been checked.  An October 22, 1965, report lists individuals whose prints were checked, and the list does not include Cox.

[73] By the time of her death in 1999, Barbara Cox was Barbara Bailey.

[74] It was as a result of this statement by Richardson in 1966, that investigators asked Gladys Wyckoff whether Jones had received any calls at the salon, and Wyckoff replied that she had received two calls, but she could not remember from whom.

–28–

sentenced to six years in prison after he broke into her home.[75]  Williams, who was a friend of Davis's, testified against Richardson.  Williams told investigators that, as Richardson was leaving the court after being sentenced, he said to Williams: "I'm going to fix you for this."

Additionally, investigators were unable to corroborate any of the details of Richardson's account.  More importantly, none of the individuals Richardson alleged were involved had prints that matched any found on the Fairlane.[76]  Finally, even if Davis had been involved in Jones's murder, any motive would be personal, not due to Jones's race or civil rights advocacy or any other reason covered by the Till Act.

Dr. Rev. Ethel Delois Davis died on December 17, 2008.

### ii.      Robbery theory

<u>The Tyus Brothers and Walter Lee Stephenson</u>

**Ervin** and **Edward Tyus** were long-time acquaintances of Raymond and Jessie Morgan, the couple who lived on Magazine Street and witnessed what is believed to be some part of Jones's abduction on the night she was murdered.  As discussed below, the Tyus brothers were suggested as potential suspects by Mary Agnes Stephenson, Jessie Morgan's mother.  Walter Lee Stephenson was Mary Agnes's son, and Jessie Morgan's half-brother.

**Ervin Tyus.**  Mary Agnes Stephenson initially claimed that Jessie Morgan had told her that sometime after the Morgans saw a woman being dragged into the light-colored car, a man she recognized as Ervin Tyus drove back to the area in the *same car* and parked it where Jones's rental was later found.  In a later interview, Stephenson altered her story to claim that Jessie said that when Tyus returned to the area, he ran into the Morgans' home, and then he and Jessie came out of the home together.  Jessie then told Tyus that he had better get out of the car because it was the same car that the Morgans had seen earlier.  He drove away rapidly.  Both versions of the story are inconsistent with what Jessie Morgan told investigators.  Moreover, when specifically confronted with this information, Jessie Morgan denied that the light-colored car ever returned to her house or that she went outside and spoke to the driver.[77]

Ervin Tyus stated that he had driven a white car to the Morgans' home, but he averred that he had done so on the evening of Thursday, August 5, not August 4.[78]  Jessie Morgan

---

[75] A contemporaneous *Courier-Journal* article confirmed Davis's account.

[76] Henry Lee Mills was incarcerated in Texas in 1966 when his name was brought up by Richardson.  The Commonwealth Attorney's Office suggested that an LMPD investigator be sent to Texas to talk with Mills concerning David Guy.  LMPD investigators, including Lt. Charles Young, and the Commonwealth's Attorney's Office discussed whether an investigator be sent to Texas to interview Mills, but ultimately did not.  This may have been because the FBI determined that his prints did not match. Notably, the prints of David Guy and Henry Lee Mills were compared to relevant latent prints again in 1989 and again found not to match.

[77] Jessie Morgan was also asked about the information during her polygraph.

[78] Investigators confirmed that the white car Tyus said he had driven on August 5 was not Jones's rental Fairlane.

–29–

confirmed to investigators that Tyus had arrived at her house in a white convertible sometime between 8:00 and 9:00 p.m. on August 5 (not shortly after the Morgans had seen the woman being dragged into the car, as claimed by Mary Agnes Stephenson).

Tyus submitted to a polygraph examination on September 29, 1965. The polygrapher reported that Tyus had demonstrated deception when asked whether he knew Jones, whether he put Jones in the river on August 5, and whether he left a car on Del Park Terrace. Polygraph evidence, however, is inadmissible in criminal trials in Kentucky. *See Mason v. Commonwealth*, 559 S.W.3d 337, 343 (Ky. 2018) ("Kentucky law is clear in its treatment of the admissibility, or rather better termed inadmissibility, of evidence relating to polygraph examinations" and collecting cases deeming such evidence inadmissible). Moreover, in 1989, Tyus told investigators that he had failed the polygraph because he had taken it under duress by law enforcement; specifically, that the officers had interrogated him for days and beaten him. And Tyus questioned Stephenson's motives in naming him as a suspect, suggesting that she was attempting to divert suspicion from her own son, Walter Lee Stephenson.[79] This evidence alone is insufficient to prosecute Tyus. Even if additional incriminating information could be developed, Ervin Tyus could not be prosecuted because he died on February 11, 2005.

**Edward Tyus.** Mary Agnes Stephenson told investigators that Edward Tyus had been involved in several "recent" robberies, in which he would jump into a victim's car, ride in the car for a short while, and then he would beat and rob the victim.[80] Edward Tyus claimed that he was in jail on August 4 and 5, 1965, but the LMPD's records contradicted his claim. Moreover, Edward Tyus also reportedly showed deception on his polygraph when denying that he had struck Jones on August 5. Edward Tyus died on August 3, 2010, and, therefore, could not be prosecuted for Jones's murder even if additional inculpatory evidence were discovered.

As with the other suspects discussed thus far, the Tyus brothers' prints did not match those found on the Fairlane. Their only alleged motive was supplied by Mary Agnes Stephenson, who had reason to lie to protect her own son. Although they both exhibited deception on polygraphs, the exact circumstances surrounding the polygraphs are unknown and, as explained above, the evidence would be inadmissible at trial to prove the guilt of either brother. Most importantly to the Till Act analysis, even if additional evidence could be developed connecting either Tyus brother with Jones's murder, there is no evidence that they would have acted to harm Jones because of her race, or civil rights advocacy.

**Walter Lee Stephenson.** The allegations against Stephenson came from an informant. The informant reported hearing a conversation during which Walter Lee Stephenson made a statement suggesting that he and Ervin Tyus participated in the murder. Specifically, the

---

[79] Stephenson had, in fact, volunteered information about Tyus only after investigators questioned her son, and she said that her son should not be "messed with." Moreover, Stephenson gave a second statement after being told that if she could provide information about the case, investigators would perhaps speak with the Commonwealth Attorney's Office about her son's pending breaking and entering charges.

[80] There is no indication in the file as to whether investigators looked into this allegation.

–30–

informant heard Stephenson say that Ervin Tyus's role in the murder was limited to driving Jones's car back to Jessie Morgan's home. According to the informant, Stephenson also claimed at one point that he (Stephenson) was the only person who knew anything about the murder, but then had "caught himself," and added that he had not actually witnessed the murder. There are no reports in the file detailing an interview with Stephenson concerning the murder. However, while Stephenson was transported to an LMPD station following an arrest on other charges, he was asked how much he knew about the murder. Stephenson denied having any first-hand knowledge: he stated that all he knew was that his sister, Jessie Morgan, had seen a light-colored car but had not seen who was in the car. Investigators also interviewed Leora "Bunch" Ford who was reportedly present during conversation described by the informant. Ford said she had no knowledge of the murder other than what she had been told by Mary Agnes Stephenson.

Walter Lee Stephenson died on August 24, 2011.

### iii.  Nation of Islam theory

Frank A. Murphy, Jr.

**Frank Murphy** was named as a potential suspect by Mary Montgomery.[81] Montgomery said that Murphy was a friend of Montgomery's "dangerous" boyfriend, Furman Bell, and both were reportedly members of the Nation of Islam (NOI). Mary Montgomery said she thought that Murphy was involved in Jones's murder, but she did not provide any specific evidence to support her opinion and several assertions she made are flatly contradicted by evidence in the file.[82]

In 1989, LMPD Officer Jesse Taylor, one of the 1960's investigators, provided additional details concerning the Murphy investigation. Taylor said that one of the subjects affiliated with the NOI (Murphy), whom he referred to as the "Muslim subject," had left town when Taylor started investigating him.[83] Taylor also claimed that there was a connection between Murphy and the other "Muslims" and Jones's handling of Muhammad Ali's money. Taylor said that Jones was one of ten lawyers appointed to handle Ali's money. According to Taylor, Ali wanted 15% of his money to go to the "Muslims," and when Jones refused to comply with Ali's request, the two had an argument "one night" in Jones's house.[84] The 1960s file does not include any

---

[81] Mary Montgomery was also connected to another suspect, Arthur Childress, discussed later in this memorandum. Montgomery also named a second suspect, also reportedly an NOI member who lived with Murphy, but she provided even fewer details about him and the LMPD did not follow up on that suspect.

[82] Montgomery also stated that the FBI had been investigating Murphy. The FBI file for this matter contains several references to Murphy, but they are all related to the LMPD's request that the FBI check Murphy's prints. In fact, a November 27, 1965, FBI report indicated specifically that the FBI Identification Division could not locate any records for Murphy.

[83] Officer Taylor also said that when he started investigating the "Muslims," one of them called his wife and threatened to put her in the river if Taylor did not back off. Taylor opined that Murphy was an "executioner" for the "Muslims."

[84] Taylor specified that the argument occurred on a night when Ali was waiting to sign a contract with another fighter and Ali ended up waiting in his car outside Jones's home for the other fighter to arrive.

–31–

other reference or report to Taylor's theory.  Additionally, XXX told investigators in 1989 that Jones was not representing any interest of Ali at the time of her death.

The FBI file includes a request from LMPD for Murphy's fingerprints and identification records.  An October 3, 1966, FBI report states that Murphy's fingerprints did not match the latent prints and impressions previously reported as of value, and that the FBI did not have his palmprints.

According to Mary Montgomery, Murphy had a number of connections to other individuals or suspects in this case.  Murphy reportedly dated one of Mary Montgomery's sisters, Shellie White, for a few months at the end of 1964.  Montgomery intimated that White and Jones had a romantic relationship, and that Murphy might have been "very bitter" over the "close feeling" between the two women.  Moreover, Montgomery and Shellie White were cousins of Barbara Cox.[85]

Even if more evidence could be discovered inculpating Murphy, Montgomery's allegations do not indicate that he would have been motivated to harm Jones by her race or civil rights activity.  Moreover, it appears that Murphy died before 2000.[86]

### iv.    Other/unknown

Discussed herein are the Morgans, whom investigators considered suspects but who had no known motive, as well as information about a person identified only as "Keith" who was allegedly the son of a disgruntled client of Jones.  Finally, there is a discussion of an LMPD car reportedly seen on the Sherman Minton Bridge on the night of the murder.

<u>Raymond and Jessie Morgan</u>

The Morgans may be considered, at best, in the category of opportunity suspects.  There were some inconsistencies in each of their accounts of what they saw on the night that Jones was murdered.  However, the core elements of their story did not change, and Jessie Morgan passed a polygraph.[87]  Ultimately, the Morgans had no obvious motive to kill Jones, and certainly no motive tied to Jones's race or her civil rights activities.  Moreover, both the Morgans are deceased and thus cannot be prosecuted.  Raymond Morgan died on May 10, 1991.  Jessie Morgan died on August 9, 2000.

---

[85] Mrs. Jones stated that her daughter received a phone call the day before her death, though it is unclear if she meant August 3 or 4.  Mrs. Jones opined that the caller had been Shellie White.  White reportedly cursed and swore at Jones, as if jealous of Barbara Cox.

[86] Various database searches for Frank A. Murphy, Jr. (which included his reported SSN and Philadelphia address reported in 1965), connected him to an address shared with XXXX.  XXX's 2000 obituary states that XXX was predeceased by XXX father, Frank Murphy.  Therefore, it appears that Frank Murphy is also deceased.

[87] It appears that Raymond Morgan never took a polygraph.

–32–

### Keith

Investigators also examined an allegation that a group of teens, Black and white, murdered Jones, motivated, in part, by the fact that Jones had represented the father of one of the teens ("Keith") and had been unable to keep him out of jail. The allegation originated with Ronald Engelbrecht, a 16-year-old white teenager. Ultimately, investigators were able to discount the theory.

Ronald Engelbrecht came forward and was interviewed twice in 1965. He reported a story he said he heard from another white teenager, whom he knew only as "Keith." Keith said that he and some friends had killed a lawyer named Jones and thrown her off the Sherman Minton Bridge. Specifically, Keith said that he, another white man, and four Black men were walking around and saw Jones's car stopped at a stop-sign.[88] The men all got into the car with her and told her to keep driving. One of the Black men struck Jones with an object. Keith said that they eventually threw Jones's unconscious body from the Sherman Minton Bridge – a 200-foot drop. According to Keith, the group rode around in the car until it was low on gas, and then parked it on Del Park Terrace. Keith said that they had not intended to kill Jones. Jones had reportedly represented the father of one of the Black men and, as a result of an error, the father had been sent to jail for six months.

Keith's alleged account, as reported by Engelbrecht, appears to be based essentially on what was reported in the newspapers, some of which was inaccurate. Most notably, investigators determined that Jones had not been thrown from the bridge, as reported in some of the early news stories.[89] Additionally, Engelbrecht spoke about getting a reward for providing information about the murder, which would have been motive for him to fabricate the story.

Investigators, nonetheless, pursued this lead, eventually concluding that "Keith" might have been Clifford Hubbard.[90] However, when Engelbrecht was shown Hubbard in a lineup, he said that Hubbard was definitely not Keith. Additionally, Hubbard, who denied having talked about Jones's murder, provided exemplars of his fingerprints and palmprints, which did not match those lifted from the Fairlane.

### The LMPD car on the Sherman Minton Bridge

On August 12, 1965, between 1:00 and 5:00 a.m., LMPD investigators set up road-blocks on both the Kentucky and Indiana approach ramps of the Sherman Minton Bridge and stopped and questioned 222 motorists to determine if they had been on the bridge on the morning of August 5 and whether they had seen anything of interest.

---

[88] Barbara Cox said that Jones would run red lights and stop-signs when she drove late at night.

[89] The theory that Jones had been thrown from the Sherman Minton Bridge was reported again in news accounts concerning the discovery of Jones's purse on the bridge in 1968.

[90] Investigators initially thought Keith could have been 13-year-old Keith Hubbard, but witnesses said that the description given by Engelbrecht, fit more with Keith's 16-year-old brother, Clifford.

−33−

Among the motorists who were questioned and later interviewed was Peter Baker, who worked in the bakery of the Brown Hotel. Baker said that at about 4:35 a.m. on August 5, he and another employee of the Brown Hotel, later identified as Robert Bostock, were driving over the bridge into Kentucky and saw a white car stopped on the center of the bridge. A marked LMPD car was behind the white car. Baker did not see anyone standing near either car. Baker also saw two Bowman Dairy trucks and a U.S. mail truck drive by at the time.

Robert Bostock confirmed that they saw a white car with a marked LMPD car parked behind it, although Bostock recalled the cars being in the area of the exit ramp. Bostock confirmed further that it was around 4:35 a.m., but he could not be sure of the exact day. Bostock did not recall seeing anyone else on the bridge but did confirm that a Bowman Dairy truck crossed the bridge every day at about the same time as Bostock.[91]

LMPD investigators contacted the Bowman Dairy Company to see if any of the drivers had any information. Bowman Dairy drivers Kenneth Hammersmith and Leo Lori had been interviewed on the bridge on August 12. Both said that they drove south across the bridge at 4:00 and 4:30 a.m. respectively and neither saw anything.

Even assuming that the white car seen by Baker and Bostock was Jones's rented Ford Fairlane, it is highly unlikely that Jones was still in it at that point. The autopsy findings indicate that she was placed in the river and died sometime between 2:30 and 4:30 a.m. and the sighting was at 4:35 a.m.

### v. The other West End homicides

According to the LMPD investigative file, five other Black women were killed in the West End neighborhood of Louisville between January and March 22, 1965: Eliza Mae Hayden, Mary Hicks, Iza Brand, Mattie Mae Payne, and Mary L. Black. None of the murders involved abduction or drowning, although Iza Brand had been found inside a car having suffered blows to the head and her purse was missing.[92] Investigators compared the prints of the major suspects in the Hayden and Brand cases, as well as those of a number of other men convicted of rape, abduction, or malicious cutting to the prints lifted from the Fairlane, but none matched.

### B.    1980s Theory and Suspect: DeCora White's Death and Arthur Childress

As mentioned previously, DeCora Hampton White died in October 1964, less than a year before Jones was murdered. Both women were Black, and they knew each other. Additionally, unlike the other West End murders discussed above, the circumstances of Jones's and White's deaths had two similarities. First, their bodies were both found in the river. Second, although they had both been last seen headed home in their car, the cars they had been driving were found

---

[91] Although both Baker and Bostock said something to the effect of picking up the other, Bostock stated specifically that he was always drove to work.

[92] Eliza Hayden was stabbed; Mary Hicks was beaten; Mattie Payne was beaten and stabbed along with Lawrence McKinney; and Mary L. Black was shot and beaten on the head.

–34–

somewhere other than at their homes.  The potential connection between the two deaths came up briefly in the 1960's investigation, and it became the initial focus of LMPD Detective XXX's investigation in the 1980s.

### i.    Events surrounding the death of DeCora White

DeCora White was last seen alive in the early morning hours of October 3, 1964.  The prior evening, White had driven to the home of a friend, Jane Cordery, at 509 Gray Street.  White left her car there and the two women drove to a bridge club meeting, in Cordery's car.  According to Cordery, White complained that she was never allowed to do what she wanted to do.  White told Cordery that she was taking "nerve" pills.  Cordery said that White appeared to be in a good mood and drank at least ½ pint of scotch at the meeting.  After the meeting, the women returned to Cordery's home at about 3:00 a.m.  Cordery reported that White said, "I feel mental," during the drive back.  White got in her car and drove east on Gray Street, the opposite direction of her home.[93]

Three days later, on the evening of October 6, 1964, White's body was found floating in the Ohio River, about a mile north of Kosmodale, an industrial area in southwest Louisville.[94]  Three days after that, on October 9, 1964, White's car was found abandoned at 29th and Portland Streets, very close to the river and the Kentucky and Indiana Bridge.  Notably, the car was found more than 20 miles from where White's body had been found and about four miles from her home.[95]

Deputy Coroner Robert Carter told investigators in the 1980s that White had drowned, but that he had never determined the manner of her death.  He explained that at the time he saw no evidence of foul play.  White's body had not been autopsied, and her death certificate merely stated "subject apparently fell into the river." The investigation into White's death had always been designated a "corpse" investigation by the LMPD, and never a suicide or a murder.  Ultimately, Carter opined that the there was no connection between White's and Jones's death.

### ii.    Origin of Detective XXX's investigation

Detective XXX's investigation started in late 1988 and originated with information provided by LMPD Detective XXX.[96] Detective XXX wrote a letter to the LMPD Chief, Colonel Richard Dotson, in which XXX outlined XXX theory concerning the death of DeCora White and

---

[93] Coincidentally, Marvin McCoomer, the operator of Marvin's Texaco Station, located next to the Wyckoffs' home and where Jones parked her car on the night of August 4, lived at 613 E. Gray Street – very close to where DeCora White was last seen alive.  However, beyond this coincidence, there is nothing tying McCoomer to the death of either woman.

[94] White's body was found almost 20 miles from where Jones's body was found.

[95] White's car was found about two miles from Del Park Terrace, where Jones's Fairlane was found.

[96] Detective XXX.  In 1988, XXX was assigned to the Evidence Technician Unit.

−35−

its connection to Jones's murder.  Detective XXX opined that Arthur Childress, who died in 1973, murdered both DeCora White and Jones.  In essence, Detective XXX alleged that Arthur Childress had obtained control of property that DeCora White thought she should have inherited from the estate of her father, G. Wade Hampton. White had then hired Jones to dispute Childress's control of the property and Childress had murdered them both.[97]  As discussed below, there were several issues with Detective XXX's theory and the 1980s investigation ultimately determined that there was no relationship between the two deaths.[98]

According to Detective XXX, when DeCora White's father, G. Wade Hampton, died in 1955, he left his properties to his widow, Sarah Hampton, Decora's stepmother.[99]  Sometime later, Sarah Hampton married Arthur Childress, a man about 40 years her junior.  When Sarah Hampton, in turn, died in 1962, she left everything to Childress.[100] At that point, DeCora White hired Jones to try to regain some of her father's properties, including, most notably, the Hamptons' home at 2422 W. Chestnut Street, which eventually was listed on the National Register of Historic Places (NRHP) and became known as the "Doerhoefer-Hampton House."

Detective XXX reportedly looked into the probate records of both Childress and Sarah Hampton, but the file does not contain any information as to what XXX found.  However,

---

[97] Arthur Childress was first mentioned as a possible suspect in an August 27,1965, investigative report. However, that report states that Officer Jesse Taylor opined that there was no tie between the death of DeCora White and Jones and that had DeCora White sought an attorney's help in getting more money from the Hampton estate she would have contacted Benjamin Shobe, a friend of her family, and not Jones.  Childress was referenced only two other times in the 1965 file, both in November of that year.  First, Gladys Wyckoff reported information about Childress that she said she heard from a salon client, Ocia Montgomery, who had been dating Childress at the time.  That information did not involve Jones, however. Moreover, when Ocia Montgomery was interviewed in 1989, she said that the only information she had heard about Childress being a suspect in Jones's death came from Gladys Wyckoff, not the other way around.  Ocia added that, shortly after her conversation with Wyckoff, two LMPD detectives asked her about Childress, but the file does not contain a report of that interview.  Second, Mary Montgomery (who was not related to Ocia) stated that she too had dated Childress, whom she described as a "dangerous operator."  Mary Montgomery reported that Childress told her that DeCora White had given him "a little trouble" in getting his hands on the Hampton estate.

[98] Detective XXX also re-investigated Jones's murder more broadly.  Among other things, XXX interviewed Gladys Wyckoff, the Morgans, and Ervin Tyus; and XXX conducted searches for any existing physical evidence.  Any relevant information resulting from those investigative steps is incorporated in the sections related to those individuals and evidence.

[99] DeCora White's mother, Decora Simmons Hampton, died giving birth to DeCora in 1923.  G. Wade Hampton married Sarah Cathey in 1933 when DeCora was 10 years old.

[100] According to Detective XXX, after Sarah Hampton's death, Childress married another older woman, Geneva Moore, the wealthy widow of Charles Moore, a longtime Democratic Party worker and owner of various properties, including a tavern and poolroom.  Detective XXX stated that Geneva Moore died shortly after marrying Childress, and she too left everything to him.  XXX opined that Childress probably had murdered both Sarah Hampton and Geneva Moore, as well as White and Jones.  Sarah Hampton's death certificate indicates that she died of cancer. Research in the *Courier-Journal* indicates that Geneva Moore did marry Arthur Childress, but she initiated a divorce complaint against him in March 1965, and the divorce was finalized in December 1965.  The research confirms that Childress, nonetheless, continued to live at the same address as Geneva, and operated a liquor store around the corner.  However, most importantly, Geneva Moore died in 1975, two years *after* Arthur Childress so he could not have been responsible for her death.

research through several *Courier-Journal* articles and other sources determined that, while it does not appear that Sarah Hampton and Arthur Childress ever officially married, he was appointed as one of two executors of her estate in 1962, and still had an interest in Hampton House at the time of his own death in 1973.

Detective XXX cited Dorothy Richardson a primary source of XXX information. Richardson had been both a close friend of DeCora White and a client of Jones. According to Detective XXX, about eight months after DeCora's death, Jones told Richardson that DeCora had been murdered and that Jones had been investigating the murder. Jones was murdered about two months after that conversation. When Detective XXX interviewed Richardson, she confirmed that she and Jones talked about DeCora White's death and agreed that they did not think she died by suicide. However, Richardson averred that Jones never said she was working on the case or knew who had killed White.[101]

Moreover, several witnesses specifically contradicted the claim that Jones ever represented DeCora White, much less that she was working on her "murder case." Sadie Jones said that her daughter had never been DeCora White's attorney, and that she and her daughter had only ever talked about DeCora White's death as being "interesting," but nothing more specific. XXX added that Jones never handled murder cases. Leona Webb, Jones's secretary, similarly denied that Jones had ever represented White, and added that she would have known about it. Finally, XXX, who inherited 12 to 20 of Jones's pending cases after her death, said that DeCora White was not among those casefiles, nor were any murders. Childress did not appear on any of the interview lists or on the list of individuals whose fingerprints and palmprints were taken during the original investigation.[102] Investigators in 1989 asked Officer John Elliott to compare a photograph of a print from the homicide file to the prints of both Arthur Childress and of his brother Willie Childress. Elliott said neither Arthur Childress's print nor his brother's matched the print. Arthur Childress died on May 18, 1973.

## C.    2008 to 2018 Suspect: XXX

XXX, was not a suspect during the 1960s or 1980s investigations. In fact, it does not appear that XXX was ever mentioned by anyone involved in the first two investigations as either a suspect or a witness. XXX only apparent connection to the original investigation is that

---

[101] Detective XXX also reported information XXX received from Norma Shobe. In 1965, Norma Shobe was married to Benjamin Shobe, a prominent attorney and later judge, and cousin of DeCora White's husband, Dan White. Norma Shobe told Detective XXX that Jones was DeCora White's attorney and that she believed that Jones was looking into the property dispute with Childress (whom Shobe referred to as Childers). However, as discussed, Detective XXX verified that Shobe was incorrect about Jones representing White at all.

[102] As mentioned previously, there were three references to Childress in the 1965 file, but he was never interviewed. It appears, however, that investigators may have interviewed Childress's reported best friend, James Hall, who reportedly owned a gas station at 26th and Broadway Streets. In 1965, investigators spoke to a James Herbert Hall, who was in charge of the night shift at Hall's Gulf Service Station at 27th and Broadway. However, the purpose of the Hall interview was to determine if he had seen Jones on the night of August 4 to 5. Hall said that Jones had often bought gas at his station but had not done so that night. Detective XXX stated that by the time XXX learned of Hall's connection to Childress, Hall's gas station was no longer in operation, thereby making it hard for XXX to locate Hall.

–37–

XXXXX.[103]  LMPD Detective Terry Jones began to investigate XXX as a potential suspect in 2008, after receiving the information discussed below from the FBI.

### i.        The fingerprint

XXX became a suspect in June 2008, when the FBI notified the LMPD that one of XXX's fingerprints matched a latent fingerprint recovered from the Ford Fairlane.  The FBI lab sent a letter, dated June 26, 2008, which stated that the exact location of the matching print could not be determined because there was a lack of information in the original case-notes.  However, the lab did determine that the print had been lifted from one of three possible locations:

(1) white rubber lift marked "Left window inside 8-7-65 5";
(2) white rubber lift marked "Inside Rt. door Post 8-7-65 7"; or
(3) transparent lift "W 2 L".

The notation the lab interpreted as "W 2 L" was almost certainly "W Z L," Detective William Lancaster's initials, that he placed on an envelope containing the print cards that had been thrown in the trash by Sgt. Miller, as well as the remaining print-cards.  Detective Lancaster's report listing the print cards recovered from the trash includes both a print lifted from inside the left window of the Fairlane, and a print lifted from inside the right door post.[104] Two other latent fingerprints and a latent impression from the original case did not match XXX's fingerprints.[105]

### ii.        The interview and polygraph

Detective Jones determined that XXX was living in XXX, California, and flew there to interview XXX on December 16, 2008.  XXX, who turned XX years old about a month after Jones was murdered, said that XXX did not know Jones personally.  XXX denied having had any physical contact with Jones or her rental car, and XXX could not explain how XXX fingerprints could have been found inside the Fairlane.  Many of XXX's answers were evasive or equivocal.  For example, XXX denied ever knowing Jones but said that XXX "might have" put XXX hands on her rental car.[106]  On December 18, 2008, XXX submitted to a polygraph examination

---

[103] XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

[104] As mentioned previously, more prints were lifted from inside the left front window of the Fairlane under the supervision of Sgt. Miller.  However, those prints were lifted on August 9, not August 7, 1965.

[105] When an Assistant Commonwealth Attorney declined to continue investigating the case in 2010, he cited several reasons, one of which was that there was no way of knowing where the latent print that matched XXX's was found in or on the Fairlane, and that it could have been on the exterior of the car which had been left unsecured for 33 hours.  However, as indicated above, two of the three possible locations named in the FBI lab report were inside the car.  In fact, with respect to the left front window, which was found rolled down and then had to be removed, it would have been nearly impossible for fingerprints to have been left there accidentally while the car was unsecured after the murder.

[106] XXX also strangely seemed to know of Jones's visits to Joe's Palm Room.  When asked to speculate what places a woman of Jones's age would have frequented, XXX immediately named "Joe's Palm Room," which XXX referred to as "Joe's Parlor Room."  Lewis Ware, the bartender at Joe's Palm Room, told the 1960s investigators that Jones

−38−

administered by a XXX Police Department investigator. XXX reportedly showed "the highest level of deception possible on a polygraph" and, thus, failed the examination.[107] As noted above, such evidence is inadmissible to prove guilt in a criminal trial and could not be introduced by prosecutors to suggest XXX committed the crime.

### iii.    XXX's connections to the case

XXX had two connections to the case XXXXX. First, XXX acknowledged that XXX and XXX closest friends spent a lot of time in Elliott Park -- next to the Morgans' home.[108]

Secondly, Elmer Johnson, who was a sergeant in the LMPD at the time of the murder, XXXXX. Sgt. Johnson is mentioned a number of times in the original file. Of particular interest is a phone call he made to investigators at an unknown time on the "afternoon" of August 5, 1965. In the call, Sgt. Johnson reported that Jones had been driving a rental, having left her own car at Summers-Hermann. More importantly, Sgt. Johnson reported that Jones had gone to visit Wyckoff the night before, after Wyckoff had called to say that she was in some trouble. He also reported that the two women had gone to a "hamburger place," that Jones often spent the night at Wyckoff's, and that they had had several arguments.[109] Thus, XXXXX appeared to have "early" knowledge of some of the circumstances surrounding Jones's death. Based on the chronology of the LMPD report that included Sgt. Johnson's call, it appears that it came in sometime between 2:30 p.m. and 5:10 p.m. on August 5.[110] Regardless of when exactly Sgt. Johnson made the call, there is a lack of evidence to suggest that he had obtained his information in a nefarious way. Among other things, his regular duties were in the 2d Division, where Jones's home was located and where her body was found. In any case, even if evidence could be developed linking Elmer

had regularly frequented Joe's Palm Room around a year before her death, and she had visited again about two weeks before. Tracey Levison similarly said that Jones had visited the bar, a year or two before her death.

[107] Detective Jones had already returned to Kentucky when the polygraph was administered by XXX Police Department (XPD) investigators. It appears that following the examination, XPD investigators conducted another video-recorded interview of XXX. The DVD recordings of the polygraph and XPD interviews were forwarded to Detective Jones.

[108] Ervin Tyus (one of the 1960s suspects) told investigators that he had lived with Morgans for about four months in the summer of 1964, so he could spend time in Elliott Park. Additionally, Ernest Mayfield, Jr., who lived with his mother, Lorean Mayfield, at 3121 Del Park Terrace, and was briefly considered a suspect, told investigators in 1965, that he usually spent his days in Elliott Park.

[109] Sgt. Johnson also reported that he thought Wyckoff's husband was in prison at the time or had just gotten out, which was inaccurate.

[110] According to the report, the following had occurred before the call. First, the LMPD had obtained the make, model, and license plate of the Fairlane. Although not made specific, this was likely from the missing person report made by Sadie Jones at 1:30 p.m. As previously indicated, the missing person report stated that Jones had last been seen at midnight leaving an unidentified friend's home located at 21st and Broadway (i.e., Gladys Wyckoff's address). At 2:30 p.m., that missing person report was updated to include the fact that Jones's body had been positively identified as hers by her law partner. It was only then that the LMPD put out the broadcast for the Fairlane. The broadcast included the instruction not to touch the car if found but to call the "finger print men." The report then discussed Sgt. Johnson's call, followed by a call at 5:10 p.m. from the Coroner's Office.

–39–

Johnson to the murder, he died in 1979.[111]

### iv.     2016-2018 Cold Case Homicide Investigation

In 2008, XXX was living in California, but XXX later returned to Louisville. In fact, XXX said that XXX talked to XXX in March 2017. XXX reported that XXX was very troubled when XXX told XXX, falsely, that investigators had XXX DNA and had connected it to the crime. According to XXX, XXX did not deny XXX involvement in the murder.

According to a XXX *New York Times* article, *Times* reporters interviewed XXX who said that XXX knew nothing of the murder. "I didn't touch that lady," XXX said. "I don't know who did. That's all I can say." According to the article, XXX's explanation for the presence of XXX fingerprint in the Fairlane was that XXX used to hitchhike as a teenager and must have been picked up by someone who had rented the Fairlane before Jones.

Between 2016 and 2018, the LMPD's Cold Case Homicide unit conducted a number of additional investigative steps described below.

In 2016, investigators conducted another search to locate any available evidence associated with the case. A digital search located only the torn piece of paper from the *Louisville Defender*. Property room administrators indicated that there should not have been any physical evidence that had not been digitally logged. Nonetheless, investigators inspected the storage area dedicated to homicides. The oldest case found was from 1972. Investigators again took digital photographs of the *Defender* print and later enlarged the photo.

On August 31, 2017, investigators interviewed XXX. XXX stated that XXX had not seen XXX since the 1970's. XXX recalled the news coverage at the time of the murder but averred that XXX never said anything about it to XXX. XXX added that XXX was a very passive person and XXX could not imagine XXX committing a murder.

In September 2018, LMPD investigators obtained XXX's fingerprints and palmprints.[112] While providing his prints, XXX spoke briefly about the case. He re-iterated XXX claim as reported in the *Times* that XXX used to hitchhike in the neighborhood where Jones was killed and speculated that is how XXX print was found on the outside of her car.

On October 9, 2018, LMPD latent print technicians informed investigators that the prints obtained from XXX did not match the print from the *Louisville Defender*.

XXX is Black and investigators developed no evidence suggesting that XXX would have had harmed Jones because of her voting rights advocacy, her race, or for any other reason recognized by the applicable civil rights statutes. Thus, even if further evidence could be

---

[111] Sgt. Johnson retired in 1976 as a Major and was the highest-ranking Black LMPD officer at that time.

[112] In September 2018, LMPD Latent Print Technicians opined that the *Defender* print was from the second joint of a finger and LMPD did not have print cards for XXX with that area of XXX hands.

–40–

developed linking XXX to the crime, there would be no basis to prosecute XXX under the Till Act. Nor is there a basis to refer this matter for state prosecution since the state is in full possession of this evidence.

6.       Conclusion

As discussed in the synopsis, although the possibility that Jones was murdered because of her race or participation in civil rights activities cannot be fully discounted, our review did not disclose a viable lead against a living suspect who may have been motivated by such factors.

The only suspect who can be tied to the murder through physical evidence and who is still living is XXX.  As stated above, this evidence alone would be insufficient to prove XXX guilt beyond a reasonable doubt.  Moreover, even if XXX could be linked conclusively to the murder, XXX could not be prosecuted under the Till Act as no evidence has been developed that XXX acted because of Jones's race or her civil rights activities or for any other reason prohibited by civil rights laws.

In addition, no person could be prosecuted for committing a federal hate crime—even if any evidence could be developed -- because in 1965, at the time of Jones' death, no federal hate crime laws existed.  Although federal hate crime laws have since been enacted, no person may be charged for violating laws that were not in existence at the time of the murder.  The civil rights laws that did exist in 1965 largely required proof that the defendants acted under color of law, and at any rate, a five-year statute of limitations applies to such offenses that occurred prior to 1994.[113]

The Civil Rights Division has used non-civil rights federal statutes to overcome the statute of limitations challenge in certain cases – such as federal kidnapping resulting in death (18 U.S.C. §1201).  In this case, the evidence that the Fairlane was driven 51 miles, possibly in less than 12 hours, introduces the possibility that the murderer or murderers drove it across the Sherman Minton Bridge into Indiana.[114]  However, we have found no evidence that would allow

---

[113] Prior to 1994, federal criminal civil rights violations were not capital offenses, thereby subjecting them to a five-year statute of limitations.  *See* 18 U.S.C. § 3282(a).  In 1994, some of these civil rights statutes, including 18 U.S.C. § 245, were amended to provide the death penalty for violations resulting in death, thereby eliminating the statute of limitations.  *See* 18 U.S.C. § 3281 ("An indictment for any offense punishable by death may be found at any time without limitation.").  However, the Ex Post Facto Clause prohibits the retroactive application of the 1994 increase in penalties and the resultant change in the statute of limitations to the detriment of criminal defendants.  *See Stogner v. California*, 539 U.S. 607, 611 (2003).

[114] Investigators at the time seemed to have concluded (reasonably) that no one moved the Fairlane after it was seen on the morning of August 5 by several residents of the 3100 block of Del Park Terrace.  Thus, in theory, the car was driven 51 miles between 6:00 p.m. on August 4 and, at the latest, 6:00 a.m. on August 5, when it was first noticed. It also should be noted that, although the evidence indicates that Jones was not thrown from the Sherman-Minton Bridge, her purse was found on the bridge (closer to the Indiana side) in 1968.  As has been discussed, there is a question as to whether the purse had been in the same location on the bridge since the time of Jones's murder on August 5, 1965.  If it remained in the same location for the duration of that time, then it is likely that it was Jones's killer or killers who put it there while driving into Indiana (or on their way back to Kentucky).

–41–

the government to prove, beyond a reasonable doubt, that the car actually ever crossed state lines, or that, as required by the kidnapping statute, Jones was still in the car and alive when the murderer or murderers drove it across the bridge. Moreover, any defendant likely would challenge the charges, arguing that a five-year statute of limitations is also applicable to federal kidnapping.  The Division (narrowly) successfully litigated the issue in its prosecution of James Ford Seale, but the Seale case would have no precedential value both because of its procedural history and because it was prosecuted in a different Circuit.[115]

Based on the foregoing, this matter does not a disclose a prosecutable violation of any federal criminal civil rights statute and is being closed without further investigation.

Under the Till Act and its Reauthorization, the United States can refer cases to the state government for prosecution if the statute of limitations on federal offenses has expired.  As the Commonwealth of Kentucky is already aware of this matter, referral is unnecessary.

---

[115] In *United States v. Seale*, the District Court held that the 1972 repeal of the death penalty clause of the federal kidnapping statute did not apply retroactively so that prosecution of Seale for a 1964 kidnapping could go forward. However, a panel of the Fifth Circuit reversed the District Court's decision. *See* 542 F.3d 1033 (5th 2008).  In response to the government's petition for rehearing *en banc*, the full court vacated the panel decision and, by an equally divided 9 to 9 vote, affirmed the District Court's ruling on the limitations defense. *See* 570 F.3d 650 (5th Cir. 2009) (*per curiam*); *see also id*., at 651 (DeMoss, J., dissenting) (noting the affirmance's "nominal" nature in light of the deadlock).  By a 12 to 6 vote, the Fifth Circuit certified the question to the Supreme Court, which then dismissed the question.  Justice Stevens issued a statement, joined by Justice Scalia, disagreeing with the dismissal.