# CIR Exhibit 4

CIVIL RIGHTS DIVISION

Notice to Close File

File No. <u>144-82-595</u>                                    Date:  <u>June 15, 2022</u>

To:     Chief, <u>Criminal Section</u>

Re:     Thomas Kirk (Deceased)
        Texas Barton Gray (Deceased)
        Michael Jordan (Deceased)
        Guenter Mannhalt (Deceased) – Subjects;
        Edwin Pratt (Deceased) – Victim;
        <u>CIVIL RIGHTS</u>

It is recommended that the above matter be closed for the following reasons:

1.      <u>Date of the Incident</u>: January 26, 1969

2.      <u>Synopsis of the Facts and Reasons for Closing</u>:

On January 26, 1969, Edwin Pratt, a Black man who served as the director of the Seattle Urban League, was shot and killed when he opened the door to his home to investigate a noise outside.  Witnesses reported seeing two men in Pratt's driveway just before the fatal shot was

_____

Sarah Howard
Attorney Advisor

_____

_____

To:     Records Section
        Office of Legal Administration

The above numbered file has been closed as of this date.

<u>June 15, 2022</u>
Date                                    _____

                                        Barbara Bosserman
                                        Deputy Chief, Cold Case Unit, Criminal Section

FORMERLY CVR - 3 FORM CL – 3

-2-

fired, and they further reported that the men escaped in a getaway car. In the immediate aftermath of the murder, the Federal Bureau of Investigation ("FBI") worked with the King County Sheriff's Office ("KCSO") and Seattle Police Department ("SPD") to investigate the matter. The FBI reopened the case in 1994, and the Department of Justice ("the Department") opened the case again in 2019. Although these investigations resulted in a list of likely suspects, the identities of Pratt's murderers and the motive behind the crime have never been confirmed with certainty.

As explained more fully below, federal prosecution of anyone responsible for Pratt's death is not possible. All the suspects identified in the previous investigations have since died. Review of the file and discussions with academics who have studied the murder have not produced any lead that could result in the prosecution of any living person. Although, as discussed below, there is evidence that some of the possible suspects may have acted (in whole or in part) due to bias motivation, there is also evidence that the crime was committed for financial or political reasons. Thus, it is unclear that the prosecution could establish, beyond a reasonable doubt, that Mr. Pratt's murder was committed because of his race. Finally, the statute of limitations has run on all federal hate crimes, and there is no other potential basis for federal jurisdiction.

Although the Emmett Till Unsolved Civil Rights Crime Act[1] (the "Till Act") and its Reauthorization[2] authorize the Department to refer cold cases to state and local jurisdictions for prosecution, such a referral is not appropriate. The Department's review of the file has not produced evidence sufficient to prosecute any living suspects on any state charge. Therefore, the case is being closed without prosecution or referral to the state.

3.      Background

In 1969, Edwin Pratt ("Pratt") was the well-respected director of the Seattle Urban League. He was also a husband and a father, and he was at home with his family the evening of January 26, 1969, when he heard a sound outside his home. His wife, Bettye Pratt ("Bettye"), also heard the sound from upstairs where she had just finished putting the XXXX, XXX, to XX.[3] Bettye would later say that she thought the sound was snowballs hitting the outside of the house. Bettye heard Pratt ask her what the noise was, and she called out that she did not know as she ran to XXX's room out of concern that the vaporizer may have exploded.

After checking on XXX, Bettye walked across the hall to the master bedroom, where she looked out the window and saw two individuals[4] crouching behind one of the family's vehicles in

---

[1] Pub. L. No. 110-344, 122 Stat. 3934 (2008).

[2] Pub. L. No. 114-325, 130 Stat. 1965 (2016).

[3] Edwin Pratt also had XXX by XXX named XXX, who was attending the University of Miami at the time of the incident and therefore was not living at XXX.

[4] Bettye later stated to law enforcement that she thought the two assailants were "young people," but explained that she thought that because she associated young people with throwing snowballs. She described both as being "slight in build." She further described the individual who was not holding the firearm as wearing dark clothes, and the individual who fired the shotgun as wearing a dark coat and possibly a stocking cap of some kind, but she was

-3-

the carport.  As she was watching, one of the individuals stood up and fired a gun, and Bettye screamed to her husband to warn him.  Pratt, however, had already opened the door to investigate the noise.  A rifled slug, from what the FBI laboratory later confirmed was a .12 or .16 gauge shotgun, hit him in the mouth.

Almost immediately following the shooting, Bettye called XXX, XXX family.  The XXXXX – now XXXXX[5] – drove XXX to the Pratt's house, where they were directed into the house through a side door by a KCSO deputy.  While XXXX comforted Bettye, XXX went upstairs to XXX's bedroom and, at the instruction of Bettye, drove XXX to a friend's house.

When XXX returned, Bettye explained to XXX and XXX what had happened.  Although Bettye did not see where the assailants went after they fired the shot, neighbors would later state that they saw a getaway car, which they described as a 1968 Buick or a 1969 Chevrolet.

4.     The Current Till Act Investigation

An eligible entity referred this matter to the Department for review under the Till Act.  The Till Act authorizes the Department to identify, investigate, and (when warranted by the evidence) prosecute violations of criminal civil rights statutes that resulted in death and occurred before 1980.

After opening the matter as a Till Act case, the FBI – along with Assistant United States Attorneys from the United States Attorney's Office for the Western District of Washington and an attorney from the Civil Rights Division's Cold Case Unit – met with XXX and XXX colleagues XXX and XXX.  XXX was a XXX of the Pratt family at the time of Edwin Pratt's death.  XXX and XXX colleagues have conducted extensive research regarding the murder.  In addition to speaking with these individuals, the Department reviewed FBI records from the agency's 1969 and 1994 investigations, requested records from KCSO and SPD and reviewed available materials from their files,[6] reviewed news articles from the time of the murder, and reviewed files collected by XXX and XXX colleagues through their research.

As explained more fully below, investigators considered a wide variety of potential motives and developed multiple potential suspects throughout the course of the 1969, 1994, and current investigations.  By the end of the 1969 investigation, the KCSO, SPD, and FBI (collectively, "law enforcement") had begun to focus primarily on whether Pratt had been killed as part of a murder-for-hire scheme involving Thomas ("Tommy") Kirk as the gunman and Texas Barton ("Bart") Gray in some capacity.  The leads ran cold, however, and law enforcement was not able to prove the murder-for-hire scheme beyond a reasonable doubt.

---

not able to see any other identifying characteristics.  Neighbors of the Pratts described the two assailants as young, white men.

[5] XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  XXX and two of XXX colleagues have extensively researched the Pratt murder and shared their findings with the FBI.

[6] In response to the Department's request, the SPD indicated that they did not have a file on Pratt.  The KCSO was unable to provide records.  However, because the FBI worked in connection with the KCSO and SPD during both the 1969 and 1994 investigations, information from both of these entities was incorporated into the FBI files.

-4-

The same theory was revisited in both the 1994 and present investigations. Law enforcement gathered information that further implicated Kirk as the gunman, and Gray and Michael ("Mike") Jordan began to emerge as the potential lookout and getaway car driver, respectively. Still, evidence was not sufficient to bring federal or state charges against any living subject. Thus, it will likely never be known for certain whether the killing was in fact carried out as part of a paid contract and, if so, who paid for the contract and why. Based upon the available evidence, however, the most likely theory is that a team of paid assailants, acting upon economic, political, or racial motives (or some combination of the three), killed Pratt.

## A.    The 1969 Investigation

Directly following Pratt's death, the KCSO, working in connection with the SPD, opened a homicide investigation. The FBI also opened an investigation at the request of the Department to determine whether the case could be prosecuted under any of the existing federal civil rights statutes. The manner of Pratt's death was readily apparent, but little else was known at the outset of the investigation. Given Pratt's position with the Seattle Urban League, law enforcement suspected that his death might be motivated by race or by his civil rights advocacy, but there was no solid evidence of the assailants' motive. Moreover, no one had given a detailed description of the suspects.

### 1.  *Early Theories*

Seattle and King County businesses pooled their resources to offer rewards of up to $10,500 for information about the crime, and law enforcement received numerous tips that began to shed light on potential suspects. These tips underscored investigators' suspicions that Pratt's race and/or his civil rights work had motivated the attack, as nearly all of the individuals interviewed by law enforcement believed that these factors likely played a role in Pratt's death. Indeed, Bettye indicated that she and Pratt had received threatening phone calls related to Pratt's work with the Seattle Urban League. In particular, Bettye remembered receiving a call after Medgar Evers was killed,[7] in which a male voice told her that if she did not make her husband "shut up," he would end up like Evers.[8]

At one point, the FBI pursued a lead[9] from a police informant, who reported that a man named Kenneth Moen had discussed killing a prominent Black civil rights figure in Seattle because

---

[7] Medgar Evers, the first NAACP Field Secretary in Mississippi, was assassinated outside his home on June 12, 1963. His assailant, Byron de la Beckwith, was convicted of his murder in 1994 after two previous prosecutions in 1964 ended in hung juries.

[8] Bettye stated that she had received the call one morning about two years before her husband's death. However, she was unable to remember the specific date of the call and was unable to identify the caller beyond describing the voice as that of an adult white man. Because of the time that had passed and the lack of details, law enforcement was unable to pursue this call as a lead in Pratt's murder investigation.

[9] This summary does not contain a comprehensive list of leads pursued by the FBI. Many others were considered but not pursued after a preliminary investigation. For example, multiple witnesses interviewed by law enforcement noted that XXX, a member of the United Black Front, had become hostile to Pratt during a meeting of

-5-

a friend of his had recently been killed by a Black man.  Although enough evidence pointed to Moen's guilt for him to be taken into custody, he passed a polygraph test in which he denied involvement in Pratt's murder, and law enforcement developed no corroborating evidence and thus no longer pursued him as a viable subject after that.[10]

XXX, who became the XXX of the Seattle Urban League following Pratt's death, opined that Pratt's comparatively moderate positions created enemies in both the local Black and white communities.  Pratt had been involved in two specific projects that multiple witnesses identified as garnering hostility.  The first was the Seattle Urban League's Operation Equality, and the second was Pratt's desire to end suspected drug activity occurring near a local high school.

Operation Equality was a program run by the Seattle Urban League that focused on ending discriminatory housing practices in the local area.[11]  According to witnesses, Operation Equality was controversial in the Black community not because of its stated purpose but because certain individuals disagreed with Pratt's strategies for accomplishing Operation Equality's goals, as well as the goals of the Seattle Urban League more broadly.[12]  Pratt was widely considered a moderate, which sparked anger from individuals who advocated for a comparatively more aggressive approach.

XXX, the XXX of Operation Equality at the time of Pratt's death, identified several individuals as being particularly critical of Pratt's work, although he told law enforcement he did not have specific reason to believe they had been involved in the murder.  One such critic mentioned by XXX, Keve Bray,[13] was also reported to law enforcement by two other Seattle Urban

---

the Seattle Urban League in December 1968; Pratt had reportedly taken some of XXX' statements as threats. The FBI contacted XXX by phone about the meeting, although he refused to be interviewed in person, at least in part because of what he perceived to be racist views held by the FBI.  By phone, XXX explained that he had been upset at the meeting regarding the proposed arrangements for spending certain funds, but he otherwise recalled that the meeting was no different from others and stated that he did not know of any threat made at the meeting.  Records do not indicate that XXX was considered seriously as a suspect as the investigation progressed.

[10] XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

[11] *See* Seattle Municipal Archives, available at [The Seattle Open Housing Campaign, 1959-1968 - CityArchives | seattle.gov](#).

[12] For example, in addition to Operation Equality, Seattle Urban League employee XXX recalled that Pratt opposed a movement that advocated for the position that control over the curriculum and activities in local schools should be held exclusively by members of the Black community.  According to XXX, Pratt believed this encroached on individuals' choice of association.  Pratt's beliefs on this matter prompted threats from members of the Black community that were serious enough for Pratt to comment to XXX that he wondered if he was becoming paranoid.

[13] XXX also mentioned Cliff Hooper and Henry Roney as being particularly critical of Pratt's work.  Like Bray, Hooper was associated with the Afro American Journal, and Roney was a local contractor.  Roney and his wife were interviewed by the FBI a month after Pratt's murder.  Roney stated that he had been at a meeting at the time of Pratt's death and did not hear about the incident until someone who had seen the news of the murder on television contacted Roney to let him know.  Roney further relayed that his most recent conversation with Pratt had been pleasant.  Roney's wife, Elizabeth Roney ("Elizabeth"), stated that she had received a call a few days after Pratt's murder in which she heard an unknown voice say, "Tell Roney he is next on the list."  Because Elizabeth was unable to provide any further details about the call, law enforcement was not able to pursue this incident as a lead.

League employees. Bray was a frequent contributor to the Afro American Journal and, according to XXX, had made threats against Pratt in the Journal as recently as one week before Pratt's death. Seattle Urban League employee XXX reiterated XXX's statements, telling the FBI that since September 26, 1968, the Journal had printed what XXX considered to be threats – using the word "eliminate" – on at least three different occasions.[14] Witnesses described the threats being lodged at Pratt by Bray and others as reflecting a general "power struggle" among leaders of different factions of the community.

Bray refused to be interviewed by the FBI, stating that he was suspicious of white FBI agents as he was concerned they were products of white institutional racism. No other evidence was developed suggesting that Bray was involved. Moreover, he did not outlive Pratt by long; Bray was murdered in 1972 in a chain of events similar to Pratt – he was shot twice when he answered a knock on his door.[15]

There was also speculation that Pratt was murdered due to his interest in stopping the local drug trade. XXX's Delicatessen – a business owned by Guenter Mannhalt and XXX – had developed a reputation for drug dealing, despite being located in close proximity to a high school. According to XXX, Pratt had, within the week before his death, sent a letter to the mayor, city councilmen, and several judges protesting the reduced sentences of the Mannhalt XXX, who had been arrested and charged with possession and distribution of narcotics. Further, a confidential source told law enforcement that he believed Pratt may have been killed for "stepping on some toes" in the drug community. The source specifically mentioned the Mannhalt's store and noted that the XXX were, at the time of the interview, imprisoned at the XXX.

In addition to examining racial and political motives for the murder, law enforcement pursued several leads related to Pratt's romantic relationships after a woman who was having an affair with Pratt expressed concern that one of her family members might have been involved in the murder. After further investigation, however, the FBI determined that the family member in question was not involved.

Because several local newspapers printed a sketch of the alleged getaway car's appearance, law enforcement also received numerous tips from individuals who saw a vehicle matching the getaway car's general description. Further, the FBI obtained the names of all individuals who rented a car matching the getaway car's description from a total of 34 rental agencies in the local area over the weekend of the murder. Law enforcement also attempted to obtain identifying information for all 1968 Buick GS 350 and GS 400 models listed as being sold in Seattle and King

---

[14] The Department attempted to locate the Afro American Journal entries referenced by XXX and XXX, including by making requests of the Oregon Historical Society. However, few copies of the Journal remain available for review, and the only entry the Department was able to locate that mentioned Edwin Pratt – titled "Death is No Stranger to the Black Man" – was authored by Cliff Hooper shortly after Pratt's death.

[15] XXX confessed to killing Bray in 1981. Bray had moved to Denver in 1971, and XXX told law enforcement that the murder was related to a dispute within the Denver Black Muslim community. As such, there is no indication that Bray's and Pratt's murders were related, other than the similar circumstances under which both men died. *See* He Killed Edwin Pratt, *supra* note 9.

-7-

County,[16] and law enforcement obtained identifying information for 10 such Buick vehicles in Snohomish County.  None of these efforts, however, led to evidence tying any car or any person to the crime.

### 2.  *Murder-for-Hire Theory*

In early February 1969, law enforcement began to develop a clearer picture of who the assailants were, and they refocused the investigation accordingly.  Specifically, the investigation began to focus on whether Bart Gray and/or Tommy Kirk killed Pratt or paid to have him killed.

XXX, an inmate at the King County Jail, told the FBI that, before being incarcerated, he had received a telephone call around the middle of October 1968 in which an unknown man asked him if he would like to make some money.  The man arranged to meet with XXX at Bob's Chili Parlor in Seattle that same afternoon.  Upon arrival, XXX reported that he was motioned over to two men sitting at a table, and XXX heard both a bartender and a waitress refer to one of the men as "Bart."

After approximately 30 minutes of small talk, "Bart" informed XXX that he had a job for him.  Using racial slurs, Bart explained that they wanted a man "wiped out," and that man was a civil rights leader.  Bart offered XXX $2,000 for the job.  XXX declined, but Bart contacted him again approximately one month later.  According to XXX, Bart stressed that it would be easy to ring the doorbell and shoot the unnamed civil rights leader right away.  XXX again declined.  XXX told the FBI, however, that after he himself had been incarcerated, his XXX had continued to receive telephone calls similar to those he had received from Bart.[17]  The FBI followed up with XXX's XXX, who recalled receiving a telephone call over a month earlier in which the caller stated they did not know that XXX was in jail and offered to post his bail and have their own attorney contact XXX.  XXX's XXX said that she thought the name "Bart" sounded familiar, but she was not sure if Bart was the individual who had called.  XXX's XXX also advised that XXX often told what she described as "tall tales."[18]

About six months later, Bart himself contacted law enforcement with information about the murder.  The KCSO relayed to the FBI that an attorney for "Bart Gray" had stated that his client had information related to the Pratt murder.  Through his attorney, Gray – who was incarcerated in the King County Jail on charges of killing Tommy Kirk – reported that on either the day of the Pratt murder or the day before, he and three other men were in a tavern in Mountlake Terrace when one of the men offered $25,000.00 to kill Pratt.  Gray did not name the individual who offered the money, but he stated that Kirk accepted the contract and was the individual who

---

[16] Records do not indicate how many of these cars were identified by authorities.

[17] XXX later claimed to know who ultimately accepted Bart's offer – information which was passed along to the FBI by another inmate at the King County Jail – but the FBI determined that this later embellishment of the original story was likely inaccurate and a result of word spreading throughout the jail that the FBI and the SPD had been asking inmates about the Pratt investigation.

[18] Notably, the FBI followed up with Bob's Chili Parlor the same day, but the employees did not match the description provided by XXX.  Moreover, the bartender and waitress did not know anyone named "Bart."

-8-

fired the shot that killed Pratt.  Gray provided names of two other men he claimed had been with Kirk at the time of the murder, although he did not include himself in that group.  Gray further reported that the car the assailants had used was parked every day on the South Concourse at Seattle-Tacoma Airport.

On August 20, 1969, the KCSO again contacted the FBI to report that a second inmate at the King County Jail, XXX, had identified Tommy Kirk as the gunman who killed Pratt.  XXX's information corroborated Gray's report that the killing had been arranged by contract, and the contract had been given at a tavern in Mountlake Terrace, Washington.  XXX also corroborated Gray's report that the getaway car was parked at the airport.

XXX subsequently indicated that he had heard that the getaway car was a stolen, two-tone green 1968 Chevrolet.[19]  As before, XXX reported that the car was parked at the airport. Although Gray had described the contract price as $25,000, XXX stated it was $30,000.  Consistent with his prior statement and with Gray's account, XXX identified Tommy Kirk as the individual who had accepted the contract and received the money.  XXX reported that Mike Jordan, Kirk, and an individual named XXX planned to use the money for drug dealing activities.

Finally, an individual named XXX informed the KCSO that Tommy Kirk and Mike Jordan had arrived at his apartment early on the morning of January 27, 1969 – the morning following Pratt's murder – seeking to hide a shotgun.  XXX believed, based on his conversation with Kirk on that date, that Kirk had murdered Pratt.

Although Kirk was identified by multiple witnesses as the individual who fired the shot that killed Pratt, law enforcement lacked any physical evidence tying him to the crime.  Moreover, Kirk was killed only a few months after Pratt; he was shot by Bart Gray in a feud possibly involving the money received from the Pratt murder, drugs, a romantic interest, or some combination of the three.

At this point, the investigation stalled.  Although law enforcement had developed a list of subjects beyond Kirk with a motive to kill Pratt – including Gray, Jordan, Guenter Mannhalt, Bray, and Moen – they did not have sufficient evidence to charge any of them.  As such, the case remained cold.

### B.    The 1994 Investigation

As the twenty-fifth anniversary of Pratt's death approached, several newspapers published articles recounting the events leading up to his murder.  These articles prompted new witnesses to come forward, and the KCSO informed the FBI that it was reopening the Pratt case on November 14, 1994.

---

[19] This time, XXX provided information to Seattle Urban League XXX XXX, who passed the information along to the FBI.  XXX stated that the information had been provided by Mike Jordan.

-9-

One of the new witnesses, XXX, contacted the Seattle Post-Intelligencer, seeking to give his account.[20]  According to the reporting, XXX stated that he was an acquaintance of Kirk's, and that he had gained his information about the case through fellow inmates at XXX in 1971.  He alleged that Kirk, Gray, and a third individual had comprised the team of hitmen who assassinated Pratt – with Kirk as the gunman, Gray as the lookout who accompanied Kirk to the door, and the third man as the getaway driver – and that they had been hired to commit the crime "by construction contractors angry with Pratt's efforts to boost employment" for the Black population.  Although unnamed at the time of the article (because he was still alive and had not been charged with a crime), the third man is now known to have been Mike Jordan.  Reporters from the Seattle Post-Intelligencer interviewed Jordan, who told them that police had examined his car in 1969 but had not contacted him otherwise.[21]  Jordan denied any involvement in the murder.

Another new witness who came forward in 1994 was XXX, who stated that Bart Gray had told him that Tommy Kirk had accepted and completed a contract to shoot a civil rights leader.  XXX relayed that Gray told him specifically that Kirk had been approached by two businessmen in suits, who offered him the contract.

One witness, however, changed his story from the one he told law enforcement during the previous investigation.  XXX recanted his previous statement, in which he alleged that Tommy Kirk and Mike Jordan had come to his apartment wanting to hide a shotgun the morning after Pratt's murder.  When he was interviewed by the FBI in 1995, XXX stated that his original story was false and had been told in an attempt to reduce the then-charges against him.  XXX did explain, however, that the "street talk" was that this was not a case of murder for hire; rather, he claimed that an altercation between Kirk and Pratt prompted the crime.  XXX noted that Kirk was known as someone who "would just pull a gun and shoot somebody."  XXX further described Kirk as being a racist who was fearful of being killed by a Black man.  Despite having named Jordan specifically in his 1974 interview, XXX denied ever having known him when speaking with the FBI in 1995.

Jordan himself was interviewed by the FBI during the renewed investigation.  At the time, Jordan was incarcerated at Washington State Penitentiary.  Jordan told investigators that Tommy Kirk admitted shooting Pratt – specifically, that Pratt opened the door and Kirk shot him in the head.  He further recalled that Kirk had a lot of money the day following Pratt's murder.  Jordan said that Kirk told him he "blew this guy away" and it was the "easiest money ever made."  Jordan explained that he believed Pratt was killed because he was a Black man in a white neighborhood and because he was fighting for change.  Jordan opined that while he did not believe Kirk himself held racist views, Kirk was willing to do anything for money.  Jordan did not implicate himself in the shooting and denied going to XXX's apartment the morning after the shooting, although he admitted that he and Kirk had previously been hired together to kill someone else.[22]  Jordan also

---

[20] New Clues in 1969 Murder, SEATTLE POST-INTELLIGENCER (Dec. 13, 1994).

[21] As explained in further detail above, law enforcement identified many cars matching the description of the getaway car during the 1969 investigation.  The Department has, however, been unable to corroborate Jordan's statement that his car was searched in 1969.

[22] In that instance, Jordan explained, he and Kirk only beat up the target and kept the money.

implicated another person in Pratt's murder, an individual he identified as "XXX." However, when the FBI later interviewed XXX – Kirk's former XXX – XXX denied any knowledge of who killed Pratt, and there was no other evidence supporting XXX's involvement.

During the renewed investigation, a confidential source reported to the FBI that Fred Barnes had been murdered in Seattle around the same time that Pratt had been murdered. The source further stated that they had heard that an individual named "Roney" may have been in some way responsible for the murder, because both Barnes and Roney were involved in obtaining certain contract bids. The same source believed that Barnes had been affiliated with Pratt and that both murders were motivated by the fact that Roney, Barnes, and Pratt were all involved in "minority contracting." The "Roney" that the source spoke of was likely Henry "Hank" Roney, who had been the head of the Northwest chapter of the National Association of Minority Contractors at the time of Pratt's death.[23] Roney had been identified in the 1969 investigation as critical of Pratt's work.

Although the 1994 investigation uncovered additional witnesses with information suggesting that Tommy Kirk was the gunman responsible for Pratt's death and that Bart Gray and Mike Jordan were his accomplices, the investigation still did not uncover sufficient evidence to bring charges against any living subject. Bart Gray died in 1991, and law enforcement did not have enough evidence to charge Mike Jordan. Further, while the investigation turned up new information indicating that Henry Roney may have ordered the killing, there was too little information to seek an indictment. Thus, the FBI concluded its investigation a second time on December 9, 1997. Similarly, the Civil Rights Division formally closed its case on April 20, 1998, noting that there were no active investigative leads.

### C.    The Current Investigation

When the Department reopened its investigation into the Pratt murder under the Till Act in 2019, several relevant pieces of information had been unearthed since the time the case was previously closed.

In 2011, the XXXXX published an article based in part on a new interview with XXXXXXXXXXXXXXXXXXXX.[24] XXX, too, opined that Kirk had shot Pratt. But, according to XXX, the shooting was not committed for money; rather, XXX described the murder as a "monumental hate crime" committed by Kirk alone. XXX explained that Kirk knew of Pratt because Pratt was often in the news at the time, and Kirk had, using racial slurs, stated that he was going to shoot Pratt. Further, XXX said that XXX was at XXX home when Mike Jordan, Tommy

---

[23] XXXXXXXXXXXXXXX.

[24] *Id.*

Kirk, and Bart Gray arrived hours after Pratt was killed, corroborating accounts[25] that the three were together shortly after the murder. XXX described all three as "wired and freaked out."

XXX was not an eyewitness to the shooting and did not state that Kirk confessed to the murder or indicate that XXX otherwise had direct personal knowledge that Kirk had committed the murder. XXX did not recall Kirk purchasing a used Corvette in the days following – a purchase that other witnesses had alleged Kirk made using the money he was paid for the crime. Rather, XXX stated that XXX remembered Kirk only driving a stolen Corvette, and XXX explained that XXX was also not aware of XXXX, XXXXXXX, having any extra cash on hand after that evening.

The FBI conducted two interviews with XXX, who was a XXX of the Pratts at the time of the shooting and who had contacted the FBI to offer the extensive research XXX had conducted since the murder. In the first interview, the FBI focused on XXX's experience as the Pratts' XXX and a witness to circumstances surrounding the shooting. The second interview focused on XXX and XXX colleagues' subsequent research regarding the crime. None of the details XXX recalled from the night of the murder, however, provided active investigative leads.

From their research, XXX and XXX colleagues opined that Tommy Kirk, Bart Gray, and Mike Jordan were directly involved in Pratt's murder as the gunman, lookout, and getaway driver, respectively. XXX and XXX colleagues further concluded that the likely motive for Pratt's death was his advocacy for ending the illegal distribution of drugs at XXX's Delicatessen, the business located close to a high school and known for its role in the local drug trade; his advocacy for eliminating racial discrimination in housing decisions in Seattle; or both.

Specifically, XXX and XXX colleagues believed that Guenter Mannhalt was a likely co-conspirator in Pratt's murder, as he and XXX were the XXX of XXX's Delicatessen. As described above, multiple witnesses mentioned during the 1969 investigation that a potential motive for Pratt's killing may have been his work to end the local drug trade, and at least one witness mentioned Pratt's efforts to oppose a sentence reduction for the Mannhalt XXX. However, although he lived longer than all other viable suspects in Pratt's murder, Mannhalt died on April 1, 2019.

In sum, the present investigation ended in the same manner as the previous two – with further indications that Tommy Kirk was the gunman who killed Pratt; with a list of likely accomplices but no confirmed motive; and with no living subjects available for a prosecution. The FBI closed its investigation into Pratt's murder again on December 8, 2021.

5.    Legal Analysis

The Till Act investigation into Pratt's murder is being closed because the murder cannot be federally prosecuted. All of the suspects identified by the federal and local investigations, as well as those identified by academics who studied the murder, are now deceased. Although the

---

[25] In 2006, XXX told law enforcement that he was at the Jordan's home with XXX the evening of the Pratt murder when Kirk, Gray, and Jordan arrived. He described the three as "pretty pumped up" and stated that they were carrying a 12-gauge shotgun. *See id.*

-12-

most recent investigation has shed new light on the possible hitmen and their possible co-conspirators, no information or evidence was obtained that identified previously unknown living subjects. Further, even if a living subject were identified, other barriers would likely preclude a federal prosecution. Evidence is insufficient to prove, beyond a reasonable doubt, the elements of the federal hate crimes in effect on the date of Pratt's death. More fundamentally, the statute of limitations has run on every possible federal civil rights offense. As such, the matter should be closed without prosecution.

### A.    All of the Known Subjects Are Deceased

All known suspects in the Pratt murder investigation are deceased, and all viable leads have been exhausted. No one associated with the murder-for-hire theory is still alive. As described above, Tommy Kirk, the alleged gunman, was killed by Bart Gray only four months after Pratt's murder. The other two individuals allegedly involved in the shooting – Bart Gray and Mike Jordan – died in 1991 and 2006, respectively. Mannhalt, whom XXX and XXX colleagues believe ordered and/or financed the shooting, died in 2019.

All other individuals whom witnesses identified as possibly responsible for Pratt's death are also now deceased. Bray was himself murdered in 1972; Roney died in 1996;[26] and Moen died in 2005. Because all known suspects are deceased, and there is no evidence pointing to the involvement of anyone who has not been previously identified, this matter should be closed without prosecution.

### B.    Even If Living Suspects Were Identified, Other Barriers Prevent Federal Prosecution

Even if the known suspects in Pratt's murder were alive (or if additional suspects could be identified), there would be insurmountable barriers to a federal prosecution. Most fundamentally, the statute of limitations has expired on any prosecution that could be brought under any federal civil rights statute. At the time Pratt was killed in 1969, there were only two federal hate crime statutes under which a prosecution could have been brought based on the facts of the case:[27] the criminal provisions of the Fair Housing Act, codified at 42 U.S.C. § 3631, and the criminal statute prohibiting interference with protected activities, codified at 18 U.S.C. § 245. In 1969, these statutes were subject to a five-year limitations period, which has long expired. *See* 18 U.S.C. §

---

[26] XXXXXXXXXXXXXXXXXXXXX.

[27] There also existed two Reconstruction-era civil rights offenses, but these would not have applied to Pratt's murder. Section 242 of Title 18 prohibits persons acting under color of law from willfully depriving others of constitutional rights. *See* 18 U.S.C. § 242. However, to prosecute anyone for violating this statute, the government would have to prove that the defendant acted under color of law, and no evidence suggested at any point that any suspect was acting under color of law. Section 241 of Title 18 prohibits conspiring to injure, oppress, threaten, or intimidate others in the free exercise or enjoyment of rights and privileges secured to them by the Constitution or federal law. *See* 18 U.S.C. § 241. Section 241 does not apply exclusively to defendants acting under color of law; it also applies to private actors when the right secured by the Constitution or federal law is protected against private (as opposed to solely government) interference. As explained in further detail above, however, there was not conclusive evidence that Pratt was killed because he was exercising any such right. Therefore, Section 241 did not apply.

-13-

3282(a).[28]  The government cannot prosecute any defendant after expiration of this limitations period.

The Department of Justice has used non-civil rights statutes to overcome the statute of limitations challenge in a small number of cases, such as those involving kidnapping across state lines, *see United States v. Seale*, 600 F.3d 473 (5th Cir. 2010), or offenses occurring on federal land, *see United States v. Avants*, 367 F.3d 433, 440 (5th Cir. 2004).  However, there is no evidence to suggest that Pratt was transported across state lines, that his murder occurred on federal land, or that any other federal statute applies.  For these reasons, the government cannot now federally prosecute anyone for the murder of Edwin Pratt.

It is also unclear whether the government could prove a violation of either statute beyond a reasonable doubt.[29]  Because Pratt was killed in his home, the Fair Housing Act might initially appear to apply to his case.  However, to prosecute anyone for violating the relevant provisions of the statute, the government would have to prove beyond a reasonable doubt that the defendant acted because of race and because of the victim's occupancy of his home.  In order to prove these motives beyond a reasonable doubt, the government would have to show that Pratt would not have been killed *but for* his race and *but for* his occupancy of his home.  *See Burrage v. United States*, 571 U.S. 204, 211 (2014) (explaining that proving but-for causation requires "proof that the harm would not have occurred in the absence of" the conduct at issue) (internal quotations omitted).

While there is a significant amount of evidence suggesting a racial motivation for Pratt's murder, there is also evidence suggesting a financial or political motive.  As such, it is not clear that the government would be able to prove but-for causation and meet the high standard of proof beyond a reasonable doubt that the defendant acted because of race.[30]  Moreover, the evidence developed to date is insufficient to prove, beyond a reasonable doubt, that the assailants acted *because* Pratt was exercising a housing right.  Therefore, even if a known suspect were alive, it is unclear that the evidence would be sufficient to prove, beyond a reasonable doubt, that those responsible violated the Fair Housing Act.

---

[28] In 1994, several of these statutes were amended to eliminate the statute of limitations for certain death-resulting offenses.  This was accomplished by making certain offenses defined by 18 U.S.C. §§ 241, 242 and 245 death eligible.  *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994); 18 U.S.C. § 3281 ("An indictment for any offense punishable by death may be found at any time without limitation.").  The *Ex Post Facto* clause prohibits the government from retroactively extending the statute of limitations once it has expired.  *See Stogner v. California*, 539 U.S. 607, 610 (2003).  A violation of 42 U.S.C. § 3631 is not, however, death eligible, and its statute of limitations remains five years.

[29] 42 U.S.C. § 3631.

[30] Attorneys from the Department have met with XXX to discuss the analysis included in this memorandum, and XXX maintains that the government would be able to prove racial motivation beyond a reasonable doubt if a living suspect were available for prosecution.  The Department agrees that there exists substantial evidence that Pratt's murder was racially motivated; however, as explained in further detail above, it is not clear that the evidence is sufficient to prove all the elements of a charge under the Fair Housing Act beyond a reasonable doubt.

-14-

The second federal statute in place at the time of Pratt's murder, 18 U.S.C. § 245(b)(2)(C), prohibits violent interference with other enumerated rights, including employment activities.[31] Several witnesses suggested that Pratt was killed because of his work for the Seattle Urban League. However, in order to prosecute anyone for violating § 245(b)(2)(C), the government would have to prove beyond a reasonable doubt that the defendant acted because of race and because the victim was exercising the right to enjoy private employment. Again, the government would have to prove that the crime would not have occurred *but for* these motivations. As under the Fair Housing Act, there is insufficient evidence to prove either of these motivations beyond a reasonable doubt, foreclosing prosecution.

### C.      *Referral to the State is Not Appropriate in this Case*

The Till Act and its Reauthorization provide that the federal government can assist state or local governments in prosecuting cold cases when the cases cannot be prosecuted federally. However, referral to the state is not appropriate here, as both the federal and local investigations have concluded that the primary suspects in the Pratt murder are now deceased, and all leads to previously unidentified suspects have been exhausted.

### 6.      Conclusion

Edwin Pratt's untimely death was a tragic loss for his loving family and the community for which he fiercely advocated during his lifetime. However, after a thorough evaluation of all available evidence, the Civil Rights Division concludes that this matter should be closed without prosecution, as there is no basis for federal prosecution or referral to the state. The United States Attorney's Office for the Western District of Washington concurs with this recommendation.

---

[31] 18 U.S.C. § 245.