# CIR Exhibit 6



**Archives**
U.S. Department of Justice



SPEECH

# Principal Deputy Assistant Attorney General Vanita Gupta Delivers Remarks at 21st Annual Conference of the National Association for Civilian Oversight of Law Enforcement

Tuesday, October 6, 2015

**Location**
Riverside, CA
United States

*Remarks as prepared for delivery*

Good morning.  I want to thank Brian Buchner and the National Association of Civilian Oversight in Law Enforcement (NACOLE) for this invitation.  It's an honor to speak with you this morning about the Civil Rights Division's work in ensuring constitutional policing, building police-community trust and — related to those outcomes — the importance of accountability and community engagement.  I have been at the helm of the division just about one year and it has been a year when, you won't be surprised to hear, these issues have predominated.  They have been a priority not just for the Civil Rights Division, but also for the Department of Justice writ large.

We've all heard the names.

**CIR Ex. 6 p. 1**

Eric Garner.  John Crawford.  Tamir Rice.

We know the tragic stories.

Rekia Boyd.  Walter Scott.  Freddie Gray.

And we've witnessed the sobering public reactions...in Ferguson, New York, Baltimore...and right here in New Jersey.

While the facts of many of these cases have been disputed or remain under investigation, we can all agree that the deaths of these individuals have been tragic.  And they have revealed the distance between law enforcement and local communities, particularly low-income communities of color.

Over the past year, this job has taken me to cities across the country.  I have sat down with those who have lost children in officer-involved shootings — their pain is real and profound.  I have spoken with young people who tell me they have lost faith in our justice system.  Many of them see police as preying on, rather than protecting them.  They complain that the police don't value their rights, or indeed, their lives.  They speak of the frequent humiliation in encounters with the police.  They talk about being tired of being viewed as criminals first, human beings second.

In the very same cities where residents tell me they feel marginalized, I hear from officers who feel attacked and undervalued.  They talk about slashed department budgets, resulting in drastic cuts for community policing and neighborhood patrols.  They talk about how the actions of a few bad actors have tarnished the whole profession.  They speak about being blamed for policies not of their making.  They point out that no one talks about the tens of thousands of times situations don't escalate.  They talk about how the daily stress of their jobs takes a toll.

There is truth in both of these perspectives.  But the thing I'm struck most by is the wide gap, both in empathy and in language, between these two sets of conversations.

There is one thing, though, that everyone agrees on: we are facing serious challenges when it comes to the erosion of trust between America's law enforcement officers and the communities they serve.

And the consequences of this distrust can be devastating.  Where people perceive the criminal justice system to be arbitrary, biased and unfair, they are less likely to cooperate with law enforcement, to help law enforcement solve or prevent crime, making us all less safe.  And, over time, the distrust and alienation experienced in some communities can build into a powder keg of resentment, ready to be ignited by a single tragic incident.  We have

seen this over and over—at least as far back as Watts in 1965, in Los Angeles after the Rodney King verdict in 1992, in Ferguson in 2014, and in Baltimore this year.

The first step in addressing the lack of trust is acknowledging its sources. Mistrust can't be explained away as the kneejerk reaction of the ill-informed or the hyperbolic.

FBI Director James Comey has noted that, "[a]t many points in American history, law enforcement enforced the status quo, a status quo that was often brutally unfair to disfavored groups." As Commissioner [William] Bratton explained, this history has an enduring effect. "None of us did these things," he told an audience of officers. He said, "None of us were troopers on the bridge at Selma. But it doesn't matter that these things happened before many of us were even born. What matters is that our history follows us like a second shadow."

The mistrust is also the product of lived experience, of negative interactions that communities have had with law enforcement. Something as quietly humiliating as being mistreated during a traffic stop. Stories can circulate through a neighborhood—or these days, across the nation via social media. Over time, they can build into a painful narrative that divides community members and police.

The lack of trust also undeniably results from our criminal justice policies over the last few decades, and the concentrated impact they have had on poor and minority communities. Law enforcement practices such as we saw in Ferguson regarding the targeting of the African American community to generate revenue. Sentencing policies that result in mass incarceration, particularly of people of color accused of low level crimes. And the devastating consequences that convictions have had on individuals' ability to find work, secure stable housing and reintegrate into society. We are now witnessing a tectonic shift on these issues as people on both sides of the political aisle are reevaluating our approach to criminal justice so that we can take a more targeted, effective and fair approach to public safety.

At the Civil Rights Division, rebuilding police-community trust is not just a civil rights priority but also a public safety and officer safety priority.

Partly, we contribute to this process by holding individual officers accountable for criminal misconduct. We have prosecuted over 350 law enforcement officers since 2009. Under federal law, we have a single criminal statute, which requires us to prove beyond a reasonable doubt that the officer willfully deprived the victim of his constitutional rights. It's the highest intent standard in criminal law. We are aggressive but thorough and fair, following the evidence where it leads, whether that means an indictment or closing the case.

**CIR Ex. 6 p. 3**

Criminal prosecution, though important, is a limited tool.  It gets at individual accountability.  That's why we also engage in systemic reform — investigating local law enforcement agencies where we believe there may be a pattern or practice of constitutional violations, such as excessive force or racial profiling.  Our investigations rely on intensive community and law enforcement input, experts including current or former police chiefs, and extensive document and data review.

Over the past six years, we have opened 22 investigations of law enforcement agencies across the country, and have reached agreements in 19 jurisdictions to correct unconstitutional police practices.

An example of this work is our investigation of the Ferguson, Missouri, Police Department (FPD).  In Ferguson, we found a community where unlawful police practices created an intensely charged atmosphere where people feel under siege by those charged to serve and protect them.  As explained in our report from March of this year, we determined that the FPD engages in a pattern or practice of conduct that violates the United States Constitution and federal law, including:

- Stops without reasonable suspicion and arrests without probable cause, in violation of the Fourth Amendment;

- Excessive force in violation of the Fourth Amendment;

- Unlawful interference with First Amendment rights, including the right to record and to protest police activity;

- Discrimination against African Americans in violation of the 14th Amendment and federal statutory law; and

- Violation of due process and equal protection in the operation of its Municipal Court.

We found that this unconstitutional conduct stems from the interaction of two dynamics: Ferguson's undue focus on revenue generation through policing and pervasive racial bias in the police department and court system.

These dynamics fostered unconstitutional practices at nearly every level of Ferguson's law enforcement system.  One example: during the summer of 2012, a Ferguson officer detained a 32-year-old African American man who had just finished playing basketball at a park.  The officer approached while the man was sitting in his car, cooling off.  The car's windows appeared to be more heavily tinted than Ferguson's code allowed, so the officer may have had grounds to question him.  But, with no apparent justification, the officer proceeded to escalate the situation, accusing the man of being a pedophile.  He prohibited the man from using his cell phone and ordered him out of his car for a pat-down search, even though he had no reason to suspect that the man was armed.  And when the man objected — citing his

**CIR Ex. 6 p. 4**

constitutional rights — the police officer drew his gun, pointed it at the man's head and arrested him on eight different counts. The arrest caused the man to lose his job.

We observed that even minor code violations can sometimes result in multiple arrests, jail time and payments that exceed the cost of the original ticket many times over.

For example, in 2007, one woman received two parking tickets that — together — totaled $152. To date, she has paid $550 in fines and fees to the city of Ferguson. She's been arrested twice for having unpaid tickets and she has spent six days in jail. Yet she still — inexplicably — owes Ferguson $541. Her story is only one of dozens of similar accounts that our investigation uncovered.

This case — and there were many like it — reflects the choice Ferguson made to let revenue generation drive policing. We uncovered emails explicitly stating that enforcement strategies had been undertaken "to fill the revenue pipeline." Officers were instructed to take ticketing "to the next level" or risk "disciplinary action." The amount collected in fines and fees exploded, nearly tripling from $1.38 million in 2010 to a projected almost $3.1 million in 2015. There were 50 percent more tickets issued in 2014 than in 2010 — even though Ferguson's population did not change.

We also found evidence of unlawful discrimination in Ferguson. African Americans make up 67 percent of the population, but from 2012 to 2014, they constituted:

- 85 percent of the people subject to a vehicle stop;
- 90 percent of people who received a citation; and
- 93 percent of people arrested.

And discretionary police actions were overwhelmingly concentrated on the black population. To take just one example, 95 percent of "manner of walking in roadway" charges — that's jaywalking — were levied against African Americans.

We found racial disparities in virtually every available metric. From 2012 to 2014, African Americans were more than twice as likely as white drivers to be searched during vehicle stops, but 26 percent less likely to be found in possession of contraband. In 88 percent of cases in which FPD documented the use of force, force was used against African Americans. In all cases in which canines were used against subjects for whom racial information is available, the subject was African American.

The evidence of racial bias comes not only from statistics, but also from disturbing email messages sent by police and court supervisors. One email depicted President Obama as a chimpanzee. Another joked about a man who applied for welfare for his dogs because they are "mixed in color, unemployed, lazy, can't speak English, and have no friggin' clue who their

**CIR Ex. 6 p. 5**

daddies are."  Another joked that a black woman received $5,000 from "Crimestoppers" for having an abortion.  The emails were incontrovertible evidence of a culture infected by racial bias.

These findings reveal that the public trust in Ferguson law enforcement and its criminal justice system, especially among African Americans, was damaged long before August 2014.  When there is this level of broad community distrust, public safety suffers and the job of delivering police services is rendered more difficult and more dangerous.

We are currently working toward reform in Ferguson.  The agreements that come out of these cases — court-enforceable, independently monitored consent decrees — can serve as blueprints for reform around the country.  They incorporate elements we have found are essential to rebuilding trust and police legitimacy.

Each is locally tailored, but there are common themes among them:

- Police commanders must create opportunities for line officers to have positive interactions, outside of the enforcement context, with individuals they may encounter as victims, witnesses or subjects.  This is a fundamental component of community policing.

- Structured community engagement is vital.  There are a host of models for that, and each community must determine which works best for it.  I'll come back to this in a moment.

- Improper bias — both explicit and implicit bias — must be identified and corrected.  The science shows that we all hold biases we aren't aware of.  But by identifying them, we can learn to manage them.  And of course, positive interactions are key to reducing unconscious stereotyping.

- Training, of course, is key.  There is particularly groundbreaking and innovative research and training on de-escalation that is changing use of force norms.  PERF (Police Executive Research Forum) and police departments around the country, like Seattle (SPD), are helping to lead the charge.

- We need better research and data.  To ensure policing is done constitutionally and without discrimination, police departments must collect data on their pedestrian and vehicle stops, frisks, searches, arrests; covering important demographic information, such as race and gender.  There is simply too much we don't know that we should.

- Departments must also commit to transparency, because the more communities know about police activity, the more operations can reflect community values and priorities.

- There must also be fair, consistent and robust internal and external systems of accountability so that police departments can course correct when problems are identified.  It's not fair to the public or to officers, for example, if internal affairs

**CIR Ex. 6 p. 6**

investigations are inconsistent, or if there's a mismatch between officer conduct and discipline.

- Officer safety and wellness is vitally important and too often ignored. The overwhelming majority of police officers are driven to the police academy out of a commitment to public service and a desire to make an impact in their communities. But the truth is, we ask more from our police officers that anyone reasonably can expect. We have thrown the criminal justice system at so many of our social problems — mental illness, alcohol and drug addiction, school discipline challenges — and given officers essentially two tools to deal with them: arrest and incarceration. Officers need training to ensure de-escalation with those in crisis and respectful interactions with LGBTI persons, immigrants with language barriers and other vulnerable populations. Critically, we also owe it to officers to provide them the professional support to cope with the stress and trauma they encounter on the job.

- And procedural justice matters. Research shows that being treated fairly and respectfully matters as much as the ultimate result of a person's interaction with police. People want and need to trust the police. Trust is formed not just through words but through deeds as well. At its core, constitutional policing must involve the treatment of fellow human beings, regardless of salary, race or stature, with compassion, respect and dignity.

I want to spend a few more minutes on community engagement, which I know is important to so many of you. For many of us who have been engaged on criminal justice reform for many years, this past year's events were not a result of a new phenomenon or new set of concerns. It was just that community mobilization and video recordings elevated the issue for the nation once again. And in some ways, this past year has really highlighted grassroots community engagement with policing on the streets — the ubiquitous phone documentation of law enforcement interactions with civilians. Combined with social media, this has created a new form of engagement. But we also know that video doesn't always tell the whole story because it may capture only a brief moment of time from one perspective. Nor is it a substitute for sustained, structured and empowered community engagement.

At the Civil Rights Division, we make it a priority to hear directly from community members during our investigations and in the remedial process. By the same token, we believe community input and oversight are essential to reform that will last. Ongoing community engagement is critical to ensuring that police departments are democratically accountable institutions. So we require these in our consent decrees.

Community input is critical to the legitimacy and enduring success of any reforms. That's why our findings letters are public — meaningful community engagement starts with a public accounting of what's broken. It's also why when developing reforms, we don't endorse any single model of civilian oversight ex ante. Instead, we consider the existing dynamics and rely on the input of the community.

**CIR Ex. 6 p. 7**

In Cleveland, for example, there already existed a civilian oversight body that investigated complaints of misconduct and recommended discipline.  Overwhelmingly, we heard from the community that it wanted this body to remain in place, but to be strengthened.  So we negotiated a consent decree that reflected those wishes and created supplemental structures, such as a community police commission to weigh in the on police department policies and training.  This commission has 13 members representing a variety of stakeholders, including civil rights and police union leaders.

In Seattle, the agreements also required the creation of a commission, including broad community and officer representation, to make recommendations regarding police practices.  That commission has now been in place for more than two years, and although there have been bumps along the road, we are committed to making the commission's voice strong, because it is essential to our reform efforts.

Seattle also has a Crisis Intervention Committee (CIC), an interagency group composed of a cross-section of stakeholders, including mental health professionals, clinicians, community advocates, academics, representatives of the judiciary and Seattle PD.  The CIC develops critical components of the SPD's strategy for engaging with individuals who are in behavioral crisis.

Our Portland agreement aims to change the way officers interact with people in behavioral health crisis, and ensure that those encounters don't result in unnecessary force.  That agreement restructured existing mechanisms to create a community oversight and advisory board to help implement agreed reforms.

More broadly, we need much more data and research on what models of community engagement and civilian oversight work best in different communities.  The work of NACOLE and all of you involved in this issue will be incredibly important to us going forward.

Before I finish, there are a few things that bear highlighting.

First, there is no contradiction between constitutional policing and public safety.  There is no contradiction between us caring about police officers and making sure our laws are applied fairly.  In fact, if we do this right, police practices that accord with the law will result in greater trust, more mutual respect and less crime.  The community will work with law enforcement to solve and to prevent crime.

Second, we cannot have a conversation about policing in isolation of broader systemic inequality.  Many of the problems in our criminal justice system reflect structural barriers to opportunity.  The elevated conversation gives us an opportunity to connect these dots and address inequalities in housing, education, access to transportation, good jobs and more.  These things are undeniably related.

**CIR Ex. 6 p. 8**

Third, ensuring fair, constitutional policing and building community trust is a national challenge, but it calls for local solutions.  Yes, the commitment of the Justice Department is important.  Ultimately, however, police departments and communities will achieve progress because of the hard work of officers, union leaders, advocates, elected officials and everyday people.  Residents who have experienced crime and who have ideas about how to fight it.  Local leaders who have the courage to reorient law enforcement culture.  It will be people like all of you who create lasting change.

Finally, let's remember that building trust is a long, ongoing process.  Like in any part of life, relationships can take years to form, but can be easily broken.  We can repair these relationships, but it won't happen quickly, and it can't start the day after a critical incident.  It takes years of commitment.

This work is like being part of a family — it's loud, large, and messy.  And let's be real, no one likes everyone in their family.  So we're not always going to agree.  We're going to get on each other's nerves sometimes.  We're going to offend each other sometimes.  We're going to argue.

If we would take the time to listen — really listen — and understand why most protestors take to the streets, why police officers risk their lives every day, we would find that, while perspectives may differ, people's aspirations — and their values — tend to be very similar.

We all want safer streets.  We all want stronger communities.  We all believe in justice.

Working together, we have the power to accomplish all three.  Working together, we have the power to advance the pursuit of justice that has always bound this nation together.  Thank you very much.

---

**Speaker**

Vanita Gupta, Head of the Civil Rights Division

**Topic**

> **CIVIL RIGHTS**

**Component**

Civil Rights Division

**CIR Ex. 6 p. 9**