# CIR Exhibit 8



**Archives**
U.S. Department of Justice



**PRESS RELEASE**

# Federal Officials Decline Prosecution in the Death of Freddie Gray

Tuesday, September 12, 2017

**For Immediate Release**

Office of Public Affairs

The Justice Department announced today that the independent federal investigation into the death of Freddie Gray, Jr., on April 19, 2015, in Baltimore, Maryland, found insufficient evidence to support federal criminal civil rights charges against six Baltimore Police Department (BPD) officers.

Overview

On May 1, 2015, the Baltimore State's Attorney's Office (SAO) charged BPD Officers Caesar Goodson, William Porter, Garrett Miller, and Edward Nero; Lieutenant Brian Rice; and Sergeant Alicia White with criminal offenses related to Gray's arrest and death. The charged offenses included reckless endangerment, involuntary manslaughter, and second degree depraved heart murder. Ultimately, four out of the six officers took their cases to trial, and in each instance, the prosecution was unable to secure a conviction. The SAO's first trial, which was against Porter, resulted in a mistrial after the jury failed to reach a verdict. In the next three trials, Nero, Goodson, and Rice were acquitted on all charges following bench trials. After the fourth trial ended in acquittal on July 18, 2016, the SAO dismissed the remaining counts against Porter, Miller, and White, ending all state prosecutions related to Gray's death.

The Department conducted a comprehensive independent investigation of the events surrounding Gray's death and carefully reviewed the materials and evidence generated by

<strong>CIR Ex. 8 p. 1</strong>

BPD and the SAO. Career prosecutors examined evidence from numerous sources, including surveillance videos from closed circuit cameras (CCTV) that captured various sites where Gray was taken while in custody; cell phone videos taken by civilian witnesses at the time of Gray's arrest; numerous witness interviews (transcripts, audio, and video recordings); photos; maps; medical reports; an autopsy conducted by the Office of the Chief Medical Examiner for the State of Maryland; police dispatch recordings; reports concerning DNA and blood stain evidence; BPD documents related to Gray's arrest and the investigation of his death; personnel files and background materials for the subjects; BPD policies and training materials; phone records; demonstrative evidence; the SAO's investigative file concerning the incident; trial transcripts; and trial court verdicts and findings of fact. Additionally, the FBI and federal prosecutors conducted witness interviews of BPD personnel in order to clarify procedural questions with respect to police investigative practices.

<u>Applicable Law</u>

The Department examined the facts in this case under all relevant criminal statutes. The principal criminal statute applicable to these facts is Title 18, United States Code, Section 242, Deprivation of Rights Under Color of Law. In order to proceed with a prosecution under Section 242, prosecutors must first establish beyond a reasonable doubt that a law enforcement officer deprived an individual of a constitutional right. Prosecutors considered multiple theories of liability, based on multiple constitutional provisions, including theories of false arrest, excessive force, and deliberate indifference to the risk of serious harm to Gray.

Additionally, to prove that any police encounter violated section 242, the government must also prove beyond a reasonable doubt that the officer acted willfully. This high legal standard – one of the highest standards of intent imposed by law – requires proof that the officer acted with the specific intent to do something the law forbids. It is not enough to show that the officer made a mistake, acted negligently, acted by accident, or even exercised bad judgment.

Although Gray's death is undeniably tragic, the evidence in this case is insufficient to meet these substantial evidentiary requirements. In light of this, and for the reasons explained below, this matter is not a prosecutable violation of the federal civil rights statutes.

<u>Factual Summary</u>

While this summary is based on, and consistent with, all facts known to the government, it does not include or discuss every fact learned or gathered during the thorough investigation.

At approximately 8:39 am on April 12, 2015, Freddie Gray was standing on a street corner with another male when he made eye contact with Lieutenant Brian Rice, a uniformed police officer who was on bicycle patrol in BPD's Western District. After making eye contact with

**CIR Ex. 8 p. 2**

Lieutenant Rice, Gray ran. In response, Rice chased Gray and radioed that he was pursuing a suspect. Officers Garrett Miller and Edward Nero, both of whom were also on bicycle patrol, joined Lieutenant Rice in pursuing Gray. After approximately one minute, near Presbury and Mount Street, Gray surrendered to Officer Miller after Miller drew his Taser and threatened its use. The officers handcuffed and frisked Gray, leading to their discovery of what appeared to be an illegal switchblade knife in Gray's pocket. Miller placed the knife on the ground, and Gray attempted to move toward it. In response, Officer Miller placed Gray, who was sitting on the ground, on his stomach. Gray began to flail his legs, and Miller placed Gray into a leg lace, which is a leg lock technique designed to stop the legs from moving. Officer Caesar Goodson then arrived with an empty police wagon for the purpose of transporting Gray. Video evidence shows that a small crowd of civilians gathered near the wagon and angrily protested Gray's arrest. As the officers led Gray to the vehicle, he yelled about his wrists. Also, according to statements the officers later made to investigators, Gray would not walk on his own power, causing his feet to drag on the ground. Nonetheless, video shows that he stood by himself on the ledge of the wagon before entering. Officers Miller and Nero were assisted by another officer in placing Gray on a bench on the right side of the rear cabin. Gray faced a hard partition that completely separated the right and left sides of the wagon. The officers did not seat belt Gray. One of the officers later testified that they did not do so for reasons of officer safety, given the gathering angry crowd.

Once Gray was placed inside of the wagon and the doors were shut, witnesses could hear him banging against the wagon and yelling. At the direction of Lieutenant Rice, Goodson drove Gray in the wagon from the location of the arrest (Stop 1) to a location down the street at Mount and Baker Street (Stop 2), so that the officers could place leg shackles on Gray away from the civilians. Officers Miller, Nero, and Lieutenant Rice met Goodson at Stop 2, along with Officer William Porter and others. While at Stop 2, Gray resisted efforts of the officers to remove him from the wagon and place him into shackles. In response, Miller and Rice pulled Gray out of the wagon while he yelled and flailed. While the officers were placing new restraints on Gray, a crowd of up to nine civilians formed near the wagon and began to angrily yell at the officers about Gray's arrest. Some yelled that the officers had injured Gray. Officer Porter assisted with crowd control. Lieutenant Rice and Officers Miller and Nero attempted to place Gray back into the rear of the wagon. As they did so, Gray went limp, and according to the officers, refused again to walk on his own power. This prompted Lieutenant Rice to enter the wagon and lift Gray inside head-first by pulling Gray's shoulders while Nero lifted Gray's legs. Lieutenant Rice left Gray on the floor of the wagon on his stomach with Gray's head facing toward the front of the wagon and his hands cuffed to the rear. No officer seat-belted Gray. Once the wagon doors were shut, Rice, Miller, Nero, Porter, and multiple civilian witnesses heard Gray yell and bang against the wagon from the inside, causing it to visibly shake. Lieutenant Rice instructed Goodson to drive Gray to central booking, and at approximately 8:53 am, Goodson left Stop 2 and drove in that direction. Medical experts have

**CIR Ex. 8 p. 3**

agreed that sometime during the approximately 25 minutes that followed, while Gray rode in the rear of the police wagon, he sustained a fatal neck and spinal injury in a manner that is largely unknown.

Video indicates at around 8:56 am, while Officer Goodson was transporting Gray in the back of the wagon from Stop 2 to central booking, he made a wide right turn onto Freemont Avenue from Riggs Street, and briefly crossed over the double yellow line in the roadway. He then made an unannounced stop near Freemont Avenue (Stop 3). While there, Goodson got out of the wagon, walked to the rear of the vehicle, and disappeared from camera view for approximately 10 seconds. Goodson then got back in the van and drove away. It is unclear whether Goodson had any interaction with Gray at the back of the wagon at this stop, or what Goodson might have observed or heard. Goodson declined to provide a statement to state investigators about Gray or about that day. There is no other evidence of what occurred at Stop 3.

At approximately 8:59 am, after leaving Stop 3, Officer Goodson radioed to request that a police unit meet him at Druid Hill Avenue and Dolphin Street (Stop 4) for the purpose of checking on Gray. Officer Porter answered Goodson's call and later provided two statements to investigators. He also testified at trial about his version of events. As Goodson has never given a statement in the criminal case, and could not legally be compelled to do so, Porter's accounts offer the only evidence of what occurred at Stop 4. According to Porter, when he arrived at Stop 4, he met Goodson at the rear of the wagon, and Goodson opened the doors without discussion. There, Porter observed Gray lying on his stomach on the floor of the wagon with his head toward the front of the wagon, his feet toward the door, and his hands cuffed behind him. Gray asked for "help," prompting Porter to ask what was wrong with him. According to Porter, Gray did not immediately reply, and then stated, "Help. Help me up." In one of his statements to investigators, Porter is alleged to have also heard Gray say "I can't breathe," although he later denied having heard that.

After Gray asked for help, Officer Porter entered the wagon, pulled Gray up, and placed him on the bench. According to Porter, Gray used his own legs to assist Porter in placing him on the bench. Once there, Gray sat normally and supported his own head. Porter asked Gray if he wanted to go to the hospital, and Gray replied that he did. Gray did not complain of pain or of a specific injury, and Porter did not see any visible injury. Gray spoke in a regular tone of voice and breathed normally. According to Porter, because there were no signs of genuine medical distress, Porter did not believe that Gray was actually injured, despite Gray's complaints. Porter allegedly believed that Gray was either lethargic from banging against the wagon, or was feigning a medical issue in order to avoid going to jail. However, because of Gray's complaints, Porter told Goodson, who was standing at the rear of the wagon, that Gray was not going to "pass medical" at central booking. Goodson agreed, and Porter suggested that Goodson take Gray straight to the hospital. However, at that moment, at

**CIR Ex. 8 p. 4**

approximately 9:07 am, Lieutenant Rice radioed a request for available police units and a police wagon to respond to a different location. In response, Porter left the wagon, got back into his car, and responded to Rice's dispatch. Goodson responded to Lieutenant Rice's request as well and did not take Gray to the hospital. Again, neither officer seat-belted Gray.

Video surveillance reveals that the wagon arrived at Lieutenant Rice's location (Stop 5) at approximately 9:11 am. When Goodson arrived, he parked the wagon near Lieutenant Rice and Officers Miller and Nero, who were standing on the sidewalk with a new handcuffed arrestee. It was decided that the new arrestee would be transported in the wagon back to the Western District police station for questioning. The doors to the rear of the wagon were opened, and at some point, another officer who had arrived at Stop 5 observed Gray kneeling in the wagon in a posture that resembled a praying position while facing the bench. In addition, Sergeant Alicia White arrived in order to investigate a complaint that an anonymous caller had made earlier that day about an altercation in the area. According to a statement later made by Sergeant White, she looked into the wagon, and while she could not see Gray's face, she saw him kneeling on the wagon floor, facing away from her, and leaning over the bench with his head down. White attempted to question Gray, believing that he might know something about the complaint she was investigating. He gave no verbal response, but made an audible noise. White interpreted Gray's silence as an indication that he did not want to cooperate with the police. Porter also attempted to speak to Gray at Stop 5, and asked Gray again if he wanted to go the hospital. Gray answered, "Yes." According to Porter, he told Sergeant White that Gray wanted a medic, and in response, Sergeant White told Porter to follow the wagon back to the Western District to drop off the new arrestee, and then escort Gray to the hospital. At 9:16 am, Goodson left for the Western District station with Gray and the new arrestee in tow. The new arrestee later told investigators that the ride to the police station was smooth and lacked rapid accelerations, decelerations, or turns. The arrestee also stated that he heard loud banging from the other side of the wagon, and that he believed, based on the sound alone, that Gray was knocking his head against the wagon's middle partition.

Upon Gray's arrival at the Western District station (Stop 6), at approximately 9:18 am, Officer Porter, Sergeant White, and another BPD officer found Gray to be unconscious. Porter noted that Gray's eyes were shut, his neck was limp, and he appeared not to be breathing. Sergeant White observed that Gray was drooling. Two officers, one of whom was Sergeant White, called for paramedics. Once the paramedics arrived, they observed that Gray was not breathing, had a small amount of blood coming from his nose, and had frothy vomitus discharge around his mouth. Gray also smelled of feces, indicating incontinence.

The paramedics took Gray to the hospital, where he remained comatose for days. During that time, he underwent multiple rounds of surgery. CT and MRI scans revealed that he suffered from a fractured neck and pinched spinal cord. Medical experts who analyzed the injuries

**CIR Ex. 8 p. 5**

later determined that they were akin to those sustained by a person who dives into a shallow pool and hits his head on the bottom, causing the neck to break when his head rotates forward. Those experts largely concluded that sometime in between Stops 2 and 6, Gray's head forcefully impacted the interior surfaces of the wagon, such as the walls or doors, causing the injury. On April 19, 2015, Gray died as a result of medical complications accompanying those injuries.

Discussion

Lieutenant Brian Rice, Sergeant Alicia White, Officer William Porter, Officer Garrett Miller, and Officer Edward Nero each provided detailed statements to local investigators offering their version of what happened near the time of Gray's fatal injury. Officers Porter, Miller, and Nero also testified about the matter in state criminal trials. In order to pursue any prosecution in this case, the government would have to disprove these accounts and establish that the officers' actions or inactions with respect to Gray constituted a willful violation of Gray's Fourth Amendment or Fourteenth Amendment rights. During a detailed and thorough investigation, the Department reviewed and analyzed numerous interviews of witnesses to the events surrounding Gray's injury. In determining whether it was possible to disprove the officers' statements beyond a reasonable doubt, the Department took into account all of the evidence in the case, including, among other things, all witness statements, any video and audio evidence, medical evidence, and other relevant documents. The Department considered all of the evidence in light of the legal standards for proving criminal cases of false arrest, excessive force, and deliberate indifference.

With respect to a false arrest charge, the Department determined that it could not disprove the officers' statements regarding the events leading to the arrest. According to the officers, Gray was detained after he made eye contact with Lieutenant Rice and then immediately ran from him. At the time, the bicycle officers were conducting proactive enforcement in an area known for drug sales. Once the officers stopped Gray, they admitted to securing him with handcuffs and then performing a cursory search for weapons, which yielded an illegal knife. A test of that knife later revealed that it opened with a spring-assist, which corroborates Officer Miller's determination that it was a switchblade knife. In light of the Supreme Court's decisions regarding the thresholds for reasonable suspicion and probable cause, prosecutors concluded that a false arrest under the Fourth Amendment was not supported by the facts. Gray's unprovoked flight from Lieutenant Rice, which occurred in an area known for drug sales, gave the officers reasonable suspicion to briefly detain him. Miller's discovery of a knife that appeared to be an illegal switchblade supplied probable cause to arrest Gray.

In order to fully assess whether the officers used unreasonable force when arresting Gray, the Department closely examined medical evidence, video recordings, and witness accounts. The legal standard for such a prosecution would require the government to prove beyond a

**CIR Ex. 8 p. 6**

reasonable doubt that an officer's use of force during Gray's arrest was objectively unreasonable based on all of the surrounding circumstances, and thereby violated the Fourth Amendment. The law requires that the reasonableness of an officer's use of force on an arrestee be judged from the perspective of a reasonable officer on the scene, rather than with the added perspective of hindsight.

The evidence in this matter overwhelmingly contradicted reports from some civilian witnesses that Gray was either tased or beaten by the officers. The doctor who performed Gray's autopsy and testified for the state concluded that there was no medical evidence indicating that Gray's injuries were caused by excessive force during the arrest, and no medical evidence showing that Gray had been tased. In fact, all medical professionals who testified at the state trials agreed that Gray was injured sometime after Stop 2 while he was being transported in the wagon. BPD investigators analyzed all of the subjects' Tasers after Gray's arrest and confirmed that none of the subjects had deployed their Tasers that day. One witness who claimed to have seen Gray tased later recanted that assertion at trial. Additionally, at least two civilian witnesses reported that they did not see any officer strike, punch, or kick Gray, and at least one such witness denied that officers placed Gray into the wagon forcefully. None of the video evidence established that Gray was struck, tased, or otherwise subjected to unreasonable force. Finally, all officers who were present for Gray's arrest, and gave formal statements, denied ever seeing anyone use excessive force against Gray. To be sure, Officer Miller admitted to using a leg lace on Gray in order to temporarily immobilize Gray's legs, but Miller's assertion that he did so in response to Gray's flailing is unrebutted by the evidence. Based on this assertion, his use of a leg lace cannot be proven unreasonable, and the medical evidence does not establish that the leg lace resulted in injury to Gray.

The Justice Department also considered whether the evidence established that Officer Goodson intentionally gave Freddie Gray a "rough ride" in the back of the wagon, thereby using excessive force in violation of the Due Process Clause. Pursuing this charge would require the government to prove that Officer Goodson gave Gray a ride that objectively harmed him, and that Goodson did so "maliciously and sadistically" in order to cause Gray harm. The evidence could not bear this burden. In spite of the fact that video evidence shows Goodson making a wide right turn and briefly crossing the double yellow line prior to arriving at Stop 3, neither that video, nor the other evidence, conclusively established that Goodson drove recklessly. An expert on retaliatory prisoner transport practices who testified at trial for the state acknowledged that he had seen no evidence that Goodson made abrupt starts, stops, or turns, and that he was not sure whether Goodson had given Gray a "rough ride." Goodson provided no statement to investigators that would illuminate how he operated the wagon, and an arrestee who was placed in the wagon at Stop 5 described the drive to Stop 6 as a "smooth ride." In addition, the medical evidence does not conclusively establish that

**CIR Ex. 8 p. 7**

Gray's injuries were caused by reckless driving, or even by poor driving. There is no evidence that Officer Goodson harbored any animus toward Gray or desired to harm him. Goodson's failure to seatbelt Gray, without more, does not prove intent to harm. The evidence cannot disprove exculpatory explanations for failing to seatbelt Gray, explanations having nothing to do with intent to harm.

In order to determine whether the officers' failure to seatbelt Gray constituted deliberate indifference to a serious risk of harm to Gray in violation of the Fourteenth Amendment, federal investigators paid particular attention to the law enforcement witness statements, training records, and BPD policies. Under the law, it would not be enough to show that an officer merely had an awareness of some risk of serious harm or that an officer should have had such an awareness. The law would require the government to prove that the officers actually knew that transporting Gray without a seatbelt created a substantial risk of serious harm, and that they actually knew that their actions were inappropriate. The officers made no admissions that would allow us to prove that any of the officers were actually aware that transporting Gray without a seatbelt in back of a police wagon would create a substantial risk of serious harm. The Department also cannot prove that the officers received training regarding substantial risks or harms associated with the transportation of un-seat-belted detainees. The Department reviewed longstanding BPD polices for seat-belting that were in effect until just days before Gray's arrest, and those polices afforded officers the discretion to refrain from seat-belting detainees if the officers believed there were security risks involved. Given the angry crowds at Stops 1 and 2, and in light of Gray's combative behavior once inside the wagon, the Department cannot prove that the officers believed that their failure to seatbelt Gray was an inappropriate balancing of the safety risks involved. Accordingly, to the extent that the officers violated department policy in failing to seatbelt Gray, those failures suggest civil negligence rather than the high standard of deliberate indifference.

The Justice Department also considered whether the officers were deliberately indifferent to Gray's serious need for medical care. The relevant medical evidence does not conclusively establish that Gray had already sustained his fatal neck injury by the time Officers Porter, Goodson, and White observed him at Stops 4 and 5. Medical experts who examined Gray's death were sharply split during the state trials as to whether Gray suffered this injury sometime between Stops 2 and 4, or sometime between Stops 5 and 6. Experts who testified for the officers maintained that the neck injury Gray suffered would have caused near instantaneous (rather than progressive) paralysis, loss of breathing, and loss of speech. Given that testimony, and Porter's unrebutted statement that Gray was speaking at Stops 4 and 5, the Department cannot prove beyond a reasonable doubt that Gray had already suffered his neck injury by the time officers saw him at those stops. Even if Gray had already been injured, the evidence does not prove that the officers were aware of the serious nature of

**CIR Ex. 8 p. 8**

that injury. At Stop 4, Gray was talking, able to maintain a seated position, and supported his own neck. At Stops 4 and 5, he was breathing and conscious. There is no evidence that he was bleeding or had any other visible injury. He was not drooling, had no liquid discharge around his mouth, and was not incontinent at that point. At Stop 6, Gray exhibited symptoms of medical distress that he did not exhibit earlier. There appears to have been a consensus among the medical experts who testified at the state trials that Gray's injuries manifested themselves internally and would not have necessarily had visible signs. The Department is mindful of the fact that Gray asked for medical assistance and appeared lethargic at Stops 4 and 5, however, the evidence does not disprove Porter's statement that he delayed Gray's requests for a medic because he believed Gray was fatigued after banging himself against the wagon and might have been feigning injury. Regardless of whether Sergeant White or Officer Porter acted negligently by not calling a medic prior to Stop 6, it would be impossible to prove that either deliberately ignored Gray's needs.

In light of the above analysis, the evidence gathered during this investigation is insufficient to prove beyond a reasonable doubt that the officers violated Gray's Fourth Amendment rights against false arrest and unreasonable force, or his Fourteenth Amendment right to be free from excessive force and deliberate indifference.

In analyzing a potential charge under section 242, the Department also considered whether the evidence was sufficient to prove the statutory element of willfulness. To establish that the officers acted willfully, the government would be required both to disprove the officers' account of their interaction with Gray and to affirmatively establish that the officers instead acted, or failed to act, with the specific intent to violate Gray's rights. At a minimum, this would require proof that the officers knew that they were treating Gray in a wrongful manner, yet chose to do so anyway. For many of the same reasons described above, the evidence is insufficient to prove willfulness and cannot bear this heavy burden.

Conclusion

After an extensive review of this tragic event, conducted by career prosecutors and investigators, the Justice Department concluded that the evidence is insufficient to prove beyond a reasonable doubt that Officer Caesar Goodson, Officer William Porter, Officer Garrett Miller, Officer Edward Nero, Lieutenant Brian Rice, or Sergeant Alicia White willfully violated Gray's civil rights. Accordingly, the investigation into this incident has been closed without prosecution.

In this case, the U.S. Attorney's Office of the District of Maryland, the Civil Rights Division, and the FBI each devoted significant time and resources to investigating the circumstances surrounding Gray's death and to completing a thorough analysis of the evidence gathered. The Justice Department remains committed to investigating allegations of excessive force by

law enforcement officers and will continue to devote the resources required to ensure that all serious allegations of civil rights violations are thoroughly examined. The Department aggressively prosecutes criminal civil rights violations whenever there is sufficient evidence to do so.

*Updated February 5, 2025*

**Components**

[Civil Rights Division](#)　|　[Civil Rights - Criminal Section](#)

Press Release Number: 17-999

✉ **Office of Public Affairs**
U.S. Department of Justice

📞