# CIR Exhibit 9

 **Archives**
**U.S. Department of Justice**

≡

**PRESS RELEASE**

# Federal Officials Close Investigation Into Death of Alton Sterling

Wednesday, May 3, 2017

**For Immediate Release**

Office of Public Affairs

The Justice Department announced today that the independent federal investigation into the fatal shooting of Alton Sterling on July 5, 2016, in Baton Rouge, Louisiana, found insufficient evidence to support federal criminal charges against Baton Rouge Police Department (BRPD) Officers Blane Salamoni and Howie Lake, II.  Career prosecutors from the U.S. Attorney's Office (USAO) for the Middle District of Louisiana and the Justice Department's Civil Rights Division, along with officials from the FBI and the Justice Department's Community Relations Service, met today with Sterling's family and their representatives to inform them of the findings of the investigation and the decision.

*Overview*

The Department conducted a ten-month, comprehensive, and independent investigation of the events surrounding Sterling's death.  Federal agents and career prosecutors examined evidence from multiple independent sources, including all available footage from police vehicles that responded to the scene and the body-worn cameras from responding officers; cell-phone videos of the incident; interior and exterior surveillance video footage from the store where the shooting occurred; evidence gathered by the BRPD's crime lab; BRPD documents related to the shooting; personnel files and background material for both involved officers, including prior use-of-force incidents; BRPD policies and training materials; all relevant dispatch recordings between and among local law enforcement, including the

**CIR Ex. 9 p. 1**

originating 911 calls; forensic evidence reports; the autopsy report; photographs of the crime scene; toxicology reports; EMS reports; and extensive additional electronically-stored evidence. As part of the investigation, the FBI laboratory conducted an expert forensic analysis of the video footage capturing the incident between Sterling and the officers. The FBI also interviewed dozens of witnesses, including civilian witnesses who were present at the scene and officers who responded to the scene after the shooting. The Department also consulted with two independent use-of-force experts whom the Civil Rights Division has previously used as government witnesses in criminal prosecutions of civil rights violations.

### *Applicable Law*

The Department examined the facts in this case under all relevant federal criminal statutes. The federal criminal statute applicable to these facts is Title 18, United States Code, Section 242, Deprivation of Rights Under Color of Law. In order to proceed with a prosecution under Section 242, prosecutors must establish beyond a reasonable doubt that a law enforcement officer acted willfully to deprive an individual of a federally protected right. The right implicated in this matter is the Fourth Amendment right to be free from an unreasonable seizure. This right includes the right to be free from unreasonable physical force by police. To prove that a police shooting violated the Fourth Amendment, the government must prove beyond a reasonable doubt that the use of force was objectively unreasonable based on all of the surrounding circumstances. The law requires that the reasonableness of an officer's use of force on an arrestee be judged from the perspective of a reasonable officer on the scene, rather than with added perspective of hindsight. The law set forth by the Supreme Court requires that allowances must be made for the fact that law enforcement officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.

Additionally, to prove that a shooting violated section 242, the government must prove beyond a reasonable doubt that the officers acted willfully. This high legal standard – one of the highest standards of intent imposed by law – requires proof that the officer acted with the specific intent to do something the law forbids. It is not enough to show that the officer made a mistake, acted negligently, acted by accident or mistake, or even exercised bad judgment.

Although Sterling's death is tragic, the evidence does not meet these substantial evidentiary requirements. In light of this, and for the reasons explained below, the federal investigation concluded that this matter is not a prosecutable violation of the federal statutes.

### *Factual Summary*

While this summary is based on, and consistent with, all facts known to the government after a thorough investigation, it does not include or discuss all facts known to federal law

**CIR Ex. 9 p. 2**

enforcement officials or gathered through this investigation.  Many of the facts gathered through the federal investigation are not permitted to be disclosed, and other particularly sensitive facts and evidence are not being disclosed in order to protect the integrity of the State Attorney General's inquiry into whether any state statutes were violated.

The investigation revealed that at approximately 12:30 a.m. on July 5, 2016, an individual called 911 from a location near the Triple S Food Mart ("Triple S") and reported that he had been threatened outside of a store by a black man wearing a red shirt and selling CDs.  The caller reported that the man had pulled out a gun and had the gun in his pocket.  The caller's first call disconnected, but he called back a few moments later and reiterated his report.  Dispatch relayed that information to Officers Lake and Salamoni, who responded to the Triple S, where they saw Sterling, wearing a red shirt and standing by a table with a stack of CDs.

The subsequent exchange between Sterling and the officers happened very quickly, with the events – from the officers' initial approach to a struggle on the ground to the shooting – happening in rapid succession.  From the moment when Officer Lake gave his first order to Sterling, through the firing of the final shot, the entire encounter lasted less than 90 seconds.  More specifically, from the start of the officers' physical struggle with Sterling on the ground, through the firing of the final shot, the encounter lasted less than 30 seconds.

Multiple videos captured portions or the entirety of the officers' interaction with Sterling.  These include cell-phone videos, surveillance video from the store, and video from the officers' body cameras and a police vehicle.  FBI video forensic experts also provided enhancements of relevant videos for the portion of the struggle that immediately preceded the shooting.

The videos show the officers as they arrived on scene and engaged with Sterling.  The videos show that the officers directed Sterling to put his hands on the hood of a car.  When Sterling did not comply, the officers placed their hands on Sterling, and he struggled with the officers.  Officer Salamoni then pulled out his gun and pointed it at Sterling's head, at which point Sterling placed his hands on the hood.  After Sterling briefly attempted to move his hands from the hood, Officer Lake then used a Taser on Sterling, who fell to his knees, but then began to get back up.  The officers ordered him to get down, and Officer Lake attempted unsuccessfully to use his Taser on Sterling again.  Officer Salamoni holstered his weapon, and then tackled Sterling; both went to the ground, with Officer Salamoni on top of Sterling, who was on his back with his right hand and shoulder partially under the hood of a car.  Officer Lake joined them on the ground, kneeling on Sterling's left arm while Officer Salamoni attempted to gain control over Sterling's right arm.  Officer Salamoni then yelled, "Going for his pocket. He's got a gun! Gun!"  Officer Salamoni then unsuccessfully attempted to gain control of Sterling's right hand, while Officer Lake drew his weapon and yelled at

**CIR Ex. 9 p. 3**

Sterling, again directing him not to move.  Less than one second later, during a point at which the location of Sterling's right hand was not visible to the cameras, Officer Salamoni again yelled that Sterling was "going for the gun!"  Officer Salamoni then fired three shots into Sterling's chest.

After the first three shots were fired, Officer Salamoni rolled onto on his back, facing Sterling's back, with his weapon still drawn.  Officer Lake stood behind both of them with his weapon drawn and pointed at Sterling.  Sterling began to sit up and roll to his left, with his back to the officers.  Sterling brought his right arm across his body toward the ground, and Officer Lake yelled at Sterling to "get on the ground." As Sterling continued to move, Officer Salamoni fired three more rounds into Sterling's back.  Within a few seconds, Officer Lake reached into Sterling's right pocket and pulled out a .38 caliber revolver.  Investigators later confirmed that Sterling's gun was loaded with six bullets at the time of this exchange.

Following the shooting, Officers Salamoni and Lake each provided a detailed statement offering his version of how and why this shooting happened.  According to the officers, Sterling was large and very strong, and from the very beginning resisted their commands. The officers reported that they responded with multiple different compliance techniques and that Sterling resisted the entire time.  Both officers reported that when they were on the ground, they saw Sterling's right hand in his pocket, with his hand on a gun.  Officer Salamoni reported that he saw the gun coming out and attempted to grab it, but Sterling jerked away and attempted to grab the gun again.  Officer Salamoni then saw "silver" and knew that he had seen a gun, so he began firing.  Both officers reported that after the first three shots, they believed that Sterling was attempting to reach into his right pocket again, so Officer Salamoni fired three more times into Sterling's back.

<em>Discussion</em>

In light of the officers' explanations of the shooting, the government, in order to prove a Fourth Amendment violation, would be required to (1) disprove the officers' accounts, (2) prove an alternative account that demonstrates that the officers' actions were objectively unreasonable; and (3) prove that the officers knew that their actions were unreasonable and took them anyway.  The evidence in this case is insufficient to bear the heavy burden of proof under federal criminal civil rights law.

To fully assess whether this shooting constituted an unreasonable use of force, federal investigators closely examined, among other things, all of the evidence concerning the location of Sterling's right hand prior to the first set of shots.  As mentioned, although the videos do not show Sterling's right hand at the time those shots were fired, they show that Sterling's right hand was not under Officer Salamoni's control.  The evidence also cannot

**CIR Ex. 9 p. 4**

establish that Sterling was *not* reaching for a gun when Officer Salamoni yelled that Sterling was doing so.

Federal investigators interviewed numerous civilian witnesses to determine whether they could provide additional relevant information on the question of whether Sterling reached for a gun.

Only two witnesses reported to the FBI that they could see Sterling's right hand, and they indicated that his hand was not in his pocket.  However, because of other inconsistencies in their statements, and because of the fact that parts of their accounts are materially contradicted by the videos, their accounts are insufficient to prove the position of Sterling's right hand/arm beyond a reasonable doubt at the time the shots were fired.  Although the Department found no reason to doubt the sincerity of the witnesses' accounts, this incident happened in an instant, and the witnesses may have had no reason to be specifically watching for the precise location of Sterling's right hand at the time of the shooting.  Given the inconsistencies in the civilian witnesses' perspectives and recollections and the fact that the video establishes that Officer Salamoni did not have control over Sterling's right hand just before the shots were fired, the evidence simply cannot establish beyond a reasonable doubt the position of Sterling's right hand at the exact time of the shooting, a split-second later.  The Department therefore cannot disprove the officers' claim beyond a reasonable doubt.

The investigators also consulted with two independent, nationally recognized use-of-force experts with whom the Civil Rights Division has previously consulted in civil rights cases. While both experts criticized aspects of the officers' techniques, they also concluded that the officers' actions were reasonable under the circumstances and thus met constitutional standards.  The experts emphasized that the officers were responding to a call that someone matching Sterling's description had brandished a weapon and threatened another person; that Sterling was large and strong; and that Sterling was failing to follow orders and was struggling with the officers.  The experts noted that the officers also attempted to control Sterling through multiple less-than-lethal techniques before ultimately using lethal force in response to Officer Salamoni's perception that Sterling was attempting to use a gun.

The investigators' review of BRPD files revealed no prior incidents involving substantiated allegations of misconduct by Officers Salamoni or Lake.

In light of these facts, the evidence gathered during this investigation is insufficient to prove, beyond a reasonable doubt, that the use of force leading up to and including the shooting violated the Fourth Amendment.

The federal investigators also considered whether the evidence proved the distinct statutory element of willfulness.  To establish that the officers acted willfully, the government would

**CIR Ex. 9 p. 5**

be required both to disprove the reason the officers gave for the shooting and to affirmatively establish that the officers instead acted with the specific intent to violate Sterling's rights — meaning that, in shooting Sterling, the officers knew that what they were doing was unreasonable or prohibited, and chose to do it anyway.

For many of the same reasons described above, the evidence is insufficient to prove beyond a reasonable doubt that the officers' actions were a willful violation of the Fourth Amendment. When Officer Salamoni first reported that Sterling was going for the gun, he said, "Going for his pocket, he's got a gun! Gun!"  Significantly, Officer Salamoni did not shoot Sterling at this point, and, instead, attempted to gain control of Sterling's right hand.  Officer Lake also warned Sterling not to move.  Seconds later, Officer Salamoni yelled again that Sterling was "going for the gun!" and only then did he fire his own weapon.  This evidence suggests that Officer Salamoni fired his weapon when he believed that Sterling was going for his gun a second time, after Officer Lake had warned Sterling not to move.  In order to prosecute this matter, the government would have to prove beyond a reasonable doubt not only that Sterling was not reaching for his gun, but also that, despite Officer Salamoni's contemporaneous statements to the contrary, he did not *believe* that Sterling was reaching for his gun after being warned not to move.  The Department lacks the evidence to prove either of those propositions beyond a reasonable doubt.

The investigators also considered whether Officer Salamoni's second series of shots was a prosecutable Fourth Amendment violation. Although the videos show that Sterling's right hand was not in or near his right pocket, Sterling was continuing to move, even after being shot three times and being told again not to move by Officer Lake.  Meanwhile, the officers were behind Sterling, and Officer Salamoni was lying on the ground, facing Sterling's back. Given these circumstances, the evidence cannot establish beyond a reasonable doubt that it did not appear to Officer Salamoni that Sterling was reaching for his pocket.  Nor could the Department prove that the officer's conduct was willful.

<em>Conclusion</em>

In sum, after extensive investigation into this tragic event, career Justice Department prosecutors have concluded that the evidence is insufficient to prove beyond a reasonable doubt that Officers Salamoni and Lake willfully violated Sterling's civil rights.  Given the totality of the circumstances – that the officers had been fighting with Sterling and had attempted less-than-lethal methods of control; that they knew Sterling had a weapon; that Sterling had reportedly brandished a gun at another person; and that Sterling was much larger and stronger than either officer – the Department cannot prove either that the shots were unconstitutional or that they were willful.  Moreover, two different, independent experts opined that this shooting was not unreasonable given the circumstances.  With respect to the first series of shots, the experts assessed that it was not unreasonable for Officer Salamoni

**CIR Ex. 9 p. 6**

to use lethal force, in light of all of the circumstances referenced above.  With respect to the second series of shots, both experts emphasized that officers are trained to eliminate a threat, and that Sterling appeared to pose a threat because he was still moving and his right hand was not visible to Officer Salamoni.  Accordingly, the federal investigation into this incident has been closed without prosecution.  Federal officials intend to provide the investigative file to the Louisiana Attorney General's Office, which intends to conduct its own investigation into whether the conduct at issue in this investigation violated state law.

In this case, the U.S. Attorney's Office for the Middle District of Louisiana, the Justice Department's Civil Rights Division, and the FBI each devoted significant time and resources to investigating the circumstances surrounding Sterling's death and to completing a thorough analysis of the evidence gathered.  The Justice Department remains committed to investigating allegations of excessive force by law enforcement officers and will continue to devote the resources required to ensure that all serious allegations of civil rights violations are thoroughly examined.  The Department aggressively prosecutes criminal civil rights violations whenever there is sufficient evidence to do so.

*Updated February 5, 2025*

---

**Topic**

**CIVIL RIGHTS**

**Components**

Civil Rights Division | Civil Rights - Criminal Section | Community Relations Service | Federal Bureau of Investigation (FBI) | USAO - Louisiana, Middle

Press Release Number: 17-487

 **Office of Public Affairs**

U.S. Department of Justice