# CIR Exhibit 10



Archives
U.S. Department of Justice



**PRESS RELEASE**

# Justice Department Announces Closing of Investigation into 2014 Officer Involved Shooting in Cleveland, Ohio

Tuesday, December 29, 2020

**For Immediate Release**

Office of Public Affairs

The Justice Department announced today that the career prosecutors reviewing the independent federal investigation into the fatal shooting of Tamir Rice on Nov. 22, 2014, in Cleveland, Ohio, found insufficient evidence to support federal criminal charges against Cleveland Division of Police (CDP) Officers Timothy Loehmann and Frank Garmback. Yesterday the department notified counsel for Mr. Rice's family of the decision and today sent a letter to Mr. Rice's family explaining the findings of the investigation and reasons for the decision.

*Applicable Law*

The department examined the facts in this case under relevant federal criminal statutes. The federal criminal statute applicable to these facts is Title 18, U.S. Code, Section 242, Deprivation of Rights Under Color of Law. In order to proceed with a prosecution under Section 242, prosecutors must establish beyond a reasonable doubt that a law enforcement officer acted willfully to deprive an individual of a federally protected right. The right implicated in this matter is the Fourth Amendment right to be free from an unreasonable

**CIR Ex. 10 p. 1**

seizure.  This right includes the right to be free from unreasonable physical force by police.  To prove that a police shooting violated the Fourth Amendment, the government must prove beyond a reasonable doubt that the use of force was objectively unreasonable based on all of the surrounding circumstances.  The law requires that the reasonableness of an officer's use of force on an arrestee be judged from the perspective of a reasonable officer on the scene, rather than with added perspective of hindsight.  The law set forth by the Supreme Court requires that allowances must be made for the fact that law enforcement officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.  Finally, caselaw establishes that an officer is permitted to use deadly force where he reasonably believes that the suspect posed an imminent threat of serious physical harm, either to the officer or to others.

Additionally, to prove that a shooting violated section 242, the government must prove beyond a reasonable doubt that the officers acted willfully.  This high legal standard – one of the highest standards of intent imposed by law – requires proof that the officer acted with the specific intent to do something the law forbids.  It is not enough to show that the officer made a mistake, acted negligently, acted by accident or mistake, or even exercised bad judgment.

Although Tamir Rice's death is tragic, the evidence does not meet these substantial evidentiary requirements.  In light of this, and for the reasons explained below, career federal prosecutors with both the Civil Rights Division and the U.S.  Attorney's Office concluded that this matter is not a prosecutable violation of the federal statutes.

*Factual Overview*

This summary is based on, and consistent with, all facts known to the government after a thorough examination, most of which are undisputed.

On Nov. 22, 2014, Tamir spent the majority of the day at the Cudell Park Recreation Center (CPRC).  Throughout the day, Tamir was frequently seen playing with a toy black airsoft pistol with a removable magazine that was visually virtually indistinguishable from a real .45 Colt semi-automatic pistol. Tamir would periodically point the toy gun at individuals at the CPRC and at the adjoining playground.

At approximately 3:11 p.m., an individual made a "911" call to report that a "guy with a pistol" was pointing a gun at multiple people on the playground at the CPRC.  The caller gave a detailed description of the individual, stated that he was "probably a juvenile," and that the gun was "probably fake," but he also described the scene as very frightening.  On the date of the incident, Tamir was 12-years-old and stood 5'7" and 195 lbs.

**CIR Ex. 10 p. 2**

A 911 dispatcher subsequently broadcast the call as a "Code 1" (the highest priority call) and Officers Garmback and Loehmann radioed that they would respond. The information the dispatcher relayed to Officers Garmback and Loehmann was "there's a black male sitting on the swing. He's wearing a camouflage hat, a gray jacket with black sleeves. He keeps pulling a gun out of his pants and pointing it at people." The dispatcher did not relay that the individual might be a juvenile or that the gun might be fake. Thus, the officers believed that they were responding to a playground where a grown man was brandishing a real gun at individuals, presumably including children.

Video from the CPRC captured the subsequent events. It is important to note that the video footage is grainy, shot from a distance, does not show detail or perspective, and portions of the incident are not visible because of the location of the patrol car. Further, the time lapse footage captures approximately two frames per second at a variable rate, which is incapable of capturing continuous action.

Officers Garmback and Loehmann approached the CPRC's playground area with a swing set, Tamir's reported location. Tamir was not in the swing set area when the patrol car entered the park, but was sitting alone at a picnic table under the gazebo located west of the swing set. He matched the description of the suspect provided by the dispatcher. No other people were in the immediate area.

It is not clear from the video evidence when Tamir became aware of the patrol car driving toward the gazebo. Tamir stood up at the picnic table approximately 10 seconds before the shooting and over the course of the next three seconds, he walked around the end of the table in a semi-circle, so that he was facing in the general direction of the oncoming patrol car but not yet moving toward it. Meanwhile, the patrol car continued to approach the gazebo.

Tamir began walking forward toward the passenger side of the approaching patrol. Meanwhile, Officer Garmback applied the brakes in an attempt to stop the patrol car, but due to the wet conditions on the ground the car did not stop where he intended and instead slid forward approximately 40 feet. As the patrol car came to a stop a short distance from Tamir, who by that point had stopped moving forward and was stationary, Officer Loehmann exited the still moving patrol car. At that moment, it appears that Tamir made movements of some sort with both his left and right arms. The positioning of the moving arms suggests that Tamir's hands were in the vicinity of his waist, but his hands are not visible in the video. Officer Loehmann fired two shots within less than two seconds of opening the passenger door, striking Tamir once in the abdomen.

As soon as Officer Loehmann exited the patrol car, he fell to his right and to the ground, toward the rear of the patrol car, resulting in an ankle injury. When Officer Loehmann got to

**CIR Ex. 10 p. 3**

his feet, he quickly moved to the rear driver's side of the patrol car for cover while continuing to aim his drawn weapon in Tamir's direction. Meanwhile, Officer Garmback exited the patrol car and began moving to the front of the vehicle, where he stood for approximately 15 seconds with his gun drawn and pointing in Tamir's direction. Enhanced video stills show a dark object (the toy gun) appear on the floor of the gazebo within a few feet of Tamir approximately 7 seconds after the shooting, just as Officer Garmback reached the front of the patrol car and just after Tamir's upper body moved to the ground (and out of view of the surveillance camera). Officer Garmback stood at the front of the patrol car for approximately 15 seconds with his gun drawn and pointed in the direction of Tamir, then moved into the gazebo and kicked the toy gun and magazine further away from Tamir.

After Officer Garmback kicked the toy gun and magazine into the grass, he reported the shots fired and requested emergency medical assistance.

*Video Evidence*

The CPRC has a number of surveillance cameras, and the incident is captured on video. Unfortunately, as previously discussed, this video is a time lapse video, has no audio, is grainy, shot from a significant distance, does not show detail or perspective, and portions of the incident are not visible because the incident occurred on the passenger side of the patrol car, and the camera is shooting from the driver's side of the patrol car; thus, the patrol car blocks the camera's view of parts of the activity during the relevant time. Tamir's hands are not visible in the video during the relevant time.

The video generally shows that the patrol car came to a stop a short distance from Tamir, and that Officer Loehmann exited the still moving patrol car. At that moment, Tamir made movements of some sort with both his left and right arms. The positioning of the moving arms suggests that Tamir's hands were in the vicinity of his waist, but his hands are not visible in the video and it cannot be determined from the video what he was doing. Officer Loehmann fired two shots within seconds of opening the passenger door, striking Tamir once in the abdomen.

*Officer Statements*

In on-scene statements to three responding law enforcement officers, starting approximately one minute after the shooting, Officer Loehmann repeatedly and consistently stated that Tamir was reaching for his gun just before Officer Loehmann shot. Officers Loehmann and Garmback gave several additional statements to other responding officers in the minutes and hours after the shooting. In those statements, both officers repeatedly and consistently stated that Officer Loehmann gave Tamir multiple commands to show his hands before shooting, and both officers repeatedly and consistently said that they saw Tamir reaching for his gun. Both officers submitted written statements concerning the incident

**CIR Ex. 10 p. 4**

approximately a year later, and repeated these seminal points. Officers Loehmann and Garmback are the only two witnesses in the near vicinity of the shooting.

*Civilian Witnesses*

Only one civilian witness reported seeing any part of the fatal encounter; an additional witness said that she heard shots and heard commands after the shots. However, the eyewitness's two statements are inconsistent; the earwitness reported hearing three shots; both witnesses were approximately 315 feet away; and neither of them stated that they saw Tamir's movements immediately preceding the shooting

*Expert Witnesses*

1. *Video Expert*

An expert forensic video analyst analyzed the video evidence, which consists of compressed time lapse footage. He identified numerous technical variables that can result in the misinterpretation of the images by an untrained observer of compressed video images. He noted that the time lapse footage consists of a series of stills, with approximately two stills captured per second. In analyzing the relevant video footage in this case, the expert found that, throughout the two camera recordings, the refresh rate in which the video captures a new still image varies from approximately one image per second to up to eight images per second.[1] He further stated that there is no foundation to establish the precise timing from image to image. As a result, the video in this system is referred to as a 'variable refresh rate recording."

Thus, even when the video was enhanced to the still frames, there are unknown time gaps of up to a full second between each frame. The video and the corresponding still frames are incapable of capturing the nuances of continuous action.

1. *Use of Force Experts*

Seven experts reviewed this case and opined on whether Officer Loehmann's use of force was objectively reasonable or unreasonable: four of whom were hired by the CCPO and agreed that the shooting was objectively reasonable; three of whom were retained by the Rice family and agreed that the shooting was objectively unreasonable. Because the experts relied heavily on the poor-quality video of the incident and reached different conclusions about what it showed, their conflicting opinions added little to the case, other than to solidify the conclusion that the video evidence is not dispositive and is insufficient to establish beyond a reasonable doubt what Tamir was doing in seconds before he was shot.

*Analysis Regarding a Deprivation of Rights Under Color of Law*

In order to establish a federal civil rights violation, the government would have to prove that Officer Loehmann's actions were unreasonable under the circumstances, and that his actions were willful. As noted above, caselaw establishes that an officer is permitted to use deadly force where he reasonably believes that the suspect posed an imminent threat of serious physical harm, either to the officer or to others. Here, in light of the officers' explanations that Officer Loehmann shot because it appeared to him that Tamir was reaching for his gun, the government would necessarily have to prove beyond a reasonable doubt that 1) Tamir was not reaching for his gun; and 2) that Officer Loehmann did not perceive that Tamir was reaching for his gun, despite his consistent statements to the contrary. The evidence is insufficient for the government to prove this.

To fully assess whether this shooting constituted an unreasonable use of force, career prosecutors closely examined, among other things, the evidence concerning the movement of Tamir's arms and hands just prior to the shots. As mentioned, the video footage is of extremely poor quality and has gaps in time of up to one second. The footage does not establish that Tamir was drawing a weapon from his waistband; however, the footage also does not establish that Tamir was *not* reaching for a gun when Officers Loehmann and Garmback state that he was doing so.

The evidence in this case fails to definitively establish what happened at the time of the shooting. Both officers have consistently and repeatedly maintained that they saw Tamir reach for his gun. The toy gun was found on the ground near where Tamir fell, suggesting that it was on his person and that he handled it after standing up beside the picnic table. The video evidence is simply not definitive on Tamir's movements at the relevant time. Multiple experts examined the grainy, non-continuous, indistinct video in which the patrol car blocks part of the view at the relevant time. Those experts differed in their opinion of what Tamir was "likely" doing with his arms and hands, but all agreed that his arms were moving and that his hands, though not visible, would have been in the general area of his waist. The experts' opinions were of little assistance in assessing criminal guilt, because their analysis amounted to a 20/20 hindsight review of still frames from a non-continuous video that could not, and does not, capture all that happened in the relevant time period of approximately two seconds, but nevertheless portrays Tamir's hands in the vicinity of his waist just prior to the shooting. Further, the civilian witnesses shed little light on Tamir's actions just before he was shot.

Based on this evidence and the high burdens of the applicable federal laws, career prosecutors have concluded that there is insufficient evidence to prove beyond a reasonable doubt that Tamir did not reach for his toy gun; thus, there is insufficient evidence to establish that Officer Loehmann acted unreasonably under the circumstances.

As noted above, in analyzing a potential charge under 18 U.S.C. § 242, federal investigators must also consider whether the evidence proves the statutory element of willfulness — meaning, that, in shooting Tamir, Officer Loehmann knew what he was doing was wrong and chose to do it anyway. As noted above, an accident, a mistake, an officer's misperception, or even an officer's poor judgment or negligence does not constitute willful conduct that can be prosecuted under this statute.

Even if the government were to accept entirely the conclusions of the expert who opined that Tamir had his hands in his jacket pockets as he approached the patrol car, prosecutors would still be unable to disprove Officer Loehmann's consistent statements regarding his own perceptions of Tamir's movements. Within a minute of the shooting and with no opportunity to reflect, view video, or discuss the matter with others, Officer Loehmann said that he fired in self-defense and had no choice. He has given multiple additional statements, in which he has consistently maintained that he shot because he believed that Tamir was drawing a weapon; there is insufficient evidence to refute that central point.

Similarly, Officer Garmback has maintained since moments after the shooting that he heard Officer Loehmann give repeated commands to Tamir to show his hands, and that he saw Tamir reaching for a weapon in his waistband. Both officers sought cover from the patrol car, held Tamir at gunpoint for approximately 15 seconds, and generally responded to the incident in a manner consistent with their stated belief that Tamir was drawing a gun.

For many of the same reasons the evidence is insufficient to prove beyond a reasonable doubt that the shooting violated the Fourth Amendment, the evidence is also insufficient to establish beyond a reasonable doubt that the officers acted willfully. Even if federal prosecutors could definitively prove that Tamir did not in fact reach toward his waistband to draw his toy gun, the government could not establish that Officer Loehmann did not perceive that Tamir did so.

*Analysis Regarding Obstruction of Justice*

Career federal prosecutors also reviewed the evidence to determine whether there was sufficient evidence to prove that Officers Loehmann and/or Garmback obstructed justice in their statements to law enforcement officers. These career prosecutors concluded that it did not.

In order to prove obstruction, the government would have to prove the officers knowingly made false statements, and that they did so with the intent to obstruct a federal investigation. As previously noted, the officers each gave multiple statements to law enforcement officers on the day of the incident, starting within a minute or so of the incident, without time to reflect, discuss, or view video. They each provided a written statement approximately a year later. Some of their statements are more detailed than others, and with

**CIR Ex. 10 p. 7**

slightly different verbiage, but all of which were generally consistent, particularly on the seminal facts.  As the experienced career prosecutors who reviewed this matter know, when witnesses give multiple statements, there are almost always inconsistencies due to the fallibility of the human memory.

Because there is insufficient evidence to establish that the statements by Officers Loehmann and Garmback are in fact untrue, there is also insufficient evidence to establish that they *knew* them to be untrue or that they made them with the intent to obstruct the investigation.

*Conclusion*

In sum, after extensive examination of the facts in this tragic event, career Justice Department prosecutors have concluded that the evidence is insufficient to prove beyond a reasonable doubt that Officer Loehmann willfully violated Tamir Rice's constitutional rights, or that Officers Loehmann or Garmback obstructed justice.  In this case, the U.S. Attorney's Office for the Northern District of Ohio, the Justice Department's Civil Rights Division, and the FBI each devoted significant time and resources to examine the circumstances surrounding Tamir Rice's death and to completing a thorough analysis of the evidence gathered.  The Justice Department remains committed to investigating allegations of excessive force by law enforcement officers and will continue to devote the resources required to ensure that all serious allegations of civil rights violations are thoroughly examined.  The department aggressively prosecutes criminal civil rights violations whenever there is sufficient evidence to do so.

[1] For comparison, most modern video captures approximately 60 frames per second.

*Updated February 5, 2025*

**Topic**

CIVIL RIGHTS

**Components**

Civil Rights Division     |     Civil Rights - Criminal Section

**CIR Ex. 10 p. 8**