# CIR Exhibit 11

U.S. Department of
# JUSTICE

# 2024 Emmett Till Annual Report For Congress



February, 2025

Civil Rights Division

*Criminal Section*

**<u>INTRODUCTION</u>**

This is the twelfth annual report (Report) submitted to Congress pursuant to the Emmett Till Unsolved Civil Rights Crime Act of 2007, Pub. L. No. 110-344, 122 Stat. 3934 (2008),[1] as well as the sixth report submitted pursuant to the Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016, Pub. L. No. 114-325, 130 Stat. 1965 (2016),[2] collectively referred to hereinafter as the Till Act.  This Report includes information about the Department of Justice's (Department) activities in the time period since the eleventh Till Act report, and fifth Reauthorization report, which was submitted to Congress in December 2023.

Section I of the Report summarizes the historical efforts of the Department to prosecute cases involving racial violence and describes the genesis of its Cold Case Initiative.  It also provides an overview of the factual and legal challenges that federal prosecutors face in their efforts to secure justice in unsolved Civil Rights Era homicides.  Section II of the Report provides information on the progress made since the last report.  It includes a chart of the progress made on cases referred to the Department pursuant to the Till Act.  Section III of the Report provides a brief overview of the cases the Department has closed or referred for prosecution since its last report.  Case-closing memoranda written by Department attorneys explaining the reasons for closing or referring these reports are available on the Department's website: https://www.justice.gov/crt/civil-rights-division-emmett-till-act-cold-case-closing-

---

[1] The Till Act requires the Attorney General to conduct a study and report to Congress not later than six months after the date of enactment of the Act, and each year thereafter, regarding the Department's efforts to investigate and resolve unsolved Civil Rights Era homicides.

[2] The Reauthorization extended the Till Act, including its reporting requirements, for an additional ten years.

memoranda.  As additional case closing memoranda are drafted and approved, they will be made available on the website.  These memoranda are first reviewed to ensure compliance with FOIA regulations.[3]  Section IV of the Report provides additional information required by the Till Act, other than the statistical information provided in Section II.  Section V of the Report sets forth the Department's work on conducting Till Act training and outreach.

Anyone wishing to provide information about an unsolved civil rights murder that occurred before 1980 is encouraged to send information to the Cold Case Unit's email. Persons with information are encouraged to send it to this email, regardless of whether it is a cold case that is currently being examined by the Department, one that has previously been examined and is now closed, or one that is not included on the list of matters the Department has ever investigated.  The Cold Case Unit's email address is:

Coldcase.Civilrights@usdoj.gov.

## I.    THE DEPARTMENT OF JUSTICE'S EFFORTS TO INVESTIGATE AND PROSECUTE CIVIL RIGHTS ERA HOMICIDES

### A.  Overview and Background

The Department's current efforts to bring justice and resolution to Civil Rights Era cold cases under the Till Act is a continuation of efforts begun decades ago.  The following summary places the Department's current efforts in their historical context.

*Reconstruction Era through the 1930s*

Since the Reconstruction Era (1865-1877), the Department has taken the lead in prosecuting crimes of racial violence in the United States.  These efforts were hampered for

---

[3] The Department will continue to make available case-closing memoranda as they are drafted, reviewed, and redacted by privacy and FOIA attorneys.

many decades, however, by the lack of an effective federal anti-lynching law or other laws specifically prohibiting bias-motivated crimes. When prosecuting cases of racial violence during this era, the Department relied on the Reconstruction Era Enforcement Acts, enacted in 1868, 1870, and 1871. But given the courts' restricted interpretation of these statutes, they proved to be extremely limited tools for addressing lynchings and other acts of racial violence.

The most famous case of the Reconstruction Era arose from a mass killing of Black residents in Colfax, Louisiana. The prosecution resulted in a Supreme Court decision that severely limited the Department's ability to prosecute hate crimes. The defendants in that case had been charged by indictment and convicted of conspiring to deprive the victims of various enumerated rights, privileges, and immunities guaranteed by the Constitution. The Court, however, overturned the convictions, finding most of the indictment counts were defective because those counts charged *private* actors with depriving the victims of constitutional rights, whereas the constitutional provisions at issue placed limitations only on the conduct of *government* actors. *See United States v. Cruikshank*, 92 U.S. 542, 554 (1875).

During the post-Reconstruction Era, racial unrest – particularly in the form of "public spectacle" lynchings – increased. The problem posed by such lynchings, and the federal government's limited ability to redress such horrific wrongs, was recognized at the highest levels of the Department when, on March 2, 1909, Attorney General Charles Bonaparte urged the Supreme Court to hold in contempt local officials and members of a mob who kidnapped and lynched a Black man named Ed Johnson. Johnson was lynched after a mob seized him from a local jail, where he was being held while he appealed his conviction. In arguing that the defendants should be held in contempt, Attorney General Bonaparte acknowledged the inadequacy of state laws to remedy the underlying violence against Johnson. "Lynchings have

-4-

occurred in defiance of state laws," he said, and further noted that state courts had made, at most, "only [a] desultory attempt" to punish the lynchers. http://www.famous-trials.com/sheriffshipp/1064-bonaparteclosing. The defendants were convicted of contempt of court.[4] *See generally United States v. Shipp*, 214 U.S. 386 (1909).

The lack of a federal anti-lynching law made it difficult for the federal government to redress acts of racial violence and, as noted by Attorney General Bonaparte, states rarely did. Partly for this reason, violence escalated through the turn of the century and continued through World War I. In 1919, as soldiers returned from war, the country was gripped by Red Summer, a particularly violent time characterized by hundreds of instances of mob violence against Black communities through murder, assault, arson, and other forms of terror. *See generally* Cameron McWhirter, *Red Summer: The Summer of 1919 and the Awakening of Black America* (Henry Holt and Company, 2011); Phillip Dray, *At the Hands of Persons Unknown*, Chapter 8 (Modern Day Library, 2002). This violence continued in the following years, as illustrated by the Tulsa Race Massacre of 1921.

*World War II through the 1950s*

In 1939, the Department made significant advances in addressing the problem of racial violence. Attorney General Frank Murphy created a Civil Liberties Unit (shortly thereafter renamed the Civil Rights Section) in the Criminal Division of the Department of Justice. Its mission was threefold: enforcing the federal civil liberties statutes, identifying the need for additional legislation, and "invigorat[ing] . . . the federal government's endeavors to protect

---

[4] Shipp and two other defendants were sentenced to 90 days imprisonment in the United States Jail in the District of Columbia. The other three defendants receive 60-day sentences. The Trial of Sheriff Joseph Shipp et al.: An Account (famous-trials.com).

fundamental rights." https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/07-07-1939pro.pdf.

In 1940, O. John Rogge, Assistant Attorney General for the Criminal Division, urged United States Attorneys to take a more aggressive approach to prosecuting crimes of racial violence, including the lynchings of Black victims. Attorney General Francis Biddle agreed, noting in a speech delivered during World War II that "[o]ne response to the challenge of Fascism to the ideals of democracy has been a deepened realization of the importance of these rights, based on a belief in the dignity and the rights of individual men and women." Francis Biddle, An Address by Francis Biddle, Attorney General of the United States Annual Conference of the National Urban League, https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/09-28-1944.pdf. Soon thereafter, the Department began to investigate and attempt to prosecute more bias-motivated murders.

Although Assistant Attorney General Rogge's directive demonstrated an increasing federal will to address the problem of racial violence, the federal government still lacked the necessary tools to adequately address the problem. Because there was no federal anti-lynching law, the Department could use only the Reconstruction Era laws, then codified at 18 U.S.C. §§ 51 and 52, to prosecute acts of racial violence. Nonetheless, the Department, using only these limited tools, brought federal charges against Claude Screws, a Georgia sheriff, in 1943. Screws had ordered his deputies to arrest Robert Hall, a Black man against whom Screws held a grudge. After arresting him, Screws and his deputies brutally beat Hall to death. Although Screws was convicted of depriving Hall of his constitutional rights while acting under color of law, his conviction was reversed because the Supreme Court determined that the instructions

-6-

given during trial were inadequate. *See*

http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=5229&context=mulr; *Screws*

*v. United States*, 325 U.S. 91 (1945).

The Department also attempted to use the Reconstruction Era laws to prosecute

members of a mob who murdered Cleo Wright on January 25, 1942.  Wright was a Black man

who, while awaiting trial for allegedly assaulting a white woman and attacking a police officer,

was kidnapped from a jail cell in Sikeston, Missouri, by a mob of angry white men.  The mob

burned Wright alive.  Attorney General Biddle authorized a federal prosecution under the

Reconstruction Era statutes.  Evidence was presented to a grand jury, but the grand jury refused

to issue an indictment.  The same grand jury issued an advisory report, later made public, in

which it labeled the crime a "shameful outrage" and even stated that Wright had been denied

"due process of law," but nonetheless found that the mob's actions did not constitute a crime

under federal law.  Victor W. Rotnem, *The Federal Civil Right "Not to Be Lynched,"* 28 Wash.

U. L. Rev. 57 (1943),

http://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=3888&context=law_lawreview.

Victor Rotnem, who had become the Chief of the Civil Rights Section in 1941, urged

the Department to argue for a more aggressive application of the Reconstruction Era statutes

that protected persons against deprivations of their rights guaranteed by the Constitution and

other federal laws. Rotnem argued that, although the right to due process of law protected

citizens against only those deprivations of life, liberty, or property committed without due

process by a *governmental* entity, private persons who commit lynching, like those in the mob

who murdered Wright, could still be prosecuted under the Reconstruction Era statutes.  *See id.*

at 62.  He asserted that, by kidnapping a person from jail, defendants directly interfered with

-7-

that person's right to have a state or local government try him for the crime he was accused of committing, thus denying him the right to due process of law. *See id.* Courts, however, largely did not accept these arguments, and the lack of a specific federal hate crime law, coupled with restrictive interpretations of Reconstruction Era statutes, dramatically limited the kinds of prosecutions the Department could undertake.

*The Civil Rights Era*

The Civil Rights Division was established in 1957 and, thereafter, the Department achieved greater success in prosecuting civil rights cases. The first notable success came in the case of *United States v. Price*, commonly referred to as the "Mississippi Burning" case. The case involved the 1964 murders of James Chaney, Andrew Goodman, and Michael Schwerner – three civil rights workers kidnapped and murdered during Freedom Summer, a time when civil rights organizations, including the Congress of Racial Equality (CORE), the Student Nonviolent Coordinating Committee (SNCC), and the Congress of Federated Organizations (COFO), actively recruited students from across the nation to come to Mississippi to participate in voter registration and other civil rights-related activities. The Ku Klux Klan (Klan), which opposed the goals of Freedom Summer, responded with violence. Chaney, Goodman, and Schwerner, who had traveled to Mississippi to help with voter registration efforts, were arrested by Neshoba County Deputy Sheriff Cecil Ray Price and jailed in Philadelphia, Mississippi. The three civil rights workers later were released from custody. Deputy Price, however, coordinated their release with members of the Klan, who killed the young men, burned their car, and buried their bodies in an earthen dam. Following an investigation by the Federal Bureau of Investigation (FBI), 19 defendants were indicted. Seven of those defendants were convicted at trial and another pleaded guilty. The jury was unable to

reach a verdict with respect to three additional defendants and acquitted the remaining eight defendants.

In that same era, the Department achieved convictions of two Georgia Klansmen responsible for the murder of Lieutenant Colonel Lemuel Penn, a Black WWII veteran. The defendants, Cecil Myers and Howard Sims, believed that Black men were coming to Georgia to test newly enacted civil rights laws. When they saw a car with Black men in it, they targeted the car's occupants based solely on their race, shooting at the men and killing Lieutenant Colonel Penn. Although Myers and Sims were convicted in federal court, other defendants who were indicted with them, as part of an overarching conspiracy to intimidate Black residents, were acquitted.

In both the "Mississippi Burning" case and the case resulting from Penn's murder, the defendants challenged the Department's authority to bring federal charges. In responding to these challenges, the Department obtained important Supreme Court victories that permitted a more expansive application of the Reconstruction Era statutes. *See United States v. Price*, 383 U.S. 787, 794 (1966) (establishing that private persons may act under color of law when they act in concert with state actors); *United States v. Guest*, 383 U.S. 745, 757–58 (1966) (establishing that the right to interstate travel is a right that may be protected against private interference if the interference of that right is the primary purpose of a conspiracy).

Even more significantly, Congress passed the first federal hate crime statutes in 1968: one prohibiting violent interference with housing rights (42 U.S.C. § 3631), and another prohibiting violent interference with several enumerated rights, including voting and employment activities (18 U.S.C. § 245). These statutes were important tools in the federal arsenal that, for the first time, clearly and unambiguously allowed for the federal prosecution

-9-

of racially motivated murders and assaults, even when none of the defendants was acting under color of law.

Unfortunately, these new statutes alone were not transformative. Each statute originally had only a five-year statute of limitations period, meaning the government had to bring charges within five years of the crime, even when the crime resulted in death. Thus, in cases in which families were too frightened to report crimes, or in which the federal government otherwise failed to indict a case within five years, the government was barred from prosecuting the case, except in the unlikely event that another federal statute, such as interstate kidnapping or murder on federal land, applied. Moreover, not all racially motivated crimes could be prosecuted because, for federal jurisdiction to apply, prosecutors had to prove not only bias motivation, but also that a defendant had acted to interfere with one of the federally protected rights specifically set forth in the statute, such as the right to fair housing or the right to employment.

*The Modern Era*

More recently, Congress has enacted significant legislation that has given federal prosecutors greater flexibility and authority to prosecute bias-motivated crimes. In 1996, Congress passed the Church Arson Prevention Act, which prohibits destruction and damage to houses of worship motivated by either race or religion, and which also prevents interference with the free exercise of religion. *See* Church Arson Prevention Act of 1996, Pub. L. No. 104–155, 110 Stat. 1392 (codified at 18 U.S.C. § 247). In 2018, Congress amended this law to expand the definition of religious real property to allow prosecution of more acts of destruction. *See* Protecting Religiously Affiliated Institutions Act of 2018, Pub. L. No. 115-249, § 2, 132 Stat. 3162.

-10-

In 1994, Congress amended 18 U.S.C. §§ 241, § 242, and 245 to allow the government to seek the death penalty for civil rights-related crimes resulting in a victim's death. *See Violent Crime Control and Law Enforcement Act of 1994*, Pub. L. No. 103-322, § 60006, 108 Stat. 1970, 2109, 2113, 2147. Because there is no statute of limitations for death-eligible offenses, bias-motivated crimes that are committed after 1994 and result in death may now be charged even decades after the offense occurred. Congress, however, may not extend a statute of limitations that has already expired. *See Stogner v. California*, 539 U.S. 607, 632–33 (2003) (legislatures lack the constitutional power to expand the limitations period after the period has expired). Therefore, these amendments do not permit the government to prosecute cases in which the statute of limitations had expired by 1994.

In 2009, Congress further enhanced the ability of prosecutors to charge defendants with committing a federal hate crime by passing the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009 (Shepard-Byrd Act), now codified at 18 U.S.C. § 249. The Shepard-Byrd Act eliminates the requirement that prosecutors prove a defendant intended to interfere with a victim's federally protected right for race-based crimes. To secure a conviction under the Shepard-Byrd Act, a federal prosecutor need prove only that a defendant willfully inflicted death or bodily injury upon a victim, or attempted to do so with a dangerous weapon, and that the defendant acted because of the race, color (or other enumerated protected characteristic) of the victim or some other person. Additionally, under the Shepard-Byrd Act, there is no statute of limitations if death results from the defendant's actions.

In March 2022, the President signed into law the Emmett Till Antilynching Act, creating a conspiracy-specific law that can be used to prosecute the most serious conspiracies

-11-

to commit hate crimes, including those that result in death or serious bodily injury or that involve kidnapping or its attempt, aggravated sexual abuse or its attempt, or an attempt to kill.

**B. Passage of Laws Promoting the Investigation and Prosecution of Civil Rights Era Offenses**

The federal government's increased ability to prosecute modern day hate crimes, including lynchings, still leaves unaddressed those cases that it was unable to prosecute in the past. For this reason, in 2008, Congress enacted the Till Act and, in 2016, its Reauthorization. These acts obligate the Department of Justice to identify, investigate, and, where appropriate, prosecute any civil rights offense that occurred before 1980 and resulted in death.

In January 2019, Congress enacted the Cold Case Records Collection Act (CCRCA), which President Trump signed into law. This legislation again stresses the desire that crimes from the Jim Crow Era not be forgotten. *See* Civil Rights Cold Case Records Collection Act, Pub. L. No. 115-426, 132 Stat. 5489 (2019). This Act establishes a collection of hate crime investigative records within the National Archives that may be accessed and reviewed by scholars, the civil rights community, and the general public. In February 2022, Congress confirmed four members to the five-member CCRCA Review Board. Members of the Civil Rights Division's Cold Case Unit have been working with members of the Review Board and staff at the National Archives to comply with the requirements of the CCRCA.

**C. History of the Cold Case Initiative**

The Department is committed to achieving justice in Civil Rights Era cold cases. In fact, the Department's efforts to achieve justice in these cases predate the original Till Act. As explained in prior reports, since the passage of the Till Act, Department lawyers and FBI

agents have jointly participated in a multi-faceted strategy to identify cases that might potentially be prosecuted.

The Department began its Cold Case Initiative (Initiative) in 2006.  The first step of this Initiative was to have each of the FBI's 56 field offices identify cases that might warrant review.  In 2007, the Department began an extensive outreach campaign to solicit assistance from the NAACP, Southern Poverty Law Center, and the National Urban League, as well as various community groups, the academic community, and state and local law enforcement organizations.  The Department also conducted an aggressive media campaign, granting interviews to numerous outlets, including the New York Times, the Washington Post, the Baltimore Sun, National Public Radio, the British Broadcasting Company, 60 Minutes, Dateline, and local media outlets, in an effort to elicit the public's assistance with locating witnesses to these crimes, as well as family members of the victims.  When the Department's work on the Initiative began, the Department had identified 95 matters for further review.  As a result of outreach efforts since the Till Act, that number has grown to 138.

### D.  Past Efforts to Prosecute Cold Cases

The Department's efforts to identify and resolve Civil Rights Era cold cases (both before and since the Till Act) have resulted in two successful federal prosecutions and three successful state prosecutions.

*Federal Prosecutions*

The first Twenty-First Century federal prosecution of a Civil Rights Era cold case was the prosecution of Ernest Avants.  *See United States v. Ernest Henry Avants*, 367 F.3d 433 (5th Cir. 2004).  This case involved the 1966 murder of Ben Chester White, a Black farm worker.  Avants and two other Mississippi Klansmen lured White to Pretty Creek Bridge

-13-

in the Homochitto National Forest outside of Natchez, Mississippi.  Once there, the

Klansmen shot White multiple times with an automatic weapon and once with a single-

barrel shotgun.  White's bullet-ridden body was discovered several days later.  The

murder was intended to lure Dr. Martin Luther King, Jr., to the area so that he, too,

could be murdered, assaulted, or otherwise harmed.  A 1967 state prosecution for

murder resulted in an acquittal for Avants and a mistrial for another defendant, who is

now deceased.  A third defendant, also now deceased, was never prosecuted by state

officials.  In 1999, the Department opened an investigation into White's murder using a

federal statute (18 U.S.C. § 1111) that can be used to prosecute murder on federal lands.

Avants was indicted in June 2000, convicted in February 2003, and sentenced to life in

prison in June 2003.  He died in prison in 2004.

The second federal prosecution of a Civil Rights Era cold case was *United States v.
James Ford Seale*, 600 F.3d 473 (5th Cir. 2010).  This case involved the 1964 murders of two

19-year-old Black men, Charles Moore and Henry Dee, in Franklin County, Mississippi.  On

May 2, 1964, James Ford Seale and other members of the Klan forced Moore and Dee into a

car and drove them into the Homochitto National Forest.  Mistakenly believing, without any

evidentiary basis, that Dee was a member of the Black Panthers and that he was bringing guns

into the county, the Klansmen beat the young men while interrogating them about the location

of the weapons.  In order to stop the beating, the young men falsely confessed, telling the

Klansmen that guns were stored in a nearby church.  The Klansmen then split into two groups:

one searched the church for the guns and the other – including Seale – transported the victims

to a remote location on the Mississippi River after briefly crossing into Louisiana.  Moore and

Dee, bound and gagged, were chained to an engine block and railroad ties, taken by Seale out

-14-

onto the water in a boat, and pushed overboard to their deaths.  Their severely decomposed bodies were found months later.

Seale and another Klansman, Charles Edwards, were arrested on state murder charges in late 1964, but the charges were later dropped.  In 2006, the Civil Rights Division and the United States Attorney's Office for the Southern District of Mississippi re-opened an investigation into the murders.  The investigation determined that the subjects had crossed state lines during the commission of the crime and, as a result, the government could prosecute the subjects under the federal kidnapping statute (18 U.S.C. § 1201).  Edwards, who did not directly participate in the murders, was granted immunity and testified against Seale, the only other surviving participant.  Seale was indicted in January 2007.  In June 2007, Seale was convicted on two counts of kidnapping and one count of conspiracy.  He was sentenced to three terms of life imprisonment.  Seale's convictions were upheld after extensive appellate litigation.  *See United States v. Seale*, 600 F.3d 473 (5th Cir. 2010).  Seale died in prison in 2011.

*State Prosecutions*

The first successful, federally assisted state prosecution under the Initiative was against Klansmen who bombed the Sixteenth Street Baptist Church in Birmingham, Alabama, on a Sunday morning in 1963.  The defendants targeted the church because it served a Black congregation and because it had been used as a meeting place for non-violent protests against the city's segregation laws.  Four young girls – Addie Mae Collins, Denise McNair, Carole Robertson, and Cynthia Wesley – were killed in the blast.  Because of the code of silence among supporters of the Klan, no one was brought to justice for the murders until 1977, when Robert Chambliss was tried and convicted.  *See generally Chambliss v. State*, 373 So. 2d 1185,

-15-

1187 (Ala. Crim. App. 1979).  Chambliss died in 1985.  Pursuant to the Department's pre-Till Act cold case process, the case was re-examined in the late 1990s and early 2000s.  As a result, the United States Attorney for the Northern District of Alabama was cross-designated to serve as the lead prosecutor in two state trials charging Tommy Blanton and Bobby Cherry with murder.  Blanton was convicted in April 2001 and sentenced to four life terms.  *See generally Blanton v. State*, 886 So. 2d 850, 857 (Ala. Crim. App. 2003).  Blanton died in prison in 2020. Cherry was convicted in May 2002 and also sentenced to four life terms.  *See generally Cherry v. State*, 933 So. 2d 377, 379 (Ala. Crim. App. 2004).  Cherry died in prison in 2004.

The second successful, federally assisted state prosecution was against one of the defendants against whom the jury failed to reach a verdict in the "Mississippi Burning" case (described in Part A).  In a June 2005 trial, Edgar Ray Killen was convicted of three counts of manslaughter and sentenced to 60 years in prison.  *See Killen v. State*, 958 So. 2d 172, 173 (Miss. 2007).  Killen died in prison in 2018.

The most recent successful, federally assisted state prosecution was against James Bonard Fowler in 2010.  Fowler, an Alabama State Trooper, fatally shot Jimmie Lee Jackson in 1965 during a protest in Marion, Alabama.  Jackson's murder served as a catalyst for the famed 1965 march from Selma to Montgomery.  *See State v. Fowler*, 32 So. 3d 21, 23 (Ala. 2009).  Fowler was convicted of misdemeanor manslaughter and sentenced to six months in prison.  *See* http://www.nytimes.com/2010/11/16/us/16fowler.html.

### E.  Barriers to Successful Federal Prosecution of Cold Cases

Despite achieving convictions in a few Civil Rights Era cold cases, there remain significant legal limitations on the federal government's ability to prosecute these cases.  For example, the Constitution's *Ex Post Facto* clause prohibits the government from prosecuting

defendants using laws that were not yet enacted at the time a crime was committed.  Thus, when the government evaluates whether it can bring a case in federal court, it must look to the statutes that existed at the time the crime was committed.  As discussed above, there were no federal hate crime laws until 1968.  Moreover, because those early laws require proof of an intent to interfere with a federally protected right, it can be more difficult to obtain convictions under the 1968 laws than it would be under modern hate crime laws, like the Shepard-Byrd Act, that have eliminated the requirement that prosecutors prove a nexus with a federally protected right.

If an act of racial violence occurred before 1968, when the first federal hate crime statutes were enacted, then the government must charge a defendant with violating a Reconstruction Era statute, in which case it is even more difficult for the government to obtain a conviction as most charges that could be brought under these statutes would require proof that at least one defendant acted under color of law.  In rare instances, as noted above in the prosecutions of Avants and Seale, the government may charge a subject with violating another federal statute, such as murder occurring on federal lands (18 U.S.C. § 1111) or kidnapping across state lines (18 U.S.C. § 1201), if facts exist to support those charges.

The government also cannot prosecute a defendant if the statute of limitations (a deadline by which prosecutors must charge a crime) has expired.  Before 1968, all federal hate crimes had a five-year statute of limitations (which has now been eliminated for the most serious hate crime offenses).  However, if an act of racial violence that otherwise meets the elements of a federal hate crime occurred before 1994, the case cannot now be prosecuted.

State murder prosecutions, while not affected by these particular factors, may be barred if there was a previous trial on the same or substantially similar charges.  The constitutional

-17-

protection against double jeopardy prohibits retrial by the same sovereign for the same offense of persons who were previously found not guilty or who were convicted but received shockingly light sentences. There is no exception to this constitutional protection, even if it now appears in modern times that the jurors, prosecutors, or even the court harbored racial prejudice.

Another legal hurdle to successfully prosecuting cold cases is that suspects die, leaving no one to prosecute. The Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments give defendants the right to be present at a public trial. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) (explaining that the right to be present at trial emanates both from the defendant's Sixth Amendment right to confront accusers as well as from the Due Process Clause). Defendants cannot be afforded such rights after death, and therefore the government may not proceed with a prosecution without an available defendant.[5]

As a practical matter, even if there is no legal bar to prosecution, there are evidentiary difficulties inherent in all cold case prosecutions. The older the case is, the more difficult it is to overcome these obstacles. First, witnesses die or can no longer be located. Second, memories fade and evidence is destroyed or cannot be located. Finally, original investigators often lacked the technical and scientific advances relied upon today, thus rendering scientific

---

[5] Even a defendant who has been convicted by a jury may have his conviction abated *ab initio* if that defendant dies while a direct appeal of the conviction is pending. In such a circumstance, the prosecution is not merely dismissed. Instead, everything associated with the prosecution is extinguished, leaving the defendant "as if he had never been indicted or convicted." *See United States v. Estate of Parsons*, 367 F.3d 409, 413 (5th Cir. 2004) (en banc).

or technical conclusions inaccurate or incomplete (and the evidence on which a scientific conclusion was based may have been destroyed in the routine course of business or may have simply degraded over time).  In such cases, even if a living subject exists, these evidentiary hurdles will likely render it impossible for prosecutors to prove guilt beyond a reasonable doubt.  Even with our best efforts, investigations into historic cases are exceptionally difficult, and rarely will justice be reached inside of a courtroom.

II.    **COLD CASE STUDY AND REPORT: CASE PROGRESS SINCE THE LAST REPORT**

Pursuant to sections 3(c)(1)(A)-(E) of the Till Act, the Department must report to Congress the total number of investigations opened for review under the Till Act, the number of new cases opened for review since the last report to Congress, the number of unsealed federal cases charged, the number of cases referred by the Department to a state or local government agency or prosecutor, and the number of cases that were closed without federal prosecution.  In addition, the Reauthorization Act requires the Department to report the number of cases referred by an eligible entity.  This information is set forth below.

**A.  Total Cases Opened for Review**

Pursuant to section 3(c)(1)(A) of the original Till Act, the Department provides Congress information on the number of open investigations under the Act.  As discussed above, the Department's efforts to investigate and prosecute unsolved Civil Rights Era homicides predate the Till Act.  During the course of the Department's focus on these matters, it has opened for review 138 matters, involving 160 known victims, and has fully investigated and resolved 128 of these matters through prosecution, referral, or closure.

-19-

**B.  Cases Opened Since the Last Report to Congress**

Pursuant to section 3(c)(1)(B) of the original Till Act, the Department provides Congress information on the number of new cases opened since the last report to Congress. Since the last report to Congress in December 2023, the Department has opened one new Till Act investigation and has continued its examination of those opened in prior periods.  Since the last study period, the Department has continued to receive and review numerous case referrals through its Cold Case inbox or other means, including a convening hosted by the Criminal Section of the Civil Rights Division.  Only one of these matters was opened.  Three cases referred to us remain under review.  One of these cases had previously been reviewed and closed under the Till Act, but we are evaluating whether to re-open the investigation based upon the referral.  Two of the cases examined fit within the scope of the Till Act but a preliminary review found insufficient evidence to open the matter as a Till Act case.  All other matters were not opened because they did not fit within the scope of the Till Act.  These cases were either not death-resulting cases, did not involve an alleged violation of civil rights laws, or occurred after 1980.  Allegations of civil rights offenses that occurred after 1980 were, where appropriate, referred to a Deputy Chief of the Civil Rights Division for analysis.

During the last reporting period, there were two cases that the Department was still assessing.  One of these cases concerning the Tulsa Race Massacre, was referred to the Department by an eligible entity.  Since the last reporting period the Department decided to undertake an official examination and evaluation of this case.  This examination and evaluation was completed in January 2025 and the Department issued a report on its findings which can be found at: https://www.justice.gov/crt/case/ac-jackson.  Although the Department opened the case for review and evaluation, it never opened an investigation because it was clear from the

-20-

start that prosecution was impossible due to the age of the matter. The Department has decided not to open the other case that was being reviewed during the last reporting.

### C. Cases Unsealed Since the Last Report to Congress

Pursuant to section 3(c)(1)(C) of the original Till Act, the Department provides notice that no charged federal cases have been unsealed since the last report.

### D. Cases Referred to State or Local Authorities

Pursuant to section 3(c)(1)(D) of the original Till Act, the Department informs Congress that 11 of the 138 matters opened for review have been referred to state authorities since Congress enacted the Till Act. No cases were referred to state authorities during this past reporting period.

### E. Cases Closed Since the Last Report to Congress

Pursuant to section 3(c)(1)(E) of the original Till Act, the Department provides the following information about cases it has closed. To date, the Department has closed 115 cases without prosecution or referral to the state. (Of the 128 matters it has fully investigated and resolved, 11 were referred to the state, two federally prosecuted, and the remainder were closed with a written explanation.) There have been no federal prosecutions since the last report. As explained more fully in Section IV below, in the last reporting period, three cases were resolved without referral to the state. The reason each matter was closed is summarized below. A longer memorandum explaining the reasons for the Department's resolution of the case is available at the Department's website: https://www.justice.gov/crt/civil-rights-division-emmett-till-act-cold-case-closing-memoranda.

In total, since the original Till Act was enacted, 117 cases that were opened for investigation have been closed without referral to the state. The reasons for closure vary and

include, most notably, (1) the death of all identified subjects; (2) the expiration of the federal statute of limitations coupled with a double jeopardy bar to state prosecution; (3) an inability to prove that the death of the victim resulted from an act of violence; (4) the inability to prove that any deliberate murder was motivated by racial animus or that the murder was otherwise a civil rights offense, or (6) a combination of reasons.

### F. Chart

The Department provides the following chart to illustrate the statistics provided in subsections A through E of Section III of the Report.  It lists the names of the victims, incident locations, incident dates, and closing dates (for those cases that are closed) of all cases that have been opened from the time the original Till Act took effect through October 2024.

| CASES | NAME OF VICTIM | INCIDENT LOCATION | INCIDENT DATE | CLOSING DATE |
|---|---|---|---|---|
| 1. | Anthony Adams | Salt Lake City, Utah | November 3, 1978 | May 26, 2020 |
| 2. | Louis Allen | Amite County, Mississippi | January 31, 1964 | May 18, 2015 |
| 3. | Andrew Lee Anderson | Crittenden County, Arkansas | July 17, 1963 | April 9, 2010 |
| 4. | Frank Andrews | Lisman, Alabama | November 28, 1964 | November 13, 2013 |
| 5. | Jerry Lee Armstrong | De Soto County, Mississippi | December 23, 1977 | |
| 6. | Isadore Banks | Marion, Arkansas | June 8, 1954 | August 2, 2012 |
| 7. | John Bennett* | Augusta, Georgia | May 9-11, 1970 | |
| | Sammie L. McCullough* | Augusta, Georgia | May 9-11, 1970 | |
| | Charlie Mack Murphy* | Augusta, Georgia | May 9-11, 1970 | |
| | Charles Oatman* | Augusta, Georgia | May 9-11, 1970 | |
| | John Stokes* | Augusta, Georgia | May 9-11, 1970 | |
| | Mack Wilson* | Augusta, Georgia | May 9-11, 1970 | |
| | William Wright, Jr.* | Augusta, Georgia | May 9-11, 1970 | |
| 8. | John Larry Bolden | Chattanooga, Tennessee | May 3, 1958 | April 15, 2010 |
| 9. | Preston Bouldin | San Antonio, Texas | May 8, 1953 | May 26, 2011 |
| 10. | Michael Bowman* | Barton, Arkansas | May 23, 1970 | |
| | Robert Lee Hayes* | Barton, Arkansas | May 23, 1970 | |
| | Eddie Jackson* | Barton, Arkansas | May 23, 1970 | |
| | Johnny Lee Williams* | Barton, Arkansas | May 23, 1970 | |

| 11. | James Brazier | Dawson, Georgia | April 20, 1958 | April 6, 2009 |
|---|---|---|---|---|
| 12. | Thomas Brewer | Columbus, Georgia | February 18, 1956 | April 6, 2009 |
| 13. | Clyde Briggs* | Franklin County, Mississippi | January 18, 1965 | April 21, 2021 |
| 14. | Hilliard Brooks | Montgomery, Alabama | August 12, 1950 | April 9, 2010 |
| 15. | Benjamin Brown | Jackson, Mississippi | May 11, 1967 | March 19, 2013 |
| 16. | Charles Brown | Benton, Mississippi | June 18, 1957 | April 16, 2010 |
| 17. | Gene Brown/a.k.a. Pheld Evans | Canton, Mississippi | 1964 | April 21, 2010 |
| 18. | Jessie Brown | Winona, Mississippi | On or about January 23, 1965 | April 19, 2010 |
| 19. | Leonard Brown* | Baton Rouge, Louisiana | November 16, 1972 | |
| | Denver Smith* | Baton Rouge, Louisiana | November 16, 1972 | |
| 20. | Carie Brumfield | Franklinton, Louisiana | September 12, 1967 | September 24, 2013 |
| 21. | Eli Brumfield | McComb, Mississippi | October 13, 1962 | April 16, 2010 |
| 22. | Johnnie Mae Chappell | Jacksonville, Florida | March 23, 1964 | March 20, 2015 |
| 23. | Jesse Cano | Brookville, Florida | January 1, 1965 | June 3, 2011 |
| 24. | Silas Caston | Hinds County, Mississippi | March 1, 1964 | May 2, 2010 |
| 25. | James Cates | Chapel Hill, North Carolina | November 21, 1970 | |
| 26. | James Chaney | Philadelphia, Mississippi | June 21, 1964 | June 20, 2016 |
| | Andrew Goodman | Philadelphia, Mississippi | June 21, 1964 | June 20, 2016 |
| | Michael Schwerner | Philadelphia, Mississippi | June 21, 1964 | June 20, 2016 |
| 27. | Thad Christian | Anniston, Alabama | August 28, 1965 | April 6, 2011 |
| 28. | Clarence Cloninger | Gaston, North Carolina | October 10, 1960 | April 3, 2009 |
| 29. | Jo Etha Collier* | Drew, Mississippi | May 25, 1971 | January 13, 2020 |
| 30. | Eddie Cook* | Detroit, Michigan | November 7, 1965 | May 15, 2020 |
| 31. | Willie Countryman | Dawson, Georgia | May 25, 1958 | April 6, 2009 |
| 32. | Jean Cowsert* | Mobile, Alabama | January 1967 | August 30, 2024 |
| 33. | Lee Culbreath* | Portland, Arkansas | December 5, 1965 | May 7, 2019 |
| 34. | Vincent Dahmon | N/A | N/A | April 12, 2010 |
| 35. | Jonathan Daniels | Lowndes County, Alabama | August 20, 1965 | April 26, 2011 |
| 36. | Woodrow Wilson Daniels | Yalobusha County, Mississippi | June 21, 1958 | April 12, 2010 |
| 37. | Rayfield Davis* | Mobile, Alabama | March 7, 1948 | |
| 38. | Henry Hezekiah Dee | Parker's Landing, Mississippi | May 2, 1964 | March 15, 2010 |
| | Charles Edward Moore | Parker's Landing, Mississippi | May 2, 1964 | March 15, 2010 |
| 39. | George Dorsey | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| | Mae Dorsey | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| | Dorothy Malcolm | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| | Roger Malcolm | Monroe, Georgia | July 25, 1946 | January 27, 2017 |
| 40. | Roman Ducksworth | Taylorsville, Mississippi | April 9, 1962 | April 12, 2010 |
| 41. | Joseph Dumas | Perry, Florida | May 5, 1962 | April 9, 2010 |

| 42. | Joseph Edwards | Vidalia, Louisiana | July 12, 1964 | February 20, 2013 |
|---|---|---|---|---|
| 43. | Willie Edwards | Montgomery, Alabama | January 22, 1957 | July 2, 2013 |
| 44. | James Evansingston | Tallahatchie County, Mississippi | December 24, 1955 | April 12, 2010 |
| 45. | Peter Francis* | Perry, Maine | November 15, 1965 | October 5, 2018 |
| 46. | Phillip Gibbs* | Jackson, Mississippi | May 15, 1970 | |
| | James Earl Green* | Jackson, Mississippi | May 15, 1970 | |
| 47. | Mattie Green | Ringgold, Georgia | May 19, 1960 | May 4, 2012 |
| 48. | Jasper Greenwood | Vicksburg, Mississippi | June 29, 1964 | June 17, 2010 |
| 49. | Jimmie Lee Griffith | Sturgis, Mississippi | September 24, 1965 | August 14, 2012 |
| 50. | Paul Guihard | Oxford, Mississippi | September 30, 1962 | July 19, 2011 |
| 51. | A.C. Hall | Macon, Georgia | October 13, 1962 | July 27, 2011 |
| 52. | Rogers Hamilton | Lowndes County, Alabama | October 22, 1957 | February 10, 2016 |
| 53. | Adlena Hamlett | Sidon, Mississippi | January 11, 1966 | May 26, 2011 |
| | Birdia Keglar | Sidon, Mississippi | January 11, 1966 | May 18, 2011 |
| 54. | Samuel Hammond | Orangeburg, South Carolina | February 8, 1968 | |
| | Delano Middleton | Orangeburg, South Carolina | February 8, 1968 | |
| | Henry Smith | Orangeburg, South Carolina | February 8, 1968 | |
| 55. | Collie Hampton | Winchester, Kentucky | August 14, 1966 | June 1, 2011 |
| 56. | Alphonso Harris | Albany, Georgia | December 1, 1966 | April 12, 2010 |
| 57. | Isaiah Henry | Greensburg, Louisiana | July 28, 1954 | May 21, 2012 |
| 58. | Arthur James Hill | Villa Rica, Georgia | August 20, 1965 | May 18, 2011 |
| 59. | Ernest Hunter | St. Marys, Georgia | September 13, 1958 | April 6, 2009 |
| 60. | Jimmie Lee Jackson | Marion, Alabama | February 18, 1965 | May 3, 2011 |
| 61. | Luther Jackson | Philadelphia, Mississippi | October 25, 1959 | April 16, 2010 |
| 62. | Wharlest Jackson | Natchez, Mississippi | February 27, 1967 | May 4, 2015 |
| 63. | Carol Jenkins* | Martinsville, Indiana | September 16, 1968 | |
| 64. | Alberta O. Jones* | Louisville, Kentucky | August 5, 1965 | August 11, 2023 |
| 65. | Ernest Jells | Clarksdale, Mississippi | September 20, 1963 | April 16, 2010 |
| 66. | Joseph Jeter | Atlanta, Georgia | September 13, 1958 | May 2, 2010 |
| 67. | Marshall Johns | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| | Ernest McFarland | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| | Albert Pitts | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| | David Pitts | Ouachita Parish, Louisiana | July 13, 1960 | April 22, 2010 |
| 68. | Nathan Johnson | Alabaster, Alabama | May 8, 1966 | April 21, 2011 |
| 69. | Bruce Klunder | Cleveland, Ohio | April 7, 1964 | April 16, 2010 |
| 70. | Margaret Knott* | Butler, Alabama | September 11, 1971 | September 30, 2024 |
| 71. | George Lee | Belzoni, Mississippi | May 7, 1955 | June 6, 2011 |
| 72. | Herbert Lee | Amite County, Mississippi | September 25, 1961 | April 16, 2010 |
| 73. | William Henry "John" Lee | Rankin County, Mississippi | February 25, 1965 | May 5, 2011 |

| 74. | Richard Lillard | Nashville, Tennessee | July 20, 1958 | April 15, 2010 |
|---|---|---|---|---|
| 75. | George Love | Ruleville, Mississippi | January 8, 1958 | June 10, 2011 |
| 76. | Maybelle Mahone | Zebulon, Georgia | December 5, 1956 | April 6, 2009 |
| 77. | Henry Marrow* | Granville County, North Carolina | May 11, 1970 | July 14, 2022 – referred to the state |
| 78. | Sylvester Maxwell | Canton, Mississippi | January 17, 1963 | May 2, 2010 |
| 79. | Bessie McDowell | Andalusia, Alabama | June 14, 1956 | April 9, 2010 |
| 80. | Robert McNair | Pelahatchie, Mississippi | November 6, 1965 | May 26, 2011 |
| 81. | Clinton Melton | Glendora, Mississippi | December 3, 1955 | April 12, 2010 |
| 82. | Hosie Miller | Newton, Georgia | March 15, 1965 | June 21, 2011 |
| 83. | James Andrew Miller | Jackson, Georgia | August 30, 1964 | April 12, 2010 |
| 84. | Booker T. Mixon | Clarksdale, Mississippi | October 12, 1959 | August 13, 2012 |
| 85. | Neimiah Montgomery | Merigold, Mississippi | August 10, 1964 | April 12, 2010 |
| 86. | Harriette Moore | Mims, Florida | December 25, 1951 | July 15, 2011 |
|  | Harry Moore | Mims, Florida | December 25, 1951 | July 15, 2011 |
| 87. | Oneal Moore | Varnado, Louisiana | June 2, 1965 | March 31, 2016 |
| 88. | William Moore | Attalla, Alabama | April 23, 1963 | August 2, 2012 |
| 89. | Frank Morris | Ferriday, Louisiana | December 10, 1964 | December 30, 2013 |
| 90. | James Motley | Elmore County, Alabama | November 20, 1966 | April 12, 2010 |
| 91. | Claude Neal | Greenwood, Florida | October 26, 1934 | October 1, 2013 |
| 92. | Samuel O'Quinn | Centreville, Mississippi | August 14, 1959 | May 4, 2012 |
| 93. | Herbert Orsby | Canton, Mississippi | September 7, 1964 | April 12, 2010 |
| 94. | Will Owens | New Bern, North Carolina | March 5, 1956 | April 3, 2009 |
| 95. | Mack Charles Parker | Pearl River County, Mississippi | May 4, 1959 | August 30, 2023 |
| 96. | Larry Payne | Memphis, Tennessee | March 28, 1968 | July 5, 2011 |
| 97. | Clarence Horatious Pickett | Columbus, Georgia | December 21, 1957 | April 12, 2010 |
| 98. | William Piercefield | Concordia Parish, Louisiana | July 24, 1965 | September 16, 2013 |
| 99. | Jimmy Powell | New York City, New York | July 16, 1964 | February 9, 2012 |
| 100. | William Roy Prather | Corinth, Mississippi | October 31, 1959 | February 16, 2016 |
| 101. | Edwin Pratt* | Shoreline, Washington | January 26, 1969 | June 15, 2022 |
| 102. | Johnny Queen | Fayette, Mississippi | August 8, 1965 | July 26, 2013 |
| 103. | Donald Raspberry | Okolona, Mississippi | February 27, 1965 | May 17, 2010 |
| 104. | Donna Reason* | Chester, Pennsylvania | May 18, 1970 |  |
| 105. | James Reeb | Selma, Alabama | March 9, 1965 | May 18, 2011 |
| 106. | John Earl Reese | Gregg County, Texas | October 22, 1955 | April 15, 2010 |
| 107. | Fred Robinson | Edisto Island, South Carolina | August 3, 1960 | February 2, 2012 |
| 108. | Johnnie Robinson | Birmingham, Alabama | September 15, 1963 | April 9, 2010 |
| 109. | Dan Carter Sanders | Johnston Co., North Carolina | November 18, 1946 | March 5, 2019 |
| 110. | Willie Joe Sanford | Hawkinsville, Georgia | March 1, 1957 | July 5, 2012 |
| 111. | Marshall Scott | Orleans Parish, Louisiana | January 23, 1965 | May 25, 2012 |

| 112. | Milton Lee Scott | Baton Rouge, Louisiana | July 18, 1973 | May 8, 2019 |
|---|---|---|---|---|
| 113. | Jessie James Shelby | Yazoo City, Mississippi | January 21, 1956 | May 24, 2010 |
| 114. | Ollie Shelby | Hinds County, Mississippi | January 22, 1965 | April 16, 2010 |
| 115. | George Singleton | Shelby, North Carolina | April 30, 1957 | April 16, 2010 |
| 116. | Ed Smith | State Line, Mississippi | April 27, 1958 | November 5, 2009 |
| 117. | Lamar Smith | Brookhaven, Mississippi | August 13, 1955 | April 12, 2010 |
| 118. | Maceo Snipes | Butler, Georgia | July 18, 1946 | April 12, 2010 |
| 119. | Eddie Stewart | Jackson, Mississippi | July 9, 1966 | May 26, 2011 |
| 120. | Isaiah Taylor | Ruleville, Mississippi | June 26, 1964 | April 12, 2010 |
| 121. | Ann Thomas | San Antonio, Texas | April 8, 1969 | April 15, 2010 |
| 122. | Freddie Lee Thomas | Sidon, Mississippi | August 20, 1965 | June 9, 2011 |
| 123. | John Thomas* | West Point, Mississippi | August 15, 1970 | April 17, 2019 |
| 124. | Emmett Till | Money, Mississippi | August 28, 1955 | December 6, 2021 |
| 125. | Selma Trigg | Hattiesburg, Mississippi | January 23, 1965 | May 2, 2010 |
| 126. | Ladislado Uresti | San Antonio, Texas | April 22, 1953 | April 20, 2010 |
| 127. | Hulet Varner | Atlanta, Georgia | September 10, 1966 | April 6, 2009 |
| 128. | Clifton Walker | Woodville, Mississippi | February 29, 1964 | October 1, 2013 |
| 129. | Virgil Ware | Birmingham, Alabama | September 15, 1963 | March 29, 2011 |
| 130. | James Waymers | Allendale, South Carolina | July 10, 1965 | April 15, 2010 |
| 131. | Ben Chester White | Natchez, Mississippi | June 10, 1966 | October 16, 2003 |
| 132. | John Wesley Wilder | Ruston, Louisiana | July 17, 1965 | May 25, 2011 |
| 133. | Elbert Williams | Brownsville, Tennessee | June 20, 1940 | November 4, 2018 |
| 134. | Rodell Williamson | Camden, Alabama | On or about May 20-22, 1967 | May 2, 2010 |
| 135. | Archie Wooden | Snow Hill, Alabama | December 25, 1967 | April 20, 2010 |
| 136. | Samuel Younge | Tuskegee, Alabama | January 3, 1966 | March 28, 2011 |
| 137. | Unknown* | West Point, Mississippi | 1960s/1970s | May 6, 2019 |
| 138. | Unknown | Florida | May 1969 | |

**\*Denotes matter referred to the Department by an eligible entity or a State or local law enforcement agency or prosecutor.  *See* Section 2(2)(B)(i)(IV) of the Reauthorization Act.**

### G.  Cases in the Study Period Referred by an Eligible Entity, Law Enforcement Agency, or Prosecutor

Pursuant to Section 2(2)(B)(i)(IV) of the Reauthorization Act, now set forth at 28

U.S.C. § 509 (functions of the Attorney General), Unsolved Civil Rights Crimes, § 3(c)(H), the

Department must report the number of cases referred by an eligible entity within the study

period.  An eligible entity is defined as an entity whose purpose is to promote civil rights, an

-26-

institution of higher education, or another entity, determined by the Attorney General. The Department must similarly set forth the number of cases referred to it by state or local law enforcement agencies or prosecutors.

Since the last report, no new cold cases were referred to the Department for review by an eligible entity. One previously opened Till Act case was also referred by an eligible entity; it is still being evaluated to determine whether it should be reopened. In addition, since the last report one new case was referred to the Department by a state or local government. [6]

Since the Reauthorization Act (requiring that the Department keep track of reports made by eligible entities), 19 cases involving 29 known victims have been referred by an eligible entity or by a state or local law enforcement agency or prosecutor and opened. An asterisk on the chart identifies those cases referred by an eligible entity or a state or local law enforcement agency or prosecutor and opened for investigation since the enactment of the Reauthorization Act. The referred cases closed in prior reporting periods are discussed in previous reports.

Additional referrals of new cases from eligible entities and state or local law enforcement agencies or prosecutors include ten total matters that were reviewed by attorneys in the Cold Case Unit but never opened. The Tulsa Race Massacre underwent an examination and evaluation but was not opened as a Till Act investigation. As such, it is also not included on the chart.

## III.    COLD CASE STUDY AND REPORT: SUMMARY OF CASES CLOSED SINCE LAST REPORT

---

[6] It is not being opened because a preliminary review found insufficient evidence to open the matter as a Till Act case.

Since the last report to Congress, four cases have been closed. The case closings and referral are available on the Department's website – or will be available once the memoranda have been redacted to protect the privacy rights of witnesses and uncharged subjects. The website can be accessed here: https://www.justice.gov/crt/civil-rights-division-emmett-till-act-cold-case-closing-memoranda. Summaries of the cases are provided below.

### A. James Cates

On November 20, 1970, James Cates, a young Black man who grew up in Chapel Hill, North Carolina, attended an all-night dance on the University of North Carolina Chapel Hill ("UNC") campus. The dance, organized by a UNC student organization to improve race relations, was instead the scene of a racially motivated fight in which Cates was murdered and multiple other Black men were injured.

An earlier, off-campus physical racial altercation—between members of a white supremacist motorcycle gang known as "the Storm Troopers" and Black residents of Chapel Hill—led to a later altercation at the campus event. The dance soon erupted into chaos, with multiple simultaneous confrontations between the Storm Troopers and Black attendees of the dance. During the chaos, Cates was fatally stabbed. As he lay outside the Student Union, bleeding, Cates was treated by an Army medic who had attended the dance. Cates' family and friends urged law enforcement on the scene to call an ambulance or to take Cates to the hospital. An ambulance never arrived, and by the time Cates was transported to the hospital in the back of a patrol car, his injuries had progressed too far. He was pronounced dead shortly after arriving at the hospital, in the early morning hours of November 21, 1970. Three subjects were prosecuted by the state for second-degree murder. They were acquitted in 1971.

-28-

During the Till Act investigation, the Department conducted interviews with living witnesses and individuals who have conducted independent research into Cates' death, as well as with family and friends of Cates. The Department also reviewed available court records, media reports on this event, the December 10, 1970, report following UNC's investigation into Cates' death (the "UNC Report"), and the North Carolina State Bureau of Investigation file on the Cates case.

Federal prosecution of anyone responsible for Cates' death is not possible. The statute of limitations has expired for the only two federal hate crime statutes that could have potentially been used to prosecute the case, and there is no other basis for federal jurisdiction. Because three subjects were prosecuted by the state for second-degree murder and acquitted in 1971, double jeopardy would prevent state prosecution with respect to those defendants. Accordingly, this case is not being referred to the state. Further, two of the initial three subjects are deceased and therefore cannot be prosecuted by either the federal government or the state. The available evidence is insufficient to prove that any of the remaining Storm Troopers were criminally responsible for Cates' death. The case has therefore been closed without prosecution or referral to the state.

### B. Dr. Elsie Jean Cowsert

On January 29, 1967, Dr. Elsie Jean Cowsert, a white physician attempting to aid in the desegregation of the local hospital, the Mobile Infirmary, was found shot to death in front of her home in Mobile, Alabama. She was shot in the chest at close range and broken glass from a side window was found in her pocket. As part of her desegregation efforts, Dr. Cowsert covertly provided information to officials from the U.S. Department of Health, Education, and Welfare concerning the Mobile Infirmary's efforts to prevent patient desegregation in its

-29-

facilities. Because of this, members of the community believed that she was killed due to her civil rights activities. Local newspaper articles and her death certificate indicate, however, that local law enforcement ruled her death to have been self-inflicted and accidental. There were no witnesses to Dr. Cowsert's death.

The current investigation was opened after a referral by an eligible entity. The Department undertook a review of the available evidence, including a toxicology report, newspaper articles, archive materials, and other relevant documents and investigators spoke with community members, as well as several academics who researched the case. They interviewed Dr. Cowsert's still-living friends and colleagues and reached out to the families of some of Dr. Cowsert's now-deceased colleagues. These efforts did not produce sufficient evidence to determine that Dr. Cowsert died as the result of a homicide and not an accident. Nor has the Department developed any leads sufficient to identify any person (living or dead) who might have been responsible for her death, if it was, in fact, a homicide. Without a living suspect, a prosecution cannot be undertaken.

Even if there were a known suspect in Dr. Cowsert's death, and that suspect were alive, there would be other insurmountable barriers to a federal prosecution. First, the statute of limitations has expired on any prosecution that could be brought under any federal civil rights statute. Second, without a suspect or additional evidence it is impossible to conclude that Dr. Cowsert was killed due to her civil rights activities. There is no evidence that any other federal statute applies. Third, referral to the state is not appropriate here because the investigation did not identify any suspects involved in Dr. Cowsert's death. For these reasons, the investigation has been closed without federal prosecution or referral to state authorities.

-30-

### C. Margaret Knott

On September 11, 1971, Margaret Ann Knott, a 19-year-old Black woman, was fatally injured during a sit-in demonstration in Butler, Alabama, when she was hit by a car driven by a 28-year-old white man.  The demonstration consisted of about 200 people who gathered on the streets surrounding the local courthouse on a Saturday morning to protest longstanding racial inequalities.  The current investigation was opened as the result of a referral from an eligible entity.  In pursuing this matter, the Department requested information from the eligible entity, obtained and reviewed the contemporaneous FBI files and news articles, and interviewed family members and witnesses present at the demonstration.

The case is being closed without federal prosecution because the statute of limitations has expired for the relevant federal civil rights law that could apply in this case and the facts of the present case do not permit a prosecution invoking any other federal statute.

Even if the statute of limitations had not expired, there would be insufficient evidence to prosecute this case.  The relevant federal criminal civil rights statute in effect in 1971 was 18 U.S.C. § 245(b)(2), which prohibits bias-motivated violence that interferes with certain federally protected activities.  The threshold factual question presented for a prosecution under this statute is whether there is evidence to prove beyond a reasonable doubt that the driver willfully intended to use force or the threat of force to interfere with the protestors' rights when he drove his car through the intersection where they were demonstrating and fatally injured Knott.  The current investigation focused on determining if there was evidence that the driver acted willfully.

There is no evidence that the driver intentionally chose to enter the square in order to interfere with the demonstrators; the route around the square appears to have been the usual

-31-

route from his work to his home, where he was traveling that day.  There is likewise no evidence that the driver deviated from his route or steered in the protestors' direction.

The driver claims his car accidentally struck Knott as he tried to evade protestors attacking his car.  Numerous witnesses—including both bystanders, law enforcement, and at least two protestors—saw protestors chase, pound, and jump on the driver's car.  Some witnesses recall seeing a protestor reach into the car near the driver's head, and other protestors holding the door handles on both the driver's side and passenger side.  Nearly all of the witnesses who saw the moment of impact describe the victim as still sitting on the ground at the right front side of the car, which, if accurate, comports with the driver's claim that he did not see the victim until after he drove north and looked in his rearview mirror.  Thus, the evidence is insufficient to prove beyond a reasonable doubt that he willfully used force or threat of force because of Knott's race or her use of the street to engage in civil rights activity.

Because the evidence is insufficient to prove that the driver acted deliberately or recklessly in striking Knott, it would also not support state charges such as murder or manslaughter charges.  Thus, the matter has also not been referred to the state.

### D. Henry Marrow

Henry D. "Dickie" Marrow, Jr. was a 23-year-old Black man and Army veteran who was beaten and shot to death in Oxford, North Carolina, on May 11, 1970, after allegedly saying something that offended a white woman.  Following Marrow's death, the state tried two of the men for charges relating to Marrow's death.  One of these men was also charged with a felonious assault for firing his shotgun at a second victim, who survived.  Both men were acquitted after the third man, who was not originally charged, testified that he, and not the charged shooter, fired the shot (albeit accidentally) that killed Marrow.  The third man was

never formally charged with any crime associated with Marrow's beating and murder, and the second man was never tried for the felonious assault on the surviving victim.

As explained in the Department's last Report to Congress (available at: https://www.justice.gov/crt/cold-case-initiative), the Department identified what it believed to be new information related to the identity of the person who shot and killed Marrow. Despite this new information, the Department concluded that the federal statute of limitations had expired and therefore a federal prosecution was not viable. However, the Department concluded that prosecution by the state against all three men on additional state charges may still have been possible, as there is no statute of limitations for felonies in North Carolina. The Department therefore referred this matter to North Carolina's Office of the District Attorney – Eleventh Prosecutorial District in July 2022, for its analysis of whether state prosecution of any living subject was possible. While awaiting a determination by that office, the Department learned that one of the defendants had recently died. After learning that the District Attorney's Office was not inclined to pursue an investigation or prosecution of the remaining living subjects, the Department closed its investigation.

## IV.    COLD CASE STUDY AND REPORT: REPORT ON NON-CASE SPECIFIC FACTORS

Pursuant to sections 3(c)(1)(F)-(G) of the Till Act, the Department must report to Congress the number of attorneys who worked on any case under the Till Act, as well as the number of grant applications submitted by state or local law enforcement agencies for expenses associated with their investigation and prosecution of cases under the Till Act, and the amount of any grants awarded. This information is set forth below.

### A.  Number of Attorneys Who Worked in Whole or in Part on Cases

Pursuant to section 3(c)(1)(F) of the original Till Act, the Department provides the following information about the number of attorneys who have worked on cold cases.  More than 90 federal prosecutors have worked on cases reviewed as part of the Department's Cold Case Initiative and work under the Till Act.  During this reporting period fourteen attorneys have worked 5,756.75 hours on Till Act cases and other cold case matters.[7]  Some of these attorneys have reviewed files (many of which are extensive) and drafted memoranda explaining decisions about why a case could not be prosecuted.

In addition, two contract investigators spent 2,212 hours on cold case work[8] and a victim-witness coordinator has devoted multiple hours reaching out to victims' families.  This number does not include the numerous federal agents, local law enforcement officials, or other contract employees who have provided additional assistance.

## B.  Number of Grants

The Emmett Till Cold Case Investigations and Prosecution Program, launched in fiscal year 2020, provides support to state, local, and tribal law enforcement and prosecutors in their investigation and prosecution of cold case murders associated with civil rights violations. Funds are limited to address violations of civil rights statutes resulting in death that occurred no later than December 31, 1979.  General information about the program is available here:

---

[7] The last Report only included hours expended between July 1, 2022, and June 30, 2023. Accordingly, for the current Report the Department is reporting the number of hours expended since the last reporting period; 4,427.75 represents the hours expended attorneys of the Criminal Section of the Civil Rights Division on cold case work between July 1, 2023, and January 1, 2025.

[8] This number also represents the hours expended by investigators between July 1, 2023, and January 1, 2025.

[Emmett Till Cold Case Investigations and Prosecution Program | Overview | Bureau of Justice Assistance (ojp.gov)](#).

In fiscal year 2024 the Bureau Justice Assistance (BJA) awarded $1 million to the Orleans Parish District Attorney's Office under the Emmett Till Cold Case Investigation and Prosecution Program to continue its work identifying, researching, and cataloguing Jim Crow cold case homicides.  Through a previous grant under this program, this office is investigating nearly 175 racial terror homicides in New Orleans.  The new award will allow this office to continue investigating cases, to hold public hearings, and to publish a website featuring investigation findings.

In fiscal year 2024 BJA's training and technical assistance provider under the Emmett Till Cold Case Investigation and Prosecution Program launched a microgrant program.  The program is geared to help jurisdictions with discovery work or with discrete resource requests related to unsolved civil rights cold case homicides.  Applications for microgrants will be accepted on a rolling basis and more information can be found at [https://ncjtc.fvtc.edu/programs/PR01555295/emmett-till-cold-case-investigations-and-prosecution-program](https://ncjtc.fvtc.edu/programs/PR01555295/emmett-till-cold-case-investigations-and-prosecution-program).

### C.  Community Outreach to Address Tensions

The Community Relations Services (CRS), which was created by the 1964 Civil Rights Act, was given key authorities under the Till Act and its Reauthorization to bring together law enforcement agencies and communities in the investigation of civil rights era murders, and to address tensions raised by civil rights era murders.  During this reporting period, with the help of six hand-picked "Till Act Team" detailees, CRS has begun analyzing legal and policy issues

-35-

relating to the Till Act, along with community conflicts resulting from unsolved civil rights era crimes that could set the stage for potential community outreach.

### D. Notifying Victim Family Members

The Cold Case Unit has devoted considerable resources to locating the next of kin of cold case victims, and we have met with family members in all of the cases closed during this reporting period. Generally, a Victim-Witness Coordinator from the Civil Rights Division contacts the next of kin to alert him or her that a matter involving a loved one is being reviewed to determine whether the family member would like to meet with attorneys and investigators during the review. This process not only alerts family members that the death is under review, but also allows Cold Case Unit attorneys to obtain any information or suggestions about leads that the family wishes to provide.

If a decision is made to close the case, the family member is again contacted and attorneys from the Division meet with the next of kin, either in person or through a virtual platform. This contact is followed up by a letter fully setting forth the reason a case has been closed or other action has been taken. In some rare instances, the government has been able to give family members further closure by returning property of their loved one that had been long held in evidence files.

## V.   IMPLEMENTATION OF THE REAUTHORIZATION ACT

The Reauthorization Act, enacted on December 16, 2016, requires, among other things, that the Department meet regularly with civil rights organizations, institutions of higher education, and Department-designated entities to coordinate information sharing and to discuss the status of the Department's Till Act work. *See* Section 2(I)(c)(3) of the Reauthorization Act, now set forth at 28 U.S.C. § 509 (functions of the Attorney General), Unsolved Civil Rights

-36-

Crimes, § 3(b)(4).  The Act also requires that the Department hold meetings with representatives of the Civil Rights Division, FBI, the Community Relations Service, eligible entities, and, where appropriate, state and local law enforcement agencies to discuss the status of the Department's work under this Act.  *See* Section 2(2)(iii)(4) of the Reauthorization Act, now set forth at 28 U.S.C. § 509 (functions of the Attorney General), Unsolved Civil Rights Crimes, § 2(2).

During this reporting period, the Criminal Section of the Civil Rights Division hosted a convening to share the Cold Case Unit's work with and get input and referrals from the greater cold case community, including civil rights organizations and institutions of higher learning. This convening included presentations from the Assistant Attorney General for Civil Rights, Kristen Clarke, the Cold Case Unit, the FBI, Community Relations Service, Bureau of Justice Assistance, the Civil Rights Cold Case Records Review Board, and Reverand Wheeler Parker, cousin of Emmett Till.  It also included a session in which attendees could meet with Cold Case Unit attorneys in small breakout groups to provide referrals and answer questions.  Over 70 people attended this convening.

The Department also provided an additional training in this reporting period to the same academic institution discussed in the last report.

As first stated in the 2018 report and reiterated last year, the FBI has developed a Till Act training, which it can give to interested community groups with the assistance of prosecutors in the Civil Rights Division's Criminal Section.  The Department of Justice's Hate Crime Initiative has developed a hate crime webpage that contains a contact link that can be used by any community group interested in requesting a training.

As noted above, anyone wishing to report a hate crime may continue to do so through the Cold Case Unit email: Coldcase.Civilrights@usdoj.gov.

## VII.    CONCLUSION

The Department remains committed to working with eligible entities and others to identify potential cases that fall under the Till Act's jurisdiction.  We will devote all necessary resources to ensure that those matters are reviewed and investigated as appropriate.  Our efforts in doing so are to provide transparency to family members of the victims and to provide the greater public with truthful accounts of these matters.  Of course, the Department remains committed to prosecuting any cold case in which living subjects exist, and in which the law and facts, including facts supporting federal jurisdiction, warrant prosecution.  Should we identify a prosecutable case for which we are unable to establish federal jurisdiction, we will lend our assistance and resources to our state and local partners to ensure that best efforts are put forth to achieve justice.