Matthew S.L. Cate (SBN 295546)
matt@matthewcatelaw.com
**LAW OFFICE OF MATTHEW S.L. CATE**
101 Montgomery Street, Suite 900
San Francisco, CA 94104
Tel/Fax: 415-964-4400

D. Victoria Baranetsky (SBN 311892)
**THE CENTER FOR INVESTIGATIVE REPORTING**
222 Sutter Street, #600
San Francisco, CA 94108
Telephone: (510) 982-2890
Fax: (510) 849-6141
vbaranetsky@cir.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| The Center for Investigative Reporting,<br><br>Plaintiff,<br><br>v.<br><br>United States Department of Justice,<br><br>Defendant. | Case No. 4:25-cv-7309-AMO<br><br>Hon. Araceli Martínez-Olguín<br><br>**Plaintiff's Reply in Support of its Cross-Motion for Partial Summary Judgment**<br><br>Hearing: November 12, 2026<br>Time: 2:00 p.m.<br>Courtroom: 5 |

## Table of Contents


Table of Authorities ........ iii

I. Reply Argument ........ 1

A. The DOJ has failed to make a "substantial" showing that compliance with the First Request would be unduly burdensome. ........ 2

B. The DOJ has failed to demonstrate that reasonably foreseeable harm would arise from disclosure of the Closing Memos. ........ 5

C. The DOJ has failed to prove Closing Memos are prepared "in anticipation of litigation" and that Exemption 5 applies. ........ 9

D. The DOJ has not carried its segregability burden. ........ 12

E. The Court should sustain CIR's objections to the Buchko Declaration. ........ 14

II. Conclusion ........ 15

## Table of Authorities

**Cases**


*A. Michael's Piano v. FTC*, 18 F.3d 138 (2d Cir. 1994) .......... 11

*ACLU of N. Calif. v. U.S. Dep't of Justice*, 880 F.3d 473 (9th Cir. 2018) .......... 6, 13

*Am. Small Bus. League v. Dep't of Defense*, 372 F. Supp. 3d 1018 (N.D. Cal. 2019) .......... 6

*Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) .......... 6, 11

*Dhakal v. FBI*, No. 1:24-CV-02525 (TNM), 2026 WL 787865 (D.D.C. Mar. 20, 2026) .......... 6

*Delaney, Migdail & Young, Chartered v. I.R.S.*, 826 F.2d 124 (D.C. Cir. 1987) .......... 11

*Garris v. FBI*, 937 F.3d 1284 (9th Cir. 2019) .......... 14

*Gavin v. SEC*, No. 04-4522 PAMJSM, 2007 WL 2454156 (D. Minn. Aug. 23, 2007) .......... 12

*Gov't Accountability Project v. U.S. Department of Justice*, 852 F. Supp. 2d 14 (D.D.C. 2012) .......... 12

*Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1 (D.D.C. 2000) .......... 12

*Kishore v. U.S. Dep't of Justice*, 575 F. Supp. 2d 243 (D.D.C. 2008) .......... 12

*Kwoka v. I.R.S.*, No. 17-CV-1157 (DLF), 2018 WL 4681000 (D.D.C. Sept. 28, 2018) .......... 3

*Leopold v. U.S. Dep't of Justice*, 94 F.4th 33 (D.C. Cir. 2024) .......... 5, 11

*Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) .......... 2, 3

*Nat'l Sec. Counselors v. CIA*, 969 F.3d 406 (D.C. Cir. 2020) .......... 2

*Pinson v. U.S. Department of Justice*, 80 F. Supp. 3d 211 (D.D.C. 2015) .......... 2

*Prison Legal News v. Lappin*,
603 F. Supp. 2d 124 (D.D.C. 2009) ....14, 15

*Public Citizen v. Department of Education*,
292 F. Supp. 2d 1 (D.D.C. 2003) ....4

*Rosenfeld v. U.S. Dep't of Justice*,
No. C07-03240MHP, 2008 WL 3925633 (N.D. Cal. Aug. 22, 2008) ....14

*Rudometkin v. United States*,
140 F.4th 480 (D.C. Cir. 2025) ....13

*Schoeffler v. U.S. Dep't of Agriculture*,
795 F. App'x 526 (9th Cir. 2020) ....15

*Senate of Puerto Rico v. U.S. Dep't of Justice*,
823 F.2d 574 (D.C. Cir. 1987) ....10, 11

*Shaw v. FBI*,
749 F.2d 58 (D.C. Cir. 1984) ....14

*Tereshchuk v. Bureau of Prisons*,
67 F. Supp. 3d 441 (D.D.C. 2014) ....3, 4

*Weirich v. Bd. of Governors of the Fed. Reserve Sys.*,
No. CV-10-5031-EFS, 2010 WL 4717211 (E.D. Wash. Nov. 15, 2010) ....2

**Federal Statutes**

5 U.S.C. § 552(a)(8)(A) ....5

5 U.S.C. § 552(a)(8)(B) ....5

18 U.S.C. § 242 ....1, 4, 7, 9

FOIA Improvement Act of 2016 ....5, 6, 13, 14

**Federal Rules**

Fed. R. Evid. 602 ....8

Fed. R. Evid. 701 ....8

Fed. R. Evid. 702 ....8

## I. Reply Argument[1]

The DOJ's opposition to CIR's Cross-Motion fails to sufficiently address and rectify the fundamental inadequacies of the DOJ's position, on every front, and thus fails to carry its burden according to FOIA.

First, the DOJ confirms it knows how to search for memos responsive to the First Request, and its speculative burden claim does not rise to the level required to excuse the agency from its statutory obligations. The agency's newly estimated time for compliance is not particularly uncommon, and the DOJ provides no evidence whatsoever that compliance will hinder its operations.

Second, the DOJ fails to prove that the disclosure of the Closing Memos—which memorialize decisions to close certain cases under 18 U.S.C. § 242 rather than strategies litigating them—would cause any reasonably foreseeable harm to the interests protected by the attorney work-product doctrine. Indeed, the DOJ does not even suggest that its history of releasing Closing Memos and other material that is functionally identical to them has led to harm of any sort to those interests.

Third, the DOJ's attempt to characterize the Closing Memos as material created in *anticipation of litigation* is inconsistent with their clear purpose, function, and language. As the DOJ conceded in its opening brief, and as the records themselves demonstrate, Closing Memos memorialize the decision to close a case file without prosecution. Because they cannot reasonably be claimed to have been created in anticipation of litigation, Exemption 5 does not apply.

Finally, the DOJ concedes it has not complied with its statutory obligation to justify wholesale withholding of memos based on the claim that they allegedly contain material covered by Exemptions 3, 6 and/or 7. The DOJ ignores the fact that it has previously disclosed Closing Memos in redacted form, including by obscuring asserted Exemption 5 material. And the DOJ fails to account for the fact that the segregability analysis must now be undertaken in conjunction with the foreseeable harm standard. Its bald insistence that harm from disclosure must be assumed and, thus, the entirety of the Closing Memos must be withheld violates both FOIA requirements and, in particular, the way Congress intended them to work together.

---

[1] Capitalized terms in this reply have the same meaning as conveyed in CIR's Cross-Motion, and all internal citations, quotation marks, and brackets have been omitted from the citations in this brief.

For these reasons, the Court should grant CIR's Cross-Motion, deny the DOJ's Motion, and order the agency to comply with CIR's FOIA requests as required by law.

**A. The DOJ has failed to make a "substantial" showing that compliance with the First Request would be unduly burdensome.**

The DOJ concedes, as it must, that it knows how to search for Closing Memos responsive to the First Request. *See generally* DOJ Opp'n at 10–13. Its burden argument thus turns on the possibility that completing the search may require 1,200 hours.[2] *Id.* Even if its estimate is accurate, it does not render the search completed and certainly doesn't render the First Request unreasonably burdensome.

First, the DOJ's suggestion that it does not know what CIR has requested or how to comply with the request is as inexplicable as it is plainly disproved by its own evidence. *See* DOJ Opp'n at 12 ("Plaintiff incorrectly assumes that DOJ 'knows exactly what CIR wants and how to comply with the request.'") (quoting Cross-Mot. at 3). The DOJ cannot seriously claim it does not understand the request, which seeks a *singular* type of specified record and is therefore far afield from the broadly phrased requests at issue in *National Security Counselors* and *Weirich v. Board of Governors of the Federal Reserve System*. *See* DOJ Opp'n at 12 (citing cases); *see also Nat'l Sec. Counselors v. CIA*, 969 F.3d 406, 409–10 (D.C. Cir. 2020) (request for *all* "records pertaining to the IBM supercomputers named 'Watson'" held too broad); *Weirich*, No. CV-10-5031-EFS, 2010 WL 4717211, at *4 (E.D. Wash. Nov. 15, 2010) (request sought "*any* documents of meetings held by, or discussions between, any members of the Federal Reserve concerning why emergency funds were given to commercial banks which were nearly insolvent, instead of requesting the FDIC to intervene near the point of insolvency") (emphasis added). The DOJ has, in fact, laid out a detailed search plan for how to search for these exact records. *See* Cross-Mot. at 11 (citing Buchko Decl. ¶ 42 & n.3); *see also* Second Buchko Decl. ¶ 9(b). That the DOJ must actually search for those records, including by taking "administrative steps to retrieve the boxes" that may contain responsive memos, DOJ Opp'n at 11, does not mean it

[2] Emphasizing that the DOJ's motion lacked any concrete estimate of the alleged burden of compliance with the First Request, *see* Cross-Mot. at 9–10, is hardly a "gripe[]." *Compare* DOJ Opp'n at 11 *with, e.g.*, *Pinson v. U.S. Dep't of Justice*, 80 F. Supp. 3d 211, 216 (D.D.C. 2015) ("[I]t is the agency's burden, when claiming a search to be unreasonably burdensome, to "provide sufficient explanation as to why such a search would be unreasonably burdensome.") (quoting *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995), among other cases).

does not know how to find the records.[3] It quite clearly does. And that fact likewise substantially distinguishes this case from the several cases the DOJ cites in support of its position. *See* Cross-Mot. at 10–11 (discussing cases).

Second, the DOJ argues that there is no "index to the thousands of boxes DOJ would need to review to look for closing memos." *See* DOJ Opp'n at 12 (citing *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995)). But the search effort the DOJ has described is hardly like the completely unguided search deemed unreasonably burdensome in *Nation Magazine*: the DOJ admits that it can find potentially relevant files through the use of "records transfer memoranda to identify the relevant box or boxes" that are likely to contain case files with Closing Memos. *See* Buchko Decl. ¶ 42 n.3; *see also* Second Buchko Decl. ¶ 9 (explaining that "transfer memoranda associated with" cases involving potential violations of 18 U.S.C. § 242 that resulted in death are used "to identify the location of the relevant case files").

Finally, even if it turns out to be accurate, the DOJ's back-of-the-napkin guess that it may take 1,200 hours to review those "transfer memoranda" and search potentially as many as "3277 boxes of files" does not rise to the level of undue burden that allows noncompliance with a FOIA request. *See, e.g.*, *Tereshchuk v. Bureau of Prisons*, 67 F. Supp. 3d 441, 455–56 (D.D.C. 2014), *aff'd by Tereshchuk v. Bureau of Prisons*, No. 14-5278, 2015 WL 4072055 (D.C. Cir. June 29, 2015) (rejecting argument where agency demonstrated "the request implicates 214,456 responses stored in hardcopy in various facilities that would have to be redacted before production"); *Kwoka v. I.R.S.*, No. 17-CV-1157 (DLF), 2018 WL 4681000, at *5 (D.D.C. Sept. 28, 2018) ("even taking the IRS at its word, the Court does not find roughly 2,200 hours of review time to constitute an 'unreasonably burdensome search'").

The DOJ's attempt to distinguish this case from *Tereshchuk* in particular falls short. The DOJ emphasizes, as if it were relevant, that the issue in that case was whether the time to *review* already identified records was burdensome rather than search for them in the first place. *See* DOJ Opp'n at 12 (citing 67 F. Supp. 3d at 454). But the focus there, as it must be here, is the extent to which compliance with the FOIA request "would burden the agency and whether such a burden is unusual." *Tereshchuk*, 67 F. Supp. 3d at 455. In that case, the agency was concerned about the burden of reviewing the records

[3] The DOJ does describe the efforts required to take these "administrative steps."

rather than searching for them; here it is the opposite.[4] But the question remains whether the "severity of the burden" claimed is too steep and "unusual" to require compliance. *Id.* at 456. The DOJ has failed to demonstrate that it is.

Similarly, the DOJ's effort to distance this case from *Public Citizen v. Department of Education*—on the suggestion that the DOJ's search here may not "turn up responsive documents"—is also unavailing. *See* DOJ Opp'n at 12 (quoting 292 F. Supp. 2d 1, 6 (D.D.C. 2003)). It cannot genuinely be disputed that the DOJ's search will result in the disclosure of additional Closing Memos. It of course remains possible that *some* Closing Memos may not have been prepared or retained in the case files. *See* Buchko Decl. ¶ 44 (explaining that of 53 cases responsive to Second Request, six did not contain responsive Closing Memos). But the DOJ does not present any evidence to suggest that Closing Memos for the 1998–2017 timeframe were not prepared or otherwise never existed for the "approximately 1670 cases" of closed investigations of alleged violations of 18 U.S.C. § 242 that resulted in death. Second Buchko Decl. ¶ 9(a).[5] If the DOJ searches for memos responsive to the First Request, it will certainly "turn up responsive documents," and the agency provides no reason to think otherwise.

The DOJ knows what the First Request seeks. It knows how to conduct a search for records responsive to it. There is no genuine dispute that the search would be fruitful. And while the effort will take time, it will not require an "unusual" amount of it or otherwise hinder the DOJ's operations. *See Tereshchuk*, 67 F. Supp. 3d at 455–56. The Court should accordingly order the DOJ to comply with the First Request.

//

//

---

[4] The DOJ does not address the burden of reviewing the Closing Memos. The evidence shows, meanwhile, that while they vary in length the memos average about 8 pages each, follow a standard format, and generally involve the same sort of allegedly exempt material. *See* DOJ Attachment A (identifying length of memos responsive to Second Request); CIR Exs. 1–4.

[5] The 1670-case estimate as stated in both the DOJ's opposition and Second Buchko Declaration differs from the "approximately 1773 cases" the DOJ previously identified as potentially containing Closing Memos. *Compare* DOJ Opp'n at 11 and Second Buchko Decl. ¶ 9(b) *with* Buchko Decl. ¶ 40. Using the lower figure, extrapolating the case-to-memo ratio from the DOJ's results in searching for memos responsive to the Second Request (*see* Buchko Decl. ¶ 44), and assuming that *one-third* of the memos have been lost from the file for whatever reason, the DOJ's search would still result in about 1,000 Closing Memos.

### B. The DOJ has failed to demonstrate that reasonably foreseeable harm would arise from disclosure of the Closing Memos.

The DOJ tries to avoid its burden to demonstrate reasonably foreseeable harm from disclosure of Closing Memos by trying to argue the statutory standard does not apply, ignoring case law, the interests intended to be served by the work-product doctrine, and mischaracterizing the nature and relevance of its repeated disclosures of other Closing Memos and similar analyses. If the foreseeable harm standard is to mean anything and to serve the purposes that Congress intended, *see* Cross-Mot. at 16, its application here requires disclosure of the Closing Memos.

The DOJ is wrong to suggest that CIR is trying to impose "a new and heightened harm standard" and, moreover, to argue that the standard does not apply to exemption claims based on asserted attorney work-product material. *See* DOJ Opp'n at 4; *see also id.* at 6 (arguing that "once a document is confirmed to be work product" reasonably foreseeable harm from disclosure should be assumed). For one, *Congress* imposed the standard when it passed the FOIA Improvement Act of 2016 to ensure compliance with FOIA given the increasing concern about agencies trying to avoid disclosure—and particularly through improper assertions of Exemption 5 claims. *See* Cross-Mot. at 16. And the law could hardly be more clear in providing that even if material falls under Exemption 5 (or other exemptions), the DOJ cannot withhold it from disclosure unless it is reasonably foreseeable "that disclosure would harm an interest protected by" that exemption. 5 U.S.C. § 552(a)(8)(A). Had Congress intended attorney work product to fall outside the requirements of the reasonably foreseeable harm standard it would have done so. *Cf. id.* § 552(a)(8)(B) (excluding Exemption 3 claims from standard). But Congress did not relieve agencies of the duty to demonstrate reasonably foreseeable harm from disclosure of attorney work product, and the DOJ must therefore show that, in the specific circumstances presented by this case, disclosure of the Closing Memos would cause reasonably foreseeable harm to the interests the work-product doctrine is meant to protect. *See, e.g.*, *Leopold v. U.S. Dep't of Justice*, 94 F.4th 33, 37 (D.C. Cir. 2024) (foreseeable harm standard requires "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede" the interests protected by a FOIA exemption).

The DOJ also conspicuously avoids addressing the interests the attorney work-product doctrine is designed to protect. *See* DOJ Opp'n at 4–7; *see also* DOJ Mot. at 9–11. Instead, it oddly suggests that CIR's characterization of those interests is either of its own making or derived from a D.C. Circuit case that did not involve claimed attorney work product. *See* DOJ Opp'n at 5. To be clear, CIR has applied the Ninth Circuit's description of the interests served by the doctrine. *See* Cross-Mot. at 17 (quoting *ACLU of N. Calif. v. U.S. Dep't of Justice*, 880 F.3d 473, 486 (9th Cir. 2018)). As that court has explained, the doctrine's "focus on the integrity of the trial process is reflected in the specific limitation of the work-product privilege to materials prepared in anticipation of litigation or for trial. Materials serving no cognizable adversarial function, . . . generally would not constitute work product." *ACLU of N. Calif.*, 880 F.3d at 486. That echoes the D.C. Circuit's instruction, in another Exemption 5 case, that the purpose of the work-product doctrine "is not to protect any interest of the attorney, who is no more entitled to privacy or protection than any other person, but to protect the adversary trial process itself" and more particularly to prevent lawyers from "prob[ing] each other's thoughts and plans concerning the case." *See* Cross-Mot. at 13 (quoting *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980)).

But rather than trying to demonstrate *what possible harm* disclosure of the Closing Memos would cause to *those interests*, the DOJ urges the Court to establish a general rule that any disclosure of any type of attorney work product must always be assumed to cause harm, regardless of the circumstances. DOJ Opp'n at 6. The cases it cites for this proposition, however, do not support it. In *ACLU of Northern California*, the district court order on review was issued well before passage of the FOIA Improvement Act and thus did not address the reasonably foreseeable harm standard. *See generally* 880 F.3d at 483–91. Both of the district court cases the DOJ cites for its automatic-harm rule, meanwhile, involved documents that attorneys prepared amid active civil litigation. *See Dhakal v. FBI*, No. 1:24-CV-02525 (TNM), 2026 WL 787865, at *4 (D.D.C. Mar. 20, 2026) ("Specifically, the withheld material comprised the preliminary evaluation of [the plaintiff's] tort claim."); *Am. Small Bus. League v. Dep't of Defense*, 372 F. Supp. 3d 1018, 1022–23, 1029–30 (N.D. Cal. 2019) (records at issue transmitted between the agency and a contractor during litigation in which they shared a common interest). Even assuming that courts should find, as a blanket rule, that disclosure of attorney

work product concerning *pending litigation* must always be assumed to harm the interests protected by the work-product doctrine (and Congress certainly gave no indication that they should), it does not necessarily follow that the adversarial process will always be harmed from disclosure of records comprising *backward-looking* explanations for *not initiating* litigation at all. The nature of the Closing Memos and their lack of any relationship to pending litigation must be taken into account—especially where identical records have previously been disclosed by the agency with no resulting harm, but rather resulting in a benefit to the public.

Moreover, none of the cases on which the DOJ relies involve repeated agency disclosures of material that is functionally the same as the alleged attorney work-product. The DOJ's attempt to avoid the impact of that crucial fact here is without merit. For one, it mischaracterizes CIR's argument as based on waiver principles and as urging the Court to impose an absurd rule that CIR is not proposing and that does not necessarily flow from what CIR asks here. *See* DOJ Opp'n at 7 ("Under Plaintiff's reasoning, a party who waives work product protection in one case would be forced to waive work product protection of unrelated subject matter in all future cases."). CIR is not suggesting that the mere fact of the DOJ's disclosure of other Closing Memos, on its own, requires disclosure of all Closing Memos based on waiver. CIR is instead pointing out that (1) the DOJ has disclosed scores of Closing Memos and similar records that intentionally reveal the agency's reasons for not pursuing criminal charges in scores of cases without remotely "interfer[ing] with prosecutors' ability to do their jobs," *see id.*, and (2) given that track record, there is no basis to conclude that disclosure of the requested Closing Memos would do so, either. In other words, the prior disclosures do not constitute a waiver; they just stand as evidence that no reasonably foreseeable harm would arise from disclosure of additional material explaining the agency's decisions (reached in some instances nearly 30 years ago) not to prosecute Section 242 cases.

The DOJ unsuccessfully tries to distinguish the Closing Memos it is withholding from CIR from the other memos and similar materials it has publicly disclosed. *See* DOJ Opp'n at 8–10. It argues that Closing Memos relating to Emmett Till Act investigations were prepared with the foreknowledge

//

//

that they would be disclosed. *Id.* at 8 (citing Second Buchko Decl. ¶ 8(a)).[6] It claims that a lengthy report on the shooting of Michael Brown and press releases regarding other killings are not, exactly, Closing Memos, argues that the personnel who prepared the Brown report "would have different expectations" from personnel who prepare Closing Memos, and suggests that the press releases are substantively different from the Closing Memos from which they derived. *Id.* (citing Second Buchko Decl. ¶ 8(c)(iv), (d)).[7] But the DOJ does not actually demonstrate that the content of any of the 127 publicly available Emmett Till Act memoranda, the Brown report, or the press releases differs in any meaningful way from the Closing Memos. The format and content of the Emmett Till Act memos that the DOJ voluntarily discloses are indistinguishable from the Closing Memos CIR has obtained, which in turn mirror the form and content of the Closing Memos that the DOJ seeks to withhold. *Compare* CIR Exs. 1–2 *with* CIR Exs. 3–4; *see also* Buchko Decl. ¶ 47 (explaining that Closing Memos follow a standard format and reflect the same type of information). The Brown report also reflects an extensive discussion section that reveals the agency's rationale for declining prosecution. *See* CIR Ex. 7 at 78–86. So, too, do the press releases, which contain detailed discussion sections that quite obviously convey the DOJ's rationale for closing those cases. *See* CIR Ex. 8 at 6–9; CIR Ex. 9 at 4–6; CIR Ex. 10 at 5–8. Beyond their identical nature in form, these materials were all prepared to serve the same function: To explain the agency's rationale for declining to prosecute.

If there is any reason why the publicly available explanations for nonprosecution do not harm and have not harmed the interests served by the attorney work-product doctrine but disclosure of the explanations reflected in the Closing Memos would, the DOJ conspicuously declines to provide it. The DOJ suggests that prosecutors prepared the public-facing records with a different frame of mind. *See, e.g.*, DOJ Opp'n at 8. But it has not demonstrated that their allegedly different mindset led to any meaningful difference in the content of those materials and the Closing Memos that it seeks to withhold. The DOJ does not actually assert, much less prove, that prosecutors are any more or less candid in their discussions of why they are closing a given case based on whether it is an Emmett Till Act

---

[6] CIR objects to Buchko's unfounded speculation about prosecutors' mindset when they prepare Closing Memos. *See* Fed. R. Evid. 602, 701, 702.

[7] CIR objects to Buchko's unfounded speculation about DOJ employees' mindsets when they prepared the report about the Brown shooting. *See* Fed. R. Evid. 602, 701, 702.

investigation or whether they otherwise expect the Closing Memo to be publicly accessible. And it provides no evidence that the DOJ, when publicly disclosing its reasons not to prosecute these types of cases, takes any particular steps to ensure that the disclosure does not "seriously interfere with prosecutors' ability to do their jobs." That is plainly because disclosure of prosecutors' reasons for closing Section 242 cases without filing charges does not threaten any harm to the adversary process.

The DOJ has thus failed to demonstrate that disclosure of the Closing Memos would cause reasonably foreseeable harm to the interests protected by the work-product doctrine. The Court need look no further. It should order the DOJ to disclose the requested Closing Memos to effectuate Congress' language and underlying intent of the foreseeable harm standard, regardless of any of the cited exemptions.

**C. The DOJ has failed to prove Closing Memos are prepared "in anticipation of litigation" and that Exemption 5 applies.**

The DOJ argues that the Closing Memos must have been prepared in anticipation of litigation, and thus constitute attorney work product, because they allegedly are mere recommendations to close ongoing investigations and that the eventual adoption of the memos and file closures pursuant to them "does not extinguish work product protection." *See* DOJ Opp'n at 1–4. The question, however, is not whether the use of the memos to close the case file "extinguish[es]" the protection but is instead whether the material was created in anticipation of litigation in the first instance.

It bears repeating that, in its opening brief, the DOJ conceded that Closing Memos are records "describing the DOJ Civil Rights Division's decisions to close particular civil rights investigations without bringing criminal charges." DOJ Mot. at 1. Further, it also initially explained that "litigation is anticipated when the Government is investigating specific wrongdoing in an attempt to gather evidence and build a case against a suspected wrongdoer." *See* Cross-Mot. at 14 (citing Buchko Decl. ¶ 51). The Closing Memos cannot have been prepared "in an attempt to gather evidence and build a case" when they indisputably are created to describe the rationale for "decisions to close" the case file without pursuing charges—as their explicit language confirms. And because they were therefore not prepared in anticipation, the Closing Memos do not constitute attorney work product. *See, e.g.*, Cross-Mot. at 13–16.

To try to avoid the logical conclusion of its own admissions, the DOJ now tries to "clarif[y]" its position. *See* DOJ Opp'n at 2. It argues that CIR reads too much into the title of the Closing Memos—which plainly confirms that the memos are "notice[s] to close case file"—while vaguely mentioning the case-closure process to try to suggest that the Closing Memos might have been prepared with the looming possibility of litigation. *See* DOJ Opp'n at 2 (citing Second Buchko Decl. ¶ 6). This effort, however, makes little logical sense and only raises more questions than it answers. It does not explain what steps must be taken to approve or reject a Closing Memo/"Notice to Close File," it does not refute that the prosecutors who draft the memos clearly do not anticipate litigation (as these memos all confirm), and it fails to identify the "CRT decisionmakers" who supposedly make the final decision to close the file or demonstrate that Closing Memos are reviewed in anything other than a *pro forma* posture with a genuine anticipation of potential litigation. It also fails to show how a signed or even unsigned Closing Memo would not be the official closure of the case file. The lack of any detail about the case-closure process is all the more revealing when it is clear that Closing Memos are placed in the case file without necessarily being signed and dated by anyone, much less by a CRT decisionmaker who was anticipating potential litigation when they received and reviewed the memo. *See* CIR Ex. 1 at 1 (undated, unsigned Closing Memo regarding Billey Joe Johnson death); Jones Decl. ¶¶ 8–10 (explaining circumstances of release of Johnson memo);[8] CIR Ex. 3 at 1 (indicating date of memo but no signatures or formal date of file closure); CIR Ex. 4 at 1 (indicating date of memo and formal closure of file but no signatures).

Having thus failed to demonstrate, as a matter of fact, that the Closing Memos were prepared in anticipation of litigation, the DOJ's discussion of the case law is foundationally misguided.

For example, the DOJ mischaracterizes *Senate of Puerto Rico v. U.S. Department of Justice* as focused on whether the investigations in that case were open or active or closed. *See* DOJ Opp'n at 2–3 (citing 823 F.2d 574, 586 (D.C. Cir. 1987)). Instead, as the D.C. Circuit explained, in the more complete text of the footnote that the DOJ quotes: "the testing question is whether, in light of the

[8] The DOJ's blanket objection to the entirety of the Jones Declaration, *see* DOJ Opp'n at 10 n.2, ignores that, among other things, it authenticates and provides the foundation for the release of the Billey Joe Johnson Closing Memo. The objection should be overruled.

nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." 823 F.2d at 586 n.42. In other words, the court emphasized, "[t]he presence, or, as in this case, the absence of an ongoing investigation is but one aspect of the relevant 'factual situation' a court must consider in evaluating an agency's work-product claim." *Id.* The DOJ's narrow focus on whether the Closing Memos were prepared while investigations were technically open misses the point: the memos were prepared to explain why there would be no prosecution; they cannot logically have been prepared in anticipation of litigation.

The DOJ's attempt to sweep aside *Coastal States* falls short for the same reason. *See* DOJ Opp'n at 3 (citing 617 F.2d at 858). The persuasive influence of that case does not depend on whether it involved "an investigative memo," *see id.*, but instead derives from its clear instruction that an Exemption 5 claim based on the work-product doctrine must be assessed with an eye on the *purpose* underlying that doctrine (*i.e.*, to protect the adversarial trial process) and with the recognition that "it is firmly established that there is no privilege at all unless the document was initially prepared in contemplation of litigation, or in the course of preparing for trial." *See* 617 F.2d at 864–65. In other words, "the function of the documents [is] the critical issue." *Delaney, Migdail & Young, Chartered v. I.R.S.*, 826 F.2d 124, 127 (D.C. Cir. 1987) (citing 617 F.2d at 858). The function of a Closing Memo, of course, is to close the file while explaining why there will be no prosecution; it cannot have been prepared in anticipation of litigation.

Meanwhile, the DOJ's effort to compare the Closing Memos to the FTC material at issue in *A. Michael's Piano v. FTC*, DOJ Opp'n at 3, only underscores the deficiency of the DOJ's showing here. In *A. Michael's Piano*, the agency explained its case-closure procedures in detail, identified who did and did not have authority to close a matter, and proved that the memo recommending final disposition of the case was in fact preliminary because it was later reviewed and approved by the office with that authority. *See* 18 F.3d 138, 141–42 (2d Cir. 1994). Meanwhile, there is no suggestion in that case that the memorandum recommending disposition of the case was formally characterized as a notice of closing the case file or bore any of the other indicators of finality appearing in the Closing Memos, unlike the case here. *See, e.g.*, CIR Ex. 2 at 6 ("Federal prosecutors with the Criminal Section of the Civil Rights Division and the United States Attorney's Office for [the local district] concluded that

there is no credible evidence to support any allegation that Lacy's death was a homicide" and, thus, "this matter should be closed."); CIR Ex. 3 at 41 ("[T]his matter does not disclose a prosecutable violation of any federal criminal civil rights statute and is being closed without further investigation."); CIR Ex. 4 at 14 ("[T]he Civil Rights Division concludes that this matter should be closed without prosecution . . . . The United States Attorney's Office for the Western District of Washington concurs with this recommendation."). *A. Michael's Piano* is thus of no use here.

Finally, in *Government Accountability Project v. U.S. Department of Justice*, the materials held to be exempt as attorney work-product were prepared while the DOJ's investigation into a matter was pending and nearly two years before it was closed. *See* 852 F. Supp. 2d 14, 24–26 (D.D.C. 2012). The records there were not anything remotely like the Closing Memos. Nor, as CIR demonstrated in its Cross-Motion, were the records at issue in the other cases on which the DOJ relies, given that those cases involved documents concerning cases that were, in fact, actually litigated. *See* Cross-Mot. at 15–16 (discussing *Kishore v. U.S. Dep't of Justice*, 575 F. Supp. 2d 243, 259 (D.D.C. 2008); *Gavin v. SEC*, No. 04-4522 PAMJSM, 2007 WL 2454156, at *9 (D. Minn. Aug. 23, 2007); *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 4 (D.D.C. 2000)). As *Heggestad* emphasized, when assessing whether a document is exempt as attorney work product, "[t]he primary purpose for the creation of the document is the critical issue." *See* 182 F. Supp. 2d at 8. The DOJ's cryptic discussion of the case-closure process, meanwhile, fails to demonstrate that the "primary purpose" of the Closing Memos is anything other than the "Notice to Close File" that they purport to be.

The DOJ has thus failed to carry its burden to prove that the Closing Memos were prepared in anticipation of litigation and thus may lawfully be withheld under Exemption 5.

**D. The DOJ has not carried its segregability burden.**

The DOJ concedes that it has not met its burden to justify nondisclosure of Closing Memos, in their entirety, on the basis of its Exemptions 3, 6 and 7 claims. *See* DOJ Opp'n at 13–15 (failing to address segregability as to those claimed exemptions); Cross-Mot. at 11–12 (demonstrating agency's failure to provide segregability analysis). Those claimed exemptions cannot support wholesale non-disclosure, and the question of whether and to what extent they may justify redactions to Closing

Memos must be addressed as required by the FOIA. Segregability could certainly address all of these claimed exemptions, as has been routinely done with disclosures of other Closing Memos.

Meanwhile, even assuming that the Closing Memos implicate attorney work product (and they do not, because they were not prepared in anticipation of litigation), the Ninth Circuit has explained that "segregable sections" of records that do not reflect "factual material intertwined with legal analysis in a document prepared by an attorney in anticipation of litigating a specific case" should be disclosed. *ACLU of N. Calif.*, 880 F.3d at 489. Thus, while it is "ordinarily" the rule that documents covered by the attorney work-product doctrine may not need to be subjected to the segregability requirement, the Closing Memos contain several discrete, independent sections of factual material that are clearly *not* "intertwined with legal analysis" and that should accordingly be disclosed. *Id.*; *see also, e.g.*, CIR Ex. 1 at 1–11. Indeed, the DOJ has produced Closing Memos having redacted certain sections according to Exemption 5. *See* CIR Ex. 1 at 13–14.

Further, the requirement to assess segregability of information within the Closing Memos must be viewed in light of the reasonably foreseeable harm standard. *See, e.g.*, *Leopold*, 94 F.4th at 37 ("Even if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects."). As discussed above and in CIR's Cross-Motion, the entirety of the Closing Memos can be released without causing harm to the interests protected by the work-product doctrine. But even if that were not the case, the FOIA Improvement Act requires the DOJ to demonstrate that the memos cannot possibly be released in a way that discloses information that would *not* harm the interests protected by the work-product doctrine. *See id.* ("Congress re-emphasized" the segregability requirements "when adding the foreseeable harm requirement."). That rule applies with equal force to Exemption 5 claims. *See Rudometkin v. United States*, 140 F.4th 480, 494 (D.C. Cir. 2025) (district court reversed for failure to address "whether the Government demonstrated that" material protected by deliberative-process privilege "could not be segregated and disclosed without causing foreseeable harm" to the interests protected by that privilege).

The DOJ has not bothered to explain how disclosing basic factual material appearing in separate portions of the Closing Memos would cause any harm to the interests protected by the work-

product doctrine. And it has not cited any cases holding, after the passage of the FOIA Improvement Act, that factual information that is not inextricably intertwined with legal analysis in material allegedly exempt as attorney work product need not be disclosed to the fullest extent possible. Between the requirement that Exemption 5, like all other FOIA exemptions, must be "narrowly construed" and the requirement that the segregability analysis must be undertaken with an eye toward the reasonably foreseeable harm standard, the DOJ was required to show that it cannot possibly redact and release the Closing Memos in a way that serves the interests in disclosure and the interests protected by the work-product doctrine. But it has not even tried to comply with this statutory requirement of FOIA, even where it has done so before, and clearly could easily do so.

Accordingly, even if the Closing Memos reflect legal analysis protected by the work-product doctrine or any other exemption, the DOJ should be ordered to disclose them in redacted form.

### E. The Court should sustain CIR's objections to the Buchko Declaration.

The DOJ incorrectly suggests that Buchko's ability to knowledgeably testify about the agency's FOIA processing practices excuses him from needing personal knowledge or providing other foundation for his testimony on other relevant subjects. *See* DOJ Opp'n at 15. The personal-knowledge requirement is waived in FOIA cases when the testimony is about the agency's search for and processing of responsive records. *See Garris v. FBI*, 937 F.3d 1284, 1293 (9th Cir. 2019) (explaining that "[i]t makes sense" to let a FOIA supervisor testify about agency search for records because of their familiarity "with the method of storing, searching, and locating the agency's records").

But when a declarant veers outside of their lane, courts properly reject their testimony. *See, e.g.*, *Shaw v. FBI*, 749 F.2d 58, 63 n.2 (D.C. Cir. 1984) (rejecting as "ineffective for the desired purpose" testimony of FOIA office supervisor seeking to establish facts supporting Exemption 7(D) claim; because he "did not claim any personal participation in the investigation, his assertion cannot be assumed to have been made upon personal knowledge"); *Prison Legal News v. Lappin*, 603 F. Supp. 2d 124, 127 (D.D.C. 2009) ("[T]he Court cannot presume personal knowledge by the affiant, and therefore cannot presume his personal knowledge of the activities of the Bureau's regional offices."); *Rosenfeld v. U.S. Dep't of Justice*, No. C07-03240 MHP, 2008 WL 3925633, at *12 (N.D. Cal. Aug. 22, 2008) (Section Chief of FBI records section failed to lay foundation for statements about

search efforts in field offices outside his supervision). Contrary to the DOJ's suggestion, *Schoeffler v. U.S. Department of Agriculture*, 795 F. App'x 526 (9th Cir. 2020), does not excuse the personal knowledge requirement as a blanket rule. The issue in *Schoeffler* was whether the agency's search for responsive records was adequate. *Id.* at 527. It therefore did not remotely hold that declarants in FOIA cases can testify about whatever they please without demonstrating personal knowledge or other appropriate foundation for their testimony.

CIR has not objected to Buchko's testimony about DOJ's search for responsive Closing Memos or facts about processing FOIA requests. *See* Cross-Mot. at 24–25. But, even after providing a supplemental declaration, he has not demonstrated personal knowledge of or provided any foundation for his various assertions about, among other things, the creation and purpose of Closing Memos and the supposed mindset and expectations of the prosecutors who prepare them, testimony that is intended to show the supposed applicability of Exemption 5 to the Closing Memos. Because the Court "cannot presume [his] personal knowledge" on those matters, *see Prison Legal News*, 603 F. Supp. 2d at 127, it should sustain CIR's objections to paragraphs 53–54, 59, 61–62, 82–83, 85, 87, 89, 91, 93–94, and 96–98 of the Buchko Declaration and paragraphs 8(a), 8(c)(iv), and 8(d) of his second declaration.

## II. Conclusion

For the foregoing reasons and those set forth in CIR's Cross-Motion, the Court should deny the DOJ's motion for summary judgment and grant CIR's cross-motion for partial summary judgment.

Date: August 27, 2026

**LAW OFFICE OF MATTHEW S.L. CATE**

*/s/ Matthew S.L. Cate*
Matthew S.L. Cate

**THE CENTER FOR INVESTIGATIVE REPORTING**

*/s/ D. Victoria Baranetsky*
D. Victoria Baranetsky

*Counsel for Plaintiff*